# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND, | |
| REFUGEE DREAM CENTER, | |
| SERVICE EMPLOYEES INTERNATIONAL UNION, | |
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, | |
| AFRICAN COMMUNITIES TOGETHER, | |
| VENEZUELAN ASSOCIATION OF MASSACHUSETTS, | |
| PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, and | |
| AMERICAN GATEWAYS, | |
| *Plaintiffs,* | Case No. |
| v. | **COMPLAINT** |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | |
| JOSEPH EDLOW, in his official capacity as Director of the United States Citizenship and Immigration Services, | |
| DEPARTMENT OF HOMELAND SECURITY, and | |
| KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, | |
| *Defendants.* | |

**INTRODUCTION**

1.      This lawsuit challenges four policies (the "Challenged Policies") recently enacted by the United States Citizenship and Immigration Services ("USCIS") with the express goal of intimidating noncitizens living in the United States, making life so unbearable here that they are forced to leave, and, if necessary, manufacturing conditions to remove them from the country. These policies have flung noncitizens living in the United States into an indefinite state of limbo, confusion, and uncertainty. Longterm residents who have waited years to secure a green card now have reason to believe they will never be granted permanent legal status. Laborers face the prospect of losing their work permits, their livelihood, and their ability to provide for their families. And eligible asylum seekers who came to this country fleeing persecution are confronting the likelihood that they will never be granted the refuge they seek.

2.      *First*, USCIS has halted all adjudications of requests for asylum, without regard to the applicant's country of origin (the "Global Asylum Hold"). As a result, USCIS is indefinitely refusing to grant anyone asylum regardless of where they come from or the severity of the persecution they are fleeing.

3.      *Second*, USCIS has halted all adjudications of requests for immigration benefits (the "Benefits Hold") submitted by people from any of the thirty-nine countries subject to entry restrictions imposed by President Trump (the "Travel Ban"). People from a far-reaching list of countries (including Afghanistan, Nigeria, Somalia, Haiti, Laos, and Venezuela, to name a few) can no longer receive important immigration benefits from USCIS, including work permits, green cards, or

naturalization. As a result, many noncitizens living in this country have lost their jobs, and others have lost legal status and now are subject to immigration enforcement and removal.

4. *Third*, USCIS is reviewing and reconsidering all of its past decisions granting any immigration benefit to anyone from a country subject to the Travel Ban and who entered the country since the beginning of the Biden Administration (the "Comprehensive Re-Review"). For example, permanent residents who have been living in the country lawfully for years will now be reinterviewed and have their green card eligibility reconsidered. They will be exposed to immigration confinement and removal simply because they entered the country during the Biden Administration. This policy is a transparent attempt to target, intimidate, and terrorize noncitizens, who have already been granted immigration benefits, solely on the basis that they entered the country while the current President's political adversary was in power.

5. *Fourth*, USCIS has announced amendments to its Policy Manual that require agency personnel to consider a person's country of origin as a negative factor when adjudicating a request for discretionary benefits (the "Country-Specific Factors Policy"). Specifically, the revisions to the manual instruct immigration officers to consider certain "country-specific factors" about an applicant's home country. These are the same factors that the Trump Administration cited as the basis for its Travel Ban. Accordingly, for an applicant from a Travel Ban country, the immigration officer is now required to consider the applicant's country of origin as a significant negative discretionary factor when deciding whether to grant the benefit. In effect, USCIS has erected a prohibitive barrier to people who hail from countries the President dislikes

and has repeatedly disparaged—including not only the Travel Ban countries but also other non-white, non-European countries—from ever receiving asylum, a green card, a work permit, or other discretionary immigration benefits.

6.    These policies each violate the Administrative Procedure Act ("APA") because they exceed the statutory authority conferred on USCIS by the Immigration and Nationality Act ("INA"), are arbitrary and capricious, were promulgated without following notice-and-comment procedures, and violate the Fifth Amendment's guarantees of due process and equal protection.

7.    Plaintiffs are a coalition of nonprofit organizations that represent and serve immigrants who live in communities across the country and hail from every corner of the world. Some Plaintiffs have seen their core activities frustrated as the Challenged Policies make it difficult, and at times impossible, for them to provide services to their clients and people in their communities. Other Plaintiffs bring this lawsuit on behalf of their members, individuals who would otherwise be eligible for critical immigration benefits, but have had those benefits indefinitely withheld, and, as a result, can no longer lawfully live and work in the country.

8.    Plaintiffs' members and clients have had their lives thrown into chaos by the Challenged Policies. For example, one Plaintiff has as a member a physician who was targeted by gangs in Haiti, sought refuge here in the United States, and was only two weeks away from receiving a decision on his asylum application when the Global Asylum Hold went into effect. Now he does not know if he will ever be granted asylum, is unable to work, and fears death if forced to return to his home country. Another Plaintiff has a member who is a postdoctoral researcher in biomedical

engineering at a major university. In just a few months, if the Benefits Hold remains in place, he and his wife will both lose their jobs, their careers, and their livelihood. And yet another Plaintiff has a member who is a college student studying political science. As a result of the Benefits Hold, her naturalization interview was canceled, her hopes of becoming a U.S. citizen have been put on hold, and, without citizenship, she cannot fulfill her dream of serving this country as a diplomat. These are just a few of the myriad examples of the extraordinary harms caused by the Challenged Policies, which have disrupted the lives and destroyed the dreams of immigrants across the United States.

9.     Plaintiffs bring this lawsuit to stop these harms by requiring USCIS to comply with its obligations under the APA, the INA, and the Constitution. Plaintiffs seek, among other relief, a declaration that the policies are unlawful and vacatur of the policies under the APA.

## JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the action arises under federal law, and Plaintiffs seek relief under the Administrative Procedure Act, 5 U.S.C. §§ 701–706. The Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 and its common law equitable powers.

11.    Venue is proper under 28 U.S.C. § 1391(e)(1) because each defendant is an agency of the United States or an officer or employee of the United States sued in his or her official capacity; Plaintiffs Dorcas International Institute of Rhode Island

and Refugee Dream Center have their principal places of business in this judicial district; and no real property is involved in this action.

## PARTIES

### I.    Plaintiffs

12.    **Plaintiff Dorcas International Institute of Rhode Island ("Dorcas International")** is a nonprofit organization headquartered in Providence, Rhode Island, that has been serving immigrants, refugees, and low-income Rhode Islanders for more than 100 years. One of Dorcas International's core programs is citizenship and immigration legal services, providing consultations to thousands of individuals annually and assisting an average of more than 1,500 clients each year with applications and legal representations for a wide array of immigration matters— including naturalization, permanent residence applications, family petitions, temporary protected status, deferred action, unlawful presence waivers, asylum applications, deportation defense, and legal services for victims of crime. Dorcas International serves a diverse client population that includes refugees, asylees, and other low-income Rhode Islanders from countries around the world. Dorcas International serves immigrant communities that rely on USCIS to adjudicate requests for immigration benefits so that they can live and work in the United States. Dorcas International brings this lawsuit on behalf of itself.

13.    **Plaintiff Refugee Dream Center ("RDC")** is a nonprofit organization headquartered in Providence, Rhode Island, that provides direct services to refugees, with a focus on provision of services aimed at helping newly resettled refugees achieve self-sufficiency. RDC is an organization created by refugees, for refugees, with a

majority of the staff being refugees themselves. RDC's core services and programs are designed to foster refugee self-reliance and independence, and include adult education, employment services, legal and immigration support, case management, youth support, health promotion, language access services, psychosocial support, and reception and placement of newly arriving refugees. RDC serves immigrant communities that rely on USCIS to adjudicate requests for immigration benefits so that they can live and work in the United States. RDC brings this lawsuit on behalf of itself.

14.     **Plaintiff Service Employees International Union ("SEIU")** is a labor organization headquartered in Washington, D.C. Founded in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland, today SEIU represents approximately two million working people united by the belief in the dignity and worth of workers and the services they provide. SEIU has over 150 affiliates across the United States, Puerto Rico, and Canada, including in Rhode Island. SEIU members work in healthcare, the public sector, and in property services, including as physicians, technicians, long-term care workers, janitors, security officers, airport workers, librarians, childcare workers, educators, fast food workers, and employees who work for city, county, and federal governments. SEIU members include noncitizens who rely on USCIS to adjudicate requests for immigration benefits so that they can live and work in the United States. SEIU brings this lawsuit on behalf of its members.

15.     **Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW")** is a labor union

based in Detroit, Michigan. UAW is one of the largest and most diverse unions in North America, with members in the United States, including Puerto Rico, in Canada, and in virtually every sector of the U.S. economy. UAW has nearly 1,000,000 active and retired members. UAW's members include noncitizens who rely on USCIS to adjudicate requests for immigration benefits so that they can live and work in the United States. UAW brings this lawsuit on behalf of its members.

16.     **Plaintiff African Communities Together ("ACT")** is a nonprofit membership-based organization headquartered in New York, New York. ACT fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States. ACT has thousands of members nationwide. Its membership is diverse and includes people around the United States who are the nationals or descendants of myriad African nations, as well as their family members. ACT's members include noncitizens who rely on USCIS to adjudicate requests for immigration benefits so that they can live and work in the United States. ACT brings this lawsuit on behalf of its members.

17.     **Plaintiff Venezuelan Association of Massachusetts ("VAM")** is a nonprofit membership-based organization headquartered in Boston, Massachusetts. VAM provides services to noncitizens who recently arrived from Venezuela and other countries. These services range from assistance with employment and obtaining driver's licenses to legal guidance on adjustment of immigration status and applying for asylum. VAM also supports newly arrived noncitizens by providing basic necessities like clothing, food, and rent assistance. VAM has almost 20,000 members across the United States. VAM's members include noncitizens who rely on USCIS to

adjudicate requests for immigration benefits so that they can live and work in the United States. VAM brings this lawsuit on behalf of its members.

18.    **Plaintiff Partnership for the Advancement of New Americans ("PANA")** is a nonprofit membership organization headquartered in San Diego, California. PANA is dedicated to advancing the full economic, social, and civic inclusion of refugees. It advocates for public policy solutions that will ensure local governments invest in the long-term economic self-sufficiency of newcomers and refugee families, including effective resettlement strategies and equitable allocation of federal resources. PANA supports communities directly affected by unjust immigration policies, including nationals from Afghanistan, Iran, Libya, Somalia, Sudan, Ethiopia, Syria, and Yemen who have resettled and continue to seek refuge in the San Diego region. PANA has over 500 members. PANA's members include noncitizens who rely on USCIS to adjudicate requests for immigration benefits so that they can live and work in the United States. PANA brings this lawsuit on behalf of its members.

19.    **Plaintiff American Gateways** is a nonprofit organization headquartered in Austin, Texas, that provides legal representation, advocacy, and education services to low-income noncitizens and their families in central Texas. American Gateways serves immigrant communities that rely on USCIS to adjudicate requests for immigration benefits so that they can live and work in the United States. American Gateways brings this lawsuit on behalf of itself.

## II.    Defendants

20.    **Defendant United States Citizenship and Immigration Services ("USCIS")** is a component agency of the Department of Homeland Security. It is headquartered in Camp Springs, Maryland. USCIS is responsible for adjudicating applications and petitions for immigration benefits. USCIS issued the policies this lawsuit is challenging.

21.    **Defendant Joseph Edlow** is the Director of USCIS and has responsibility for overseeing and running the agency. He is sued in his official capacity.

22.    **Defendant Department of Homeland Security** is a federal agency. It is headquartered in Washington, D.C.

23.    **Defendant Kristi Noem** is the Secretary of Homeland Security and has responsibility for overseeing and running DHS. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

## I.    Congress Charged USCIS with Adjudicating Immigration Benefits.

24.    USCIS is the federal agency responsible for adjudicating requests for immigration benefits. *See* 6 U.S.C. § 271 (establishing the agency and its functions); *see also* USCIS Policy Manual, vol. 1, pt. B, Ch. 1, https://perma.cc/232E-8XHB (archived Feb. 28, 2026) (discussing the purpose and background of the agency). The term "immigration benefits" refers to the immigration classifications, statuses, authorizations, and forms of relief established by Congress under federal immigration law that determine whether and under what conditions noncitizens may

enter the United States, obtain or maintain a lawful status or period of authorized stay, work in the country, obtain lawful permanent residence, and ultimately naturalize as United States citizens.

25.    USCIS exerts extraordinary power over noncitizens in the United States by deciding who is allowed to work in the country, who is granted asylum, who is granted permanent legal status, and many other decisions with life-altering consequences. *See generally* William A. Kandle, Cong. Rsch. Serv., R48021, USCIS: Operations and Issues for Congress (Apr. 5, 2024), https://perma.cc/N9HM-GXES.

### A.    Immigration Benefits Adjudications

26.    USCIS adjudicates a wide variety of immigration benefits including nonimmigrant status, lawful permanent resident status, naturalization, asylum, temporary protected status, and employment authorizations.

27.    Every year USCIS receives and adjudicates millions of requests for various immigration benefits. In Fiscal Year 2023, the agency received over ten million requests for benefits, including over three million applications for employment authorization (a work permit) and around two million applications for lawful permanent residence status (a green card). *See* Kandle, *supra* at 2-3.

28.    Congress directed USCIS to adjudicate immigration benefit applications according to the eligibility criteria Congress established. *See, e.g.*, 8 U.S.C. § 1158(d)(1) (providing the agency "shall" establish a procedure for adjudication of asylum applications). Congress also prescribed extensive criteria that  render an immigrant ineligible for benefits, *see, e.g.*, *id.* § 1182 (inadmissibility grounds), while

prohibiting consideration of other criteria, *id.* § 1152(a)(1)(A) (prohibiting discrimination in the issuance of immigrant visas).

29.    Congress also directed the Executive Branch to promulgate regulations to establish certain criteria and processes governing immigration benefits adjudications. *See, e.g.*, *id.* § 1255(a) ("The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and *under such regulations* as he may prescribe, to that of [lawful permanent resident] if" three criteria are met) (emphasis added); *id.* § 1182 (containing more than fifteen rulemaking directives).

30.    Congress has also established a policy "that the processing of an immigration benefit application should be completed no later than 180 days after the initial filing of the application." 8 U.S.C. § 1571(b).

31.    When adjudicating benefits applications, USCIS conducts security screenings and background checks on the applicants. USCIS has a well-established, multi-layered protocol for screening and vetting applicants to protect national security and ensure programming integrity. This process includes biometric data collection, FBI background checks, social media screening, and interagency vetting.

32.    The following table summarizes some of the most common benefits adjudicated by USCIS:

| Category | Benefit | Description | Example |
|---|---|---|---|
| Requests for Nonimmigrant Status | Petition for a Nonimmigrant Worker (Form I-129) | Request to come to the country to temporarily perform labor | A software engineer applying for an H-1B visa |
| | Petition for Nonimmigrant Status (Form I-918) | Request for nonimmigrant status for victims of certain qualifying violent crimes who provided assistance to law enforcement | A victim of domestic violence who cooperated with police and is seeking legal status in the country |
| | Application to Extend/Change Nonimmigrant Status (Form I-539) | Request to extend stay in the country or change the basis of the stay | A tourist who wants to extend their stay to finish medical treatment |
| Requests for Immigrant Status | Application to Register for Permanent Residence or Adjust Status (Form I-485) | Request for lawful permanent residence or a "green card" | Someone in the country on a work visa who is now applying for a green card |
| | Petition for Alien Relative (Form I-130) | Request by a U.S. citizen or lawful permanent resident to establish a qualifying family relationship for a noncitizen relative for future family-based immigration benefits | The first step for a U.S. citizen wishing to bring their spouse from overseas to live with them permanently |
| | Immigrant Petition for Alien Worker (Form I-140) | Petition to classify a noncitizen for an employment based immigrant visa category and to support their pursuit of lawful | A researcher with an advanced degree applying for residency based on work that is in the national interest |

|  |  | permanent residence |  |
| --- | --- | --- | --- |
| Requests for Humanitarian Protection | Application for Asylum and for Withholding of Removal (Form I-589) | Request for protection for those fearing persecution in their home country based on protected grounds | A political activist fleeing a country where they face imprisonment |
|  | Refugee/Asylee Relative Petition (Form I-730) | Request to bring immediate family members of a principal refugee or asylee to the United States | A person granted asylum in the United States petitioning for their spouse or children to join them |
|  | Application for Temporary Protected Status (Form I-821) | Request for a temporary legal stay and protection from removal due to unsafe conditions in a home country | Someone seeking temporary protection from a war or natural disaster |
| Employment Authorization | Application for Employment Authorization (Form I-765) | Request for a work permit providing a legal right to work in the United States | An asylum seeker requesting authorization to work while their asylum application is pending |
| Naturalization | Application for Naturalization (N-400) | Request to become a United States citizen | A lawful permanent resident who has been in the country five years and now seeks to naturalize |

33.    Many of the benefits adjudicated by USCIS are available only to applicants who are already in the United States. These include some of the most

common applications, including asylum, adjustment of status, naturalization, and employment authorization.

34.    Noncitizens rely on USCIS to adjudicate benefits applications quickly and fairly. Without timely adjudications, many noncitizens are left in legal limbo, unable to secure legal status, reunite with family members abroad, or lawfully work for a living. Others face crippling uncertainty about whether they have a future in this country. Timely processing of benefits applications is necessary for noncitizens to achieve economic self-sufficiency and contribute to the good of society. Without it, skilled professionals cannot fill critical labor shortages, entrepreneurs cannot launch businesses, doctors cannot care for their patients, and others are prohibited from contributing to public good in a variety of ways.

## B.    Discretionary Benefits

35.    For some (but not all) of the benefits adjudicated by USCIS, the agency has discretion to deny the request even if the applicant is otherwise entitled to the benefit. *See* USCIS Policy Manual, *Discretionary Analysis*, vol. 1, pt. E, ch. 8, https://perma.cc/SC8V-32YP (last visited Mar. 4, 2026) ("Many immigration benefits require the requestor to demonstrate that the request merits a favorable exercise of discretion in order to receive the benefit. For these benefits, a discretionary analysis is a separate, additional component of adjudicating the benefit request.").

36.    USCIS adjudicates discretionary benefits according to the policies outlined in the USCIS Policy Manual. The USCIS Policy Manual is the "agency's centralized online repository for USCIS' immigration policies." USCIS, *Policy Manual*, https://perma.cc/3KED-YQAK (archived Mar. 4, 2026). It "contains the

15

official policies of USCIS and assists immigration officers in rendering decisions" on immigration benefit requests. *Id.*

37.    The Policy Manual constrains the exercise of discretion by immigration officers adjudicating requests for immigration benefits. While an immigration officer adjudicating a discretionary benefit request has "some autonomy in the way in which he or she decides a particular case," that autonomy "may only be exercised within the confines of certain legal restrictions." USCIS Policy Manual, *Discretionary Analysis*. In particular, "the [individual officer's] exercise of discretion cannot be arbitrary, inconsistent, or dependent on intangible or imagined circumstances." *Id.*

38.    Historically, when exercising its discretion, USCIS has generally considered only factors pertaining to the individual applicant and whether that individualized inquiry indicates that the applicant should receive the benefit. Prior to the enactment of the policies at issue in this litigation, USCIS did not consider the applicant's country of origin when exercising its discretion, nor did it discriminate on the basis of country of origin or nationality.

39.    The USCIS Policy Manual prescribes a three-step process for adjudicating discretionary benefits. The first step is fact finding, which refers to the process of gathering and assessing information about the applicant's background, such as information about the applicant's immigration history and criminal record. The second step is determining whether the applicant meets the threshold eligibility requirements for the benefit requested. The final step is conducting the discretionary analysis.

40.     Under the USCIS Policy Manual, the discretionary analysis requires individualized assessments. The Policy Manual provides a lengthy but non-exhaustive list of applicant-specific facts that may be relevant to the discretionary analysis. Those factors include the applicant's ties to family members in the United States, the duration of the applicant's lawful residence in the United States, the applicant's character and conduct, service in the U.S. armed forces, history of employment, history of paying taxes, and humanitarian concerns.

41.     Once these facts are gathered, the immigration officer must consider whether the factors are positive or negative, and then weigh the factors to determine whether a positive exercise of discretion is warranted. While the discretionary analysis is generally holistic and requires the immigration officer to consider the totality of the circumstances, sometimes the gravity of a negative factor is of such significance that the factor by itself weighs heavily against a favorable exercise of discretion.

### C.     Affirmative Asylum

42.     One of the core humanitarian benefits adjudicated by USCIS is asylum. Noncitizens present in the United States may affirmatively apply to USCIS for asylum, which, if granted, provides a pathway to permanent legal status to people who credibly fear persecution if returned to their country of nationality or last residence. Affirmative asylum is distinct from defensive asylum, which is raised in removal proceedings and is adjudicated by the Executive Office of Immigration Review, not USCIS. *See generally* Andorra Bruno, Cong. Rsch. Serv., R48249, What is Affirmative Asylum? (Oct. 24, 2024), https://perma.cc/ZZ9B-MCPK.

43.    To be eligible for affirmative asylum, an applicant must already be in the United States and generally may not be in removal proceedings.

44.    To qualify for this protection, the applicant must demonstrate a well-founded fear of persecution in their country on account of their race, religion, nationality, membership in a particular social group, or political opinion.

45.    To apply for affirmative asylum, the applicant submits Form I-589 (Application for Asylum and for Withholding of Removal) to USCIS. As part of the application process, the applicant provides biometric data and undergoes background and security checks. The applicant is then interviewed by a USCIS asylum officer. Once the application and interview process are complete, USCIS determines whether the applicant is statutorily eligible for asylum and whether the applicant merits a favorable exercise of discretion.

46.    USCIS may impose certain "conditions or limitations on the consideration of an application for asylum" but it must do so "by regulation." 8 U.S.C. § 1158 (d)(5)(B).

47.    USCIS is generally required to adjudicate an affirmative asylum application within 180 days. 8 U.S.C. § 1158 (d)(5)(A)(iii).

48.    While an asylum application is pending, the applicant is eligible to apply to USCIS for employment authorization, which allows the asylum applicant to work in the United States while awaiting a determination on their asylum application.

49.    Once granted asylum, the asylee has a path to obtaining a green card and eventually citizenship. After one year of lawful presence in the United States, an asylee may become a lawful permanent resident. After at least five years of

continuous residence as a lawful permanent resident, the former asylee may apply for and obtain U.S. citizenship.

## II. President Trump Enacts a Travel Ban Targeting Non-White and Majority-Muslim Countries.

50.    During the 2024 presidential election, then-candidate Donald Trump made "crackdowns" on immigrant communities a key feature of his campaign, promising to usher in the "largest deportation program in American history." Jeanine Santucci, *Trump Has Promised Mass Deportations. Can He Do It in His 2nd Term as President?*, USA Today (Nov. 6, 2024), https://perma.cc/5339-WSLU; Alice Herman, *Donald Trump Repeats Anti-Immigrant Threats at Milwaukee Rally*, Guardian (Nov. 2, 2024), https://perma.cc/AG8M-MRKE. At a December 2023 rally in New Hampshire, Trump told onlookers, "They're poisoning the blood of our country." *Former President Trump Holds Rally in Durham, New Hampshire*, C-SPAN (Dec. 16, 2023), https://perma.cc/HLP3-YT94; Ginger Gibson, *Trump Says Immigrants Are 'Poisoning the Blood of Our Country.' Biden Campaign Likens Comments to Hitler*, NBC News (Dec. 17, 2023), https://perma.cc/7LSW-AVD5. On the campaign trail, he repeatedly insisted on referring to immigrants as "animals," stating at a campaign event in Grand Rapids, Michigan: "I'll use the word animal because that's what they are." Craig Mauger & Melissa Nann Burke, *Trump in Michigan Labels Flow of Immigrants at Southern Border 'Country Changing'*, The Detroit News (Apr. 2, 2024), https://perma.cc/Q8QT-NMQ5; WOOD TV8, *Former President Trump Speaks in Grand Rapids*, YouTube (Apr. 2, 2024), https://perma.cc/WV2B-EZHH.

51.    Candidate Trump also pledged to restore the travel ban imposed during the first Trump Administration, which barred people from seven majority Muslim

countries from entering the United States. Exec. Order No. 13769, 82 Fed. Reg. 8977 (2017). Candidate Trump stated that, if reelected, he would restore the travel ban "even bigger than before and much stronger than before." Kathryn Watson, *Trump Says He'd Bring Back 'Travel Ban' that's 'Even Bigger than Before'*, CBS News (July 7, 2023), https://perma.cc/E885-NCYR; Roll Call Factbase Videos, *Speech: Donald Trump Holds a Political Rally in Council Bluffs, Iowa – July 7, 2023*, YouTube (May 21, 2025), https://perma.cc/92MN-QCER.

52.     When President Trump returned to power, he made good on that promise. On the first day of his second term, President Trump directed members of his cabinet to compile a list of countries to include in a new travel ban. Exec. Order 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025).

53.     President Trump subsequently issued a proclamation barring nationals from nineteen countries from entering the United States. Pres. Procl. No. 10949, 90 Fed. Reg. 24497. On December 16, 2025, President Trump issued a second proclamation expanding the list of countries subject to the ban to thirty-nine. Pres. Procl. No. 10998, 90 Fed. Reg. 59717 (collectively, the "Travel Ban"). The countries subject to the Travel Ban are predominantly non-white, non-European and majority-Muslim countries.

54.     The Travel Ban purportedly aims to protect U.S. citizens "from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." 90 Fed. Reg. at 24497. In announcing the Travel Ban, President Trump put it somewhat differently. He said his goal was to "keep the radical Islamic terrorists out

of our country." *Fact Sheet: President Donald J. Trump Restricts the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, The White House (Jun. 4, 2025), https://perma.cc/36KL-PE27.

55.    Under the Travel Ban, people from any of the thirty-nine listed countries (and those using travel documents issued by the Palestinian Authority) are barred from entering the United States on an immigrant visa—i.e., a visa issued to a person who intends to live permanently in the United States. Additionally, while people from twenty of the countries may be eligible for certain specified nonimmigrant visas—i.e., a visa issued to someone who intends to visit the country temporarily such as for business or tourism—people from the other nineteen Travel Ban countries are barred from entering the United States on a nonimmigrant visa.

56.    The nineteen countries for which entry is totally banned are Afghanistan, Burkina Faso, Burma (Myanmar), Chad, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Mali, Niger, Republic of the Congo, Sierra Leone, Somalia, South Sudan, Sudan, Syria, and Yemen.

57.    The twenty countries for which entry is generally banned but subject to exceptions for certain nonimmigrant visas are Angola, Antigua and Barbuda, Benin, Burundi, Côte d'Ivoire, Cuba, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Togo, Tonga, Turkmenistan, Venezuela, Zambia, and Zimbabwe.

58.    The Travel Ban was issued pursuant to Section 212(f) of the INA, which authorizes the president to restrict foreign nationals from entering the country if

allowing entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The stated purpose of the Travel Ban is to protect the United States "from terrorist attacks and other national security or public-safety threats." 90 Fed. Reg. at 24498. The President purportedly determined which countries would be subject to the ban by assessing certain country-specific factors, including "each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals." *Id.*

59.    For each country included in the Travel Ban, the Ban states which factors the President relied on in deciding to subject that country to the bar. For some countries, the Travel Ban cites multiple factors, but for many others, only a single factor is cited. For instance, for the Republic of the Congo and Burundi, the only factor cited is the countries' purportedly high visa overstay rate.

60.    The Presidential Proclamations enacting the Travel Ban do not discuss or refer to immigration benefits afforded to noncitizens who are already present in the United States and do not set forth any legal or policy rationale for denying immigration benefits to noncitizens in the country.

## III.    In a Social Media Rampage, President Trump Announced a Brutal Crackdown on Immigrants Living in the United States.

61.    On November 26, 2025, the eve of Thanksgiving, a tragic and isolated shooting occurred near the White House. A man experiencing severe mental illness traveled from Bellingham, Washington, to Washington, D.C. and shot two national

guardsmen, killing one of them. The alleged perpetrator is an Afghan national who was granted asylum in 2025.

62.     President Trump immediately blamed the shooting on immigrants from countries he dislikes. In a series of social media posts beginning on Thanksgiving Day and continuing through the weekend, President Trump expressed his contempt for immigrants living in this country, focusing on immigrants from predominantly non-white, majority-Muslim, and non-European countries.

63.     A few days after the shooting, President Trump reposted Defendant Secretary of Homeland Security Kristi Noem's post describing immigrants as "killers, leeches, and entitlement junkies." @realDonaldTrump, Truth Social (Dec. 1, 2025, 9:36 PM), https://perma.cc/P9V8-WZG7. Her post continued, "Our forefathers built this nation on blood, sweat and the unyielding love of freedom—not for foreign invaders to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS. WE DON'T WANT THEM. NOT ONE." *Id.*

64.     On the same day, President Trump reposted a video of a congressman saying that "[t]here are some people who will never assimilate into this country whether it is because of cultural irregularities or their refusal to submit to Western values. We should not insist on bringing those people into the country." @realDonaldTrump, Truth Social (Dec. 1, 2025, 11:27 PM), https://perma.cc/S687-XY8A. The congressman further stated that "[t]here are tens of thousands of people in the country right now if not more than that who are going to commit harms on the American people." *Id.*

65. In response to the shooting, President Trump vowed he would do everything he could to purge the country of immigrants from disfavored countries. In a Thanksgiving Day missive, he promised to "permanently pause migration from all Third World Countries" and to "remove anyone who is not a net asset to the United States, or is incapable of loving our country." @realDonaldTrump, X (Twitter) (November 28, 2025, 12:10 AM), https://perma.cc/7J6S-SRPU. In the same post, he said that he would "end all Federal benefits and subsidies to noncitizens of our Country, denaturalize migrants who undermine domestic tranquility, and deport any Foreign National who is a public charge, security risk, or non-compatible with Western Civilization." *Id.*

66. He ended his holiday message with, "Only REVERSE MIGRATION can fully cure this situation. Other than that, HAPPY THANKSGIVING TO ALL, except those that hate, steal, murder, and destroy everything that America stands for — You won't be here for long!" *Id.*

67. When a reporter asked him a few days later what he meant by the phrase "reverse migration," President Trump responded, "it means get people out that are in our country. Get them out of here. We have a lot of people in our country who shouldn't be here." @Fox News, X (Twitter) (Nov. 30, 2025, 8:11 PM), https://perma.cc/3VZ2-TU4F.

## IV. USCIS Rushes to Implement President Trump's Promised Immigration Crackdown by Enacting the Challenged Policies.

68. Consistent with the Trump Administration's goal of making life in the United States so unbearable for noncitizens that they choose to leave the country—

and expelling them if they don't—Defendants announced the four policies that are the subject of this lawsuit.

69.    The four challenged policies were announced in three memoranda issued by USCIS in late 2025 and early 2026.

70.    The first memorandum ("November Memorandum") was issued on Thanksgiving Day, immediately following the shooting in Washington, D.C. *See* USCIS, PA-2025-26, Policy Alert: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits (Nov. 27, 2025) ("Nov. Mem."), (attached as Exhibit A). It announced revisions to the USCIS Policy Manual ("Country-Specific Factors Policy"), directing USCIS personnel to consider an applicant's country of origin when adjudicating a discretionary benefit application and to treat it as a "significant negative factor" if the applicant comes from a country whose nationals are subject to the Travel Ban or that the Administration otherwise disfavors.

71.    A few days later, on December 2, 2025, USCIS issued the second memorandum ("December Memorandum"). *See* USCIS, PM-602-0192, Policy Memorandum: Hold and Review of All Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025), https://perma.cc/8B72-YGCQ ("Dec. Mem.") (attached as Exhibit B). This memorandum announced three new policies that, like the Country-Specific Factors Policy, severely restrict the ability of noncitizens living in the United States to obtain or retain durable immigration status.

72. First, the memorandum directed an immediate and indefinite hold on all asylum applications without regard to the applicant's country of origin (the "Global Asylum Hold"). This hold remains ongoing.

73. Second, the memorandum ordered an immediate and indefinite suspension of all pending "benefit requests" for individuals from the nineteen countries that are subject to the initial Travel Ban, regardless of when those individuals entered the United States or how long their benefit applications have been pending (the "Benefits Hold"). This hold remains ongoing.

74. Third, the memorandum directs a re-review of all approved benefit requests for any individual from one of the countries subject to the Travel Ban who entered during the Biden Administration or thereafter (the "Comprehensive Re-Review").

75. The December Memorandum states that "[w]ithin 90 days of issuance of this memorandum" (i.e., by March 3, 2026), USCIS would "issue operational guidance" on these policies. USCIS did not publicly issue any operational guidance clarifying the December Memorandum. In response to a court order to produce the promised operational guidance, USCIS filed a declaration that confirms the policies announced in the December Memorandum remain in effect indefinitely. *See Doe v. Trump*, ECF No. 49-1 (D. Mass. Mar. 3, 2026).

76. On January 1, 2026, USCIS released a third memorandum ("January Memorandum"). *See* USCIS, PM-602-0194, Policy Memorandum: Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries (Jan. 1, 2026), https://perma.cc/C9WT-2GZM (attached as Exhibit C). The January

Memorandum extends the Benefits Hold and Comprehensive Re-Review to people from the twenty additional countries that were added to the Travel Ban under the second Presidential Proclamation and clarifies the scope of the Benefits Hold.

77.    The policies announced in these memoranda and challenged in this litigation (the "Challenged Policies") are discussed in more detail below.

**A.    The Global Asylum Hold**

78.    Under the Global Asylum Hold, announced in the December Memorandum, USCIS has indefinitely halted all adjudications of affirmative asylum applications regardless of the applicant's country of origin or the severity of the persecution the applicant has suffered. The policy has suspended the adjudication of over one million pending asylum applications.

79.    Specifically, the December Memorandum "directs" USCIS personnel to "[p]lace a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review." Dec. Mem. (Ex. B) at 1.

80.    Under the December Memorandum, USCIS personnel do not have discretion to adjudicate applications that meet the eligibility requirements, even if required by court order: "Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director." *Id.* at 3.

81.    The Global Asylum Hold is indefinite. The December Memorandum states that the policy will remain in place pending a "comprehensive review," but it does not explain what that comprehensive review will entail or how long it will last.

The memorandum represents that USCIS will undertake certain additional background checks to determine asylum eligibility, but it does not explain why the implementation of these additional vetting measures requires halting all asylum adjudications or how long the implementation of the vetting measures will take. Accordingly, the Global Asylum Hold has, and will continue to, indefinitely halt asylum adjudications, and no asylum seeker will be able to secure an asylum determination from USCIS for the foreseeable future.

82.     In issuing the Global Asylum Hold, USCIS stated that the agency aims to "prioritize the safety of the American people" and cites two examples of crimes allegedly committed by people from Afghanistan. Dec. Mem. (Ex. B) at 2. The December Memorandum claims that the crimes allegedly committed by Afghans show "what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people," Dec. Mem. (Ex. B) at 2, but cites no evidence that expedience was prioritized or that there was a lack of screening or vetting in either individual's case.

83.     The December Memorandum provides no other explanation for the Global Asylum Hold. It does not explain what specific objectives a blanket hold on asylum adjudication is intended to achieve or explain how the Global Asylum Hold would achieve those unstated objectives. Nor does the memorandum explain what evidence the agency relied on or what alternative policy options were considered.

84.     To the extent it cited any legal authority, the December Memorandum relied on the Presidential Proclamation announcing the Travel Ban. *See* Dec. Mem. (Ex. B) at 1 n.1. It noted that the Travel Ban is an "[e]xercise[] [of] authority under

section 212(f) of the Immigration and Nationality Act (INA)" and explained that under section 212(f) of the INA, "the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests." *Id.* But the memorandum did not address how section 212(f) of the INA authorizes a cessation of asylum adjudications. The December Memorandum did not invoke any other statutory authority besides section 212(f).

### B.    The Benefits Hold

85.    The December Memorandum also directed an immediate moratorium on immigration benefit adjudications for any individuals from countries designated in the Travel Ban. This sweeping directive purports to replace Congress's scheme of individualized immigration benefit adjudications with an indefinite categorical suspension of applications whenever the applicant is a noncitizen who is a national of or born in one of the countries designated by President Trump in the Travel Ban.

86.    Under the Benefits Hold, adopted in the December Memorandum, USCIS has indefinitely halted all adjudications of requests for immigration benefits submitted by people from the thirty-nine countries subject to the Travel Ban.

87.    The December Memorandum "directs" USCIS personnel to "[p]lace a hold on pending benefits requests for aliens from countries listed in" the Travel Ban "pending a comprehensive review, regardless of entry date." Dec. Mem. (Ex. B) at 1.

88.    Agency regulations define "benefit request" as "any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit." 8 C.F.R. § 1.2. Thus, USCIS' immediate hold on all benefits requests for any individual from a Travel Ban country extends to every conceivable immigration

application or request, including, for example, adjustment to lawful permanent residence and employment authorizations.

89.    The Benefits Hold applies even where the delay in adjudication causes accrual of unlawful presence that can impact benefits eligibility or where it causes a lapse in immigration status that can foreclose access to related federal benefits (such as work authorization) and state benefits (such as driver's licenses and health insurance). Lapses in or expiration of lawful immigration status, in turn, can subject someone to immigration confinement and forced removal from the United States, including to third countries with unsafe conditions—resulting in forced separation from dependents, family, co-workers, and community in the United States. And the Benefits Hold applies even to benefits made non-discretionary by statute or regulation and even where USCIS has already determined the noncitizen meets all legal requirements.

90.    The January Memorandum expanded the scope of the Benefits Hold by extending it to people from countries newly added to the Travel Ban. In doing so, USCIS also exempted certain benefits applications from the Benefits Hold. One of the exemptions appears to be specifically aimed at permitting DHS to pursue enforcement action against individuals whose benefits request applications relied on an underlying program that has since been terminated. For example, the Trump Administration has announced terminations of Temporary Protected Status ("TPS") for thirteen countries, many of which are on the Travel Ban list. Now, under this exemption, USCIS may deny the application to pursue removal. *See* Jan. Mem. (Ex. C) at 4–5.

91.     The Benefits Hold is indefinite and "will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum." Jan. Mem. (Ex. C) at 3.

92.     The December and January Memoranda invoke national security concerns, but neither explains what specific public safety or national security objectives the Benefits Hold is intended to achieve or how the Benefits Hold would advance those unstated objectives. Neither memorandum explains what evidence USCIS relied on or what if any other policy options USCIS considered.

93.     To the extent it asserts any legal authority for the Benefits Hold, the December Memorandum cites only the Presidential Proclamation announcing the Travel Ban. *See* Dec. Mem. (Ex. B) at 1 n.1. It notes that the Travel Ban is an "[e]xercise[] [of] authority under section 212(f) of the Immigration and Nationality Act (INA)" and explains that under section 212(f) of the INA, "the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests." *Id*. But neither the December Memorandum nor the January Memorandum explains how section 212(f) authorizes a cessation of benefits adjudications for people from Travel Ban countries. The December and January Memoranda do not invoke any other statutory authority besides section 212(f).

## C.     The Comprehensive Re-Review

94.     In the December Memorandum, USCIS announced the Comprehensive Re-Review policy, stating that it will conduct a re-review of all benefits requests previously granted to noncitizens from Travel Ban countries who entered the U.S. during the Biden Administration or later.

95.     Specifically, the December Memorandum directs USCIS personnel to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in" the Travel Ban "who entered the United States on or after January 20, 2021." Dec. Mem. (Ex. B) at 1. The memorandum further explains that all noncitizens from Travel Ban countries will "undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." *Id.*

96.     Accordingly, under the Comprehensive Re-Review policy, noncitizens from Travel Ban countries who entered the country on or after January 20, 2021 must now be reinterviewed by USCIS and have their immigration benefits reconsidered and potentially revoked. For example, a person from a Travel Ban country who was granted asylum during the Biden Administration will now be subject to re-review and risk having their asylee status revoked, which would leave the person without legal status and subject to removal proceedings. Likewise, a person who was granted adjustment of status to lawful permanent residence during the Biden Administration will be subject to re-review and risk having their green card revoked, which would leave the person without status and subject to removal proceedings.

97.     Neither the December Memorandum announcing Comprehensive Re-Review, nor the January Memorandum, explains what procedures or standards USCIS will apply in conducting the re-review or determining whether a noncitizen poses a national security threat. And neither state how long the re-review will take or what process, if any, will be afforded to the noncitizens subject to it.

98.    The December Memorandum cites the Presidential Proclamation announcing the Travel Ban. *See* Dec. Mem. (Ex. B) at 1 n.1. It notes that the Travel Ban represents an "[e]xercise[] [of] authority under section 212(f) of the Immigration and Nationality Act (INA)" which authorizes the President to "suspend or restrict the entry of any aliens deemed detrimental to U.S. interests." *Id.* Neither the December Memorandum nor the January Memorandum provide any further analysis explaining how section 212(f) of the INA authorizes USCIS to reconsider past benefits determinations, and neither cite any other statutory authority for the Comprehensive Re-Review beyond section 212(f).

### D.    The Country-Specific Factors Policy

99.    In the November Memorandum, USCIS announced revisions to its Policy Manual instructing USCIS personnel to take into account certain considerations about an applicant's country of origin when deciding whether the applicant should receive a discretionary benefit.

100.    The November Memorandum announcing the Country-Specific Factors Policy states: "Effective immediately, USCIS will consider relevant country-specific facts and circumstances such as those outlined in [the Travel Ban] as part of its adjudication of discretionary benefit requests. Discretionary benefit requests that USCIS adjudicates include, but are not limited to, certain adjustment of status applications, extension of nonimmigrant stay, and change of nonimmigrant status." Nov. Mem. (Ex. A) at 1. The November Memorandum then states that USCIS will consider "country-specific factors" including those discussed in the Travel Ban (including, for example, whether a country has a known "terrorist presence" or a high

visa overstay rate) "as significant negative factors in the adjudication of discretionary benefits requests." *Id.* at 2. It also explains that "country-specific factors" include "insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the countries identified in [the Travel Ban]." *Id.*

101.    USCIS has implemented this new policy of considering an applicant's country of origin as a negative factor when adjudicating a discretionary benefits request through various amendments to the USCIS Policy Manual. Among other revisions, USCIS revised the Policy Manual chapter titled "Discretionary Analysis" to include a new section entitled "Country-Specific Facts and Circumstances." *See* USCIS Policy Manual, vol. 1, pt. E, ch. 8, https://perma.cc/SC8V-32YP (archived Mar. 3, 2026). The revisions explain that although the Travel Ban's "categorical ineligibility for entry or admission" does not apply to discretionary benefits sought by applicants physically present in the United States, USCIS will nonetheless "consider on a case-by-case basis" the very same "country-specific facts and circumstances" that President Trump purported to rely on in determining which countries to include in the Travel Ban, making clear that those facts and circumstances will count "as [] significant negative factor[s] when making an individual assessment in weighing discretion." *Id.* Thus, for example, where a noncitizen's country of origin was listed on the Travel Ban based on a supposedly high visa overstay rate, that overstay rate must be treated as a significant negative factor weighing against the noncitizen's benefits application. That is true regardless of whether the visa overstay rate is relevant to the benefit requested.

102.    The Country-Specific Factors Policy also instructs USCIS personnel to hold these country-specific factors against applicants even if they are not from a Travel Ban country, if the immigration officer thinks they nonetheless apply. For example, if an applicant is from a country not subject to the Travel Ban, but the immigration officer believes that the applicant's country of origin has a high visa overstay rate, then under the Country-Specific Factors Policy, the immigration officer must consider the high visa overstay rate as a significant negative factor. The Country-Specific Factors Policy thus authorizes immigration officers to discriminate against people on the basis of country of origin even if they do not come from one of the Travel Ban countries.

103.    As a result of the Country-Specific Factors Policy, people from Travel Ban countries face a prohibitive barrier to receiving discretionary immigration benefits, whether they seek asylum protection, a green card, or work authorization. Notably, that barrier will remain in place even if the Benefits Hold is lifted, and USCIS resumes adjudicating benefits. That means that anyone from a country disfavored by the President and his Administration will continue to face a permanent structural impediment to receiving any discretionary immigration benefits.

104.    The only statutory authority cited for the Country-Specific Factors Policy in the November Memorandum is a cursory reference to "the President's recent exercise of his authority under Section 212(f)" in the Travel Ban. In particular, the November Memorandum states that "USCIS is now updating its guidance to explain how INA 212(f)," and the Travel Ban, "impact USCIS' exercise of discretion." Nov. Mem. (Ex. A) at 1. The memorandum notes that "INA 212(f) authorizes the President

to, by proclamation, suspend the entry of all aliens or any class of aliens, or impose on the entry of aliens any restrictions he may deem appropriate." *Id.* But the Memorandum does not explain why issuance of the Travel Ban requires modifications to USCIS' exercise of discretion when adjudicating discretionary benefits applications. Nor does the Memorandum explain how section 212(f) authorizes USCIS personnel to discriminate on the basis of national origin.

## V.     Plaintiffs Are Severely Harmed by the Challenged Policies.

105.    Plaintiffs are organizations that represent and serve the individuals, families, and communities subject to these illegal and inhumane benefits-restricting policies.

106.    Some Plaintiffs are associations whose members are suffering and will continue to suffer harms stemming from the Challenged Policies, including the fear and uncertainty that come with being in immigration limbo; the loss of jobs and the income that supports them and their families both in the United States and in their home countries; the inability to complete academic and professional degrees; and the pain of being separated from family members, some of whom are living in danger abroad.

107.    Other Plaintiffs are organizations that serve immigrant communities whose core functions are impeded by these policies. These organizations' work has become far more difficult and far more costly as a result of the Challenged Policies, making it harder to provide effective legal and social services to individuals who rely on USCIS to adjudicate benefits requests so that they can lawfully live and work in this country.

A.    **Dorcas International Institute of Rhode Island**

108.    Plaintiff Dorcas International's mission is to cultivate an inclusive community for immigrants and those seeking refuge by providing integrated services, fostering cross-cultural understanding, and nurturing strong partnerships. Dorcas International provides its clients with innovative wraparound services to help those seeking to overcome educational, cultural, economic, legal, and language barriers.

109.    Dorcas International's Citizenship & Immigration Services ("CIS") program is the largest of Dorcas International's programs by client volume, historically serving approximately 5,000 clients annually. Dorcas International is one of only four programs in Rhode Island that is recognized by the Department of Justice and has DOJ-accredited staff who can represent clients before USCIS. Dorcas International's CIS staff provide consultations to thousands of individuals annually and assist an average of more than 1,500 clients each year with applications and legal representation.

110.    Dorcas International serves a diverse client population that includes refugees, asylees, immigrants, and low-income Rhode Islanders from countries around the world. A significant portion of Dorcas International's clients are nationals of one or more of the thirty-nine countries subject to the USCIS policies challenged in this lawsuit. In particular, Dorcas International's Refugee Resettlement program resettled individuals from multiple Travel Ban countries in the most recent fiscal year, including Afghanistan, Burundi, Eritrea, the Republic of the Congo, Somalia, Sudan, Syria, and Venezuela.

111.    Many of Dorcas International's clients have pending applications for immigration benefits that are directly affected by the Challenged Policies. Dorcas International currently has hundreds of pending immigration benefit applications involving individuals who are nationals of the thirty-nine countries subject to the Travel Ban, whose applications are now subject to the Benefits Hold. Dorcas International also has many pending asylum applications that are now subject to the Global Asylum Hold. Additionally, from 2021–2025, Dorcas International obtained approved asylum and other immigration benefits on behalf of countless clients who are nationals of the thirty-nine Travel Ban countries and who are now subject to the Comprehensive Re-review.

112.    The Global Asylum Hold directly interferes with Dorcas International's core work, as representing clients in asylum proceedings is one of Dorcas International's functions in its CIS program. Two of Dorcas International's CIS attorneys assist asylum seekers throughout the application process, prepare clients for interviews and hearings, and represent clients in proceedings before USCIS and the Immigration Court. Asylum proceedings are particularly challenging, and Dorcas International's lawyers have developed significant expertise in securing favorable outcomes for clients fleeing persecution. The Global Asylum Hold has completely halted this function. USCIS has required its adjudicators to stop issuing final decisions on all pending asylum applications, regardless of the applicant's country of nationality or date of entry, directing that cases be processed only "up to final adjudication" without any approval, denial, or dismissal. This policy directly

undermines Dorcas International's core mission providing immigration legal services to immigrants, including those seeking asylum.

113. Many of Dorcas International's clients currently have pending asylum applications that are now indefinitely frozen under this policy. Dorcas International's attorneys continue to invest time and resources preparing these cases, and monitoring ongoing cases, but the hold ensures that no case can reach a final decision. This creates a challenging and ever-growing backlog of open cases that Dorcas International must continue to service at its low-cost fee structure, without any prospect of resolution.

114. The Benefits Hold also directly interferes with Dorcas International's core work. USCIS has placed a hold on all pending benefit requests for nationals of the thirty-nine countries listed in the Travel Ban. Dorcas International's CIS program has historically served significant numbers of clients from the countries affected by the Benefits Hold.

115. Dorcas International currently has hundreds of pending immigration benefits application cases involving nationals of the thirty-nine Travel Ban countries whose applications are now subject to the indefinite hold. These include applications for employment authorization, adjustment of status to lawful permanent residence, family-based petitions, and other discretionary benefits. All of these applications are indefinitely stalled, with no indication from USCIS of when adjudications will resume.

116. The Benefits Hold is creating a challenging situation for Dorcas International's CIS program. If Dorcas International continues to file immigration

benefits applications for nationals of the thirty-nine Travel Ban countries, the program will accumulate an ever-increasing number of pending cases with no final adjudications. Dorcas International must continue to service these clients at its low fee structure while maintaining an ever-larger pending caseload, straining Dorcas International's budget, staff capacity, and ability to take on new clients.

117. The Benefits Hold causes concrete and severe harm to Dorcas International's clients. Clients with pending employment authorization applications face the expiration of their current work permits with no prospect of timely renewal, leading to job loss and financial hardship. Clients with pending family-based petitions and travel document applications face prolonged separation from family members abroad. These harms directly undermine Dorcas International's ability to fulfill its mission of helping immigrants and refugees achieve self-sufficiency and stability.

118. The Comprehensive Re-Review directly interferes with Dorcas International's mission. During the Biden Administration, Dorcas International obtained citizenship, green cards, asylum, temporary protected status, and other immigration benefits on behalf of many clients who are nationals of the thirty-nine Travel Ban countries. Under the Comprehensive Re-Review, USCIS has directed its personnel to re-open and review the approved benefit requests of nationals of the thirty-nine Travel Ban countries who entered the United States on or after January 20, 2021. This means that even individuals whose applications were approved years ago, after rigorous vetting and adjudication, now face the prospect of having their benefits revoked.

119.    The Comprehensive Re-Review has caused enormous fear, anxiety, and re-traumatization among Dorcas International's client population. Many of Dorcas International's clients are refugees, evacuees, and asylum seekers who have already survived war, persecution, and the trauma of displacement. The prospect of being subjected to re-examination and re-interviews about their citizenship, legal permanent resident, refugee or asylum status, though their applications were approved years ago, inflicts additional psychological harm on individuals who have already endured extraordinary suffering.

120.    The Comprehensive Re-Review Policy also undermines Dorcas International's fundamental mission of fostering self-sufficiency. Dorcas International's programs, including adult education, employment services, and refugee resettlement, are designed to help clients build stable, productive lives. The threat that previously granted benefits could be revoked at any time makes it significantly harder for Dorcas International to help clients plan for their futures, pursue employment, and invest in education. Clients who fear they may lose their legal status are less likely to make the long-term commitments to jobs, housing, and education that Dorcas International's programs are designed to support.

121.    Finally, the Country-Specific Factors Policy further directly harms Dorcas International and interferes with its core work. Because a significant portion of Dorcas International's CIS clients are nationals of countries subject to the Travel Ban, the Country-Specific Factors Policy erects a prohibitive barrier to their ability to obtain discretionary immigration benefits.

122. In fiscal year 2025 alone, Dorcas International filed more than 1,000 applications for discretionary benefits, including 627 employment authorization applications, 406 permanent residency applications, and 126 applications on behalf of Afghan evacuees, that would be subject to the country-of-origin negative factor imposed by the Country-Specific Factors Policy. For each of these applications involving a national of a Travel Ban country, USCIS adjudicators are now required to treat the applicant's country of origin as a significant negative factor, regardless of the individual's personal circumstances or merits.

123. The Country-Specific Factors Policy is particularly harmful to Dorcas International's work with unaccompanied youth. In fiscal year 2025, Dorcas International served 113 unaccompanied minors from twelve countries, many of which are subject to the Travel Ban, including Haiti, Venezuela, and Cuba. Dorcas International's attorneys are trained in trauma-informed lawyering and work to ensure that the legal process does not further harm these children. Under the Country-Specific Factors Policy, when these minors apply for Special Immigrant Juvenile Status or another discretionary benefit, their country of birth, a circumstance entirely beyond their control, will be weighed against them as a significant negative factor.

124. The Country-Specific Factors Policy has also required Dorcas International to divert resources to educating clients about the new adjudicatory framework, managing their expectations about the likelihood of obtaining discretionary benefits, and counseling clients who are discouraged from applying for benefits to which they would otherwise be entitled. Dorcas International's CIS staff

must now spend time explaining to clients that their country of origin will be weighed against them, a conversation that is deeply demoralizing for clients who have followed every rule and invested years in building their lives in the United States.

125.    Taken together, the four Challenged Policies have had a devastating cumulative impact on Dorcas International directly and on the communities it serves. The Policies collectively ensure that Dorcas International's clients from Travel Ban countries cannot obtain new immigration benefits (because of the Benefits Hold), cannot have their asylum applications adjudicated (because of the Global Asylum Hold), face the prospect of losing benefits they already have (because of the Comprehensive Re-Review), and—even if the holds are someday lifted—will face a presumptive barrier to receiving any discretionary benefit in the future (because of the Country-Specific Factors Policy).fThe Challenged Policies have not only harmed Dorcas International's clients, they have directly harmed Dorcas International's staff and impaired its organizational capacity. The Challenged Policies make it harder for Dorcas International to serve clients effectively with the limited resources it has, increasing demand for services while simultaneously making those services less likely to produce results.

126.    The Challenged Policies limit the options that have long been available to Dorcas International to submit immigration benefits applications on behalf of its clients. Dorcas International's CIS program is finding it increasingly difficult to perform its core function for clients from Travel Ban Countries and who are otherwise affected by these policies: obtaining favorable immigration outcomes for the individuals it serves. The inability to obtain results for clients, despite investing

significant time and expertise in their cases, has taken a serious toll on staff morale. These Challenged Policies have also required Dorcas International to revise its community education and outreach materials to account for the changed adjudicatory framework, diverting staff time from direct legal services.

127.    Dorcas International has served immigrants, refugees, and vulnerable Rhode Islanders for more than a century. Its organizational model is built on the premise that individuals who are in the United States and are eligible for relief and benefits will have access to a functioning immigration system through which they can obtain the legal status and work authorization they need to build stable, productive lives. The Challenged Policies have dismantled that premise for a significant portion of the population Dorcas International serves, undermining the very foundation on which Dorcas International's programs are built.

### B.    Refugee Dream Center

128.    Plaintiff RDC is an organization created by refugees, for refugees, with a majority of the staff being refugees themselves. RDC's core services and programs include adult education (including ESL and citizenship classes), employment services, legal and immigration support, case management, youth support, health promotion, language access services, psychosocial support, reception and placement of newly arriving refugees, and legislative advocacy. All of these services are essential in fostering refugee self-reliance and independence.

129.    The Challenged Policies directly interfere with RDC's core programs and activities, have frustrated RDC's mission, and have forced RDC to divert its limited staff time and organizational resources away from the services it was established to

44

provide. Approximately 88 percent of the community members RDC serves are nationals of one of the thirty-nine countries targeted by the USCIS policies challenged in this lawsuit.

130.    Because RDC operates on a drop-in model, without requiring appointments or extensive paperwork, the impact of the Challenged Policies was felt immediately and directly at RDC's offices. When community members learn of the Challenged Policies, or when the consequences of the Policies disrupt their lives, they come to RDC seeking help. Hundreds of community members are now coming in on a daily basis; RDC staff are overwhelmed. Many of these are people who did not previously need extensive services from RDC, but who now require support, legal help, and case management because of the Challenged Policies. RDC staff must respond to these community members in real time, diverting them from their assigned programmatic work.

131.    Many of RDC's community members have pending applications for immigration benefits that are directly affected by the Challenged Policies. These include applications for asylum, employment authorization, adjustment of status to lawful permanent resident, and other discretionary benefits adjudicated by USCIS. Additionally, many RDC community members who entered the United States from 2021-2025 were previously granted immigration benefits that are now subject to re-review under one of the challenged policies.

132.    The Global Asylum Hold directly interferes with RDC's core work. A central part of RDC's mission is helping refugees achieve legal stability and self-sufficiency in the United States. For many of RDC's community members, affirmative

asylum is the primary pathway through which they can obtain permanent legal status and, eventually, citizenship. Asylum is also the mechanism by which refugees who fear persecution in their home countries secure the legal protection they need to remain safely in the United States.

133.    RDC assists community members throughout the asylum process, including helping them prepare applications, connecting them with legal representation—including through volunteer Brown University medical students and doctors, who evaluate asylum applicants—and supporting them as they navigate the adjudication process. The Global Asylum Hold has brought this core function to a standstill. At least 200 of RDC's community members have pending asylum applications that are now indefinitely frozen, with no indication from USCIS of when or whether they will ever be adjudicated.

134.    As a direct result of the Global Asylum Hold, RDC staff have been required to spend substantial additional time responding to inquiries from community members about the status of their asylum applications, counseling community members about the implications of the hold for their legal status and work authorization, and attempting to identify alternative legal pathways for community members who are now in limbo.

135.    The Benefits Hold also directly interferes with RDC's core work. Because approximately 88 percent of RDC's community members are nationals of countries subject to the Travel Ban, the Benefits Hold affects an extraordinarily large share of the population RDC was established to serve. Approximately 400 of RDC's community members are directly affected by the Benefits Hold.

136. The Benefits Hold has significantly impaired several of RDC's core programs. RDC's employment services, including its Job Training program, depend on community members being able to obtain or renew work authorization from USCIS. Community members who cannot secure work permits cannot be placed in jobs, which renders RDC's employment programming ineffective for a substantial portion of its community. In 2024, RDC placed sixty-five individuals in jobs and provided Job Training to 800 participants. The Benefits Hold has undermined the effectiveness of this programming for community members from Travel Ban countries.

137. Many RDC community members have pending applications for employment authorization, adjustment of status to lawful permanent residence, or other discretionary benefits that are now subject to the Benefits Hold. These applications are indefinitely stalled, with no indication from USCIS of when adjudications will resume. That has already directly harmed RDC, as one of its staff members is no longer able to work due to an expired visa that cannot be renewed because of the Benefits Hold.

138. The Benefits Hold has also caused a significant increase in demand for RDC's food pantry and other basic-needs services. More community members are seeking food and supplies because they have lost income or are afraid to apply for public benefits. At the same time, RDC's Education & Employment staff are spending substantially more time assisting community members with benefits applications, providing transportation to appointments, and conducting one-on-one meetings to discuss policy changes and help community members navigate them. This time is

being diverted directly from ESL instruction, job training, and other educational programming.

139.    Like the other USCIS policies, the Comprehensive Re-Review directly interferes with RDC's core work. Approximately 500 of RDC's community members, primarily Afghan, Venezuelan, and Haitian nationals, received immigration benefits from 2021-2025 and are now subject to re-review. These community members obtained asylum, green cards, work permits, and other benefits through lawful processes. They have built their lives in Rhode Island in reliance on those benefits: they are employed, raising families, paying taxes, and contributing to their communities.

140.    The Comprehensive Re-Review has forced RDC to divert significant resources to addressing the needs of community members who are subject to re-review. RDC staff must now spend substantial time counseling these community members about the re-review process, helping them understand what the policy means for their legal status, connecting them with legal representation, and providing emotional and psychosocial support to community members who are in acute distress about the prospect of losing their immigration status. One of RDC's board members, an immigration lawyer, has been doing a significant amount of pro bono work, while other immigration lawyers have been offering reduced-fee legal work, to assist community members affected by the re-review. This is time and effort that would otherwise be spent delivering RDC's core programs.

141.    The Comprehensive Re-Review also undermines RDC's fundamental mission of helping refugees achieve self-sufficiency. RDC's programs are designed to

help community members build stable, productive lives. The threat that previously granted benefits could be revoked at any time makes it significantly harder for RDC to help community members plan for their futures, pursue employment, invest in education, and take the other steps necessary to become self-sufficient. Community members who fear they may lose their legal status are less likely to make the long-term commitments—to jobs, to housing, to education—that RDC's programs are designed to support. This directly undercuts the effectiveness of RDC's Job Training, ESOL, Financial Literacy, and Integration Services programs.

142.    Critically, the Country-Specific Factors Policy would continue to harm RDC and its community members even if the Global Asylum Hold and the Benefits Hold are lifted. The Country-Specific Factors Policy creates a permanent structural impediment: immigration officers will be required to weigh RDC community members' countries of origin against them in every discretionary adjudication, regardless of the individual applicant's circumstances, ties to the community, employment history, or any other factor that would ordinarily weigh in their favor.

143.    RDC exists to help refugees navigate the immigration system, obtain legal status, and achieve self-sufficiency. The Country-Specific Factors Policy makes each of these goals substantially harder to achieve for the population RDC serves. By imposing a country-of-origin penalty on discretionary adjudications, the Country-Specific Factors Policy undermines RDC's ability to guide community members toward successful outcomes in the immigration process, which lies at the heart of RDC's organizational mission.

144.    The Country-Specific Factors Policy has also required RDC to divert resources to educating community members about the new adjudicatory framework, managing their expectations about the likelihood of obtaining discretionary benefits, and counseling community members who are discouraged from applying for benefits to which they would otherwise be entitled.

145.    Taken together, the four Challenged Policies have had a devastating cumulative impact on RDC and the community it serves. The challenged policies have not merely made RDC's work more difficult in the abstract. They have directly interfered with RDC's ability to carry out its core programs and activities and impaired its organizational capacity.

146.    RDC estimates that 330 staff hours per week, across eleven staff members, are now devoted to immigration-related counseling and support that would not have been necessary absent the Challenged Policies. Staff must also be continually trained and retrained on the rapidly evolving changes to USCIS policy, which is stressful for staff and takes additional time away from direct service delivery.

147.    RDC's Refugee Integration team cannot help community members progress toward permanent legal status when adjudications are frozen. RDC's Youth Mentorship programs are strained as families face destabilizing uncertainty. RDC's Health & Safety team must address the acute psychological distress caused by the threat of status revocation instead of delivering preventive health programming. RDC's food pantry faces surging demand. And across every department, staff are

being pulled away from their assigned portfolios to respond to the crisis created by these policies.

148.    The stress of advising community members about rapidly changing and deeply harmful immigration policies—often without clear answers to provide—has also taken a significant toll on RDC's workforce, who are themselves directly affected by the Challenged Policies.

149.    Because of the time RDC must now devote to addressing the crisis precipitated by these Challenged Policies, RDC has been unable to conduct as much cultural attunement training for police departments, universities, and hospitals as it otherwise would. This training is an important part of RDC's mission and benefits not only the refugee community but the broader Rhode Island community.

### C.    Service Employees International Union

150.    Plaintiff SEIU has thousands of members, many of whom are from Travel Ban countries and who rely on USCIS to adjudicate benefits requests so that they can lawfully live and work in the country. SEIU's members have been severely affected by the Challenged Policies. For example, SEIU has members who have been removed from their work duties and are in danger of losing their jobs because USCIS has refused to adjudicate their applications to extend their H-1B statuses, meaning they can no longer work lawfully. Members with pending adjustment of status applications are being denied the opportunity to become lawful permanent residents on the basis of the Challenged Policies. These SEIU members are affected not only by the Benefits Holds but also by the Country-Specific Factors Policy. That is because even if the Benefits Hold is someday lifted, the affected SEIU members will then be

subject to the exercise of negative discretion pursuant to that policy. Additionally, SEIU also has members who received various immigration benefits, including H-1B status, green cards, and work permits, during the Biden Administration and are now subject to the Comprehensive Re-Review process.

151.    SEIU Member A is a Haitian physician trained in general surgery and trauma care who taught at a medical university in his country of origin. After being targeted by gangs, he fled Haiti and entered the United States  on humanitarian parole. As a parolee, he was authorized to work in the U.S. for two years.. SEIU Member A passed his medical licensing examinations and matched for a residency at a major U.S. hospital, where he started work in September 2025.  The hospital agreed to sponsor him for an H-1B visa, which was approved for consular processing. When he traveled to a U.S. Consulate in Mexico to apply for his corresponding visa, it was denied due to the Travel Ban. SEIU Member A was only able to re-enter the U.S. because his TPS was still valid.

152.    In October 2025, SEIU Member A applied for asylum in the United States. He had his asylum interview on December 2, 2025, and was told he would receive a decision within two weeks. The same day, the Global Asylum Hold went into effect and his asylum application was put on hold. Because his work authorization expired, SEIU Member A had to stop his residency training.

153.    The impact of these policies is devastating to SEIU Member A, who is prevented from continuing his training and is afraid he will be forced to leave the United States.

D.    **International Union, United Auto Workers**

154.    Plaintiff UAW is one of the largest and most diverse unions in the country. Its membership can be found in virtually every sector of the U.S. economy, and hails from around the globe, including many Travel Ban countries. Hundreds, if not thousands, of UAW members are and will be impacted by the Challenged Policies. In higher education, UAW represents thousands of members on F-1 and J-1 visas, including members from Travel Ban countries. Some of these members have pending green card applications, extensions or changes of nonimmigrant status, or other immigration benefit applications that have now been paused, threatening their ability to remain in the United States and continue their studies, research, and academic careers. As a result of the Challenged Policies, UAW members are experiencing serious harm to their professional and personal lives.

155.    UAW members affected by these policies face extreme uncertainty in their studies, research, and lives. UAW members whose applications are paused are unsure whether they will be able to remain in the United States to continue their studies or research projects at U.S. institutions. Similarly, UAW members who will soon need to apply for a new or different visa classification or immigration status to continue their work or study may be forced to leave the country and abandon important research and scholarship.  These impacts harm not only the UAW's members, but the U.S.-based institutions that benefit from their work.

156.    For example, UAW Member A is from Iran. He currently works at a public university as a neuroscientist, specializing in the fields of brain stimulation, psychiatry, and translational neuroscience, with a focus on developing and optimizing

non-invasive neuromodulation treatment for psychiatric disorders such as treatment-resistant depression. He filed an EB-2 National Interest Waiver I-140 around September 2023, and his application was approved around June 2024. He subsequently filed his adjustment of status application (including forms I-485, I-765, and I-131) around June 2025. He is currently on a J-1 visa. When UAW Member A checked the status of his adjustment of status application before the USCIS policies went into effect, the website included rough estimates of case processing time (e.g. "80% of cases like yours are processed in eight months").

157.   As a result of the Benefits Hold, adjudication of Member A's application has been paused and his case has not progressed through normal processing despite an approved immigrant petition and otherwise complete filings. This indefinite pause has created significant uncertainty and stress for UAW Member A and his family regarding their immigration status, employment authorization continuity, and ability to travel internationally. UAW Member A and his spouse are also expecting a child soon and the Benefits Hold has created significant stress and uncertainty for his family and their future. Timely resolution of his permanent residency process is critical for maintaining continuity of his research program, career advancement in academic environment, and stability for his family in the United States.

158.   UAW Member B is from Iran. He holds doctorates in both electrical engineering and chemical engineering. His wife holds a doctorate in hospitality marketing management. Before coming to the United States, UAW Member B and his wife resided in Hong Kong where he was a postdoctoral researcher and his wife was a senior lecturer at a university. They came to the United States because they

thought the country welcomed immigrants. They want to build their lives here and contribute to this country.

159.    In March 2024, UAW Member B came to the United States on a J-1 visa. His wife is on a J-2 visa. He is a postdoctoral researcher of biomedical imaging at a public university. His wife has an Employment Authorization Document ("EAD") through her J-2 visa and works as a pharmacy technician. UAW Member B filed an EB-2 National Interest Waiver I-140 around September 2024. His J-1 status expires this summer. UAW Member B has a job offer for when his term as a postdoctoral researcher ends, but his new employer would need to sponsor him for an H-1B visa. UAW Member B's wife's Employment Authorization Document ("EAD") expires at the end of March.

160.    As a result of the Benefits Hold, adjudication of UAW Member B's I-140 petition has been paused, and his case has not progressed through normal processing. The Benefits Hold also prevents his wife from renewing her EAD, which expires at the end of this month. The DMV refused to issue her a driver's license because they require the EAD to be valid for at least sixty days at the time of issuance. The indefinite pause has created deep anxiety for UAW Member B and his wife regarding their immigration status, employment authorization continuity, and ability to advance professionally. Timely resolution of UAW Member B's permanent residency process is critical for maintaining his and his wife's careers in the United States and stability for their family in the United States.

### E.      African Communities Together

161.   ACT has over 13,000 members around the United States who are the nationals or descendants of myriad African nations and subject to the Travel Ban. ACT connects African immigrants with free or low-cost assistance for immigration, jobs and other needs; empowers African immigrants to serve as leaders in their communities through meetings and trainings; and mobilizes African immigrants to campaign at the state, local, and national level for issues that affect them such as immigration reform and language access. Every year ACT connects hundreds of individuals with high-quality free legal services. ACT's members are suffering severe harm as a result of the Global Asylum Hold and the Benefits Hold.

162.   For example, ACT has several members from Sudan who are affected. ACT Member A is a TPS holder from Sudan who applied for travel documents in April 2025 in order to visit her family following the passing of a close relative. Because of her urgent desire to be with her family, she regularly checked in on the status of her application. She received one update in 2025 that her application was still pending. Then the Trump administration announced the Benefits Hold. She feels extremely sad and frustrated that this new policy will prevent her application from undergoing any further processing and that she will remain far from her family at a very difficult time.

163.   In addition to being a TPS holder, ACT Member A is also an asylum seeker. She applied for asylum in 2018 and after a years-long wait, she finally had her asylum interview in the fall of 2025. At the end of the interview, she was told that she should receive a decision within five days. She has not received any further

communication about her application. She is extremely concerned because her asylum application would have given her a path to permanent status at a moment when her TPS status does not feel secure. Despite an ongoing war in Sudan which would warrant an extension of her TPS status, she fears that Sudan TPS holders will face termination of their status in a few short months. If she loses her TPS-based work authorization, she will not be able to apply for an asylum-based work authorization because of the Benefits Hold. The prospect of not working causes her enormous stress because she is currently the only one supporting her family abroad.

164.    ACT Member B is a college student and green card holder from Sudan. She is studying political science and is currently in her final year. ACT Member B and her family arrived in the U.S. in 2019 as lawful permanent residents through the Diversity Visa program. In January 2025, ACT Member B applied for citizenship. Her naturalization interview was scheduled for December 2025. A few days prior to the interview, she received notice that it was rescheduled for a few days later. A few days prior to the rescheduled interview date, and after the Benefits Hold was announced, she received notice that her interview was canceled until further notice. ACT Member B has dreams of working at the State Department as a foreign service officer, a role that requires U.S. citizenship. She is very disappointed because she has been conducting her job search on the assumption that she would soon be a U.S. citizen.  Her employment options are now limited and she feels like her dream job is out of reach.

165.    ACT Members A and B are examples of the harmful impacts these policies are having on ACT members and the broader community it serves.

166.    All of the policies in question have created tremendous confusion in the communities that ACT serves. ACT's legal department is experiencing a clear increase in time and resources devoted to supporting and assisting members affected by the USCIS policies related to the travel ban because many of its clients from affected countries have applications that remain pending or effectively paused, including cases filed before the Travel Ban . Although USCIS continues to accept filings, issue receipt notices, schedule biometrics appointments, and in some cases conduct interviews, it continues to withhold adjudications.

167.    As a result of these policies, ACT spends considerable additional time and resources to monitor case progress, respond to ongoing client concerns, and provide guidance without clear timelines. This additional expenditure of time and resources has increased administrative workload and frustrated ACT's efforts to advise clients and plan next steps because standard processing expectations are no longer reliable. Service delivery has become both more time and resource-intensive and less predictable.

168.    ACT believes that the current Trump Administration is motivated by a desire to deny access to immigration benefits for non-white, non-European-descended people generally and for Black and African people, specifically.

**F.    Venezuelan Association of Massachusetts**

169.    Plaintiff VAM has nearly 20,000 members, many of whom are from countries who are on the Travel Ban. VAM's members are experiencing severe harm as a result of the Global Asylum Hold and the Benefits Hold.

170.    For example, VAM Member A is a Venezuelan man married to a U.S. citizen who filed a petition seeking to adjust his status so he and his wife can build a life together in the United States. In December 2025, VAM Member A and his wife attended their marriage-based adjustment of status interview at USCIS. At the conclusion of the interview, the USCIS officer informed VAM Member A and his wife that they would not receive a decision on VAM Member A's petition to adjust status until the "administrative pause" (Benefits Hold) affecting cases for persons from certain countries, including Venezuela, was lifted. If he is unable to adjust status, VAM Member A will lose his employment authorization and his job. VAM Member A and his wife just bought a house, and he does not know how they will make the mortgage payments if he loses his job.

171.    VAM Member B is a Venezuelan man seeking asylum in the United States. As an asylum seeker, VAM Member B is eligible for and has an EAD, or work permit, which must be regularly renewed. VAM Member B timely filed for renewal of his EAD in November 2025. To date, he has not received a response due to the Benefits Hold. VAM Member B's employer has told him that he will lose his job if he cannot produce a valid work permit by the time his current permit expires in May 2026. VAM Member B is the sole breadwinner for his family of four; his wife provides full time care for one of their two children who was born in the United States with special needs. VAM Member B is in constant fear of losing his livelihood.

172.    VAM Member C is a Venezuelan man who obtained asylum in the United States and then filed a petition to adjust his status to become a lawful permanent resident ("LPR"). In September 2025, VAM Member C received an email

from USCIS stating that an interview for his petition to become an LPR would be set soon, but to date no interview has been set. VAM Member C has repeatedly called USCIS customer service and been told that there is a suspension affecting people of his nationality due to the Benefits Hold. As an asylum seeker, VAM Member C had work authorization; after he obtained asylum, he tried to renew it but was told that he had to re-apply as an asylum recipient. He did so but to date has received no EAD, presumably also due to the Benefits Hold. If VAM Member C were an LPR, he would not need an EAD at all. Although VAM Member C is legally eligible to work, without a physical EAD he has not been able to find employment and provide for his family.

### G.     Partnership for the Advancement of New Americans

173.   Plaintiff PANA engages thousands of community members from affected countries with a core membership of 500 members. The majority of its members are refugees and former refugees who are now legal permanent residents, naturalized U.S. citizens, children of refugees in the United States, and asylum seekers. As a result of these policies, PANA is operating under an increasing atmosphere of fear and intimidation created by the federal government, particularly impacting historically underserved communities from Somalia, Afghanistan, and Sudan and those facing persecution based on national origin, religion, or political belief.

174.   PANA's members are directly impacted by the benefits-restricting memos. While PANA members from countries subject to the Benefits Hold are still able to submit benefits requests, their applications remain pending adjudication by USCIS long after they would have previously been adjudicated.

175.    For example, PANA Member A is a teenager from Somalia who in April 2024, submitted an I-589 Application for Asylum and paid the $100 fee. He is still waiting for an interview. He has also submitted an I-360 Application for Special Immigrant Juvenile Status. Member A does not know the status of these applications, neither of which will get adjudicated as long as the Global Asylum Hold and Benefits Hold are in place. Member A lives in stress because his life is at risk in Somalia and he fears deportation.

176.    PANA Member B is a young man from Afghanistan who entered the United States after being evacuated from Afghanistan and has an Afghan Special Immigrant Visa ("SIV"), available to individuals who were employed in Afghanistan by or on behalf of the U.S. government or by the International Security Assistance Force/Resolute Support. Upon admission to the United States, individuals with an Afghan SIV are eligible to become lawful permanent residents. PANA Member B filed an adjustment of status application for himself and his family of seven, which is pending and will not be adjudicated under the Benefits Hold.

177.    PANA Member C is a middle-aged man from Afghanistan who entered the United States on an Afghan SIV. PANA Member C had to leave his eldest daughter behind in Afghanistan because she was over the age of twenty-one at the time the SIV was issued and therefore not eligible to accompany him. Once PANA Member C arrived in the United States, he applied for humanitarian parole for his daughter by filing an I-131 Application for Travel Documents, Parole Documents, and Arrival Departure Records. PANA Member C's humanitarian parole request for his daughter remains pending and he does not know its status. In PANA's experience, a

humanitarian parole application would typically be adjudicated by now. Currently, PANA Member C's daughter is living in hiding because she does not have an immediate male family member in Afghanistan, where women are required to have a *mahram* or male guardian.

178.    PANA Member D is a young man from Sudan who entered the United States in 2024 and timely submitted an I-589 Application for Asylum which is currently pending. Without knowing what the future has in store for him, PANA Member D lives in a constant state of limbo. He does not know how to move forward with his life and future if he does not know what will happen with his immigration application. He runs the risk of being placed in removal proceedings and being forced to return to the country he fled, where individuals like him are facing ethnic cleansing.

179.    PANA Member E is a young man from Somalia who was granted asylum.  PANA Member E now has an I-485 Application to Register Permanent Residence or Adjust Status. PANA Member E is sad and frustrated. He knows that he followed the process properly, completed his medical exam as required for the I-485, and paid the required application fees. Yet, his application remains pending due to the Benefits Hold.

180.    PANA members' fear, frustration, and distress are justified. They fled danger in their home countries with the belief that they had reached a safe haven in the United States where they and their family members could be free from harm. They have complied with all of the requirements for the benefits for which they have applied, only to find their applications placed on indefinite hold. They are suffering

acutely from the uncertainty that they and their family members in the United States are facing, and those seeking permission for their relatives abroad to enter the United States are experiencing the additional agony of knowing their relatives may be in danger.

### H.    American Gateways

181.    Plaintiff American Gateways is a legal service provider based in Austin, Texas. Its core activity is to provide free, culturally sensitive, trauma-informed legal representation to individuals and families seeking asylum and other kinds of humanitarian immigration relief in the United States. American Gateways supports its clients from the moment of initial intake through final adjudication of their claims for relief. The Challenged Policies directly interfere with American Gateways' core programs and activities and have frustrated American Gateways' mission.

182.    For example, American Gateways has clients who have waited for years for their asylum applications to be adjudicated but are now in indefinite limbo as a result of the Global Asylum Hold. Other clients have successfully obtained asylum and filed I-730 Refugee Asylee Relative petitions to reunite with family members from whom they have been separated, often for many years, but those petitions are now on pause due to the Benefits Hold, and their family members remain abroad and often in dangerous circumstances. American Gateways has clients who have survived human trafficking but now, due to the Benefits Hold, cannot obtain the T visa classification or access to any of its attendant benefits to help trafficking survivors heal and establish new lives for themselves in the United States. American Gateways

has clients who are eligible to naturalize but have had their naturalization ceremonies cancelled due to the Benefits Hold.

183.    Absent extenuating circumstances, American Gateways does not complete or close its cases until its clients have received final adjudication of their petitions for the immigration relief that is sought. As a result of the Global Asylum Hold and the Benefits Hold, American Gateways has to keep impacted clients' files open indefinitely, continuing to update their files with the latest information on country conditions and to update their clients about recent activity or the lack thereof on their cases. American Gateways has had to dedicate additional staff time and resources to analyze the Global Asylum Hold and the Benefits Hold, explain the implications to its impacted clients, and manage both client and staff stress around the indefinite delay.

184.    American Gateways' model relies on significant assistance from pro bono attorneys, which expands its capacity to serve low-income immigrants. American Gateways' pro bono cases and relationships have also been negatively impacted by the Global Asylum Hold and the Benefits Hold. American Gateways staff have had to take additional time and resources to explain the new policies to pro bono attorneys and help them understand the implication of the new policies for their cases and how to relay those to clients. The Global Asylum Hold and Benefits Hold mean that pro bono attorneys will have to keep their existing cases longer as their clients wait for resolution, may be unable to take on additional pro bono cases, and may be less likely to take pro bono cases in the future, or may choose to return cases to American Gateways as they are unable to take on a commitment without an end date,

thus exacerbating the already heavy and increased workload on American Gateways staff.

185.    American Gateways has represented hundreds, if not thousands, of clients who are now subject to the Comprehensive Re-Review process. Supporting clients through the Comprehensive Re-Review process will require American Gateways to re-open closed client files and dedicate significant staff resources to prepare clients to go through the re-review process. Clients, who already went through extensive vetting and waited sometimes years to receive the benefits they have, and who finally thought they were safe in the United States, will be forced to relive the trauma of their prior experiences and will be plunged back into fear and uncertainty as to whether they will be able to remain safely in the United States and able to work and provide for their families. There is no guarantee that pro bono attorneys who represented clients on their original petitions for relief will be willing or able to represent those same clients through the Comprehensive Re-Review process, so American Gateways may have to pick cases back up from pro bono attorneys and assign them to already overburdened staff.

## CLAIMS FOR RELIEF

### COUNT I
**APA, Lack of Statutory Authority, Contrary to Law, 5 U.S.C. § 706(2)(A), (C)**

186.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

187.    The Challenged Policies constitute final agency action because they reflect the final consummation of USCIS' decision-making process and determine the

rights and obligations of noncitizens living in the United States, USCIS personnel, and others.

188.    The APA requires courts to hold unlawful and set aside any final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," as well as any final agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

189.    To the extent USCIS invoked any statutory authority in promulgating the Challenged Policies, it relied exclusively on section 212(f) of the INA, which gives the president limited authority to impose entry restrictions on foreign nationals.

190.    Section 212(f) does not authorize USCIS to enact any of the Challenged Policies.

191.    To the contrary, the INA imposes an affirmative duty on USCIS to adjudicate benefit applications according to the eligibility criteria created by Congress. *E.g.*, 8 U.S.C. §§ 1158(d)(1), 1255.

192.    No other statute authorizes the Challenged Policies.

193.    The Challenged Policies therefore exceed USCIS's statutory authority, are contrary to law, and must be set aside.

## <u>COUNT II</u>
### APA, Arbitrary & Capricious, 5 U.S.C. § 706(2)(A)

194.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

195.    The Challenged Policies constitute final agency action because they reflect the final consummation of USCIS's decision-making process and determine

rights and obligations of noncitizens living in the United States, USCIS personnel, and others.

196.    The APA requires courts to hold unlawful and set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

197.    The APA's arbitrary-and-capricious standard requires that agencies make reasonable decisions and reasonably explain those decisions. Agency action violates this requirement if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

198.    In enacting the Challenged Policies, USCIS failed to adequately explain its reasoning; to the extent it did explain its reasoning, its stated reasoning was facially implausible; and it failed to consider important parts of the problem, failed to consider important reliance interests, and failed to consider whether alternative options to achieve its policy goals.

199.    The Challenged Policies are therefore arbitrary and capricious and must be set aside.

## COUNT III
## APA, Notice & Comment, 5 U.S.C. §§ 553, 706(2)(D)

200.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

201.   The Challenged Policies constitute final agency action because they reflect the final consummation of USCIS's decision-making process and determine rights and obligations of noncitizens living in the United States, USCIS personnel, and others.

202.   The APA requires courts to hold unlawful and set aside any agency action that is taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Moreover, the APA requires that when an agency issues a legislative rule, it must follow notice-and-comment procedures. *See* 5 U.S.C. § 553.

203.   The Challenged Policies are legislative rules because each "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)). Specifically, the Challenged Policies obligate USCIS personnel not to adjudicate certain immigration benefits requests, to reconsider certain benefits requests that were already granted, and to exercise negative discretion when considering other benefits requests. The Challenged Policies impose those new obligations on USCIS in a manner that is plainly not contemplated by any statute.

204.   None of the Challenged Policies were issued in accordance with notice-and-comment procedures. Defendants issued these policies without issuing a notice of proposed rulemaking, without providing the public an opportunity to comment, and without otherwise following the procedures required by 5 U.S.C. § 553.

205.   The Challenged Policies were therefore issued without observance of procedure required by law and must be set aside.

## COUNT IV
### APA, Contrary to Constitutional Right, 5 U.S.C. § 706(2)(B)
### Fifth Amendment, Equal Protection

206.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

207.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying individuals equal protection under the laws.

208.    The Challenged Policies were enacted with "invidious discriminatory purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). A plaintiff can show discriminatory purpose by pointing to a variety of evidence including the "impact of the official action," the "specific sequence of events leading up to the challenged decision[s]," and "contemporary statements" by the decisionmakers. *Id.* at 266-68.

209.    The Benefits Hold, Comprehensive Re-Review and Country-Specific Factors Policy all restrict the ability of people from Travel Ban countries to secure discretionary benefits from USCIS but do not impose the same restrictions on other countries. Most of the countries subject to the Travel Ban are majority non-white, and many are majority-Muslim. These Challenged Policies discriminate against people from countries subject to the Travel Ban on the basis of their race, religion, or national origin.

210.    Likewise, the Global Asylum Hold discriminates on the basis of their race, religion, or national origin because it purposively discriminates against people from majority non-white and majority-Muslim countries.

211.    Separately, the Country-Specific Factors Policy instructs immigration officers to consider an applicant's country of origin when determining whether to grant a discretionary immigration benefit. It allows immigration officers to determine whether certain "country-specific factors" apply to an applicant's country of origin and, if so, instructs the USCIS officer to consider that as a significant negative discretionary factor in its discretionary analysis. This policy empowers USCIS officers to make intentionally discriminatory decisions when exercising discretion and will predictably lead to purposeful discrimination against benefits applicants on the basis of their race, religion, and national origin.

212.    The government has no legitimate basis for adopting the Challenged Policies and no rational basis for discriminating against applicants for immigration benefits on the basis of their race, religion, or national origin.

213.    Because the Challenged Policies discriminate on the basis of race, religion, and national origin, the policies violate the Fifth Amendment guarantee of equal protection.

### COUNT V
**Comprehensive Re-Review**
**APA, Contrary to Constitutional Right, 5 U.S.C. § 706(2)(B)**
**Procedural Due Process, Fifth Amendment**

214.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

215.    People who have been previously granted an immigration benefit by USCIS have a property interest in that benefit. For example, a person who has been granted lawful permanent resident status has a property interest in that status.

216.    The Comprehensive Re-Review fails to ensure that benefits recipients will receive adequate notice and an opportunity to be heard and fails to ensure that re-review procedures will otherwise satisfy the requirements of due process. Among other deficiencies, the Comprehensive Re-Review policy does not clearly explain the specific criteria that will be used to determine whether to revoke immigration benefits that have already been granted. Nor does the policy direct USCIS personnel to provide benefits recipients with an explanation of the reasons why the agency is considering revoking previously granted immigration benefits. Nor does the policy instruct USCIS personnel to provide benefits recipients with an opportunity to respond before the revocation of benefits.

217.    The recipients of immigration benefits have a property interest in those benefits, and the Comprehensive Re-Review requires USCIS personnel to reconsider past benefits determinations without ensuring that the benefits recipients will be provided notice and an opportunity to respond.

218.    Accordingly, the Comprehensive Re-Review violates the Due Process Clause of the Fifth Amendment and must be set aside.

## COUNT VI
### Equal Protection, Fifth Amendment

219.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

220.    For the reasons stated above, the Challenged Policies violate the Due Process Clause of the Fifth Amendment, which prohibits the federal government from denying individuals equal protection under the laws.

221.    Accordingly, the Challenged Policies violate the Constitution and should be set aside under the Court's non-statutory review and other equitable authorities.

**COUNT VII**
**Comprehensive Re-Review**
**Procedural Due Process, Fifth Amendment**

222.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

223.    For the reasons stated above, the Comprehensive Re-Review violates the Due Process Clause of the Fifth Amendment, which prohibits the federal government from depriving a person of a property interest without providing notice and an opportunity to respond and providing other procedural protections.

224.    Accordingly, the Comprehensive Re-Review violates the Constitution and should be set aside under the Court's non-statutory review and other equitable authorities.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

a.  Stay the Challenged Policies under 5 U.S.C. § 705 to preserve the status quo for the pendency of this litigation;

b.  Preliminarily enjoin Defendants from enforcing or relying on the Challenged Policies;

c.  Hold unlawful, vacate, and set aside the Challenged Policies under 5 U.S.C. § 706;

d.  Permanently enjoin Defendants from enforcing or relying on the Challenged Policies;

e.  Declare that the Challenged Policies are unlawful under the APA and the

Constitution;

f.  Award Plaintiffs reasonable attorneys' fees and costs;

g.  Grant such other relief as the Court deems necessary, just, and proper.

Dated: March 5, 2026                Respectfully submitted,

/s/ Amy R. Romero
Amy R. Romero (RI Bar No. 8262)
Kevin Love Hubbard (MA Bar No. 704772)*
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating Counsel, Lawyers' Committee for
   Rhode Island

/s/ Ryan Cooper
Ryan Cooper (DC Bar No. 1645301)*
Anashua Dutta (DC Bar No. 90007329)*
Catherine M.A. Carroll (DC Bar No. 497890)*
Robin F. Thurston (DC Bar No. 1531399)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202) 448-9090
rcooper@democracyforward.org
adutta@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

/s/ Kristy Blumeyer-Martinez
Kristy Blumeyer-Martinez (TX Bar No.
   24087177)*
Mona Iman (CA Bar No. 309525)*
Refugee and Immigrant Center for
   Education and Legal Services
131 Interpark Boulevard
San Antonio, TX 78216

(210) 222-0964
mona.iman@raicestexas.org
kristy.blumeyermartinez@raicestexas.org

/s/ Golnaz Fakhimi
Golnaz Fakhimi* (NY Bar No. 5063003)
Melissa Keaney* (CA Bar No. 265306)
Abbey Koenning-Rutherford* (CO Bar No.
    59636))*
Muslim Advocates
1032 15th Street NW No. 362
Washington, DC 20005
(202) 655-296
golnaz@muslimadvocates.org
melissa@muslimadvocates.org
abbey@muslimadvocates.org

/s/ Kalpana V. Peddibhotla
Kalpana V. Peddibhotla (Cal. Bar No. 200330)*
Anisa Rahim (NJ Bar No. 007802007)*
South Asian American Justice Collaborative
333 West San Carlos Street Suite 600
San Jose, CA 951110
(408) 550-9240
kalpana@saajco.org
anisa.rahim@saajco.org

*Counsel for Plaintiffs*

*Motion to appear pro hac vice forthcoming