## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*,<br><br>*Defendants.* | Case No. 1:26-cv-00132-JJM-PAS |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Table of Contents ........................................................................................................... i

Table of Authorities ..................................................................................................... iii

Introduction ................................................................................................................... 1

Factual and Legal Background ..................................................................................... 4

I.  USCIS Is the Federal Agency Responsible for Processing Requests for
    Immigration Benefits. ......................................................................................... 4

    A.  USCIS Must Adjudicate Requests for Immigration Benefits
        Using the Criteria Prescribed by Congress. ............................................. 5

    B.  Affirmative Asylum Is One of the Core Humanitarian Benefits
        Adjudicated by USCIS. ............................................................................. 6

II.  President Trump Enacts an Entry Ban Barring People from Thirty-
     Nine Countries from Entering the United States. ............................................. 8

III.  Following an Isolated Shooting, President Trump Promises to Force
      "Reverse Migration." ......................................................................................... 10

IV.  USCIS Adopts the Challenged Policies Severely Restricting Access to
     Immigration Benefits. ....................................................................................... 11

     A.  The Global Asylum Hold Indefinitely Halts All Affirmative
         Asylum Adjudications. ............................................................................. 13

     B.  The Benefits Hold Indefinitely Halts Benefits Adjudications for
         People from Countries Subject to the Entry Ban. .................................. 14

     C.  The Comprehensive Re-Review Policy Requires Reconsideration
         of Previously Granted Benefits. .............................................................. 15

     D.  The County-Specific Factors Policy Updates the USCIS Policy
         Manual to Require Country-of-Origin Discrimination. ......................... 16

V.  Plaintiffs Filed This Lawsuit to Redress the Severe Harms Caused by
    the Challenged Policies. ..................................................................................... 17

Legal Standard ............................................................................................................. 18

Argument ...................................................................................................................... 19

I.      Plaintiffs Have Article III Standing..................................................................... 19

        A.      Plaintiffs Have Suffered Injury in Fact..................................................... 19

        B.      Plaintiffs' Injuries Are Caused by the Challenged Policies and
                Redressable by an Order of the Court. .................................................... 28

II.     The Challenged Policies Are Final Agency Action. ........................................ 29

III.    The Challenged Policies Violate the APA. ..................................................... 32

        A.      The Challenged Policies Exceed USCIS's Statutory Authority
                and Are Contrary to Law. ...................................................................... 32

        B.      The Challenged Policies Are Arbitrary and Capricious...................... 37

        C.      The Challenged Policies Violate the APA Because They Were
                Adopted Without Notice and Comment................................................. 51

IV.     Plaintiffs Are Entitled to Relief....................................................................... 55

        D.      The Court Should Vacate the Challenged Policies. .............................. 55

        E.      The Court Should Permanently Enjoin USCIS from Issuing or
                Enforcing any Substantially Similar Policy.......................................... 57

Conclusion .............................................................................................................. 59

# TABLE OF AUTHORITIES

## CASES

*Afr. Cmtys. Together v. Noem*, No. 25-cv-13939, 2026 WL 395732
(D. Mass. Feb. 12, 2026).................................................................................. 65

*Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28 (1st Cir. 2026)............................................ 55

*Am. Hosp. Ass'n v. Kennedy*, No. 2:25-cv-00600, 2025 WL 3754193
(D. Me. Dec. 29, 2025) ............................................................................. 53, 71

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ................................... 40, 41, 68

*Asociación de Educación Privada de P.R., Inc. v. García–Padilla*,
490 F.3d 1 (1st Cir.2007)................................................................................ 71

*Ass'n of Am. Univs. v. Dep't of Def.*, 806 F. Supp. 3d 79 (D. Mass. 2025)............................ 69, 70

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106 (D. Mass. 2025) ........................ 70

*Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143 (D. Mass. 2025)............................. 52

*Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118 (D. Mass. 2025)........................... 52

*Assoc'd Fisheries of Me., Inc. v. Daley*, 127 F.3d 104 (1st Cir. 1997)................................... 22, 60

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................. 39, 43

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) ............................... 22

*Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624 (D. Mass. Feb. 27, 2026)................. passim

*Brookings Municipal Tel. Co. v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987)..................................... 57

*Calcutt v. FDIC*, 143 S. Ct. 1317 (2023)................................................................ 48

*California v. Dep't of Transp.*, 808 F. Supp. 3d 291 (D.R.I. 2025)................................. 72

*Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) ................................................... 23

*Cent. Maine Power Co. v. FERC*, 252 F.3d 34 (1st Cir. 2001) ...................................... 70

*Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730 (E.D. Tex. 2023) ................. 72

*Connecticut v. Dep't of the Interior*, 363 F. Supp. 3d 45 (D.D.C. 2019) .................................... 43

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024)..................... 69, 70

*Dep't of Com. v. New York,* 588 U.S. 752 (2019)...................................................... 63, 64

*DHS v. Regents of the Univ. of California*, 591 U.S. 1 (2020) .................................. 39, 50, 55, 57

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) ............................................................ 38

*Doe v. Noem*, 784 F. Supp. 3d 437 (D. Mass. 2025) ................................................................. 56

*Doe v. Noem*, No. 1:25-cv-10495, 2026 WL 184883 (D. Mass. Jan. 25, 2026)...................... 56, 67

*Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017)......................................................... 66

*Doe v. USCIS,* No. 26-cv-2389 (N.D. Ill. Mar. 26, 2026) .................................................. 4, 40, 72

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)............................................ 47

*Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1 (D.C. Cir. 2011)....................................................... 67, 68

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ......................................................... 55

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)........................................................... 50

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ........................................................... 25

*FEC v. Cruz*, 596 U.S. 289 (2022)............................................................................................. 48

*Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77 (1st Cir. 2016)..................................... 42

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989)............................................................ 70

*Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024)....................................................................... 39

*Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253 (W.D. Wash. 2008) ........................................... 60

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ................................... 34

*Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025).............................................................. 57, 71

*Kravitz v. Dep't of Com.*, 366 F. Supp. 3d 681 (D. Md. 2019).................................................. 65

*La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175 (1st Cir. 1992)..................................... 66

*Liu v. Noem*, 780 F. Supp. 3d 386 (D.N.H. 2025) ................................................................... 43

*Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19 (D. Mass. 2023) ........................................... 25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................................. 23, 37

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) ................................................... 67, 69

*Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313
(D.C. Cir. Nov. 22, 2025) ............................................................................ 71

*Massachusetts v. HHS*, 513 F. Supp. 3d 215 (D. Mass. 2021) ...................................... 57

*Massachusetts v. NIH*, 164 F.4th 1 (1st Cir. 2026)................................................. 52, 72

*Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025) ................................... 52, 54, 70, 72

*Massachusetts v. Trump*, 790 F. Supp. 3d 8 (D. Mass. 2025) ....................................... 41

*Matter of Marin*, 16 I. & N. Dec. 581 (BIA 1978) ............................................................ 7

*Michigan v. EPA*, 576 U.S. 743 (2015) .............................................................. 50, 53

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................................ 72

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................. 53, 60, 62

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020)................................... 70

*Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549 (N.D. Cal. 2020)............................... 47

*Nat'l TPS All. v. Noem*, 166 F.4th 739 (9th Cir. 2026)................................................. 65

*New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018).......................... 65, 66, 67, 68

*New York v. McMahon*, 784 F. Supp. 3d 311 (D. Mass. 2025) ...................................... 53

*New York v. Trump*, 811 F. Supp. 3d 215 (D. Mass. 2025)............................................. 41, 42, 43

*Ohio v. EPA*, 603 U.S. 279 (2024)....................................................................... 50

*Oliveira v. Edlow,* No. 25-cv-13228, 2025 WL 3492110 (D. Mass. Dec. 4, 2025) ......... 40, 43, 56

*Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28
(1st Cir. 2013) ........................................................................................... 71

*President & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182 (D. Mass. 2025).......... 46, 47

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19
(D.D.C. 2025) ............................................................................................. 45

*Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58
(D.R.I. 2025).............................................................................................. 51

*Rhode Island State Council of Churches v. Rollins*, 808 F. Supp. 3d 370 (D.R.I. 2025) ....... 60, 64

v

*Rhode Island State Council of Churches v. Rollins*, No. 25-cv-569, 2025 WL 3111213 (D.R.I. Nov. 6, 2025) ................................................................ 62

*Rhode Island v. Trump,* No. 1:25-cv-128-JJM-AEM, 2025 WL 3251113 (D.R.I. Nov. 21, 2025) ................................................................ 39

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ...................................................... 72

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ................................................................ 48

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ................................................................ 24

*Texas v. Cardona,* 743 F. Supp. 3d 824 (N.D. Tex. 2024) ................................................ 72

*Texas v. U.S.*, 524 F. Supp. 3d 598 (S.D. Tex. 2021) ...................................................... 67

*Trump v. Hawaii*, 585 U.S. 667 (2018) ................................................................ 46

*U.S. v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977) ................................................................ 63

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ................................................................ 47

*Util. Air Regul. Grp. v. EPA*, No. 25-1428 (1st Cir. May 1, 2025) ................................................ 47

*Varniab v. Edlow*, No. 25-cv-10602, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026) .............. passim

*Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78 (1st Cir. 2022) ................................................ 22

*W. Virginia v. EPA*, 597 U.S. 697 (2022) ................................................................ 48

*Warder v. Shalala*, 149 F.3d 73 (1st Cir. 1998) ................................................................ 67

*Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440 (D.R.I. 2025) ................................................................ 47, 48

## STATUTES & REGULATIONS

5 U.S.C. § 553 ................................................................ 65

5 U.S.C. § 703 ................................................................ 72, 73

5 U.S.C. § 704 ................................................................ 39

5 U.S.C. § 706 ................................................................ passim

6 U.S.C. § 271 ................................................................ 4

8 C.F.R. § 103.2 ................................................................ 66

8 C.F.R. § 103.5 ................................................................................................................68

8 CFR § 274a.12 ...............................................................................................................9

8 C.F.R. § 1003.47 ............................................................................................................8

8 U.S.C. § 208.24 .............................................................................................................68

8 U.S.C. § 246.1 ...............................................................................................................68

8 U.S.C. § 1101 .................................................................................................................6

8 U.S.C. § 1158 ........................................................................................................ passim

8 U.S.C. § 1159 .................................................................................................................9

8 U.S.C. § 1182 ........................................................................................................ passim

8 U.S.C. § 1255 ................................................................................................................ 6

8 U.S.C. § 1256 ................................................................................................................ 49

8 U.S.C. § 1427 .................................................................................................. 6, 9, 49, 58

8 U.S.C. § 1446 .............................................................................................................5, 49

8 U.S.C. § 1447 ............................................................................................................. 5, 49

8 U.S.C. § 1451 ................................................................................................................ 49

8 U.S.C. § 1571 ............................................................................................................. 5, 49

Exec. Order 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) ...............................................10

Exec. Order No. 13769, 82 Fed. Reg. 8977 (2017) ...................................................... 9

Proclamation No. 10949, 90 Fed. Reg. 24497 (June 4, 2025) ................................... 10, 11, 61, 62

Proclamation. No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025) ....................................... 10, 19, 20

## OTHER AUTHORITIES

@realDonaldTrump, Truth Social (Dec. 1, 2025, 10:29 PM), https://perma.cc/3J9H-
TWVS ...................................................................................................................... 13

@realDonaldTrump, Truth Social (Dec. 1, 2025, 11:27 PM), https://perma.cc/S687-
XY8A........................................................................................................................ 12

@realDonaldTrump, Truth Social (Dec. 1, 2025, 9:36 PM), https://perma.cc/P9V8-WZG7 ................................................................................................ 12, 64

@realDonaldTrump, Truth Social (Nov. 27, 2025, 11:26 PM), https://perma.cc/NRV3-MZDJ .................................................................................... 13

@realDonaldTrump, Truth Social (Nov. 27, 2025, 11:27 PM), https://perma.cc/8JW9-D7B5 ...................................................................................... 64

Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025), https://perma.cc/2ES3-BCYU ...................................................................... 11

Andorra Bruno, Cong. Rsch. Serv., R48249, What Is Affirmative Asylum? (Oct. 24, 2024), https://perma.cc/ZZ9B-MCPK ......................................................... 8

Camilo Montoya-Galvez, *Trump Administration Scaling Back Asylum Crackdown Enacted after D.C. National Guard Shooting, Sources Say*, CBS News (Mar. 30, 2026), https://perma.cc/6HKQ-J24F .............................................. 15

DHS, Privacy Impact Assessment for Immigration Benefits Background Check System (Nov. 5, 2010), https://perma.cc/XX89-KE79 ....................................... 8

Francesca Regalado, et al., *What We Know About the Shooting of National Guard Troops in Washington*, N.Y. Times (Nov. 26, 2025), https://perma.cc/4ZVZ-3576 ................................................................................ 11, 12

Kathryn Watson, *Trump Says He'd Bring Back 'Travel Ban' that's 'Even Bigger than Before'*, CBS News (July 7, 2023), https://perma.cc/E885-NCYR ................................ 10

Maggie Astor, *Trump Doubles Down on Migrants 'Poisoning' the Country*, N.Y. Times (Mar. 17, 2024), https://perma.cc/X9VN-UPTS .................................................... 9

Margy O'Herron, et al., *Expert Brief: New Entry Bans, Same Faulty Reasoning*, Brennan Center for Justice (Dec. 19, 2025), https://perma.cc/7VVL-J6YP .................... 10

*Trump's 2025 Travel Ban: Who Is Affected and What Could It Cost the U.S. Economy*, American Immigration Council (Aug. 6, 2026), https://perma.cc/P92V-V6YJ ...................................................................... 10

USCIS Policy Manual, https://perma.cc/8LJ5-BGP5 (last updated Feb. 3, 2026) ................ passim

USCIS, Fact Sheet: Immigration Security Check—How and Why the Process Works (Apr. 25, 2006), https://perma.cc/KU8T-NFGC ................................................ 58

William A. Kandel, CRS, R4802, USCIS: Operations and Issues for Congress (2024), https://perma.cc/L2VY-8VM7 ........................................................................ 58

## INTRODUCTION

This lawsuit challenges four recent policies (the "Challenged Policies") of the United States Citizenship and Immigration Services (USCIS) aimed at forcing noncitizens to self-deport. These policies have flung noncitizens, their loved ones, and their employers into an indefinite state of uncertainty: People who have long dreamed of becoming U.S. citizens, waited their turn in line, and complied with every requirement under the law have had their naturalization ceremonies canceled. Scientists, doctors, teachers, and other workers have lost their jobs and their livelihoods. Longterm residents are now unable to obtain the stability and certainty of a green card. And asylum seekers are unable to secure refuge from persecution.

*First*, USCIS has halted all adjudications of requests for asylum without regard to the applicant's country of origin (the "Global Asylum Hold"). As a result, USCIS is indefinitely refusing to grant anyone asylum regardless of where they come from or the severity of the persecution they are fleeing.

*Second*, USCIS has halted all adjudications of requests for immigration benefits (the "Benefits Hold") from people from any of the thirty-nine countries subject to entry restrictions imposed by the President (the "Entry Ban" or "Travel Ban"). People from countries around the world (including Afghanistan, Nigeria, Haiti, Somalia, Laos, and Venezuela, to name a few) can no longer receive immigration benefits from USCIS, including work permits, green cards, or naturalization.

*Third*, USCIS is reviewing and reconsidering all of its past decisions granting any immigration benefit to anyone from a country subject to the Entry Ban and who entered the United States since the beginning of the Biden Administration (the

1

"Comprehensive Re-Review Policy"). For example, permanent residents who have been living in the country lawfully for years will, based solely on their national origin, now be reinterviewed and required to reestablish their eligibility, and, if unable, face detention and deportation.

*Fourth*, USCIS has amended it Policy Manual to require agency personnel to consider a person's country of origin as a "significant negative factor" when adjudicating a request for discretionary benefits (the "Country-Specific Factors Policy"). The revisions instruct immigration officers to consider certain "country-specific factors" about an applicant's home country. These are the same factors that the Trump Administration cited as the basis for its Entry Ban. In effect, USCIS has erected a permanent obstacle to people who hail from disfavored countries (both Entry Ban countries and others) from ever receiving many immigration benefits.

Each of the Challenged Policies violates the Administrative Procedure Act (APA). For one, USCIS has no valid statutory authority to enact the Challenged Policies. USCIS references a provision in the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(f), that gives the President the authority to restrict noncitizens from entering the country. But Section 1182(f) does not confer USCIS with any authority, much less the sweeping authority that USCIS claims. The provision's plain text confirms that it authorizes entry restrictions and nothing more.

Indeed, not only does USCIS lack authority to enact the Challenged Policies, the policies also contravene various provisions in the INA that obligate USCIS to adjudicate certain requests for immigration benefits and specify how much time the

2

agency has to complete certain adjudications, what factors it should consider, when it can withhold adjudications, and when it can reconsider adjudications. The Challenged Policies supplant this carefully crafted statutory scheme with categorical restrictions on access to immigration benefits that have no basis in the law.

Next, the policies are also arbitrary and capricious. USCIS provided no explanation of its reasoning beyond vague invocations of national security. Nor did it consider important parts of the problem such as the predictable harms the policies are inflicting on immigrant communities or the reliance interests of immigrants. And the agency did not consider alternative policies, including, for example, obvious options such as simply instituting new screening measures as part of the adjudication process. Indeed, the extraordinarily sparse administrative records show that USCIS, in enacting these policies, hardly considered anything at all.

Even if USCIS had given these issues the full consideration that the APA requires, the Challenged Policies would still not withstand arbitrary-and-capricious review because the basis for the policies is facially implausible insofar as restricting access to immigration benefits for people who are already in the country—some of whom have lawfully lived here for years—does nothing to serve national security. And the basis for the policies is also pretextual because the public record proves that their motivation was nothing other than unadulterated anti-immigrant animus.

Finally, the Challenged Policies failed to follow notice-and-comment procedures. The APA requires notice and comment here because the Challenged Policies contravene regulatory provisions that have the force of law. And the policies

3

impose new categorial rules mandating how USCIS personnel should exercise discretion going forward. The enactment of these sorts of binding norms is a telltale sign of a legislative rule that requires notice and comment.

For largely these reasons, three district courts have already held that the Benefits Hold violates the APA. *See Doe v. USCIS,* No. 26-cv-2389, ECF No. 33 (N.D. Ill. Mar. 26, 2026); *Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624 (D. Mass. Feb. 27, 2026); *Varniab v. Edlow*, No. 25-cv-10602, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026). This Court should follow their lead, grant Plaintiffs summary judgment, vacate all four of the Challenged Policies, and enter a permanent injunction prohibiting the issuance or enforcement of any similar policy.

## FACTUAL AND LEGAL BACKGROUND

### I.    USCIS Is the Federal Agency Responsible for Processing Requests for Immigration Benefits.

Congress charged USCIS with processing and adjudicating requests for immigration benefits. *See* 6 U.S.C. § 271. The term "immigration benefits" refers to the classifications, statuses, and authorizations established by Congress under federal immigration law. *See* USCIS Policy Manual, vol. 1, pt. B, ch. 1, https://perma.cc/8LJ5-BGP5 (last updated Feb. 3, 2026) ("Policy Manual"). The immigration benefits that USCIS adjudicates include, for example, applications for naturalization, to adjust status to lawful permanent residence, for work authorization, for asylum, and for temporary protected status. *Id.*

4

### A.    USCIS Must Adjudicate Requests for Immigration Benefits Using the Criteria Prescribed by Congress.

Congress has obligated USCIS to process and adjudicate many requests for immigration benefits. *E.g.*, 8 U.S.C. § 1446(d) (USCIS "shall" adjudicate naturalization applications); *id.* § 1158(d)(5)(A) (USCIS "shall" adjudicate asylum applications). Additionally, USCIS must complete many adjudications within timeframes Congress has specified. *E.g.*, *id.* § 1447(b) (120 days after the interview to adjudicate naturalization applications); *id.* § 1158(d)(5)(A)(iii) (180 days to adjudicate asylum applications); *see also id.* § 1571(b) (establishing "[p]olicy" that "the processing of an immigration benefit application should be completed no later than 180 days after the initial filing of the application").

Congress has also specified criteria governing eligibility and ineligibility for immigration benefits. For example, USCIS must determine "good moral character" before granting naturalization, *id.* §§ 1427(a)(d), 1101(f), and it cannot grant asylum to any applicant it reasonably believes presents a danger to the United States, *id.* § 1158(b)(2)(A). Congress has prescribed a wealth of other criteria that render an applicant ineligible for benefits, *e.g.*, *id.* § 1182. And it has directed the Executive Branch to promulgate regulations to establish certain additional standards and processes governing benefits adjudications. *See, e.g.*, *id.* §§ 1182, 1255(a).

Some of the immigration benefits USCIS adjudicates are non-discretionary and must be granted if the statutory eligibility requirements are satisfied. These include applications for naturalization and petitions for immigrant visas. *See* Policy

5

Manual, vol. 1, pt. E, ch. 8. For other benefits, USCIS may exercise discretion to deny the request even if the applicant is otherwise eligible  for the benefit. *See id.*

USCIS adjudicates discretionary benefits according to the processes outlined in its Policy Manual. *See id.* When USCIS considers whether to exercise discretion to grant a benefit, it is required to conduct an individualized assessment of the applicant based on the totality of the circumstances. *Id.* The Policy Manual lists several applicant-specific factors that may be relevant to the discretionary analysis, including, but not limited to, the applicant's ties to family members in the United States, the duration of the applicant's lawful residence in the United States, the applicant's character and conduct, history of employment, and history of paying taxes. *Id.; see also Matter of Marin*, 16 I. & N. Dec. 581, 584 (BIA 1978).

When adjudicating benefits applications, USCIS conducts security screenings and background checks on the applicants to determine their eligibility and suitability. 8 C.F.R. § 1003.47; *see* USCIS Policy Manual, vol. 1, pt. C, ch. 1. These background checks are extensive. *See* DHS, Privacy Impact Assessment for Immigration Benefits Background Check System (Nov. 5, 2010), https://perma.cc/XX89-KE79.

### B.    Affirmative Asylum Is One of the Core Humanitarian Benefits Adjudicated by USCIS.

Noncitizens in the United States may apply to USCIS for affirmative asylum, which, if granted, provides legal status to people who credibly fear persecution in their country of nationality or last residence. *See generally* Andorra Bruno, Cong. Rsch. Serv., R48249, What Is Affirmative Asylum? (Oct. 24, 2024), https://perma.cc/ZZ9B-MCPK. Affirmative asylum is distinct from defensive asylum,

which is raised in removal proceedings and is adjudicated by the Executive Office of Immigration Review, not USCIS. *Id.*

To qualify for affirmative asylum, the applicant must demonstrate a well-founded fear of persecution in their country on account of their race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1158(b)(1). Additionally, the applicant must already be in the United States and generally may not be in removal proceedings. *Id.* Applicants must satisfy an array of stringent statutory requirements for eligibility and ineligibility that tie to governmental interests in domestic safety and security. *E.g.*, *id.* § 1158(b)(2). USCIS may impose additional conditions or limitations rendering someone ineligible for asylum, *id.* § 1158(b)(2)(C), and specify the process for considering an application for asylum, *id.* § 1158(d)(1)—but, if it does either, it must do so "by regulation," *id.* §§ 1158(b)(2)(C), 1158(d)(5)(B).

While an asylum application is pending, the applicant is eligible to apply to USCIS for employment authorization, which allows the applicant to work in the United States while awaiting a determination on their asylum application. *Id.* § 1158(d)(2); 8 CFR § 274a.12(c)(8). Once granted asylum, the asylee has a path to obtaining a green card and eventually citizenship. After one year of lawful presence in the United States, an asylee may become a lawful permanent resident. 8 U.S.C. § 1159(b). After at least five years of continuous residence as a lawful permanent resident, the former asylee may apply for and obtain U.S. citizenship. *Id.* § 1427(a).

7

**II.    President Trump Enacts an Entry Ban Barring People from Thirty-Nine Countries from Entering the United States.**

During the 2024 election, Donald Trump vowed to stop immigrants from "poisoning the blood" of the country. Maggie Astor, *Trump Doubles Down on Migrants 'Poisoning' the Country*, N.Y. Times (Mar. 17, 2024), https://perma.cc/X9VN-UPTS. As part of that promise, he pledged to restore the entry restrictions he had imposed during his first administration, which barred people from seven majority-Muslim countries from entering the United States and suspended admission of refugees, *see* Exec. Order No. 13769, 82 Fed. Reg. 8977 (2017). Trump said that, if reelected, he would make the entry ban "even bigger than before and much stronger than before." Kathryn Watson, *Trump Says He'd Bring Back 'Travel Ban' that's 'Even Bigger than Before'*, CBS News (July 7, 2023), https://perma.cc/E885-NCYR.

Upon returning to power, President Trump did exactly that. On the first day of his second term, he directed his cabinet to compile a list of countries to include in a new entry ban. Exec. Order 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025). President Trump then issued a proclamation barring nationals from nineteen countries from entering the United States. Proclamation No. 10949, 90 Fed. Reg. 24497 (June 4, 2025). President Trump later issued a second proclamation expanding the list of countries subject to the ban to thirty-nine. Proclamation. No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025). The countries subject to the Entry Ban are predominantly non-white, non-European and majority-Muslim countries. *See* Margy O'Herron, et al., *Expert Brief: New Entry Bans, Same Faulty Reasoning,* Brennan Center for Justice (Dec. 19, 2025), https://perma.cc/7VVL-J6YP; *Trump's 2025 Travel Ban: Who Is*

8

*Affected and What Could It Cost the U.S. Economy*, American Immigration Council (Aug. 6, 2026), https://perma.cc/P92V-V6YJ.

The President issued the Entry Ban pursuant to a provision of the INA, codified at 8 U.S.C. § 1182(f), that authorizes the President to temporarily restrict noncitizens from entering the country if allowing entry "would be detrimental to the interests of the United States." The Entry Ban's stated purpose is to protect U.S. citizens from noncitizens "who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." 90 Fed. Reg. at 24497-98. The President purportedly determined which countries would be subject to the ban by looking to each country's "screening and vetting capabilities, information sharing policies," and "whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals." *Id.*

But the President's true motivations are no secret. He has described the Entry Ban as "a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia, and many other countries." Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025), https://perma.cc/2ES3-BCYU. And he called the countries subject to the ban "shithole countries," wondering aloud, "Why can't we have some people from Norway, Sweden, just a few?" *Id.*

9

**III.     Following an Isolated Shooting, President Trump Promises to Force "Reverse Migration."**

On November 26, 2025, a tragic shooting occurred near the White House. Francesca Regalado, et al., *What We Know About the Shooting of National Guard Troops in Washington*, N.Y. Times (Nov. 26, 2025), https://perma.cc/4ZVZ-3576. A man experiencing mental illness traveled to Washington, D.C. and shot two members of the National Guard, killing one. *Id.*  The alleged perpetrator is an Afghan national who was granted asylum in 2025 after supporting U.S. troops in Afghanistan. *Id.*

President Trump immediately blamed the shooting on immigrants. Shortly after the shooting, he reposted Secretary of Homeland Security Kristi Noem describing immigrants as "killers, leeches, and entitlement junkies." @realDonaldTrump, Truth Social (Dec. 1, 2025, 9:36 PM), https://perma.cc/P9V8-WZG7. The post went on to describe immigrants as "foreign invaders" who want "to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS," and concluded, "WE DON'T WANT THEM. NOT ONE." *Id.*

On the same day, President Trump reposted a video of a congressman saying that "[t]here are some people who will never assimilate into this country whether it is because of cultural irregularities or their refusal to submit to Western values. We should not insist on bringing those people into the country." @realDonaldTrump, Truth Social (Dec. 1, 2025, 11:27 PM), https://perma.cc/S687-XY8A. The congressman continued, "There are tens of thousands of people in the country right now if not more than that who are going to commit harms on the American people." *Id.*

10

In response to the shooting, President Trump vowed he would purge the country of immigrants from disfavored countries. In a Thanksgiving Day missive, he promised to "permanently pause migration from all Third World Countries" and to "remove anyone who is not a net asset to the United States, or is incapable of loving our [c]ountry." @realDonaldTrump, Truth Social (Nov. 27, 2025, 11:26 PM), https://perma.cc/NRV3-MZDJ. He also said that he would "end all Federal benefits and subsidies to noncitizens of our Country, denaturalize migrants who undermine domestic tranquility, and deport any Foreign National who is a public charge, security risk, or non-compatible with Western Civilization." *Id.*

President Trump ended his holiday message with, "Only REVERSE MIGRATION can fully cure this situation. Other than that, HAPPY THANKSGIVING TO ALL, except those that hate, steal, murder, and destroy everything that America stands for — You won't be here for long!" *Id.* When a reporter asked him what he meant by "reverse migration," President Trump responded, "it means get people out that are in our country. Get them out of here. We have a lot of people in our country who shouldn't be here." @realDonaldTrump, Truth Social (Dec. 1, 2025, 10:29 PM), https://perma.cc/3J9H-TWVS.

## IV. USCIS Adopts the Challenged Policies Severely Restricting Access to Immigration Benefits.

Consistent with President Trump's goal of making life in the United States so unbearable for noncitizens that they are forced to leave, USCIS issued the policies that are the subject of this lawsuit. The first memorandum ("November Memorandum") announced revisions to the Policy Manual directing USCIS personnel

11

to discriminate against people from Entry Ban and other disfavored countries when adjudicating discretionary benefits. *See* USCIS, PA-2025-26, Policy Alert: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits (Nov. 27, 2025) ("Nov. Mem."), PA-2025-26 Administrative Record, ECF No. 16-1 at 72–73. The second memorandum ("December Memorandum") announced three additional policies, including an indefinite hold on asylum adjudications, an indefinite hold on all benefits adjudications for people from Entry Ban countries, and a directive that certain past benefits granted to people from Entry Ban countries be reconsidered. *See* USCIS, PM-602-0192, Policy Memorandum: Hold and Review of All Pending Asylum Applications and All USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025) ("Dec. Mem."), PM-602-0192 Administrative Record, ECF No. 16-2 ("Dec. CAR") at 1–4. Finally, the third memorandum ("January Memorandum") extended the Benefits Hold and Comprehensive Re-Review Policy to people from the twenty additional countries that were added to the Entry Ban. *See* USCIS, PM-602-0194, Policy Memorandum: Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries (Jan. 1, 2026) ("Jan. Mem."), PM-602-0194 Administrative Record, ECF No. 16-3 at 45–49.

As explained below, these four policies severely restrict the ability of noncitizens from Entry Ban countries to secure and retain legal status, employment authorization, and other important immigration benefits Congress created to enable noncitizens to live and work in the country.

### A.    The Global Asylum Hold Indefinitely Halts All Affirmative Asylum Adjudications.

Under the Global Asylum Hold, USCIS has indefinitely halted all adjudications of affirmative asylum applications regardless of the applicant's country of origin, the severity of the persecution the applicant faces, or when they entered the country. Specifically, the December Memorandum "directs" USCIS personnel to "[p]lace a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review." Dec. Mem. at 1. The Memorandum does not allow USCIS personnel to adjudicate applications that meet the eligibility requirements, even if required by court order: "Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director." *Id.* at 3.[1]

In issuing the Global Asylum Hold, USCIS stated that the agency aims to "prioritize the safety of the American people," citing the shooting in Washington and another incident in which an Afghan allegedly conspired to commit a terrorist attack on Election Day 2024. Dec. Mem. at 2. The December Memorandum claims that the crimes show "what a lack of screening, vetting, and prioritizing expedient

---

[1] Recent media reports indicate that USCIS may have narrowed (or is considering narrowing) the Global Asylum Hold so that it halts asylum adjudications only for people from countries subject to the Entry Ban. *See* Camilo Montoya-Galvez, *Trump Administration Scaling Back Asylum Crackdown Enacted After D.C. National Guard Shooting, Sources Say*, CBS News (Mar. 30, 2026), https://perma.cc/6HKQ-J24F. However, USCIS has not published any new policy memorandum revising or rescinding the Global Asylum Hold. Whether the Global Asylum Hold applies to all countries, only the countries subject to the Entry Ban, or some other subset of countries, it is unlawful for all of the reasons stated herein.

adjudications can do to the American people," *id.,* but cites no evidence that lack of screening or vetting contributed to either crime. The December Memorandum provides no further policy rationale for the Global Asylum Hold, nor does it explain the legal basis for the blanket adjudicative hold.

The Global Asylum Hold is indefinite. The December Memorandum states that the policy will remain in place pending a "comprehensive review," but it does not explain what that comprehensive review will entail or how long it will last. *Id.* The memorandum represents that USCIS will undertake certain additional background checks to determine asylum eligibility, but it does not explain why the implementation of these additional vetting measures requires halting all asylum adjudications or how long the implementation of the vetting measures will take. *Id.* Accordingly, the Global Asylum Hold has indefinitely halted asylum adjudications, and no asylum seeker is able to secure an asylum determination from USCIS.

### B.     The Benefits Hold Indefinitely Halts Benefits Adjudications for People from Countries Subject to the Entry Ban.

Under the Benefits Hold, USCIS has indefinitely halted all adjudications of requests for immigration benefits submitted by people from the thirty-nine countries subject to the Entry Ban. Specifically, the December Memorandum "directs" USCIS personnel to "[p]lace a hold on pending benefits requests for aliens from countries listed in" the Entry Ban "pending a comprehensive review, regardless of entry date." Dec. Mem. at 1. This sweeping directive replaces Congress's scheme of individualized immigration benefit adjudications with a blanket suspension of adjudications whenever the applicant is from one of the countries subject to the Entry Ban and

14

without regard to how long the applicant has lived in the United States. As a result, anyone from an Entry Ban country can no longer naturalize, obtain a green card or a work permit, or secure any other immigration benefit.

As with the Global Asylum Hold, the Benefits Hold is indefinite. Jan. Mem. at 3. Individual USCIS personnel do not have authority to adjudicate benefit applications for people from Entry Ban countries, even if the applicant is otherwise eligible, even if the adjudication is required by a court order, and regardless of how long ago the applicant entered the country. *Id.* at 3. And USCIS gave no explanation for the Benefits Hold beyond cursory references to two crimes allegedly committed by people from Afghanistan and the purported need for additional screening. *Id.* at 2.

**C.      The Comprehensive Re-Review Policy Requires Reconsideration of Previously Granted Benefits.**

The Comprehensive Re-Review Policy calls for USCIS to reconsider certain benefit requests previously granted to noncitizens from Entry Ban countries. Specifically, the December Memorandum directs USCIS personnel to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in" the Entry Ban "who entered the United States on or after January 20, 2021." Dec. Mem. at 1. The memorandum explains that noncitizens from Entry Ban countries will "undergo a thorough re-review process … to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." *Id.*

The December Memorandum does not explain what procedures or standards USCIS will apply in conducting the re-review or how it will decide whether to revoke,

15

rescind, or terminate any given benefit. Nor does it explain how long the re-review will take or what process, if any, will be afforded to those affected. The Memorandum offers no explanation for the policy beyond brief references to national-security and provides no legal justification for a sweeping reconsideration of immigration benefits that have already been adjudicated and granted.

**D.    The County-Specific Factors Policy Updates the USCIS Policy Manual to Require Country-of-Origin Discrimination.**

Under the Country-Specific Factors Policy, USCIS has revised its Policy Manual to instruct USCIS personnel to discriminate on the basis of country of origin. The November Memorandum, which announced the policy, states that USCIS will now consider "any relevant country-specific factors such as those specified in [the Entry Ban] as significant negative factors in the adjudication of discretionary benefit requests." Nov. Mem. at 73. The revisions explain that while the Entry Ban's "categorical ineligibility for entry or admission does not apply" to benefits adjudications, USCIS will now consider the same "country-specific facts and circumstances" discussed in the Entry Ban as "a significant negative factor when … weighing discretion." Policy Manual, vol. 1, pt. E, ch. 8.

The Entry Ban itself purports to identify a variety of "country-specific risk factors," including whether the "country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals," as well as "each country's screening and vetting capabilities, [and] information-sharing policies." 90 Fed. Reg. at 59720. In enacting the Entry Ban, the President has already asserted that these factors are present for the thirty-nine

16

included countries. *Id.* Accordingly, the Country-Specific Factors Policy effectively directs USCIS personnel to consider being from an Entry Ban country as a significant negative factor when adjudicating discretionary benefits. But the impact of the Country-Specific Factors Policy is not limited to people from Entry Ban countries. Under the policy, USCIS will hold country-specific factors against an applicant both when the "country-specific risk factors" delineated in the Entry Ban have already been found and when USCIS personnel make that determination on their own. *See* Policy Manual, vol. 1, pt. E, ch. 8.

In short, the Country-Specific Factors Policy gives USCIS personnel freewheeling discretion to discriminate on the basis of country of origin, requiring them to discriminate against applicants from Entry Ban countries and also allowing them to discriminate against applicants from other disfavored countries. USCIS never explained its reasons or legal justification for barring people from receiving immigration benefits solely on the basis of their country of origin.

## V.   Plaintiffs Filed This Lawsuit to Redress the Severe Harms Caused by the Challenged Policies.

Plaintiffs are a coalition of nonprofit organizations that represent and serve immigrant communities around the country. Plaintiffs include Dorcas International Institute of Rhode Island ("Dorcas International"), Refugee Dream Center ("RDC"), Service Employees International Union ("SEIU"), United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), African Communities Together ("ACT"), Venezuelan Association of Massachusetts ("VAM"), Partnership for the Advancement of New Americans ("PANA"), and American Gateways.

17

The Challenged Policies have profoundly harmed the immigrant communities Plaintiffs represent and serve. Some of Plaintiffs' clients and members were on the verge of becoming U.S. citizens when the government abruptly canceled their naturalization ceremonies. *E.g.*, Sique Decl. ¶ 26; Yang Decl. ¶¶ 14, 41–43. Some are unable to obtain asylum, lawful permanent residence, or other legal status. *E.g.*, Sique Decl. ¶¶ 23–26; Medina Neuman Decl. ¶¶ 21, 24, 29–30, 40; Yang Decl. ¶¶ 14, 18–19. Velasquez Decl. ¶¶ 14, 16–17; Kassa Decl. ¶ 12; Sahid Decl. ¶ 17. Others have lost their jobs and are unable to care for their families. *E.g.*, Sique Decl. ¶¶ 24–25; Bah Decl. ¶¶ 29-30, 36; Medina Neuman Decl. ¶¶ 24, 43; Velasquez Decl. ¶¶ 15–16. Yet others face the loss of their legal status and possible removal. *E.g.*, Yang Decl. ¶ 34; Sahid Decl. ¶ 18.  And Many have suffered severe trauma and emotional distress. *E.g.*, Medina Neuman Decl. ¶¶ 23–42; Yang Decl. ¶¶ 33-35; Velasquez Decl. ¶¶ 18–19.

## LEGAL STANDARD

Generally, summary judgment "is appropriate when 'there is no genuine dispute as to any material fact.'" *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quotation omitted). However, "the summary judgment rubric has a 'special twist in the administrative law context.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc'd Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). A motion for summary judgment on a claim under the Administrative Procedure Act (APA) "is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to

18

determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Id.*

## ARGUMENT

### I.    Plaintiffs Have Article III Standing.

Every Plaintiff has satisfied the requirements of Article III, and so long as "at least one plaintiff has standing, the suit may proceed." *Capen v. Campbell*, 134 F.4th 660, 668 (1st Cir. 2025) (quotation omitted). To establish Article III standing, a plaintiff must demonstrate (1) "an injury in fact," (2) "a causal connection between the injury and the conduct complained of, and" (3) "a like[lihood] that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified). To establish standing, an organization "can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quotation omitted).

#### A.    Plaintiffs Have Suffered Injury in Fact.

##### 1.    Dorcas International, RDC, and American Gateways Have Standing in Their Own Right.

Dorcas International, RDC, and American Gateways each have standing because the Challenged Policies "directly affect[] and interfere[] with" their "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). An organization establishes injury when the defendant's actions cause a "'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Louis v. Saferent Sols., LLC,*

19

685 F. Supp. 3d 19, 32 (D. Mass. 2023) (quotation omitted). Dorcas International, RDC, and American Gateways have suffered these types of injuries.

**Dorcas International.** Dorcas International has standing in its own right because the Challenged Policies directly impair the day-to-day operation of its core programs, which include providing legal representation and social services. Sique Decl. ¶¶ 6–7. Dorcas International's mission is to help immigrants navigate the immigration system, obtain legal status, and achieve self-sufficiency. *Id.* ¶¶ 6, 40. It pursues this mission, in part, through its Citizenship & Immigration Services program, which provides low-cost legal representation to noncitizens on a wide array of immigration-related matters, including assisting with applications for naturalization, adjustment of status, asylum, and other benefits. *Id.* ¶¶ 8–11.

The Challenged Policies directly interfere with this work. The Global Asylum Hold and Benefits Hold have made it impossible for Dorcas International to bring asylum and other benefits applications to final resolution. *Id.* ¶¶ 20–21, 23–26, 29. The two adjudicative holds have resulted in an ever-growing backlog of cases, in which Dorcas International's staff must continue to invest time and resources preparing and monitoring without any prospect of resolution. *Id.* ¶¶ 21, 24–28. This swelling backlog is unsustainable and is straining the organization's ability to take on new clients and to continue to serve existing clients. *Id.* ¶¶ 21, 27–30. Additionally, the Benefits Hold has resulted in some of Dorcas International's clients losing their jobs, and others face the prospect of losing employment in the immediate future. *Id.* ¶¶ 23–28. The loss of employment eligibility has made it impossible for Dorcas

20

International's staff to provide effective job training and job placement services and affected the organization's work helping its clients achieve self-sufficiency. *Id.* ¶¶ 28–30, 46.

Likewise, the Comprehensive Re-Review interferes with Dorcas International's core activities. Dorcas International has obtained citizenship, green cards, asylum, and other immigration benefits for approximately 365 clients who entered the United States during the Biden Administration and are from countries subject to the Entry Ban. *Id.* ¶ 31. The possibility that these benefits could be revoked has been traumatizing for Dorcas International's clients and made it more difficult to help them plan for their futures, pursue employment, and invest in education. *Id.* ¶¶ 33–35. As a result, the policy has had a direct impact on Dorcas International's core education, employment, and refugee resettlement programs. *Id.* ¶¶ 34 –35.

Finally, the Country-Specific Factors Policy erects a new obstacle to the discretionary benefits applications that form a core part of Dorcas International's legal practice. *Id.* ¶¶ 36, 38–41. In 2025, Dorcas International filed more than 1,000 applications for discretionary benefits, including applications for employment authorization and adjustment of status. *Id.* at 37. By imposing a country-of-origin penalty on discretionary adjudications, the Country-Specific Factors policy has made it more difficult for Dorcas International to achieve successful immigration outcomes for its clients and has required the organization to expend additional time and resources advocating for its clients and counseling them on the new adjudicatory framework. *Id.* at 36, 38–41.

**Refugee Dream Center.** RDC likewise has standing in its own right because the Challenged Policies directly disrupts its core programming. RDC is a nonprofit created by refugees, for refugees, that provides immigration support and other social services. Bah Decl. ¶¶ 5–7. Approximately 88% of RDC's clients are from one of the thirty-nine countries targeted by the Challenged Policies. *Id.* ¶ 18.

The Challenged Policies have interfered with virtually every one of RDC's core programs. As a result of the Global Asylum Hold, at least 200 of RDC's clients have asylum applications that are indefinitely frozen, all of whom fear persecution if returned to their home countries. *Id.* ¶ 24. Another 400 of RDC's clients are directly affected by the Benefits Hold, many of whom have pending applications for adjustment of status, employment authorization, and other benefits that are indefinitely stalled. *Id.* ¶¶ 28, 30–33. As a result, RDC's clients are confused and uncertain about their futures, RDC staff are swamped with resulting requests for assistance, and RDC is required to address these immediate needs by diverting resources away from other work. *Id.* ¶¶ 22, 27, 29, 34, 39, 45, 50, 53. Additionally, the Global Asylum Hold and Benefits Hold have left many of RDC's clients without work authorization, which has made it impossible for the organization to provide effective job training and job placement services. *Id.* ¶¶ 26–27, 29–30. And as a result of the adjudicative holds, many of RDC's clients face severe economic insecurity, which has strained the organization's food pantry and basic-needs services. *Id.* ¶ 36.

Likewise, the Comprehensive Re-Review Policy threatens approximately 500 of RDC's clients who received immigration benefits from 2021 to 2025, and has

22

resulted in enormous fear, anxiety, and uncertainty. *Id.* ¶¶ 37–38. The policy forced RDC to divert resources to providing counseling, referrals, and other support, leaving the organization with fewer resources to provide core services. *Id.* ¶¶ 39–41. For example, RDC's immigration lawyers have been forced to provide pro bono and reduced-fee legal services to RDC clients who are at risk of having their legal status revoked. *Id.* ¶ 40. These lawyers otherwise could have spent more time assisting RDC clients with other legal needs in furtherance of RDC's programming. *Id.* Moreover, not only has the Comprehensive Re-Review Policy forced RDC to divert resources to respond to emergent needs, it has also made the RDC's existing work more challenging. *Id.* ¶ 41. RDC clients who fear loss of legal status are less likely to make long-term decisions with regard to employment, housing, and education, undermining RDC's job training, financial literacy and related programming. *Id.*

Finally, the Country-Specific Factors Policy directly interferes with RDC's legal services work by making it more difficult for RDC to secure adjustment of status, employment authorization, asylum, and other immigration benefits because almost all of its clients will now have their country of origin counted as a significant negative discretionary factor. *Id.* ¶¶ 42–44. In some cases, RDC's clients have even been discouraged from applying for immigration benefits to which they would otherwise be entitled because of the Country-Specific Factors Policy. *Id.* ¶ 45. And as a result of the confusion the policy has created, RDC has also been required to divert resources to counseling affected community members. *Id.*

23

Cumulatively, the Challenged Policies have had a measurable impact on RDC's ability to do its core work. RDC estimates that approximately 330 staff hours per week are now devoted to immigration counseling and support that otherwise would not have been necessary. *Id.* ¶ 51. Indeed, all RDC staff are overwhelmed, as they have been pulled away from their responsibilities to respond to the cascading crises created by the Challenged Policies. *Id.* ¶¶ 22, 51–53. RDC has been forced to hire an additional staff member to help respond to the increased volume of immigration-related inquiries and had to do so using funds that otherwise would have been used to provide direct assistance to the refugee community in Rhode Island. *Id.* ¶ 50.

**American Gateways.** American Gateways provides legal representation, advocacy, and education services to low-income noncitizens and their families in central Texas. Yang Decl. ¶¶ 5–8. Its core activities include representing individuals seeking affirmative immigration relief from USCIS. *Id.* ¶ 8. The Global Asylum Hold and Benefits Hold have resulted in American Gateways' clients' pending benefits applications being indefinitely stalled. *Id.* ¶ 14. The organization has clients who are unable to secure asylum, adjustment of status, naturalization, and important benefits because of the adjudicative holds. *Id.* ¶¶ 14–43. As a result, it has been forced to devote additional staff resources to explaining the adjudicative holds to its clients and to continue monitoring and working cases while final adjudications are being withheld, all of which ultimately results in the organization being able to take on fewer new clients and damage to staff morale. *Id.* ¶¶ 14, 17, 20–23, 27–28, 35–38, 43. For instance, American Gateways staff are required to continually update paused

24

asylum applications with current information about the conditions in their clients' home countries. *Id.* ¶ 16. Additionally, many of American Gateways' clients have lost their jobs because the adjudicative holds prevent them from obtaining work authorizations, which has resulted in American Gateways' having to spend additional resources supporting clients who now face financial distress. *Id.* ¶¶ 20–21.

The other policies have had a similar impact on American Gateways' activities. For instance, the Comprehensive Re-Review Process will require American Gateways to re-open closed client files and dedicate significant staff resources to assist clients through the re-review process. *Id.* ¶ 44. And the policies cumulatively, including the Country-Specific Factors Policy, have required the organization to spend significant additional time supporting clients and monitoring their cases, frustrated the organization's ability to bring cases to resolution, and prevented the organization from bringing new cases. *Id.* ¶¶ 45–51.

### 2. SEIU, UAW, VAM, ACT, and PANA Have Associational Standing.

The remaining Plaintiffs each satisfy the three-part test for associational standing under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). To begin, each organization has at least one member who would have standing to sue in his or her own right.

**SEIU** has members who would have standing to sue in their own right, including: (1) a physician with a pending asylum application who was two weeks away from receiving a decision before the Global Asylum Hold went into effect and who now had to drop out of his medical residency because he is unable to secure work

25

authorization; (2) two physicians with pending applications to waive the requirement of their J-1 visas that they return to their home countries and who will not be able to practice medicine if their waiver applications are not adjudicated; and (3) a physician with a pending application for an H-1B visa who will be forced out of her residency program without an adjudication. Medina Neuman Decl. ¶¶ 23–42.

**UAW** has members who would have standing to sue in their own right including: (1) a neuroscientist from Iran with pending applications for adjustment of status, travel documents, and employment authorization, none of which have been adjudicated; and (2) a postdoctoral researcher in biomedical imaging with a pending application for an employment-based visa and whose wife is seeking to renew her employment authorization, both of whom require USCIS adjudications to continue to work in the country. Sweeney Decl. ¶¶ 11–14.

**VAM** has members who would have standing to sue in their own right including: (1) a Venezuelan man with a pending adjustment of status application who will lose his job if unable to receive an adjudication; (2) a Venezuelan father seeking asylum who is unable to renew his employment authorization and will lose his job, and his ability to care for his family of four, if the authorization is not quickly renewed; (3) a Venezuelan asylee who is unable to adjust status and unable to secure employment authorization; (4) a Cuban who is unable to adjust status; and (5) a Cuban who is unable to adjust status or secure employment authorization and, as a result, has lost her job, taken on debt, and been evicted. Velasquez Decl. ¶¶ 14–19.

26

**ACT** has members who would have standing to sue in their own right, including: (1) a person from Sudan who is unable to secure asylum, travel documents or work authorization; (2) a person from Sudan who is eligible to become a U.S. citizen but has had her naturalization interview canceled; and (3) a person from Côte d'Ivoire who is unable to renew her DACA status, unable to work, and unable to care for her son with autism. Kassa Decl. ¶¶ 10–19.

**PANA** has members who would have standing to sue in their own right, including: (1) a nineteen year-old from Somalia who is unable to obtain asylum or Special Juvenile Immigrant Status and fears removal, (2) an Afghan national who served with American forces and applied for his family to become lawful permanent residents but is unable to receive an adjudication; (3) an Afghan national who is separated from his daughter in Afghanistan because he has been denied an adjudication on his application for humanitarian parole to allow her to join him in this country; (4) a man from Sudan and is unable to obtain an adjudication of his application for asylum; (5) an asylee from Afghanistan who is unable to adjust to lawful permanent resident status and unable to secure immigrant visas for his children; and (6) a man from Somalia who is unable to adjust status or to obtain travel documents to visit his family. Sahid Decl. ¶¶ 16–26.

SEIU, UAW, VAM, ACT, and PANA satisfy the remaining prongs of the associational standing test. First, the interests this suit seeks to vindicate are central to the purposes for which these organizations were formed. Broadly speaking, these organizations exist to assist their members in the immigration process as well as to

27

protect their interests, dignity, and working conditions. This lawsuit's aim of protecting noncitizens' ability to live and work in this country is squarely within their organizational purposes. Second, neither the claims asserted nor the relief requested requires the participation of individual members. Plaintiffs challenge agency actions under the APA and seek vacatur as well as declaratory and injunctive relief that would benefit all affected individuals without requiring individualized proof.

### B.   Plaintiffs' Injuries Are Caused by the Challenged Policies and Redressable by an Order of the Court.

In this case, causation is direct, and the requisite "causal connection between the injury and the conduct complained of," *Defs. of Wildlife*, 504 U.S. at 560, is straightforward. Defendants enacted the four Challenged Policies. Those policies have halted asylum adjudications, frozen benefits adjudications, directed the re-review of previously approved benefits, and required immigration officers to treat applicants' countries of origin as negative factors in discretionary determinations.

Redressability is equally straightforward. To establish that a favorable decision will redress the plaintiff's injury, the requested relief need only be likely to redress "at least some" of the plaintiff's injury. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025). Here, Plaintiffs seek a declaration that the Challenged Policies are unlawful, vacatur of those policies under the APA, and an injunction barring issuance or enforcement of any similar policy. This relief would restore the status quo ante and redress Plaintiff's injuries caused by the Challenged Policies.

28

## II.    The Challenged Policies Are Final Agency Action.

The Challenged Policies are reviewable under the APA because they are "final agency action." 5 U.S.C. § 704. The "APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citation modified). To honor that presumption, "[c]ourts are to apply the 'finality' requirement in a 'flexible' and pragmatic' fashion." *Rhode Island v. Trump,* No. 1:25-cv-128-JJM-AEM, 2025 WL 3251113, at *302 (D.R.I. Nov. 21, 2025). To be considered "final," an agency action must: (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) "be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Three courts have already applied the two-part test from *Bennett* to the Benefits Hold and concluded that it constitutes final agency action. *See Bowser*, 2026 WL 555624, at *5; *Varniab*, 2026 WL 485490, at *16–18; *Doe,* No. 26-cv-2389, ECF No. 33 at 5–6. That conclusion is correct not only as to the Benefits Hold but as to all four of the Challenged Policies.

First, the Challenged Policies mark the consummation of USCIS's decisionmaking. All four policies have been announced through the issuance of formal agency memoranda, and implementation of the policies is underway. Moreover, all of the policies were made "[e]ffective immediately." Jan. Mem. at 1; Dec. Mem. at 1; Nov. Mem. at 1. And the policies will remain in effect indefinitely unless they are formally rescinded by the agency. *E.g.*, Jan. Mem. at 3. The agency's decisionmaking process has thus come to an end and the first prong of the final agency action test is satisfied.

29

That conclusion is not disturbed by the fact USCIS might someday decide to modify or rescind any of the Challenged Policies. An "agency cannot exempt itself from APA review merely by labeling its policy [as] interim.'" *Oliveira v. Edlow,* No. 25-cv-13228, 2025 WL 3492110, at \*9 (D. Mass. Dec. 4, 2025) (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000)). As the D.C. Circuit has explained: "The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power*, 208 F.3d at 1022. In any event, it is well settled that "a temporary pause can qualify as a consummation of the agency's decisionmaking process." *New York v. Trump*, 811 F. Supp. 3d 215, 233 (D. Mass. 2025). Many "courts have concluded that an agency-imposed suspension of certain activities constitutes final agency action." *Id.* at 233 & n.8 (collecting cases); *see also Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D. Mass. 2025) (explaining that "significant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate" and collecting cases).

Second, the Challenged Policies also determine rights and obligations and are decisions from which legal consequences flow. That is because each of the Challenged Policies "altered the legal status quo" under which immigration benefits are adjudicated by USCIS. *New York*, 811 F. at 233 (quoting *Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 84 (1st Cir. 2016)). All of the Challenged Policies have direct and immediate legal consequences for noncitizens. For one, the Global Asylum Hold and Benefits Hold both deny noncitizens adjudications on requests for

immigration benefits, with the result that noncitizens are unable to obtain asylum, lawful permanent residence, naturalization, work permits, and other legal statuses. Likewise, the Comprehensive Re-Review subjects noncitizens from Entry Ban countries to a new legal process, obligating them to reestablish their eligibility for benefits they have already received and exposing them to the loss of those benefits. And the Country-Specific Factors Policy erects a barrier to securing discretionary immigration benefits for noncitizens from Entry Ban countries by requiring USCIS to discriminate on the basis of country of origin.

Numerous courts have held that agency actions that affect a noncitizen's immigration status or the benefits they are able to access constitute final agency action. *E.g.*, *Bowser*, 2026 WL 555624, at *6 (holding that the Benefits Hold is final agency action because it withholds immigration benefits including adjustment of status and employment authorization was final agency action); *Liu v. Noem*, 780 F. Supp. 3d 386, 401 (D.N.H. 2025) (holding that revocation of a student visa and resultant loss of employment authorization and status was final agency action); *Oliveira*, 2025 WL 3492110, at *10 (holding that a policy rendering some U visa applicants removable was final agency action). And the analysis under *Bennett*'s second prong does not change if one assumes the Challenged Policies are only temporary. Noncitizens subject to the policies are "trapped without recourse due to the indefinite postponement of agency action," and that alone is sufficient to show that legal consequences flow from these policies. *New York*, 811 F. at 234 (quoting *Connecticut v. Dep't of the Interior*, 363 F. Supp. 3d 45, 60 (D.D.C. 2019)).

## III.    The Challenged Policies Violate the APA.

The Challenged Policies violate the APA because: (1) they exceed USCIS's statutory authority and are contrary to law, (2) they are arbitrary and capricious, and (3) they were issued without following notice-and-comment procedures.

### A.    The Challenged Policies Exceed USCIS's Statutory Authority and Are Contrary to Law.

The Challenged Policies exceed USCIS's statutory authority and are contrary to law. *See* 5 U.S.C. § 706(2)(A), (C). The Challenged Policies (1) are not authorized by 8 U.S.C. § 1182(f) and (2) contravene various other provisions throughout the INA that prescribe in detail USCIS's obligations with regard to benefits adjudications.

1. To the extent USCIS invoked any statute as the basis for the Challenged Policies, it gestured toward Section 1182(f). But that provision does not authorize the policies. The December and January Memoranda, which announced the Global Asylum Hold, the Benefits Hold, and the Comprehensive Re-Review, both cite the President's authority under Section 1182(f) to "suspend or restrict the entry of any aliens deemed detrimental to U.S. interests" and explain that the Entry Ban was issued pursuant to this authority. Jan. Mem. at 1 n.1; Dec. Mem. at 1 n.1. The November Memorandum, which announced the Country-Specific Factors Policy, similarly notes the President's recent exercise of "his authority under INA 212(f)," which authorizes the President to, "by proclamation…suspend the entry of all aliens or any class of aliens…or impose on the entry of aliens any restrictions he may deem…appropriate." Nov. Mem. at 1. But none of the memoranda expressly rely on Section 1182(f) as the basis for the new policies.

32

That is likely because Section 1182(f) does not confer any authority on USCIS at all, much less authority to impose broad restrictions on the ability of noncitizens who are already in the country to secure and retain immigration benefits. The statute reads in relevant part:

> Whenever the President finds that the entry of any [noncitizens] or of any class of [noncitizens] into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). As the plain language of the statute makes clear, the statute authorizes *the President* to impose certain entry restrictions by Presidential Proclamation. It does not give USCIS any authority. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 80 (D.D.C. 2025) (rejecting the argument that "the President's authority under § 1182(f) is delegable to USCIS"). And in exercising that authority to issue the Entry Ban, the President did not purport to authorize the Challenged Policies or to delegate any authority to USCIS to enact any policies pertaining to the adjudication of immigration benefits, particularly to noncitizens already in the country. The two Presidential Proclamations enacting the Entry Ban are totally silent on the adjudication of immigration benefits.

Moreover, even if Section 1182(f) did confer some authority on USCIS, it does not support the Challenged Policies. The statute authorizes certain entry restrictions on noncitizens and nothing more. No language in the statute authorizes any restriction on noncitizens' ability to secure and obtain immigration benefits— particularly noncitizens who have already entered the country. That reading of the

33

statute is confirmed by *Trump v. Hawaii*, 585 U.S. 667 (2018), which extensively considered the scope of Section 1182(f) but never contemplated that it might do anything more than empower the President "to decide whether to suspend entry, whose entry to suspend, and for how long." *Id.* at 693.

A recent decision from a court in a neighboring district confirms that Section 1182(f) cannot support the Challenged Policies. In *President & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182 (D. Mass. 2025), Harvard University challenged a proclamation that prohibited noncitizens from entering the United States "to pursue a course of study at Harvard." *Id.* at 186. The court held that the proclamation was not authorized by Section 1182(f) because the proclamation was not concerned with who is allowed to enter but rather "what happens *after* the applicants enter." *Id.* at 194. The court explained that the purpose of section 1182(f) "is to regulate and influence conduct abroad, rather than at home." *Id.* at 196. Accordingly, the statute cannot authorize any policy where the "intent is not to restrict entry" but rather to effectuate domestic policy goals. *Id.* at 196; *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773–74 (9th Cir. 2018) ("The rule of decision, however, is not an exercise of the President's authority under § 1182(f) because it does not concern the *suspension* of entry…[but rather] imposes[a] penalty on aliens already present within our borders."); *Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 563 (N.D. Cal. 2020) ("Congress' delegation of authority in the immigration context under Section 1182(f) does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners.").

A broader reading of Section 1182(f) would not only contravene the statute's plain language but also run headlong into the Major Questions Doctrine. Under that doctrine, courts "'expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.'" *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 472 (D.R.I. 2025) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025). The Challenged Policies are of vast significance. They severely restrict the rights of noncitizens living in the country, rendering many unable to live or work here. Had Congress intended to give USCIS unbounded power to withhold benefits adjudications, rescind benefits, and deny benefits, for any reason it chooses, then Congress surely would have said so clearly. But Congress has not spoken clearly— not in Section 1182(f) and not elsewhere. In the absence of a "clear congressional authorization," the Challenged Policies are unlawful. *W. Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted).

Accordingly, USCIS did not have any valid authority to enact the Challenged Policies, and absent a valid statutory basis, the Challenged Policies violate the APA. *See Woonasquatucket*, 778 F. Supp. 3d at 472 ("It is well-established that an agency 'literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute.'" (quoting *FEC v. Cruz*, 596 U.S. 289, 301 (2022))). The Court should not supply a legal rationale for USCIS because an agency's actions can be upheld only on "the grounds invoked by the agency." *Calcutt v. FDIC*, 143 S. Ct. 1317, 1318 (2023) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

2. Next, the Challenged Policies contravene numerous provisions in the INA that specify how USCIS should conduct specific benefit adjudications. At minimum, the fact that Congress prescribed USCIS's adjudicative responsibilities in exacting detail provides strong evidence that Congress did not intend USCIS to have blanket authority to withhold, deny, or rescind immigration benefits for any reason it chooses.

The INA dictates many aspects of the benefit adjudication process. For one, the INA uses mandatory language to obligate USCIS to conduct certain adjudications. *E.g.*, 8 U.S.C. § 1446(d) (USCIS "shall" adjudicate naturalization applications); *id.* § 1158(d)(5)(A) (USCIS "shall" adjudicate asylum applications). The INA also specifies the amount of time the agency has to complete various adjudications. *E.g., id.* § 1447(b) (120 days to adjudicate naturalization applications following the naturalization interview*); id.* § 1158(d)(5)(A)(iii) (180 days to adjudicate asylum applications); *see also id.* § 1571(b) ("the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application"). And the INA dictates the criteria USCIS must use in determining whether an applicant is eligible for a benefit. *E.g., id.* § 1427(a) (eligibility criteria for naturalization*); id.* § 1158(b) (eligibility criteria for asylum). And the INA specifies conditions under which adjudications can be withheld and past adjudications can be reconsidered. *E.g., id.* § 1451 (conditions under which naturalization can be revoked*); id.* § 1158(c)(2) (conditions under which asylum can be terminated); *id.* § 1256(a) (conditions under which lawful permanent residence can be rescinded).

36

The Challenged Policies wantonly disregard these statutory requirements. USCIS's assertion of authority to withhold adjudications, deny immigration benefits, or rescind benefits for any reason the agency chooses flouts the INA, which carefully circumscribes the circumstances under which benefits can be withheld, denied, or rescinded. And the detailed and prescriptive nature of the statutory regime shows that Congress did not intend to give USCIS authority to enact the withhold adjudications wholesale or enact other blanket restrictions on access to immigration benefits. Had Congress intended to give USCIS that sweeping authority, it surely would have said so. *See* supra at p. 35.

### B.    The Challenged Policies Are Arbitrary and Capricious

The Challenged Policies violate the APA because they are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). USCIS (1) did not offer any reasoned explanation for the Challenged Policies; (2) did not consider important aspects of the problem, including the harms the policies are predictably inflicting on immigrant communities and the organizations that serve them; (3) did not consider the reliance interests of noncitizens who rely on the agency to adjudicate immigration benefits; (4) did not consider reasonable policy alternatives; and to the extent USCIS did provide any explanation for the Challenged Policies, its reasoning was both (5) facially implausible and (6) pretextual.

1. First, USCIS failed to comply with the fundamental rule of administrative law requiring "agencies to engage in 'reasoned decisionmaking.'" *Regents*, 591 U.S. at 16 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). To survive APA scrutiny, an agency action must be both "reasonable and reasonably explained." *Ohio v. EPA*, 603

37

U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). In other words, an agency must articulate "a satisfactory explanation for its decision, including a rational connection between the facts found and the choice made." *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 70 (D.R.I. 2025) (citation modified).

USCIS did not articulate any reasons for enacting the Challenged Policies. The December and January Memoranda offer virtually no explanation for the Global Asylum Hold, the Benefits Hold, and the Comprehensive Re-Review. The December Memorandum merely cites two crimes allegedly committed by Afghan nationals and then states that "[i]n light of identified concerns and threat to the American people," the agency has determined that the new policies are necessary. Dec. Mem. at 2. The January Memorandum similarly asserts that "aliens from high-risks countries" may "pose a threat to national security or public safety," without offering any further analysis or explanation. Jan. Mem. at 3. And the analysis in the November Memorandum, which announced the Country-Specific Factors Policy, is even more bare-bones. That memorandum references the Presidential Proclamation announcing the Entry Ban but does not articulate any policy rationale for requiring USCIS personnel to discriminate on the basis of country of origin. Nov. Mem. at 1. The paltry administrative record confirms that, in enacting the Challenged Policies, the agency relied exclusively on evidence of the two crimes committed by Afghan nationals and did not articulate any reasoning beyond the vague invocations of national security contained in the memoranda. *See* Dec. CAR at 27–32.

38

USCIS's cursory invocations of national-security fall far short of the reasoned explanation the APA demands. None of the memoranda explains why the agency determined that national security requires enacting the Challenged Policies, how the policies will further national security, or what evidence the agency considered. USCIS offered nothing more than vague, unsubstantiated warnings that the policies are necessary to protect public safety, but those "conclusory statements will not do; an agency's statement must be one of *reasoning*." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 305 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026) (quotation omitted). At most, the memoranda articulate USCIS's inchoate aspiration—to promote public safety and national security—but a statement of an agency's "goals cannot substitute for the reasoned basis required under the APA." *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 171 (D. Mass. 2025); *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 140 (D. Mass. 2025) ("Statements of aspirational goals, however, are not the same as reasoned explanations for why an action is chosen or how the chosen action will effectuate the stated goals.").

2. USCIS also failed to consider the significant harms that the Challenged Policies are predictably inflicting on immigrant communities. Those harms are illustrated by the experiences of Plaintiffs' members and clients. Plaintiffs represent noncitizens whose lives have been upended by the Challenged Policies, including noncitizens who are unable to secure asylum, lawful permanent residence, citizenship, employment authorization, and other important immigration benefits.

39

*See* supra at pp. 19–29. The policies have had a devastating impact on many noncitizens, their families, communities, and employers. *Id.*

USCIS did not so much as acknowledge these predictable harms, much less weigh the harms against the supposed benefits of the Challenged Policies. None of the memoranda announcing the Challenged Policies consider what the consequences of the policies will be for noncitizens, their families and communities. And the sparse Administrative Record does not include any indication that USCIS attempted to understand the impact that the Challenged Policies would have on immigrant communities or to otherwise assess the costs of the policies at all. Apparently, the only factual evidence that the agency considered was two press releases related to crimes allegedly perpetrated by Afghan nationals. *See* Dec. CAR at 27–32.

By ignoring the consequences of the policies it was enacting, USCIS "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That failure violates the APA, which requires an agency to "grapple with" any "substantial harms" that are likely to result from its decision. *New York v. McMahon*, 784 F. Supp. 3d 311, 358 (D. Mass. 2025). After all, "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015); *see also Am. Hosp. Ass'n v. Kennedy*, No. 2:25-cv-00600, 2025 WL 3754193, at *7 (D. Me. Dec. 29, 2025) ("A regulation is arbitrary and capricious if the agency failed to consider an important aspect of the

40

problem, which includes, of course, considering the costs and benefits associated with the regulation.").

Although USCIS noted that the Challenged Policies "may result in delay to the adjudication of some pending applications." Jan. Mem. at 4, that fleeting acknowledgment is insufficient to comply with the APA. For one, the Challenged Policies do far more than merely delay benefits adjudications: the Comprehensive Re-Review exposes noncitizens to the risk of losing benefits that have already been granted, and the Country-Specific Factors Policy erects a permanent obstacle to noncitizens from Entry Ban countries being granted any sort of discretionary benefit. Even the Global Asylum Hold and Benefits Hold cannot be fairly characterized as imposing mere "delays." Those policies place an indefinite hold on adjudications, leaving people who need benefits in a state of uncertainty with no foreseeable end. And for many noncitizens, those "delays" have resulted in immediate consequences including loss of employment and legal status. *See* supra at pp. 19–29. In any event, USCIS never explains how long the delays will last, what the consequences of those delays will be for noncitizens, or why the costs associated with the delays are outweighed by the supposed benefits of the policies. And the administrative record does not include any indication that USCIS made any attempt to understand the consequences that the delays would have on affected communities. The bare assertion that "delays" are "necessary and appropriate" is not the sort of "*reasoning*" that the APA requires. *Massachusetts*, 770 F. Supp. 3d at 305 (quotation omitted).

41

3. Next, USCIS failed to consider important reliance interests. The Challenged Policies all reflect an abrupt shift in how USCIS adjudicates benefits applications. "When an agency changes course," as USCIS did here, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016)); *see also Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026) (explaining that "reliance interests" are "a critical factor in the analysis of an arbitrary-and-capricious claim"). Specifically, an agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33.

Here, USCIS ignored profound reliance interests. Noncitizens came to the United States and made important life and career decisions with the reasonable expectation that immigration laws would be administered fairly and in a manner consistent with past practice. Many noncitizens have lived in this country for years and built and structured their lives around the understanding that they would be eligible for immigration benefits including the ability to apply for a work permit, to become a lawful permanent resident, to seek asylum, or to naturalize. *See Bowser*, 2026 WL 555624, at *8 ("There are a great deal of reliance interests at issue here. For example, in reliance on the timely adjudication of the application for immigration benefits, the [plaintiffs] fundamentally organized their lives, including their marriage, employment, insurance, family planning, savings, and long-term career

42

goals."); *Varniab*, 2026 WL 485490, at *19 ("Plaintiffs have presented evidence that in reliance on the prior policy, they legally came to the United States, obtained employment, undertook research projects, took exams, and engaged in other steps necessary to achieve their long-term goals of practicing medicine in this country.").

There are no indications in any of the relevant memoranda, or anywhere else in the administrative record, that USCIS consider these reliance interests. The failure to consider reliance interests is a classic reason why an agency action fails arbitrary-and-capricious review. Courts routinely find immigration policies unlawful when they are enacted without consideration of the reliance interests of immigrants. As one court recently explained, USCIS must consider "the reliance interests of individuals already present in the United States seeking immigration benefits. While such reliance interests of course do not necessitate the granting of any benefit, these reliance interests are sufficiently strong to necessitate that the agency acknowledge them, at a minimum, before effectively rendering individuals who lawfully entered the United States ineligible for more lasting forms of immigration relief." *Doe v. Noem*, 784 F. Supp. 3d 437, 465 (D. Mass. 2025); *see also Doe v. Noem*, No. 1:25-cv-10495, 2026 WL 184883, at *10–12 (D. Mass. Jan. 25, 2026) (invalidating a DHS policy because the agency failed to consider the significant reliance interests); *Oliveira*, 2025 WL 3492110, at *11 (similar).

4. USCIS also failed to consider reasonable alternatives. To withstand APA scrutiny, "[a]n agency must 'consider responsible alternatives' and 'give a reasoned explanation for its rejection of such alternatives.'" *Massachusetts v. HHS*, 513 F.

43

Supp. 3d 215, 225 (D. Mass. 2021) (quoting *Brookings Municipal Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)). Consistent with that principle, "when an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 591 U.S. at 30; *accord Illinois v. FEMA*, 801 F. Supp. 3d 75, 94 (D.R.I. 2025) (same).

Here, USCIS made no attempt to consider alternative policies. As discussed above, to the extent USCIS made any attempt to explain the Challenged Policies, it justified the policy changes in light of vague national-security concerns and the purported need to ensure "adequate screening and vetting" of noncitizens entering the United States. Jan. Mem. at 2. And the scant administrative record indicates that USCIS relied almost entirely on two isolated crimes as the basis for enacting the policies. Dec. CAR at 27–32. But USCIS ignored at least three obvious alternatives, well within the ambit of existing policy, that may be sufficient to ensure national security while avoiding the harms that the Challenged Policies inflict on immigrant communities.

First, USCIS could implement new vetting measures without enacting the Challenged Policies. If USCIS found its existing screening and vetting measures inadequate or that national security would be served by more rigorous screening and vetting, USCIS could simply undertake additional measures without enacting the Challenged Policies. USCIS failed to consider or explain why restricting noncitizens' access to immigration benefits is necessary to facilitate additional screening and vetting measures. Nor has it explained what added benefits are achieved by adopting

44

the Challenged Policies beyond what could be achieved through additional screening and vetting alone.

Second, USCIS could use the existing adjudicatory process and its existing vetting procedures to safeguard any national security interests. USCIS has a variety of statutory authorities that allow it take into account individual factors pertaining to an applicant's suitability to receive immigration benefit including the authority to exercise discretion against unsuitable applicant for certain benefits, *see* Policy Manual, vol. 1, pt. E, ch. 8, and other authorities that allow it to deny even certain non-discretionary benefits on suitability and related grounds, *e.g.*, 8 U.S.C. § 1427(a) (requiring a finding of "good moral character" before granting naturalization). USCIS has long employed a multi-faceted background check and vetting process to assess whether an applicant's suitability. *E.g.*, William A. Kandel, CRS, R4802, USCIS: Operations and Issues for Congress (2024) at 21–23, https://perma.cc/L2VY-8VM7; USCIS, Fact Sheet: Immigration Security Check—How and Why the Process Works at 1 (Apr. 25, 2006), https://perma.cc/KU8T-NFGC. USCIS has not explained why its existing screening and vetting procedures, and its existing adjudicatory authorities, are insufficient to protect national security or compared the costs and benefits of relying on existing vetting procedures versus the new Challenged Policies.

Third, USCIS could rely on the Entry Ban itself to achieve its purported national-security objective. All three of the memoranda announcing the Challenged Policies reference the Entry Ban and note that the President implemented the Entry Ban to prevent noncitizens from purportedly dangerous countries from entering the

45

United States. Nov. Mem. at 1 & nn.1–3; Dec. Mem. at 1–2 & n.1; Jan. Mem. at 1–2 & n.1. Whatever the merits of the President's determination that the Entry Ban somehow serves national security, it is not clear why restrictions on the ability of noncitizens to secure and retain immigration benefits are *also* necessary. USCIS never explained why the Entry Ban alone is inadequate to safeguard national security or why additional measures are needed.

As two courts have already held, the failure to acknowledge these alternative policy options and to consider whether these alternatives could achieve the agency's objectives renders USCIS's actions arbitrary and capricious. *See Bowser*, 2026 WL 555624, at *7 ("There is no evidence that [USCIS] considered reasonable alternatives to the expansive hold policy." (quoting *Varniab*, 2026 WL 485490, at *18–19)).

5. USCIS's justification for the Challenged Policies is facially implausible. An agency action is arbitrary and capricious if the agency's reasoning is "so implausible that it could not be ascribed to a difference in view." *State Farm*, 463 U.S. at 43; *accord Assoc'd Fisheries of Me., Inc.*, 127 F.3d at 109 ; *Rhode Island State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, 383 (D.R.I. 2025). Here, USCIS's stated goal—preventing people from purportedly dangerous countries from entering the United States—bears no relation at all to the Challenged Policies, which largely restrict the rights of noncitizens who are *already* in the United States and thus cannot further a goal preventing entry. *See Bowser*, 2026 WL 555624, at *8 (holding that national-security concerns do not justify withholding immigration benefits from people who "are already in the country"); *Varniab*, 2026 WL 485490, at *19 (similar);

46

*Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1260 (W.D. Wash. 2008) (similar). Given the gross mismatch between USCIS's stated objective and what the policies actually do, those policies cannot survive scrutiny under the APA.

As explained above, USCIS suggests that the Challenged Policies are necessary to protect national security by facilitating enhanced screening and vetting of noncitizens to ensure that people from dangerous countries are not allowed to enter the United States. *E.g.*, Jan. Mem. at 2 ("This order aimed to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes … [and] to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests."). The three policy memoranda also extensively reference the Entry Ban and suggest that the Challenged Policies were enacted in furtherance of the same policy considerations that underlie the Entry Ban. *See* Nov. Mem. at 1–2; Dec. Mem. at 1–2 & n.1; Jan. Mem. at 1–4 & n.1. The President justified the Entry Ban by asserting that national security requires barring people from dangerous or unreliable countries from entering the United States, specifically countries with a known terrorist presence, a high visa-overstay rate, or screen and vetting deficiencies. *See* 90 Fed. Reg. at 24498.

But the national-security justification underlying the Entry Ban (whatever its merit) is wholly inapplicable to the Challenged Policies. The Entry Ban governs who may enter the country, whereas the Challenged Policies govern the adjudication of benefits for people who are already here. Even if there were some basis for barring

47

some noncitizens from entering the country, it would not follow that the same groups should be denied immigration benefits (including work permits, permanent residence, and naturalization) once they have already been thoroughly vetted and allowed to enter. For example, the Entry Ban justifies barring people from Afghanistan in part on the basis that the country is controlled by the Taliban. 90 Fed. Reg. at 24599. That is not a reason to deny a work permit to an Afghan who has sought refuge in the United States, undergone the vetting process, and is already living in the country. Nor is it a reason to prevent an Afghan who has been lawfully living in the country as a permanent resident from naturalizing. Likewise, the Entry Ban bars people from Burma in part because the country has a high visa overstay rate. *Id.* at 24500. But that is, at best, a reason to deny a visa in the first instance. It is not a reason to deny immigration benefits to someone who already has a visa and is already at risk of overstaying.

Moreover, even if the national security concerns underlying the Entry Ban could somehow justify restricting immigration benefits for people already in the country, USCIS never explained why those restrictions were imposed without regard to when the noncitizen entered. The Entry Ban is predicated on purported findings about the conditions in each country at the time it was enacted. But the Challenged Policies affect people who entered the country long before the Entry Ban was issued and have lived in the country lawfully for years. Subjecting longstanding members of American communities to the Challenged Policies cannot be justified by the Entry Ban's purported concerns about present-day conditions in covered countries.

48

Accordingly, the sole justification that USCIS offered for the Challenged Policies "is so implausible that it could not be ascribed to a difference in a view or the product of agency expertise." *State Farm*, 463 U.S. 29, 43 (1983). The Challenged Policies therefore cannot survive arbitrary-and-capricious review. *E.g.*, *Rhode Island State Council of Churches v. Rollins*, No. 25-cv-569, 2025 WL 3111213, at *10 (D.R.I. Nov. 6, 2025) (holding that the policies at issue were "so implausible as to make them arbitrary and capricious"). And even if the national-security concerns that underlie the Entry Ban do counsel in favor of restricting benefits to noncitizens already in the country, USCIS never explains that link. Absent further explanation, the policies violate the APA.

6. Finally, USCIS's stated national-security motivations for enacting the Challenged Policies are patently pretextual. Ample evidence in the public records shows the policies were motivated by anti-immigrant animus. In considering the adequacy of an agency's stated reasoning, a court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York,* 588 U.S. 752, 785 (2019) (quoting *U.S. v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). An agency action cannot survive APA scrutiny if the agency fails to articulate the "genuine justification" for its decision and instead offers only pretextual reasoning that "is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

There is overwhelming evidence indicating the Challenged Policies were not enacted in furtherance of genuine national-security concerns. Statements made on

social media by the President and other decisionmakers at the exact time the Challenged Policies were announced indicate that the policies were animated by raw animus towards immigrants: On November 27, 2025, the day USCIS began announcing the Challenged Policies, President Trump asserted on social media that most immigrants "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels," claimed that immigrants were responsible for "social dysfunction," and blamed them for "failed schools, high crime, urban decay, overcrowded hospitals, housing shortages, and large deficits" and more. @realDonaldTrump, Truth Social (Nov. 27, 2025, 11:27 PM), https://perma.cc/8JW9-D7B5. A few days later, President Trump reposted then-Secretary of Homeland Security Kristi Noem describing immigrants as "killers, leeches, and entitlement junkies," calling them "foreign invaders" who came here "to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS," and concluding, "WE DON'T WANT THEM. NOT ONE." @realDonaldTrump, Truth Social (Dec. 1, 2025, 9:36 PM), https://perma.cc/P9V8-WZG7. These are just a few of President Trump's contemporaneous statements evidencing an unadulterated disdain for immigrants. *See* supra at pp. 10–11. In light of the statements, there is overwhelming reason to doubt that the Challenged Policies were enacted in furtherance of any legitimate policy goal.

The Court need not look further. The public record indicates that USCIS's stated reasons for enacting the Challenged Policies were a mere "distraction." *Dep't of Com.*, 588 U.S. at 785. Where there is a "disconnect" between an agency's stated

50

reasons for its decision and its actual motivations, the action is unlawful under the APA. *Id.* Courts routinely find agency action to be arbitrary and capricious when the agency's reasoning is demonstrably pretextual. *E.g.*, *Rhode Island State Council of Churches*, 808 F. Supp. 3d at 384–85 (holding the withholding of SNAP funding was arbitrary-and-capricious because the agency's stated reasoning was "entirely pretextual"); *Afr. Cmtys. Together v. Noem*, No. 25-cv-13939, 2026 WL 395732, at *1 (D. Mass. Feb. 12, 2026) (holding that the termination of TPS designation for Sudan was arbitrary and capricious because the agency gave "pretextual reasons for the termination"); *Kravitz v. Dep't of Com.*, 366 F. Supp. 3d 681, 750 (D. Md. 2019) (holding that the addition of a citizenship question to the census was arbitrary and capricious because the plaintiffs "substantiated their argument" with "evidence" that the agency's stated "rationale was pretextual"); *see also Nat'l TPS All. v. Noem*, 166 F.4th 739, 774–75 (9th Cir. 2026) (Mendoza, J. concurring) (noting "the ample evidence of racial and national origin animus in the record, which reinforces the district court's conclusion that the [agency]'s actions were preordained and [its] reasoning pretextual").

The same is true here. Even if USCIS offered a plausible rationale for enacting the Challenged Policies (and it did not), its reasoning is demonstrably pretextual and therefore cannot survive APA scrutiny.

## C. The Challenged Policies Violate the APA Because They Were Adopted Without Notice and Comment.

The Challenged Policies violate the APA because they were issued without the notice-and-comment procedures required by law. *See* 5 U.S.C. § 706(2)(D). "The APA

51

generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). And, in the immigration context, courts routinely "require agencies to engage in notice and comment rulemaking when implementing policy changes with substantive consequences for refugees and other immigrants.'" *Varniab*, 2026 WL 485490, at *20 (quoting *Doe v. Trump*, 288 F. Supp. 3d 1045, 1073 (W.D. Wash. 2017)).

The notice-and-comment requirement applies to any "legislative rule," which is a rule that "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *Azar*, 887 F.3d at 70 (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)). All of the Challenged Policies are legislative rules that required notice-and-comment procedures because those policies contravene regulations with the force of law and supplant the existing regulatory scheme with categorical rules that bind USCIS personnel and determine the rights and obligations of noncitizens.

1. The Global Asylum Hold and the Benefits Hold are both legislative rules because they replace the INA's system of individualized benefits determinations, *see* supra at 5–6, 36–37, with a categorical rule requiring USCIS personnel to withhold adjudications. The adjudicative holds also contravene an existing regulation specifying precisely the conditions under which the agency is authorized to withhold benefits adjudications, 8 C.F.R. § 103.2(b)(18), as well as a statutory provision in the

52

INA expressly requiring that when USCIS imposes "conditions or limitations on the consideration of an application for asylum" it do so "by regulation." 8 U.S.C. § 1158(d)(5)(B). The fact that the Global Asylum Hold and Benefits Hold are "inconsistent" with other rules "having the force of law" indicates that the holds are legislative rules requiring notice and comment. *Azar*, 887 F.3d at 73 (quoting *Warder v. Shalala*, 149 F.3d 73, 81 (1st Cir. 1998)).

Even if USCIS had some discretion to withhold adjudications, the Global Asylum Hold and the Benefits Hold would still require notice-and-comment because the directives override that discretion and bind the agency going forward. The adjudicative holds "direct[]" USCIS personnel to halt adjudications, Dec. Mem. at 1, Jan. Mem. at 1, and make clear that USCIS personnel do not retain the discretion to make case-by-case decisions, *e.g.*, Dec. Mem. at 3 & n.10. This sort of "mandatory language" is the hallmark of a legislative rule, *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011), because it creates "a binding norm" that cabins agency discretion going forward, *Doe*, 2026 WL 184883, at \*15. The Global Asylum Hold and the Benefits Hold "effectively replace[] agency discretion with a new 'binding rule of substantive law'" requiring USCIS personnel to halt adjudications, which means that notice-and-comment was required. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir. 1987). That would be true even if the adjudicative holds are only temporary. *E.g.*, *Texas v. U.S.*, 524 F. Supp. 3d 598, 662 (S.D. Tex. 2021) (holding that a 100-day pause on removals required notice and comment). Consistent with that logic, one court has already determined that the December Memorandum, which announced

53

the adjudicative holds, should have gone through notice and comment. *See Varniab*, 2026 WL 485490, at \*20.

2. The Comprehensive Re-Review Policy is a legislative rule for similar reasons. For one, the policy contravenes binding regulations specifying the circumstances under which benefits can be reviewed or rescinded, *e.g.*, 8 C.F.R. § 103.5 (a)(5); *id.* § 246.1; *id.* § 208.24, which is strong evidence that the policy is a legislative rule, *Azar*, 887 F.3d at 73. Further, the policy creates a new substantive rule that is binding on the agency. It "directs" USCIS personnel to "[c]onduct a comprehensive re-review of approved benefits" and "mandates" covered noncitizens undergo the re-review process. Dec. Mem. at 1. The policy requires a thorough and comprehensive re-review of all benefits previously granted to covered noncitizens and leaves USCIS personnel no discretion as to whether to review past benefits determinations or which benefits should be reviewed. That sort of comprehensive mandate, establishing a norm that is binding on agency personnel, exemplifies a legislative rule. *Elec. Priv. Info. Ctr.*, 653 F.3d at 7; *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (holding that notice-and-comment procedures were required because "the entire [rule], from beginning to end—except the last paragraph—reads like a ukase. It commands, it requires, it orders, it dictates"). It makes no difference that the Comprehensive Re-Review Policy might not change the substantive eligibility requirements for any given benefit. The fact that the policy requires noncitizens to reestablish their eligibility is enough to trigger the notice-and-comment requirement. *See Appalachian Power Co.*, 208 F.3d at 1026–

54

27 (explaining "changing the method of measuring compliance … can affect the stringency of the limitation itself" thereby requiring notice and comment).

3. Finally, the Country-Specific Factors Policy is a legislative rule. The policy replaces prior agency discretion with a new categorical rule that the agency will treat certain specified "country-specific factors" as a "significant negative factor in the adjudication of a discretionary benefits request." Nov. Mem. at 73. The revised Policy Manual directs USCIS personnel to take into account the very same factors that the President purportedly used to determine which countries are subject to the Entry Ban and specifies that those factors should count "as a significant negative factor" when deciding how to exercise discretion. *See* Policy Manual at Vol. 1., Pt. E. Ch. 8. This imposition of a new norm establishing how USCIS personnel should exercise their discretion triggers the notice-and-comment requirement. *E.g.*, *Mada-Luna*, 813 F.2d at 1014 .

## IV.    Plaintiffs Are Entitled to Relief.

### D.    The Court Should Vacate the Challenged Policies.

The APA directs federal courts to "hold unlawful and set aside" an agency action that is in excess of the agency's statutory authority, is arbitrary and capricious, was issued without observing required procedures, or that otherwise violates the APA. 5 U.S.C. § 706(2). "[T]he text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," make clear that to "set aside" an unlawful agency action means to "vacat[e]" that action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring); *see also Ass'n of Am. Univs. v. Dep't of Def.*, 806 F. Supp. 3d 79, 120–21 (D. Mass.

55

2025) ("Put simply, the APA requires this Court to 'set aside' unlawful or inadequately reasoned agency action. To 'set aside' agency action is to 'annul or vacate' it." (citations omitted)).

Vacatur is warranted. The "normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all those who would have been subject to it." *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 139 (D. Mass. 2025) (quoting *Massachusetts*, 770 F. Supp. 3d at 329). And vacatur is the only appropriate remedy here because the Challenged Policies are both contrary to law and issued without observance of required procedure. *See Ass'n of Am. Univs.*, 806 F. Supp. 3d at 123–24 (agency action that is contrary to law must be vacated); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (agency action issued without notice-and-comment must be vacated). And while remand without vacatur might sometimes be appropriate where an agency action violates the APA because of "flaws in [the] agency's explanation," that is true only where the errors are not particularly severe and can likely be mended on remand. *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001). Here, for the reasons explained above, the flaws in USCIS reasoning were grievous and are not amenable to being cured on remand.

Vacatur under the APA is not a party-specific remedy. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Corner Post*, 603 U.S. at 831 (Kavanaugh, J., concurring) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also Make the Rd. New York*

56

*v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (holding that "the APA's remedial [framework]" is not "confined to party-specific remedies"); *Illinois v. FEMA*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025) (similar); *Am. Hosp. Ass'n v. Kennedy*, No. 2:25-cv-600-LEW, 2025 WL 3754193, at *9 (D. Me. Dec. 29, 2025) (similar).

###### E. The Court Should Permanently Enjoin USCIS from Issuing or Enforcing any Substantially Similar Policy.

In addition to vacating the Challenging Policies, the Court should also permanently enjoin Defendants from enforcing any of the Challenged Policies or reissuing or enforcing any substantially similar policy. An injunction is appropriate where: "'(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief" (i.e., an injury for which there is no adequate remedy at law); "(3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction.'" *Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 40 (1st Cir. 2013) (quoting *Asociación de Educación Privada de P.R., Inc. v. García–Padilla,* 490 F.3d 1, 8 (1st Cir.2007)). Plaintiffs prevail on the merits for the reasons explained above, and Plaintiffs also readily satisfy the remaining prongs of the test.

For one, Plaintiffs' members have suffered and will imminently suffer a panoply of irreparable harms including being categorically barred from employment, separated from their families, unable to travel, unable to secure permanent legal status, and unable to naturalize, as well as resultant, severe financial and emotional

57

distress. *See* supra at pp. 19–29. In assessing the Benefits Hold, three courts have already determined that these types of harms are irreparable and granted injunctive relief to the plaintiffs before them. *See Bowser*, 2026 WL 555624, at *9; *Varniab*, 2026 WL 485490, at *22–23; *Doe,* No. 26-cv-2389, ECF No. 33 at 8. And the balance of the equities and the public interest weigh decisively in Plaintiffs' favor because "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Massachusetts*, 770 F. Supp. 3d at 326–27 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)), *aff'd*, 164 F.4th 1 (1st Cir. 2026).

Moreover, the APA specifically "authorizes 'writs of prohibitory or mandatory injunction' in addition to vacatur." *California v. Dep't of Transp.*, 808 F. Supp. 3d 291, 312 (D.R.I. 2025) (quoting 5 U.S.C. § 703). Ancillary injunctive relief is especially appropriate where vacatur under the APA is not "sufficient to redress" the relevant injuries. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). So, for example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from … conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs). Here, injunctive relief is necessary because merely setting aside the Challenged Policies

would not, on its own, necessarily prevent Defendants from continuing to restrict access to immigration benefits in the manner contemplated by the policies. Accordingly, the Court, in order to ensure a return to status quo ante, should enter a narrow injunction barring Defendants from continuing to enforce the Challenged Policies and from issuing or enforcing any substantially similar policy.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs, declare the Challenged Policies unlawful, vacate the Challenged Policies pursuant to 5 U.S.C. § 706(2), and issue an injunction pursuant to 5 U.S.C. § 703 barring Defendants from enforcing the Challenged Policies or issuing or enforcing any substantially similar policy.

Dated: April 3, 2026

Respectfully submitted,

/s/ Amy R. Romero
Amy R. Romero (RI Bar No. 8262)
Kevin Love Hubbard (MA Bar No. 704772)*
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating Counsel, Lawyers' Committee for Rhode Island

/s/ Ryan Cooper
Ryan Cooper (DC Bar No. 1645301)*
Anashua Dutta (DC Bar No. 90007329)*
Catherine M.A. Carroll (DC Bar No. 497890)*
Robin F. Thurston (DC Bar No. 1531399)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

202) 448-9090
rcooper@democracyforward.org
adutta@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

/s/ Kristy Blumeyer-Martinez
Kristy Blumeyer-Martinez (TX Bar No. 24087177)*
Mona Iman (CA Bar No. 309525)*
Refugee and Immigrant Center for Education and Legal Services
131 Interpark Boulevard
San Antonio, TX 78216
(210) 222-0964
mona.iman@raicestexas.org
kristy.blumeyermartinez@raicestexas.org

/s/ Golnaz Fakhimi
Golnaz Fakhimi* (NY Bar No. 5063003)*
Melissa Keaney* (CA Bar No. 265306)*
Abbey Koenning-Rutherford* (CO Bar No. 59636))*
Muslim Advocates
1032 15th Street NW No. 362
Washington, DC 20005
(202) 655-296
golnaz@muslimadvocates.org
melissa@muslimadvocates.org
abbey@muslimadvocates.org

/s/ Kalpana V. Peddibhotla
Kalpana V. Peddibhotla (Cal. Bar No. 200330)*
Anisa Rahim (NJ Bar No. 007802007)*
South Asian American Justice Collaborative
333 West San Carlos Street Suite 600
San Jose, CA 951110
(408) 550-9240
kalpana@saajco.org
anisa.rahim@saajco.org

*Counsel for Plaintiffs*
*Admitted pro hac vice

60