# Exhibit B

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF RHODE ISLAND**

DORCAS INTERNATIONAL
INSTITUTE OF RHODE ISLAND, et al.,

     *Plaintiffs,*

v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, et al.,

     *Defendants.*

Case No. 1:26-cv-00132-JJM-PAS

**DECLARATION OF DR. OMAR BAH IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1.     I, Dr. Omar Bah, make the following statement on behalf of the Refugee Dream Center ("RDC"). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. §1746.

2.     I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

**I.    Background and Qualifications**

3.     I am the founder of the Refugee Dream Center, and currently serve as RDC's Co-Executive Director for Programs, overseeing all grants, project management, implementation, and evaluations. I established RDC in 2015 to promote the reception, placement, and post-settlement of refugees in Rhode Island, and served as its Executive Director from its founding until 2022. I continue to be

1

closely involved in RDC's operations and have personal knowledge of the matters described in this declaration.

4.      I have lived experience regarding these issues. I am a torture survivor, former journalist, and refugee from The Gambia, one of the 39 Entry Ban countries targeted by the USCIS policies challenged in this lawsuit.  I wrote a book about my experience, *Africa's Hell on Earth: The Ordeal of an African Journalist*. I hold master's degrees in Public Administration and Counseling Psychology, and a doctorate in Organizational & Leadership Psychology. I also completed certification through the Harvard Medical School's Program in Refugee Trauma. I currently serve as an adjunct professor at William James College.

## II.    The Refugee Dream Center

5.      The Refugee Dream Center is a 501(c)(3) non-profit, non-partisan organization that provides direct services to refugees and focuses on reception, placement, and post-resettlement of refugees, filling gaps in services to achieve refugee self-sufficiency. Approximately 85 to 90 percent of RDC's work is direct service to community members.

6.      RDC is an organization created by refugees, for refugees, with a majority of the staff being refugees themselves. What sets RDC apart from other organizations is its focus on building community wherever refugees are, irrespective of the circumstances they face. RDC eliminates tedious paperwork, long waits, and appointments in an effort to serve our community. Community members can and do

walk in to RDC's offices at any time to seek assistance, and RDC staff respond to their needs in real time.

7. RDC's core services and programs include: adult education (including ESL and citizenship classes), employment services, legal and immigration support, case management, youth support, health promotion, language access services, psychosocial support, reception and placement of newly arriving refugees, and legislative advocacy. All of these services are essential in fostering refugee self-reliance and independence.

8. RDC has a staff of 19. RDC also relies on approximately 200 volunteers at any given time, including interns and Brown University medical students and doctors, who assist with evaluating asylum applicants. RDC has an annual budget of approximately $2.9 million, of which approximately half is allocated to payroll and employee benefits.

9. RDC's staff work in six specialized departments: Leadership and Administration, Finance, Health & Safety, Education & Employment, Refugee Integration, and the Youth Mentorship Program. Advocacy is built into all six departments rather than being treated as a separate function.

10. RDC was established to be a venue for community engagement and cultural exchange, and as a home away from home for refugees. It is a place for caring, self-help, and healing, while providing personal and professional development to promote empowerment, strengths cultivation, and accompaniment toward success.

RDC carries out that work through the programs described above, all of which have been directly harmed by USCIS's Challenged Policies.

11.     RDC's Program for Initial Resettlement provides caseworker support for newly arrived refugees during their first 90 days, including securing housing, transportation training, cultural orientation, enrollment in English language courses, benefits registration, medical care, enrollment in employment services, and school enrollment. After the initial 90-day period, RDC continues to provide crucial social services that refugees need to become self-sufficient, including assistance with employment, disability services, affordable housing access, and rental and income assistance.

12.     Helping refugee youth is another major focus of RDC's work. Through a wide range of activities, RDC serves youth from diverse ethnic communities, helping them connect both with each other and with their American counterparts. RDC's Youth Soccer Dream Team, Refugee Youth Bicycle Project, Book Club, Homework Helpers, Domestic Violence Prevention, City Youth Employment, substance prevention programs, and Afghan Youth Adjustment Support programs promote resilience, psychological well-being, cultural adaptation, and leadership.

13.     RDC's Integration Services Program offers support for refugees as they transition to life in the United States and work toward self-sufficiency, including housing support, employment services, general case management for medical or legal issues, food distribution, interpreting, transportation, and offering guidance and

4

referrals as necessary. RDC provides these services to ensure refugees are able to access the resources they need to thrive.

14.     The promotion of the health and welfare of refugees is also essential to RDC's mission. Our Health and Safety Program provides education and cultural orientation on healthcare and individual health to refugees, and works with resettlement agencies and other stakeholders to ensure that refugees can navigate, access, and receive safe and quality healthcare.

15.     In 2024, RDC served approximately 1,700 community members. Over 500 individuals took ESL classes; 152 took Financial Literacy classes; 192 participated in Computer Literacy courses; 181 completed Citizenship classes; and 800 participated in Job Training. RDC provided 459 home health visits, 384 phone check-ins, and Journey to Health sessions for 142 community members. RDC provided 387 hours of interpreting, distributed 30,616 meals, and placed 65 individuals in jobs.

16.     RDC also provides cultural attunement training to the Rhode Island Police Academy, the Providence Police Academy, hospitals and medical schools, and schools and universities. Additionally, RDC engages in legislative advocacy to promote the rights of refugee women, disabled people, spouses, children, and tenants, and to increase access to employment opportunities and quality health services.

### III.     RDC's Community Member Population

17.     The majority of RDC's clients, whom we refer to as community members, were lawfully admitted to the United States as refugees, having successfully gone

5

through a rigorous, multi-step screening process of interviews and security clearances. They waited years to arrive here, followed every rule required of them, and have invested enormous time and effort in becoming productive members of the Rhode Island community.

18.    Approximately 88 percent of RDC's community members are nationals of one of the 39 Entry Ban countries targeted by the USCIS Challenged Policies. The largest populations include community members from Afghanistan (approximately 20 percent of RDC's community members), Haiti (approximately 10 percent), Syria (approximately 10 percent), Senegal (approximately 8 percent), The Gambia (approximately 7 percent), Somalia (approximately 5 percent), and Mauritania (approximately 5 percent). RDC also serves significant populations from Mali (approximately 4 percent), Burma, Sudan, Venezuela, and Nigeria (each approximately 2 percent), and smaller populations from Burundi, Côte d'Ivoire, Cuba, Equatorial Guinea, Eritrea, South Sudan, Tanzania, Togo, Zambia, and Zimbabwe (each approximately 1 percent). Only approximately 12 percent of RDC's community members are nationals of countries not subject to the Entry Ban.

19.    Many of RDC's community members have pending applications for immigration benefits that are directly affected by the Challenged Policies. These include applications for asylum (Form I-589), employment authorization (Form I-765), adjustment of status to lawful permanent resident (Form I-485), and other discretionary benefits adjudicated by USCIS. Additionally, many RDC community members who entered the United States from 2021-2025 were previously granted

6

immigration benefits that are now subject to re-review under one of the Challenged Policies.

20.     Additionally, many Afghan community members entered the United States on humanitarian parole. Some of these individuals are now stuck in limbo, with asylum applications held up and hearing dates postponed as far out as 2027.

**IV.     The Challenged Policies and Their Harm to RDC**

21.     As discussed in detail below, the four Challenged Policies recently adopted by USCIS directly interfere with RDC's core programs and activities, have frustrated RDC's mission, and have forced RDC to divert its limited staff time and organizational resources away from the services it was established to provide. The four Challenged Policies are: (1) the Global Asylum Hold; (2) the Benefits Hold; (3) the Comprehensive Re-Review; and (4) the Country-Specific Factors Policy.

22.     Because RDC operates on a drop-in, open-door model, without requiring appointments or extensive paperwork, the impact of the Challenged Policies is felt immediately and directly at RDC's offices. When community members learn of these Challenged Policies, or when the consequences of the Policies disrupt their lives, they come to RDC seeking help. Hundreds of community members are now coming in on a daily basis; our staff are overwhelmed. Many of these are people who did not previously need RDC's services but who now require support, legal help, and case management because of the Challenged Policies. RDC staff must respond to these community members in real time, interfering with their assigned programmatic work.

A.    Global Asylum Hold

23.    The Global Asylum Hold directly interferes with RDC's core work. A central part of RDC's mission is helping refugees achieve legal stability and self-sufficiency in the United States. For many of RDC's community members, affirmative asylum is the primary pathway through which they can obtain permanent legal status and, eventually, citizenship. Asylum is also the mechanism by which refugees who fear persecution in their home countries secure the legal protection they need to remain safely in the United States. RDC assists community members throughout the asylum process, including helping them prepare applications, connecting them with legal representation—including through volunteer Brown University medical students and doctors, who evaluate asylum applicants—and supporting them as they navigate the adjudication process.

24.    The Global Asylum Hold has brought this core function to a standstill. At least 200 of RDC's community members have pending asylum applications that are now indefinitely frozen, with no indication from USCIS of when or whether they will ever be adjudicated.

25.    The consequences of the Global Asylum Hold are especially severe for some of RDC's most vulnerable community members. Many of RDC's Mauritanian community members were enslaved in their home country and fear torture if they are returned. Many of RDC's Senegalese community members are LGBT individuals who would face severe repression if sent back to Senegal. For these individuals, the indefinite freeze on asylum adjudications is not merely an administrative

8

inconvenience—it leaves them without the legal protection they need to avoid being returned to countries where they face real persecution.

26. RDC's Education & Employment department, led by a dedicated Program Manager and two Projects Coordinators, also cannot effectively place community members in jobs if they cannot obtain work permits.

27. As a direct result of the Global Asylum Hold, RDC staff have been required to spend substantial additional time responding to inquiries from community members about the status of their asylum applications, counseling community members about the implications of the hold for their legal status and work authorization, and attempting to identify alternative legal pathways for community members who are now in limbo. This surge of inquiries has required RDC staff to stop their other work serving community members as a direct result of the Global Asylum Hold

B. Benefits Hold

28. The Benefits Hold also directly interferes with RDC's core work. Because approximately 88 percent of RDC's community members are nationals of countries subject to the Entry Ban, the Benefits Hold affects an extraordinarily large share of the population RDC was established to serve. Approximately 400 of RDC's community members are directly affected by the Benefits Hold.

29. The Benefits Hold has significantly impaired several of RDC's core programs. RDC's employment services, including its Job Training program, depend on community members being able to obtain or renew work authorization from

9

USCIS. Community members who cannot secure work permits cannot be placed in jobs, which renders RDC's employment programming ineffective for a substantial portion of its community. In 2024, RDC placed 65 individuals in jobs and provided Job Training to 800 participants. The Benefits Hold has undermined the effectiveness of this programming for community members from Entry Ban countries.

30.    Many RDC community members have pending applications for employment authorization, adjustment of status to lawful permanent resident, or other benefits that are now subject to the Benefits Hold. These applications are indefinitely stalled, with no indication from USCIS of when adjudications will resume. That has already directly harmed RDC, as one former RDC staff member is currently unable to work due to an expired visa that cannot be renewed because of the Benefits Hold. It also creates an increasing number of community members with pending cases with no final adjudications that seek assistance from RDC, straining our budget, staff capacity, and ability to take assist other community members.

31.    In total, approximately 300 Afghan RDC community members who are not green card holders have stalled benefits applications. Approximately 10 Haitian community members have stalled benefits as a result of recent legislation. And approximately 75 RDC community members have pending adjustment of status applications that have not been adjudicated.

32.    As a result of the Benefits Hold, RDC has also seen a surge in community members seeking assistance with pending or frozen family reunification cases for which there are no clear answers, especially in the Afghan community.

33. One community member had completed the entire naturalization process and was scheduled for her naturalization oath ceremony to become a United States citizen. That appointment was canceled. Her status is now uncertain despite the fact a USCIS officer determined she was eligible for naturalization and having followed every step required of her.

34. RDC's Integration Services program, designed to help refugees transition to self-sufficiency, is similarly impaired. The Refugee Integration Department has been particularly hard hit because staff must now devote their attention to addressing the immigration-related crises of existing community members rather than helping newly arrived refugees settle into their communities.

35. The Benefits Hold has also disrupted RDC's Citizenship classes, which served 181 participants in 2024. For community members from Entry Ban countries who have not yet obtained lawful permanent resident status, the path to citizenship has been blocked entirely by the hold on adjustment of status application adjudications.

36. The Benefits Hold has also caused a significant increase in demand for RDC's food pantry and other basic-needs services. More community members are seeking food and supplies because they have lost income or are afraid to apply for public benefits. At the same time, RDC's Education & Employment staff are spending substantially more time assisting community members with benefits applications, providing transportation to appointments, and conducting one-on-one meetings to discuss policy changes and help community members navigate them. This time is

11

being diverted directly from ESL instruction, job training, and other educational programming.

C. Comprehensive Re-Review

37. Like the other USCIS policies, the Comprehensive Re-Review directly interferes with RDC's core work. Approximately 500 of RDC's community members, primarily Afghan, Venezuelan, and Haitian nationals, received immigration benefits from 2021-2025 and are now subject to re-review. These community members obtained asylum, adjustment of status, work permits, and other benefits through lawful processes. They have built their lives in Rhode Island in reliance on those benefits: they are employed, raising families, paying taxes, and contributing to their communities.

38. The announcement that USCIS may revoke, rescind, or terminate these previously granted benefits has caused enormous fear, anxiety, and uncertainty among RDC's community members. Community members who had achieved a measure of legal stability and were progressing toward self-sufficiency now face the prospect that their legal status could be stripped away without clear criteria or process. Community members who were granted asylum fear being returned to countries where they face persecution. Community members who obtained green cards fear losing their lawful permanent resident status. This pervasive uncertainty has had a deeply destabilizing effect on the community RDC serves.

39. The Comprehensive Re-Review has forced RDC to divert significant resources to addressing the needs of community members who are subject to re-

12

review. RDC staff must now spend substantial time counseling these community members about the re-review process, helping them understand what the policy means for their legal status, connecting them with legal representation, and providing emotional and psychosocial support to community members who are in acute distress about the prospect of losing their immigration status.

40. Because of the Comprehensive Re-Review, one of RDC's board members, an immigration lawyer, has been doing a significant amount of pro bono work to assist community members affected by the re-review, while other immigration lawyers have been offering reduced-fee legal work. This is time and effort that would otherwise be spent delivering RDC's core programs, but RDC's staff was compelled to respond to the effects of Comprehensive Re-Review instead.

41. The Comprehensive Re-Review also undermines RDC's fundamental mission of helping refugees achieve self-sufficiency. RDC's programs are designed to help community members build stable, productive lives. The threat that previously granted benefits could be revoked, rescinded, or terminated at any time makes it significantly harder for RDC to help community members plan for their futures, pursue employment, invest in education, and take the other steps necessary to become self-sufficient. Community members who fear they may lose their legal status are less likely to make the long-term commitments—to jobs, to housing, to education—that RDC's programs are designed to support. This directly undercuts the effectiveness of RDC's Job Training, ESOL, Financial Literacy, and Integration Services programs.

D.  Country-Specific Factors Policy

42.    The Country-Specific Factors Policy directly harms RDC and interferes with its core work. Because almost 90 percent of RDC's community members are nationals of countries subject to the Entry Ban, the Country-Specific Factors Policy erects a potentially prohibitive barrier to their ability to obtain any discretionary immigration benefit—including asylum, adjustment of status, a work permit, or a visa extension.

43.    Critically, the Country-Specific Factors Policy would continue to harm RDC and its community members even if the Global Asylum Hold and the Benefits Hold are lifted. The Country-Specific Factors Policy creates a permanent structural impediment: immigration officers will be required to weigh RDC community members' countries of origin against them in every discretionary adjudication, regardless of the individual applicant's circumstances, ties to the community, employment history, or any other factor that would ordinarily weigh in their favor.

44.    RDC exists to help refugees navigate the immigration system, obtain legal status, and achieve self-sufficiency. The Country-Specific Factors Policy makes each of these goals substantially harder to achieve for the population RDC serves. By imposing a country-of-origin penalty on discretionary adjudications, the Country-Specific Factors Policy undermines RDC's ability to guide community members toward successful outcomes in the immigration process, which lies at the heart of RDC's organizational mission.

45.    The Country-Specific Factors Policy has also required RDC to divert resources to educating community members about the new adjudicatory framework, managing their expectations about the likelihood of obtaining discretionary benefits, and counseling community members who are discouraged from applying for benefits to which they would otherwise be entitled.

46.    For example, The Gambia, the country from which I myself fled and from which approximately 7 percent of RDC's community members originate, is subject to a partial ban under the Entry Ban. Under the Country-Specific Factors Policy, USCIS officers must now treat the country-specific factors attributed to The Gambia as a significant negative factor when adjudicating any discretionary benefit for a Gambian national, regardless of that individual's personal history, ties to the United States, or contributions to their community.

## V.    Cumulative Impact of the Challenged USCIS Policies

47.    Taken together, the four Challenged Policies have had a devastating cumulative impact on RDC and the community it serves. The Policies collectively ensure that RDC's community members from Entry Ban countries cannot obtain new immigration benefits (because of the Benefits Hold), cannot have their asylum applications adjudicated (because of the Global Asylum Hold), face the prospect of losing benefits they already have (because of the Comprehensive Re-Review), and—even if the holds are someday lifted—will face a presumptive barrier to receiving any discretionary benefit in the future (because of the Country-Specific Factors Policy).

15

48.    The Challenged Policies have not merely made RDC's work more difficult in the abstract. They have directly interfered with RDC's ability to carry out its core programs and activities and impaired its organizational capacity.

49.    RDC's Refugee Integration team cannot help community members progress toward permanent legal status when adjudications are frozen. RDC's Youth Mentorship programs are strained as families face destabilizing uncertainty. RDC's Health & Safety team must address the acute psychological distress caused by the threat of status revocation instead of delivering preventive health programming. RDC's food pantry faces surging demand. RDC's Education & Employment Department are overworked and overwhelmed, and RDC has had to rely more heavily on less experienced volunteers to deliver educational programming. And across every department, staff are being pulled away from their assigned portfolios to respond to the crisis created by these Policies.

50.    RDC has also had to hire a paralegal to help community members file applications for green cards and other benefits, and to respond to the increased volume of immigration-related questions. The cost of this position has been taken from funds that would otherwise have been allocated to direct assistance for community members.

51.    RDC estimates that approximately 330 staff hours per week, across 11 staff members, are now devoted to immigration-related counseling and support that would not have been necessary absent the Challenged Policies. Staff must also be continually trained and retrained on the rapidly evolving changes to USCIS policy,

which is stressful for staff and takes additional time away from direct service delivery.

52.     The stress of advising community members about rapidly changing and deeply harmful immigration policies—often without clear answers to provide—has also taken a significant toll on RDC's workforce, who are themselves directly affected by the Challenged Policies.

53.     Additionally, because of the time RDC must now devote to addressing the crisis precipitated by these Challenged Policies, RDC has been unable to conduct as much cultural attunement training for police departments, universities, and hospitals as we otherwise would. This training is an important part of RDC's mission and benefits not only the refugee community but the broader Rhode Island community.

54.     RDC was established to bridge the gap left when the federal government's support for refugees ends after 90 days. RDC's entire organizational model is built on the premise that refugees who are lawfully admitted to the United States will have access to a functioning immigration system through which they can obtain the legal status and work authorization they need to become self-sufficient. The Challenged Policies have dismantled that premise for the population RDC serves, undermining the very foundation on which RDC's programs are built.

55.     The injuries RDC has suffered would be substantially redressed by a favorable decision in this case. If the Court enjoins the Global Asylum Hold, USCIS would resume adjudicating asylum applications, and RDC's community members,

17

including at least 200 with pending asylum cases, would be able to move forward in the asylum process. If the Court enjoins the Benefits Hold, USCIS would resume adjudicating applications for work permits, green cards, and other benefits for nationals of Entry Ban countries, and RDC's employment and integration programs would be able to function effectively for these community members. If the Court enjoins the Comprehensive Re-Review, the approximately 500 community members who received benefits during from 2021-2025 would no longer face the threat of revocation, termination, or rescission of those benefits, restoring the stability and certainty on which RDC's self-sufficiency programs depend. And if the Court enjoins the Manual Revisions, RDC's community members would no longer face a presumptive negative factor based solely on their countries of origin when applying for discretionary benefits.

56.    Without this Court's intervention, these Challenged Policies will continue to deprive RDC's community members of the ability to achieve legal stability and self-sufficiency, and will continue to impede RDC's ability to carry out its mission of supporting refugees in Rhode Island. These Challenged Policies will also deprive our community members of that most essential human necessity: hope.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this Second day of April, 2026.



Dr. Omar Bah
Founder & Co-Executive Director for Programs, The Refugee Dream Center

18