# Exhibit C

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al.,<br><br>*Defendants.* | Case No. 1:26-cv-00132-JJM-PAS |

**DECLARATION OF ELENA MEDINA NEUMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Elena Medina Neuman, make this declaration based on my personal knowledge. I declare under penalty of perjury that the following is true and correct:

1. I am over the age of eighteen and am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration through my work, materials I have reviewed, and information made available to me pursuant to my duties at the Service Employees International Union ("SEIU" or "the union"). If called as a witness in this action, I could and would testify competently to these facts.

2. I am Associate General Counsel with SEIU. I have been employed by SEIU for approximately 13 years. I am authorized to provide this declaration on behalf of SEIU.

**SEIU**

3.      SEIU was founded in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland.  Today, the union represents approximately two million members in healthcare, the public sectors, and property services—over 25% of whom identify as immigrants.  SEIU's members include physicians, long-term care workers, janitors, security officers, airport workers, librarians, child care workers, educators, fast food workers, and employees across all levels of government. A significant number of SEIU members are foreign-born U.S. citizens, lawful permanent residents, and immigrants authorized to work in the United States.  Many of SEIU's members have mixed-status families.

4.      SEIU has over 150 local union affiliates across the United States, Puerto Rico, and Canada.  In Rhode Island, the union and its affiliates represent thousands of workers across the state.  SEIU members pay voluntary membership dues to their local unions, a portion of which are remitted to SEIU.

5.      Our work is guided by our vision for a just society where all workers are valued and all people respected—no matter where we are from or the color of our skin; where all families and communities can thrive; and where we leave a better and more equitable world for future generations.

6.      To achieve this vision, the union's work is centered on forging a multi-racial, multi-generational, multi-lingual labor movement that builds worker power through unions, raises standards in workplaces and in communities, and—crucially—seeks to end poverty wages forever.

2

7. Accordingly, SEIU supports workers in organizing their workplaces, and helps workers enforce their rights through agencies at the state and federal level, including through the National Labor Relations Board, the Equal Employment Opportunity Commission, and the Occupational Safety and Health Administration. The union works to ensure that immigrant workers and U.S. citizen workers alike are protected from labor law violations. Moreover, as required by law, SEIU provides representation equally and in a non-discriminatory manner to all members of our bargaining units, regardless of age, race, gender, nationality, political beliefs, or religion. SEIU—through our members—also negotiates and enforces collective bargaining agreements that set wages, benefits, and working conditions. The union and its affiliates likewise advocate for local, state, and federal laws, regulations, policies, and programs that advance our members' interests.

8. SEIU has embraced our heritage as a union of immigrants and has stood on the frontline of immigrant justice for many decades, including through our national immigrant justice campaign called iAmerica. The objectives of iAmerica include: advocating for immigration reform at all levels to provide the opportunity for all to thrive and to provide a better future for our families; increasing awareness in our communities about the issues impacting families; fighting back against unlawful attacks on immigrant communities; helping eligible lawful permanent residents become U.S. citizens; and uniting voters of color to make their voices heard on core issues affecting immigrant communities. By way of example, SEIU

3

has advocated for comprehensive immigration reform at the federal level, bargained for contract provisions that protect immigrant members at the negotiating table, and participated in litigation to defend immigrant rights.

9.    Many SEIU members across industries and across the country are harmed by the United States Citizenship and Immigration Services ("USCIS") policy memoranda at issue in this lawsuit.  The experiences of our members at SEIU affiliate Committee of Interns and Residents ("CIR/SEIU") are representative of the scope and breadth of harm to the union's members and the communities they serve.

**CIR/SEIU**

10.    CIR/SEIU is a 501(c)(5) organization headquartered in Long Island City, New York.   CIR/SEIU represents resident physicians in California, Delaware, Florida, Illinois, Massachusetts, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, Vermont, Washington state, and Washington D.C.

11.    CIR/SEIU was established in 1957 and is the largest house staff union in the country.  The term "house staff" refers to resident physicians who are receiving post-graduate training, usually in a hospital setting.

12.    CIR/SEIU is dedicated to improving house staff working conditions, enhancing residency training and education, advancing patient care, and expanding access to healthcare.  CIR/SEIU envisions and works to achieve (1) better working conditions and training standards for all residents; and (2) a more humane, effective, and accessible quality healthcare system for all.

4

13.     CIR/SEIU's core activities include organizing, contract negotiations, contract enforcement, patient advocacy, as well as legislative and political advocacy on immigration, racial justice, reproductive rights, gun violence, and a wide range of other public health issues.

**CIR/SEIU's Members**

14.     CIR/SEIU has over 40,000 members who are house staff (i.e., interns, residents, and fellows) at hospitals around the country.

15.     CIR/SEIU has chapters at hospitals around the country.  Membership in CIR/SEIU is a prerequisite to being a member of a local CIR/SEIU chapter.

16.     House staff become members of CIR/SEIU upon (1) application and (2) authorization of the payment of dues or the tender of two months dues.  A member is in good standing if they are current in their payment of dues.

17.     CIR/SEIU has over a thousand members who are not citizens of the United States.  CIR/SEIU's noncitizen members are competent and highly qualified medical professionals who provide critical health care services to communities around the country including many underserved communities.

**The Effect of Recent USCIS Policy Changes on CIR/SEIU's Members**

18.     I am aware of three recent policy memoranda issued by USCIS including: (1) a November 27, 2025, memorandum entitled, "Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits"; (2) a December 2, 2025, memorandum entitled, "Policy Memorandum: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-

5

Risk Countries"; and (3) a January 1, 2026, memorandum entitled "Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries" (collectively, "Challenged Policies").

19.     I am aware that the recent USCIS policies include: (1) an indefinite hold on the adjudication of asylum applications ("Global Asylum Hold"); (2) an indefinite hold ("Benefits Hold") on the adjudication of any request for immigration benefits submitted by someone from one of the 39 countries subject to entry restrictions imposed by the President under Section 212 of the Immigration and Nationality Act, ("Entry Ban"); (3) a new policy requiring reconsideration of all immigration benefits granted to people from countries covered by the Entry Ban who entered the United States during the Biden Administration or later ("Comprehensive Re-Review"); and (4) revisions to USCIS's Policy Manual requiring certain "county-specific factors" to be used against benefits' applicants when USCIS exercises discretion ("Country-Specific Factors Policy").

20.     These recent USCIS policies all make it more difficult for noncitizens to receive important immigration benefits from USCIS.  Among other restrictions, the recent USCIS policies include a blanket hold on adjudications of most applications for immigration benefits for people from countries subject to the President's Entry Ban.

21.     I am aware of many CIR/SEIU members who have been seriously harmed by the recent USCIS policies.  CIR/SEIU has received reports from dozens of impacted members. These members include immigrants whose personal and

6

professional futures have been thrown into doubt as they wait to see if or when their requests for asylum, lawful permanent residence, professional visas, and other immigration benefits will ever be adjudicated. This uncertainty causes immense stress to them, which impacts their ability to provide the highest quality of care, pursue additional medical training and fellowships in their areas of specialization, and be present for their families.

22.     Many of the members were too afraid to share their stories for this litigation, even anonymously, due to the fear of retaliation from the present administration. The member stories set forth below are but a few of the many examples that CIR/SEIU members shared with us.

23.     **CIR/SEIU Member A** is a physician trained in general surgery and trauma care who taught at a medical university in his country of origin, which is one of the 39 countries to which the Challenged Policies apply. After fleeing his country of origin in order to escape persecution, he entered the United States on humanitarian parole. As a parolee, he was authorized to work in the United States for two years. CIR/SEIU Member A passed his medical licensing examinations and matched for a residency at a major U.S. hospital, where he started work in 2025.

24.     In October 2025, CIR/SEIU Member A applied for affirmative asylum in the United States. He had his interview in early December, 2025, and was told he would receive a decision within two weeks. Then the Global Asylum Hold went into effect and his asylum application was put on hold indefinitely. Because his work authorization expired, CIR/SEIU Member A had to stop his residency training.

7

Because of the Benefits Hold, he is unable to secure a new work authorization, which would allow him to continue his residency.

25.     The impact of these policies is devastating to CIR/SEIU Member A, who is not able to continue his training and is afraid he will be forced to leave the United States.  Not being able to work is harmful not just to CIR/SEIU Member A, but to his patients and to his colleagues, who now have to cover his work.  CIR/SEIU Member A is aware of the acute shortage of physicians in the U.S. and is deeply frustrated that he cannot use his skills and training to provide care to patients who desperately need it.

26.     **CIR/SEIU Member B** is an Afghan physician in his last year of his residency at a large urban hospital on the East Coast.  He waited years for the opportunity to come to the United States to further his medical training on a J-1 nonimmigrant visa.

27.     As he approached the end of his residency, CIR/SEIU Member B decided he would like to practice in a medically underserved community in the United States. He got a job offer from a hospital in the Southeastern United States and applied for a waiver of the J-1 nonimmigrant visa's requirement that he return to his home country for two years after completing his residency because that hospital is in a medically underserved area.  After he finalized his paperwork, the Benefits Hold policy was issued, and his request for a waiver remains pending.  If he does not receive the J-1 waiver, he will not be able to practice medicine in the United States.

8

28.      CIR/SEIU Member B and his wife have children, and the Benefits Hold has thrown his entire family's future into doubt and uncertainty.  CIR/SEIU Member B works with a number of other physicians who are similarly situated and reports that the Benefits Hold has caused chaos and confusion amongst his cohort, with many doctors experiencing severe stress that is harming them and their ability to provide patient care.   CIR/SEIU Member B is also concerned about what will happen to the hospital in the Southeast that he is supposed to work at if his J-1 waiver is not adjudicated, because he knows how hard it is for hospitals to recruit doctors willing to relocate to work in medically underserved communities.

29.      **CIR/SEIU Member C** is a Brazilian physician who entered the United States on a J-1 nonimmigrant visa to pursue training at a major U.S. hospital.  She later changed her status to the H-1B nonimmigrant classification for a one-year residency in internal medicine at a second hospital. In the fall of 2023, she filed a Form I-140, Petition for Alien Worker ("Form I-140" or "employment-based immigrant visa petition" or "petition"), with USCIS requesting a second-preference, employment-based immigrant visa ("EB-2 visa") and a national interest waiver, which USCIS approved.  She obtained work authorization pursuant to her approved Form I-140.  Her employment authorization expires in April 2026.  She is currently a third-year resident and relies upon this work authorization.

30.      Although she remains in a period of authorized stay under 8 C.F.R. § 274a.12(c)(35), she cannot adjust her status to Lawful Permanent Resident status or change to another nonimmigrant visa status from within the U.S.  Instead, she would

9

be required to depart the United States and pursue consular processing for either an immigrant visa or nonimmigrant visa.

31.     While Brazil is not one of the 39 countries subject to the Entry Ban, it is one of the 75 countries subject to a blanket visa ban issued by the U.S. Department of State on January 14, 2026 on the grounds that nationals from those countries are more likely to become "public charges" ("Public Charge Ban").  Accordingly, CIR/SEIU Member C, though eligible to become a Lawful Permanent Resident ("LPR"), cannot travel abroad to complete consular processing without risking an inability to return to the United States.

32.     Nor can she obtain an H-1B visa because she would have to go abroad for consular processing and would be subject to the Presidential Proclamation imposing a $100,000 fee on certain H-1B petitions.

33.     Even if the Public Charge Ban, which is currently subject to litigation, is lifted, CIR/SEIU Member C is afraid that USCIS will consider her Brazilian nationality as a negative discretionary factor pursuant to the Country-Specific Factors Policy.  CIR/SEIU Member C has invested years in her medical training here and wants to continue her specialized work in neurocritical care.  If USCIS considers her nationality a negative discretionary factor under the Entry Ban, then she may never be able to become an LPR.

34.     **CIR/SEIU Member D** is a physician and a national of an African country subject to the Entry Ban who is currently completing a clinical fellowship at a large urban research hospital on the East Coast, after he completed his residency

10

at a different major research hospital also on the East Coast.  His clinical specialty is in very high demand as he practices in an area in which there is a particularly severe shortage of physicians in the United States.

35.    CIR/SEIU Member D entered the United States on a J-1 nonimmigrant visa. He is pursuing classification in the first-preference, employment-based immigrant visa category ("EB-1"), which is reserved for individuals with extraordinary ability, as well as outstanding professors and researchers. Simultaneously, he is seeking a waiver of the J-1 two-year home residency requirement so that he does not have to return to his home country upon completion of his training.  Such waivers are a common pathway that allow J-1 physicians and scholars to continue their work in the United States.  CIR/SEIU Member D also fears persecution on account of his sexual orientation.  Returning to his home country is not an option for him, as homosexuality is punishable by imprisonment or death there.

36.    The Benefits Hold Policy has thrown CIR/SEIU Member D's future into doubt and left him anxious and afraid.  He does not know what he will do and his prior plans are no longer an option. He is so stressed and distraught about this situation that he has trouble concentrating at work and has stopped his community activities.  He is experiencing symptoms of generalized anxiety disorder and trauma, including poor sleep, night sweats, fatigue, restlessness, distractibility, panic, intrusive thoughts, and nightmares.

11

37.    **CIR/SEIU Member E** was born in Burma (Myanmar).    After completing medical school in Burma, CIR/SEIU Member E came to the United States in January 2021 on an F-1 nonimmigrant visa in order to pursue additional medical training.

38.    In February 2021, shortly after CIR/SEIU Member E arrived in the United States, there was a military coup in Burma.  Following the military coup, in May 2021, the Biden Administration designated Burma for temporary protected status ("TPS").  CIR/SEIU Member E applied for and was granted both TPS and an employment authorization ("EAD") document.  CIR/SEIU Member E then enrolled in a medical residency program in family medicine.

39.    CIR/SEIU Member E is currently in the second year of the three-year residency and was elected chief resident for the final year of the program.  CIR/SEIU Member E hopes to work as a family medicine doctor in the United States, a medical specialty confronting a significant and worsening physician shortage, after completing the residency program.

40.    In November 2025, the Trump Administration revoked the TPS designation for Burma. The revocation of the TPS designation for Burma is currently subject to litigation and as a result of a court order CIR/SEIU Member E is temporarily able to continue working as a medical resident using the EAD issued pursuant to CIR/SEIU Member E's TPS.  However, CIR/SEIU Member E could lose TPS and associated employment authorization at any moment and be forced to quit the residency program.

12

41.    In November of 2025, CIR/SEIU Member E's employer hospital submitted a Form I-129, Petition for a Nonimmigrant Worker ("Form I-129 or "nonimmigrant visa petition" or "petition") to USCIS to request an H-1B visa, which would allow CIR/SEIU Member E to complete the residency program. The hospital paid for premium processing of the petition to expedite the processing time. Subsequently, USCIS sent a Notice of Receipt and a Request for Evidence related to the petition, to which CIR/SEIU Member E timely responded, but USCIS has still not adjudicated the petition.

42.    CIR/SEIU Member E understands that the petition has not been adjudicated as a result of the Benefits Hold, and that even if the Benefits Hold were lifted, the petition could still be denied pursuant to the Country-Specific Factors Policy. If these policies remain in place and CIR/SEIU Member E is unable to obtain an H-1B visa, then CIR/SEIU Member E will likely not be able to complete the medical residency program, will not be able to practice medicine in the United States, and will lose the ability to lawfully remain in the country.

43.    Each of these members is unable to work and provide urgently needed medical care to patients throughout the United States because of the recent USCIS policies. The Benefits Hold made it impossible for these members to secure legal status, professional visas, and employment authorization. Moreover, even if the Benefits Hold is lifted these members likely still will not be able to secure important immigration benefits because USCIS will then be required to consider their countries of origin as a significant negative in conducting a discretionary analysis. As a result,

13

these members face a permanent barrier to obtaining immigration benefits from USCIS.

44.     These are just some of the many harms SEIU members are experiencing as a result of the recent USCIS policies.  Their personal and professional lives have been suddenly placed into indefinite limbo, and they are being forced to contemplate the potential loss of years of training and/or service in their chosen profession, or worse.

Signed under penalty of perjury, this 1st day of April, 2026.

_____
Elena Medina Neuman

14