# Exhibit G

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al.,<br><br>*Defendants.* | Case No. 1:26-cv-00132-JJM-PAS |

**DECLARATION OF RAMLA SAHID IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Ramla Sahid, make this declaration based on my personal knowledge. I declare under penalty of perjury that the following is true and correct:

1.     I am a first-generation Somalian immigrant and the Executive Director of Partnership for the Advancement of New Americans ("PANA").

2.     I am over the age of eighteen and am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration through my work, materials I have reviewed, and information made available to me pursuant to my duties at PANA. If called as a witness in this action, I could and would testify competently to these facts.

3.      PANA is a non-profit, non-partisan organization fighting to advance the full economic, social, and civic inclusion of refugees and displaced populations in the San Diego region, throughout California, and across the country. PANA was founded in 2015 by refugees and continues to be entirely led and staffed by refugees. We envision a world where refugees and displaced people are connected leaders building a global movement that ends forced migration and secures meaningful freedom for all.

4.      PANA works at the intersection of Black, Arab, Middle Eastern, Muslim, and South Asian ("BAMEMSA") refugee communities impacted by racial/ethnic profiling, religious bias, increased government surveillance and harassment, and poverty, among the many issues affecting our refugee communities.

5.      PANA advances significant policy reforms at the city, county, and state level to ensure new Americans have equal access to family-sustaining jobs, quality and healthy homes, and meaningful education that translates to upskilling in the workforce. In addition to policy and legal advocacy, PANA implements non-partisan programs to build and leverage deep community networks, develop community leaders, and establish a civic engagement infrastructure to amplify the voice, visibility and impact of our community.

6.      As Executive Director, I have knowledge of PANA's membership, including its members' circumstances, needs, and priorities.  I am acutely aware of the devastating impact that USCIS's benefits-restricting policies have had and are having on PANA's members.

**I.      PANA's Membership**

7.      PANA members reside throughout San Diego County.

8.      PANA's members are nationals of many countries, including Afghanistan, Iran, Libya, Sudan, Ethiopia, Somalia, Syria, and Yemen, and children of immigrants from those countries.  All but one of these countries, Ethiopia, are subject to the Challenged Policies.

9.      PANA membership requires actively supporting PANA priorities, attendance at the monthly steering committee meeting or meeting with organizers to provide input into organizational priorities, and volunteering for different roles such as attendance at specific meetings, etc.

10.     PANA engages thousands of community members but has a core membership of 500 people that are active in some form through monthly steering committee attendance, attendance at PANA events, participation in PANA actions such as the Housing is a Human Right Rally, or attendance at our 18-month Global Village Visioning meetings that guided construction of the Refugee Immigrant and Cultural Hub as a resource hub, gathering space for civil and social groups, and provision of multigenerational affordable housing units for our members.

11.     The majority of our members are refugees and former refugees who are now lawful permanent residents, naturalized U.S. citizens, or children of refugees in the U.S. In addition, our members also include a large number of asylum seekers to whom we provide legal services and other support. Some asylum seekers choose to attend and participate in our steering committee.

12.     Prior to creating an official membership form this year, we had an engagement model called the "PANA Way" where we identified potential leaders for long-term engagement.  In addition to hosting a monthly steering committee for members, we also had a weekly youth congress meeting for individuals under 30 years of age.  We believe authentic leadership development at PANA starts with relationships that includes one-on-one, person-to-person conversations to get to know constituents and identify potential leaders, and for constituents to get to know PANA staff so that PANA's goals are set both for and with the community.

13.     Now we track membership through sign-in sheets for every meeting, action, and activity and maintain active WhatsApp groups that are language-based.

14.     PANA is operating under an increasing atmosphere of fear and intimidation created by the federal government, particularly impacting historically underserved communities such as Somali refugees and those facing persecution based on national origin, religion, or political belief.  To respond to urgent threats to the Muslim community and other refugees and assist community members, PANA has had to develop a rapid response infrastructure in San Diego. PANA's members are already dealing with law enforcement harassment, concern over increased digital surveillance and physical safety issues, requests for meetings with the FBI and DHS, and the prolonged detention of asylum seekers.  Adding an indefinite pause on the adjudication of asylum requests and what used to be simple status adjustments is deeply discouraging and frustrating for PANA's members.

## II. PANA's Members Are Experiencing Immediate, Irreparable Harm from the Benefits Restrictions Policies

15. We are aware of the Global Asylum Hold, the Benefits Hold, the Comprehensive Re-Review, and the Country-Specific Factors Policy.

16. PANA's members are directly impacted by the Challenged Policies. While PANA members from countries subject to the Benefits Hold are still able to submit benefits requests, their applications remain pending adjudication by USCIS, long after they would have previously been adjudicated.

17. For example, PANA Member A is a 19-year-old who entered the United States in August 2023 from Somalia, one of the countries whose nationals are subject to the Benefits Hold. PANA Member A is employed as a warehouse worker in San Diego, California. In April 2024, he submitted a Form I-589, Application for Asylum and Withholding of Removal ("Form I-589" or "asylum application") with USCIS requesting affirmative asylum and paid the initial $100 filing fee. USCIS has yet to schedule him for an asylum interview. It is unclear how much longer it will take for USCIS to adjudicate his take now with the hold.

18. In November 2025, PANA Member A submitted a Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant ("Form I-360" or "petition for special immigrant juvenile status") requesting special immigrant juvenile status ("SIJS"). Pursuant to statute, USCIS is required to adjudicate SIJS petitions within 180 days of filing. Due to the benefits restricting policies, PANA Member A does not know the status of his application. PANA Member A fears removal because his life is at risk

in Somalia and not having an answer is extremely stressful.  He wants to be able to continue to grow and work here in the United States.

19.    PANA Member B is a 35-year-old man from Afghanistan, one of the countries whose nationals are subject to the benefits restricting policies. After being evacuated from Afghanistan, in October 2021, PANA Member B entered the United States.  PANA Member B resides in San Diego, California and currently works for a transportation company.  In August 2022, PANA Member B applied for an an Afghan Special Immigrant Visa ("SIV"), which is available to individuals who were employed in Afghanistan by or on behalf of the U.S. government or by the International Security Assistance Force/Resolute Support.  Upon admission to the United States, individuals with an Afghan SIV are eligible to become lawful permanent residents. After he was granted SIV following an appeal which was granted, in November 2025, PANA Member B filed a Form I-485, Application to Register Permanent Residence or Adjust Status ("Form I-485" or "adjustment of status application") for him and his family of seven which remains pending before USCIS.  He has two children born in the United States and now has a mixed status family.  Because of Member A's service in the 01 Forces, an elite paramilitary group trained by the CIA, his life is in direct threat if he and his family were forced to return to Afghanistan.

20.    In December 2023, PANA Member B's wife also applied for asylum while Member B's SIV appeal was pending.  In January 2024, the family had their asylum interview but more than a year later USCIS has not adjudicated their asylum applications.

21.     PANA Member C is a man in his 50's from Afghanistan who currently resides in San Diego County, California. In 2024, PANA Member C entered the United States on an Afghan SIV with his family.   PANA Member C had to leave his eldest daughter, L., behind in Afghanistan because she was over the age of 21 at the time the SIV was issued and therefore not eligible to accompany him. After PANA Member C arrived in the United States, in October 2025, he applied for humanitarian parole for his daughter by filing a Form I-131, Application for Travel Documents, Parole Documents, and Arrival Departure Records ("Form I-131" or "humanitarian parole request").   PANA Member C's humanitarian parole request for L. remains pending and he does not know its status.  L. is unmarried and has to live in hiding because she does not have an immediate male family member in Afghanistan, where women are required to have a *mahram* or male guardian.    Women are not allowed to travel long distances without a man, allowed to work or attend school, and run the risk of imprisonment.  The Taliban routinely harass women if they do not have a male guardian.   PANA Member C is very distressed right now that his eldest daughter is there without his protection.

22.     PANA Member D is a young man in his 20's from Sudan, one of the countries whose nationals are subject to the Benefits Hold.  PANA Member D resides in San Diego, California. In 2024, he entered the United States.  PANA Member D is a member of the Masalit tribe in Sudan.  He grew up in a refugee camp in Chad but was not safe there either when the Janjaweed militia began to invade the refugee camp and kill native black Africans.   He was able to escape to the United States but

the rest of his family remains in Chad.    The Janjaweed militia are now part of the Sudanese government.

23.    In March 2025, PANA Member D submitted an asylum application to USCIS which remains pending.  Without knowing what the future has in store for him, PANA Member D lives in a constant state of limbo.  He does not know how to move forward with his life and future if he does not know what will happen with his immigration application.  He runs the risk of being placed in deportation proceedings and being sent back to his home country where people are being ethnically cleansed.

24.    PANA Member E is a male is a young man from Afghanistan who works in transportation and resides in San Diego, California.  When PANA Member E came from Afghanistan to the US in 2023, he did not have enough money to bring over his wife and two children.  While PANA Member E was in the United States awaiting the adjudication of his asylum claim, his wife died of cancer. PANA Member E has been granted asylum and in September 2025, he filed an application for adjustment of status which is still pending because of the benefits restricting policies.  He is also at risk of having his asylum revoked under the Comprehensive Re-Review policy because he entered the US after January 2021.

25.    In December 2025, he also filed a Form I-730 Refugee/Asylee Relative Petition ("Form I-730") with USCIS requesting immigrant visas for his two children, ages 9 and 11, because he had to leave them behind in Afghanistan with his elderly mother serving as their primary caretaker. USCIS has failed to adjudicate the Form

I-730 and it remains pending.  PANA Member E needs his children to be with him, and his children need their father.

26.     PANA Member F is a young man from Somalia who works as a community organizer in San Diego, California.   In January 2024, PANA Member F was granted asylum.  In November 2024, PANA Member F filed an application for adjustment of status for himself.   PANA Member F is sad and frustrated.  He knows that he followed the process properly, completed his medical exam as required for the adjustment of status application, and paid the required application fees. Yet, his adjustment of status application remains pending due to circumstances beyond his control.  It feels like a collective punishment. This situation will prolong his path to citizenship.  In October 2025, he filed a Form I 131, requesting a travel document so that he can travel and meet his family members abroad whom he deeply misses; USCIS has failed to adjudicate the Form I-131 and it remains pending. He feels anxious and stressed and wishes the government would show empathy towards those who are affected.

27.     These members of PANA are all severely affected by either the Global Asylum Hold, the Benefits Hold, or both, as the adjudicative holds prevent them and their family members from receiving important legal status and other immigration benefits. However, even if the Global Asylum Hold and Benefits Hold are lifted these members would still face a permanent barrier to receiving most immigration benefits because of the Country-Specific Factors Policy. As long as the Country-Specific Factors Policy remains in place, all of PANA's members from any of the thirty-nine

countries subject to entry restrictions will be subject to an exercise of negative discretion on the basis of their country of origin. Thus, unless the Country-Specific Factors Policy is rescinded or invalidated these and other PANA members face denial of their applications for asylum, lawful permanent residence, and other immigration benefits, which, in some cases, would expose them to immigration enforcement and removal.

28.    PANA members' fear, frustration, and distress are justified. They fled danger in their home countries and believed they had reached a safe haven in the United States where they and their family members could be free from harm. They have complied with all of the requirements for the benefits for which they have applied, only to find their applications placed on indefinite hold. They are suffering acutely from the uncertainty that they and their family members in the United States are facing, and those seeking permission for their relatives abroad to enter the United States are experiencing the additional agony of knowing their relatives may be in danger and being unable to do anything about it.

Signed under penalty of perjury, this 3nd day of April, 2026.

Ramla Sahid (Apr 3, 2026 10:42:41 PDT)

Ramla Sahid

# 20260403_Draft_PANA_Declaration

Final Audit Report                                                    2026-04-03

| | |
|---|---|
| Created: | 2026-04-03 |
| By: | PANA Immigration (immigration@panasd.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAACxwyIE1L6aoN0xeLK1AgzqFTPF-j1VgQ |

## "20260403_Draft_PANA_Declaration" History

Document created by PANA Immigration (immigration@panasd.org)
2026-04-03 – 5:41:33 PM GMT

Document emailed to Ramla Sahid (ramla@panasd.org) for signature
2026-04-03 – 5:41:39 PM GMT

Email viewed by Ramla Sahid (ramla@panasd.org)
2026-04-03 – 5:42:10 PM GMT

Document e-signed by Ramla Sahid (ramla@panasd.org)
Signature Date: 2026-04-03 – 5:42:41 PM GMT - Time Source: server

Agreement completed.
2026-04-03 – 5:42:41 PM GMT

Adobe Acrobat Sign