# Exhibit H

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al., <br><br> *Defendants.* | Case No. 1:26-cv-00132-JJM-PAS |

**DECLARATION OF EDNA YANG IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Edna Yang, make this declaration based on my personal knowledge. I declare under penalty of perjury that the following is true and correct:

1.      I am the Co-Executive Director of American Gateways, which is a non-profit corporation organized under Texas law with a principal place of business in Austin, Texas. I have worked at American Gateways since 2002 and have been in my current position since 2020.

2.      I am over the age of eighteen and am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration through my work, materials I have reviewed, and information made available to me pursuant to my duties at American Gateways. If called as a witness in this action, I could and would testify competently to these facts.

1

**American Gateways**

3.      The mission of American Gateways is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict, or human trafficking.  We do so by providing exceptional legal services at low or no cost, by conducting community educational programming, and by engaging in policy-based advocacy on behalf of immigrant communities.

4.      American Gateways was founded in 1987 as the Political Asylum Project of Austin ("PAPA"). The organization's original mission was to provide representation to Central American immigrants fleeing persecution and seeking asylum in the United States.

5.       Over the past 39 years, American Gateways has grown to provide a broad range of legal services to low-income individuals and families throughout the region. American Gateways services immigrant communities throughout Central Texas and has offices in Austin, San Antonio, and Waco, Texas.  We have become an indispensable legal service provider for low-income asylum seekers and other immigrants in Central Texas.

6.      As Co-Executive Director, I oversee all of the work that American Gateways does, including our representation of people seeking asylum and our work at immigration detention centers in Texas.

**The Core Activities of American Gateways**

7.      American Gateways' core business activity is to provide free, culturally sensitive, trauma-informed legal representation to individuals and families seeking

2

asylum and other kinds of humanitarian immigration relief in the United States. American Gateways supports its clients from the moment of initial intake through final adjudication of their claims for relief.

8.      American Gateways provides direct representation to people appearing in the San Antonio Immigration Court, to people who are detained by the Department of Homeland Security ("DHS") at three immigrant detention facilities in Central Texas, and to people seeking affirmative immigration relief from U.S. Citizenship and Immigration Services ("USCIS").  We work in co-counsel relationships with pro bono attorneys in many of our cases.

9.      Since 1987, American Gateways has provided direct immigration legal services to thousands of individuals.  American Gateways represents clients who are applying for a wide array of immigration benefits.  In 2025, we provided free direct legal services to 1,237 clients and 2,157 of their family members.  We assisted an additional 2,033 individuals pursuing pro se immigration relief.

10.     In addition to these legal services, a central feature of our mission is to engage and educate immigrant communities, as well as local stakeholders, about immigration law and processes, individuals' rights within these processes, and forms of immigration relief for which an individual might be eligible. We regularly hold trainings on these topics in the communities we serve.

**The Challenged Policies Seriously and Irreparably Harm American Gateways**

11.     The new USCIS benefits-restricting policies ("Challenged Policies") frustrate the mission of American Gateways, force us to divert organizational resources, and cause irreparable harm to the organization.

12.     The November 27, 2026, Policy Alert, "Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits," ("Country-Specific Factors Policy") directs that USCIS will consider relevant country-specific facts and circumstances such as those outlined in Presidential Proclamation 10949 as part of its adjudication of discretionary benefits requests. This policy implicates include benefits that American Gateways regularly assists clients in seeking, such as naturalization and adjustment of status. Our clients seeking adjustment of status are asylees, trafficking and crime victims, minors who have been abandoned, abused, and neglected, and those seeking to reunite their families permanently. The December 2, 2026 memo, "Hold and Review All Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries," ("Global Asylum Hold" and "Benefits Hold") extended to cover additional countries by the January 1, 2026 memo, directly impacts American Gateways' clients, many of whom come from countries designated as "high-risk" such as Afghanistan, Haiti, and Venezuela. In addition to pausing benefits adjudications, the January 1 memo also directs USCIS personnel to "conduct a comprehensive re-review of approved benefits requests" for individuals from "high risk countries" if those benefits were approved on or after January 20, 2021 (during the Biden Administration) ("Comprehensive Re-review"). "High risk countries" are

4

those that are subject to Presidential Proclamations 10949 (June 4, 2025) and 10998 (December 16, 2025) (together, "Entry Ban.")

13.     American Gateways is already dealing with the impact of the Challenged Policies. The Country-Specific Factors Policy and the Global Asylum Hold are not limited to particular countries of origin, so they impact all of our clients seeking discretionary benefits, including but not limited to asylum.  Approximately 11% of American Gateways' clients are from one of the 39 countries subject to the Entry Ban and are therefore impacted by the Benefits Hold and Comprehensive Re-review.

14.     Specifically, we have clients whose asylum applications are on pause due to the Global Asylum Hold and others whose Form I-730 Refugee/Asylee Relative Petitions have been paused due to the Benefits Hold, thus preventing their family members from joining them in the U.S. and forcing them to remain in potentially dangerous situations abroad. We have clients whose naturalization oath ceremonies have been canceled and who have been prevented from naturalizing, despite the fact that a USCIS officer has already completed their naturalization interview and determined that they are eligible to naturalize.  We have clients whose adjustment of status and employment authorization applications remain pending long after they would previously have been adjudicated, because of the Benefits Hold. Each impacted client whose case could and likely would have been resolved within a reasonably predictable timeframe before the Challenged Policies is now indefinitely on American

5

Gateways' docket, thus continuing to require our resources and preventing us from undertaking new representation.

**The Global Asylum Hold**

15.    The Global Asylum Hold directly compromises the ability of American Gateways to serve and represent people seeking asylum. Currently, we represent 250 people in their asylum cases.  About 15% of our asylum cases are affirmative cases pending before USCIS.

16.    Affirmative asylum applications must be filed within a year of entry, 8 U.S.C. 1158(a)(2)(B), can take over a year to adjudicate, and require at least one interview with an asylum officer. American Gateways has had to dedicate additional staff resources to explain the Global Asylum Hold to clients and to continually update their pending asylum applications with current conditions in their home countries.

17.    Even though the Global Asylum Hold is in effect, the USCIS office continues to hold asylum interviews with applicants, so we must continue to work with and prepare our clients for this process. At those interviews, applicants are told that a decision cannot be made on their claim and that there is no timeframe for when a decision will be made. This uncertainty causes an undue amount of stress and fear for our clients, who are already survivors of some of the worst imaginable trauma. In addition, it requires our staff to continue to monitor and explain the delay in the adjudication of applications to clients. Moreover, we anticipate that if the Global Asylum Hold continues for an extended amount of time, re-interviews may be necessary in order to obtain a final adjudication on a pending application. Having to

6

continue to provide support to clients whose applications are indefinitely pending, and update applications that would otherwise have been adjudicated, divert American Gateways' resources from assisting new asylum seekers and clients who are not seeking asylum.

18.     For example, we are currently representing a family of three from Burundi who have a pending affirmative asylum application before USCIS. The primary applicant, Mr. N, is a human rights attorney who represented young women who had been sexually assaulted by government officials and agents and were seeking justice for the crimes committed against them. Because of his human rights work, Mr. N was accused of treason. Mr. N was arrested and jailed without a trial and tortured.  He was shot, but managed to survive and return home, only to discover that his spouse had been jailed and sexually assaulted as well. Mr. N was eventually able to reunite with his family and flee Burundi for the U.S.

19.     Mr. N and his family applied for asylum in 2018 and had to wait six years for their asylum interview, which just took place in February 2026. American Gateways prepared him for the interview and discussed the Global Asylum Hold with him. Prior to the Benefits Hold, asylum officers were issuing decisions within two to four weeks of the interview. At that interview, Mr. N. was told that a decision could not be made on his case because of the pause on adjudications and that it was unknown when a decision could be made. After years of waiting in limbo, the additional uncertainty of having to wait for a final decision simply because their interview was scheduled after the Global Asylum Hold went into effect has been

incredibly difficult for Mr. N and his family.   American Gateways cannot complete Mr. N's case or close this matter until Mr. N's family's asylum application has been fully adjudicated, thus frustrating our core business activity of undertaking new representation.

20.   Individuals with pending asylum applications are eligible for employment authorization, which is renewable as long as the asylum seeker continues to pursue their claim.   This, too, is a benefit that has been paused as a result of the Benefits Hold.   Supporting our clients' applications for employment authorization is part of American Gateways' core work. American Gateways' clients from one of the "high risk" countries with new asylum claims are not able to obtain employment authorization, and those with pending asylum claims are not able to timely renew their employment authorization.   This causes our clients enormous financial stress and hardship. American Gateways has had to dedicate more staff time to supporting clients who are facing the loss of their employment authorization and those who are unable to obtain it.

21.   For example, American Gateways represents a number of asylum-seeking families from Venezuela who have sought to renew their employment authorization in order to continue to work and support themselves. Because they are Venezuelan, they have not received decisions on their employment authorization applications, and many have lost their jobs as a result. They have had to seek assistance from community members and food banks due to financial instability and have sought additional assistance from our staff not only for resources to help with

their financial situation, but also for additional legal advice and assistance due to their lack of employment status.  Having to provide support and legal advice to clients whose asylum-based employment reauthorization applications would have been routinely approved before the Challenged Policies took effect diverts American Gateways' resources from undertaking new client representation.

22.    Because of the pause on asylum application adjudications, American Gateways' client files for asylum seekers are staying open indefinitely, requiring additional staff time to monitor and maintain pending applications. Communicating with clients who are impacted by the Global Asylum Hold and the pause on employment authorization is time-consuming and stressful both for our clients and for the staff members assisting them. Our clients are nervous and afraid for themselves and their family members.  They do not know how they are going to be able to support themselves or if they will be able to safely remain in this country.  The increase in time we must spend supporting our impacted asylum-seeking clients decreases our ability to take on additional cases.

23.    As a result of the Global Asylum Hold, American Gateways has been severely obstructed in assisting people eligible for and affirmatively seeking asylum and the associated benefit of employment authorization, despite these individuals having a legal right to seek asylum.

9

**The Benefits Hold**

24.     The Benefits Hold is impacts a wide range of American Gateways' other clients, including clients seeking to adjust status, to obtain visas available to victims of trafficking and other abuses, and to petition for their relatives.

**Adjustment of Status**

25.     For example, we currently represent eight of the nine members of the A family from Afghanistan.  Eight of the family members –Mr. and Mrs. A and six minor children, all under the age of 14-- were granted asylum in September 2024 because Mr. A worked closely with the US military in Afghanistan. The ninth family member is a child who is a US citizen.

26.     Immigrants who are granted asylum are eligible to adjust their status to legal permanent residence.  Mr. A diligently sought legal counsel to assist the family with filing their adjustment of status applications, and after finding funding for all eight family members' required medical exams, American Gateways submitted all eight applications in December 2025. Mr. A has various letters from US military members recommending him for permanent status here in the US because of his work.  The family completed biometrics and were awaiting an adjustment of status interview and a final decision by USCIS, but because of the Benefits Hold their applications for adjustment of status are now on indefinite pause.  Despite the fact that the family timely filed their applications for adjustment of status, that they completed all requirements for their applications, that they both are statutorily eligible to adjust status and merit a favorable exercise of discretion, USCIS has failed

to adjudicate their applications due to the Benefits Hold, and the family remains in limbo. American Gateways is unable to complete their representation of the family in their adjustment of status proceedings and close their case.

27. The Challenged Policies' impact of forcing American Gateways to keep this and hundreds of other cases open indefinitely pending adjudication, whereas they would previously have typically been adjudicated within a predictable timeframe, frustrates American Gateways' core business activity because the more cases open cases we have on our docket, the fewer new cases we are able to undertake. These policies have resulted in a significant increase of our staff's time and resources. A growing docket of cases without a decision is unsustainable, even if many of those cases have already been filed and are just pending adjudication. Keeping cases open for long and indefinite period of time is a significant drain on resources and time for our staff. After an application has been filed and is pending, our staff continue to remain in regular communication with clients to give them updates and track case processing times. If a case falls outside of processing times, then our staff will seek to make an inquiry to USCIS about the reason for the delay. In cases where there are indefinite delays due to policy changes, our staff will remain in regular contact with clients to keep them informed on any updates or changes and to combat misinformation. Our staff has an ethical duty to communicate regularly with clients to keep them reasonably informed about their case status. This includes prompt notification of decisions requiring client consent, consulting on strategy, responding to inquiries, and explaining matters enough for informed decisions, etc. With the fear

11

and uncertainty that all of our clients are currently facing, along with the misinformation that has been circulating in the communities we serve, the workload for our staff in ensuring that clients are accurately informed of changes and what is happening in their cases has increased significantly. Currently, I would estimate that the staff time used to communicate with clients about these changes has nearly doubled.

28.     Changes in clients' life circumstances, policy changes from the federal government, and other issues require additional work and education to current clients.  That means that we are less able to take on new matters, meet certain grant/contract requirements and have to seek amendments of those, or pivot our work and resources to give some sort of help to individuals that we cannot represent fully though we may have been able to do so before which affects our ability to advance our core service of legal representation. .

**U and T Visa Applicants**

29.     The Benefits Hold also directly impacts and hinders American Gateways' ability to represent survivors of rape, sexual assault, domestic violence, and other crimes. These vulnerable immigrants are eligible to apply for immigration status in the form of U or T visas, the granting of which is subject to USCIS discretion. We currently represent more than 400 people pursuing U or T visas. Immigrants from any of the "high risk counties" who are otherwise eligible for a U or T visa are now subject to the Benefits Hold.

30.     U and T visas were established by the Victims of Trafficking and Violence Protection Act in 2000.  U visas are set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. American Gateways represents U visa applicants who have survived a range of crimes and have provided law enforcement with information to help investigate and prosecute these crimes.  U visas processing times are severely delayed, with a backlog of approximately eight years for existing applications and 20 years for new applications. USCIS is currently adjudicating applications filed in 2018.  American Gateways has clients who have been waiting for years for their U visas and who are now subject to the Benefits Hold.

31.     T visas are available to certain victims of severe forms of trafficking in persons.  Human trafficking is a crime in which traffickers use force, fraud, or coercion to compel individuals to provide labor or services, including sex.  American Gateways has clients who have survived human trafficking and are eligible for T visas, but whose applications are now subject to the Benefits Hold.

32.     In addition, individuals with pending applications for U or T visas are eligible for work authorization, and American Gateways assists clients seeking work authorization.  However, the Benefits Hold impacts these clients as well.

33.     For example, American Gateways represents Ms. B, a single mother from Venezuela with  three young children. She fled Venezuela seeking safety based on her political opinion and is seeking asylum in the United States. Her seven-year-

13

old daughter was sexually abused by a man when they first sought shelter in the U.S. Ms. B noticed her daughter had become more withdrawn. After she discovered that her daughter had been abused, she immediately sought medical attention and also reported what had happened to the police. Because of Ms. B's assistance, the man who committed the sexual abuse was arrested and charged. Ms. B continued to assist with the investigation after the arrest.

34.    Ms. B and her family filed U visas based on the horrific crime in 2025. Ms. B is working to assist her daughter in healing from the sexual abuse and also find stability for herself and her other children. The Global Asylum Ban and Benefits Hold have created a great deal of uncertainty and anxiety for Ms. B and her children, because Ms. B cannot obtain a bona fide determination on her application and employment authorization with deferred action status that she and her children would have obtained prior to the Benefits Hold. Without this, Ms. B and her children are vulnerable to arrest, detention, and removal.  If Ms. B is detained, American Gateways will have to dedicate resources towards trying to free them from detention and fighting their removal cases, which is much more resource intensive than representing someone who is not detained and would be a considerable burden on American Gateways' capacity.  In the meantime, Ms. B is trying to create an environment where her children can feel safe and secure. American Gateways will be unable to complete and close this case until Ms. B and her two children receive their U visas as victims of this crime.

14

35.    Because of the pause on adjudication of U and T visa applications, American Gateways' client files for U and T visa seekers are staying open indefinitely, requiring additional staff time to monitor and maintain pending applications. Individuals, like Ms. B, seeking U or T visas have often been traumatized by the circumstances that are the basis for seeking these visas and the delay and uncertainty are deeply upsetting to them. Individuals with pending U visa applications have been waiting for years for their visas to be approved, only for them now to be placed indefinitely on hold, while individuals with indefinitely pending T visa applications are unable to access needed benefits and services as survivors of human trafficking.

36.    Communicating with clients who are impacted by the pause on these applications and the pause on employment authorization is time-consuming and stressful both for our clients and for the staff members assisting them. The clients are very anxious about whether they will be able to stay in the United States and how they will be able to support themselves and their families. The increase in time we must spend supporting our impacted U and T visa applicants decreases our ability to take on additional cases, which has a negative impact on staff morale.

37.    As a result of the pause on U and T visa adjudications, American Gateways has been severely obstructed in assisting people eligible for and seeking these visas and the associated benefit of employment authorization.

38.    In addition to the pauses on the adjudication of asylum claims and U and T visas and attendant work authorization, American Gateways' work is being

directly impacted and negatively affected by the pause on other discretionary benefits.

**Refugee/Asylee Relative Petitions**

39.     American Gateways has clients whose Form I-730 Refugee/Asylee Relative Petitions are subject to the Benefits Hold. Our client, Mr. DE, experienced political persecution and religious persecution in his home country. He was beaten, raped, and severely tortured by an opposing political party and fled to a new country only to be persecuted again due to his religious beliefs and xenophobia. He spent months in hiding until he could flee to the U.S. to be with his wife and children who were already here. His wife, Mrs. DE, won asylum in 2023, and we submitted a Form I-730 seeking derivative asylum status on Mr. DE's behalf which has been pending since June of 2023. Based on our experience, his application would have been approved by now, but for the Benefits Hold. The pause on the Form I-730 decisions has caused a great deal of stress and uncertainty to Mr. DE, who continues to fear being detained by DHS and returned home and killed.

40.     These are just a few of the myriad examples of clients whose cases have been impacted by the Benefits Hold. American Gateways is unable to resolve any of these cases and clear them off our docket until the applications are adjudicated. Keeping these cases open means that we are continually checking with the clients to provide and receive updates, and monitoring reports on changing country conditions that could impact their families. This harms our capacity to take new clients.

### Naturalization

41.    American Gateways provides naturalization clinics and represents clients who are seeking to become naturalized United States citizens. The pause on naturalization has deterred individuals from applying for benefits to which they have a right. One of our attorneys completed a consultation in mid-February 2026 with a longtime client from Angola who won asylum based on political persecution and is now a lawful permanent resident. This client qualifies for naturalization and wants to become a US citizen but is not sure if she wants to move forward with filing a Form N-400, Application for Naturalization, with USCIS, knowing a decision on her application would be indefinitely on hold.  The client was seeking to naturalize in order to obtain the benefits of US citizenship including petitioning for parents, which can only be done by a US citizen. In addition, the client wanted to become a US citizen in order to exercise her right to vote in elections. This pause has caused us to use additional resources to discuss with clients the fact that their naturalization cases will be indefinitely paused until there is a change in policy. Some choose not to move forward, but others do, and as long as those clients cannot obtain naturalization, we cannot complete and close their cases.

42.    American Gateways represents Ms. W, who is a survivor of family violence from Nigeria. American Gateways represented her in her Battered Spouse Waiver application to obtain lawful permanent residency. We then represented her in her naturalization application, which was recommended for approval in May 2025. Ms. W had two different oath ceremonies scheduled in December of 2025, both

17

of which were subsequently canceled. We have reached out to USCIS to try and reschedule the oath ceremony multiple times as over two months have passed since the initial cancellation, asking for an oath ceremony to be scheduled. Thus far, we have received no response to those inquiries and Ms. W. remains in limbo.

43.    American Gateways cannot complete and close Ms. W's case until her naturalization is granted. We are considering federal litigation on her behalf. The additional time and resources required to keep the client's file current while we continue to press for her ceremony to be scheduled, much less the significant time and resources it will take to litigate her case in federal court, divert American Gateways' staff's time and attention from developing new cases and supporting other clients.

**The Comprehensive Re-Review**

44.    American Gateways has represented hundreds, if not thousands, of clients who are now subject to the Comprehensive Re-Review Policy. Supporting clients through the Re-Review process will require American Gateways to re-open closed client files and dedicate significant staff resources to prepare clients to go through the re-review process. Clients who already went through extensive vetting and waited sometimes years to receive the benefits they have, and who finally thought they were safe in the United States, will be forced to relive the trauma of their prior experiences and will be plunged back into fear and uncertainty as to whether they will be able to remain safely in the United States and able to work and provide for their families. There is no guarantee that pro bono attorneys who represented clients on their original petitions for relief will be willing or able to

18

represent those same clients through the Re-Review process, so American Gateways will have to pick cases back up from pro bono attorneys and assign them to already overburdened staff.

**The Challenged Policies Negatively Affect American Gateways' Ability to Accomplish its Core Activities**

45.    Collectively, the Challenged Policies have had a significant negative impact on American Gateways' ability to accomplish our mission and engage in our core activities.

46.    The Challenged Policies are preventing American Gateways from closing cases. As long as a case is open on our docket, our staff has to keep the client and the client's file continually updated with any change in circumstance and/or policy that impact the client's case. The number of open cases on our docket limits us from undertaking new representation.

47.    Our staff has had to dedicate additional capacity to understanding the Challenged Policies, analyzing their impact on our clients, and identifying the clients whose cases have been or are going to be affected. Explaining the Challenged Policies to our impacted clients and supporting them as they navigate the implications for their particular cases has been time-consuming and intensely stressful for our staff. Clients who thought they were finally close to the resolution of their cases, with the prospect of safety and security in the United States ahead of them, are devastated by news of these potentially indefinite delays. Staff have to spend extra time supporting these clients and keeping their pending petitions current so that they may be timely adjudicated if and when the pause is lifted.

19

48.  The additional time spent in explaining these changes and their impacts to clients has also significantly affected American Gateways' staff morale. Concerns about the harm to the communities, increased case dockets, and uncertainty about when cases will be completed have taken a toll on all of our dedicated staff. Negative impacts on staff morale have a downstream impact on staff retention, which in turn leaves large gaps in services that are needed in the low income communities we serve.

49.  American Gateways co-counsels with pro bono attorneys and also places entire cases with pro bono attorneys.  We offer case support to pro bono attorneys, most of whom do not practice immigration law. Our staff has had to take additional time and resources to explain the Challenged Policies to pro bono attorneys and help them understand the implications for their cases and how to relay that information to clients. The Challenged Policies will require pro bono attorneys to keep their existing cases longer as their clients wait for resolution.  This means that they may be unable to take on additional pro bono cases and may be less likely to take pro bono cases in the future, or may to choose to return cases to American Gateways as they are unable to take on a commitment without an end date, thus exacerbating the already heavy and increased workload on our staff.

50.  In addition to the impacts on our direct representation work, our community education work has also been impacted by the USCIS benefits restricting memos.  We have received an increasing number of calls from community members with questions about the policies, who are trying to understand if and how the policies will impact them, which further stretched our limited resources.

51.    In sum, the Challenged Policies harm our organization by frustrating our ability to resolve cases and preventing us from taking new ones; requiring us to spend significant additional time supporting clients subject to them and monitoring their benefits applications; damaging our ability to recruit and retain pro bono counsel; causing stress to our staff and our clients, resulting in longer consultations which prevent us from doing other work; and burdening our public education program by increasing the requests we're receiving from individuals anxious that the policies impact them.  The Comprehensive Re-Vetting Policy may significantly exacerbate these harms by requiring us to dedicate staff resources to cases that are closed.

Signed under penalty of perjury, this 2nd day of April,  2026.


_____

Edna Yang

21