**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

DORCAS INT'L INST. OF R.I., *et al.*,

     Plaintiffs,

v.

U.S. CITIZENSHIP AND
IMMIGRATION SERVS., *et al.*,

     Defendants.

Civil Action No.
26cv132-JJM-PAS

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT, MOTION
TO DISMISS (FIFTH AMENDMENT CLAIMS), AND
OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

# Table of Contents

Table of Authorities ...................................................................................................... iii

Introduction .................................................................................................................. 1

Standard of Review....................................................................................................... 3

Legal Background—The Immigration and Naturalization Act ................................... 5

Factual Background ...................................................................................................... 10

    Presidential Policy and Inter-Agency Factfinding .......................................... 10

    USCIS Policy Memoranda .............................................................................. 11

    Progress on USCIS Implementation ............................................................. 13

Argument ...................................................................................................................... 14

I.    Because the Court lacks subject-matter jurisdiction over Plaintiffs' claims, they should be dismissed. ................................................................. 14

    A.    Because the Challenged Policies implicate national security—and, thus, separation-of-powers concerns—they are not justiciable. .................................................................................... 14

    B.    The INA strips the federal courts of judicial review of the Challenged Policies. ........................................................................ 17

    C.    Plaintiffs' APA claims are not justiciable because adjudication of immigration benefits is committed to USCIS discretion. .......................................................................................... 22

    D.    Because the Challenged Policies do not constitute final agency action, Plaintiffs' claims are not ripe. ...................................... 24

II.    Plaintiffs—none of whom is an applicant for or recipient of immigration benefits—lack standing............................................................. 29

    A.    Plaintiffs lack organizational standing. ................................................ 30

    B.    Plaintiffs lack associational standing.................................................... 34

    C.    Plaintiffs lack redressable injuries........................................................ 38

III.    The USCIS policy memoranda and the temporary adjudication pause are consistent with the INA and APA. .................................................. 40

    A.    The INA and its governing regulations expressly authorize enhanced scrutiny of immigration benefits applications and awards and the temporary adjudication pause................................... 40

i

1.      The Court should reject Plaintiffs' arguments that the Challenged Policies exceed the government's statutory authority. .................................................................. 43

2.      The Court should reject Plaintiffs' arbitrary-and-capricious arguments. ................................................ 45

B.      USCIS was not obligated to conduct notice-and-comment rulemaking to issue its interpretive guidance in the Challenged Policies. ......................................................... 50

IV.     Plaintiffs lack Fifth Amendment claims. ........................................................ 53

V.      If the Court does not grant summary judgment to the Defendants, the Court should narrowly prescribe any resulting relief. ............................. 57

A.      The proper remedy would be remand the policy memoranda to USCIS. ...................................................................... 57

B.      The Court should reject Plaintiffs' request to enjoin imagined, prospective agency action that might impose "similar" policies. .................................................................. 58

C.      The Court should limit any permanent injunctive relief to the named Plaintiffs and any identified and verified members of the organizational Plaintiffs. ............................................. 59

D.      Any injunctive relief should be stayed pending appeal and accompanied by a bond. ...................................................... 61

Conclusion ................................................................................................. 62

## Table of Authorities

**Cases**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) .................................................................................. 27

*Abuzeid v. Mayorkas,*
   62 F.4th 578 (D.C. Cir. 2023) ................................................................. 18

*Albalwah v. Edlow,*
   No. 1:25-cv-01255, 2025 WL 3033472 (D. Colo. Oct. 29, 2025) ....................... 22

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell,*
   No. 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ....................... 33

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003) .................................................................................. 14

*Ameziane v. Obama,*
   699 F.3d 488 (D.C. Cir. 2012) ......................................................... 15, 16

*Antonishin v. Keisler,*
   627 F. Supp. 2d 872 (N.D. Ill. 2007) .................................................... 22

*Ass'n of Am. Physicians & Surgeons v. Sebelius,*
   746 F.3d 468 (D.C. Cir. 2014) ............................................................... 53

*Ass'n of Am. Univs. v. Dep't of Def.,*
   792 F. Supp. 3d 143 (D. Mass. 2025) ................................................... 46

*Ass'n of Am. Univs. v. Dep't of Energy,*
   789 F. Supp. 3d 118 (D. Mass. 2025) ................................................... 46

*Atieh v. Riordan,*
   797 F.3d 135 (1st Cir. 2015) .................................................................... 5

*Aversa v. United States,*
   99 F.3d 1200 (1st Cir. 1996) ................................................................... 3

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................... 4

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................ 25

*Beshir v. Holder,*
   10 F. Supp. 3d 165 (D.D.C. 2014) ................................................... 19, 23

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002),
   *cert. denied,* 537 U.S. 1171 (2003) ...................................................... 43

*Bluestone Env't Grp., Inc. v. Zapisek,*
No. 3:21-cv-30056-MGM, 2022 WL 16857173, (D. Mass. Nov. 10, 2022) .......................................................................................................... 4

*Boston Redev. Auth. v. Nat'l Park Serv.,*
838 F.3d 42 (1st Cir. 2016) .................................................................. 4

*Bouarfa v. Mayorkas,*
604 U.S. 6 (2024) ................................................................................. 7

*Bowser v. Noem,*
No. 26-CV-10382-AK, 2026 WL 555624 (D. Mass. Feb. 27, 2026) .................. 49

*Brown v. Gen. Servs. Admin.,*
425 U.S. 820 (1976) ............................................................................ 23

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................................ 57

*Carney v. Adams,*
592 U.S. 53 (2020) ........................................................................ 55, 58

*Casa De Maryland v. U.S. Dep't of Homeland Sec.,*
924 F.3d 684 (4th Cir. 2019) ........................................................... 50, 52

*Cath. Charities CYO v. Napolitano,*
368 F. App'x 750 (9th Cir. 2010) (unpublished) ...................................... 27

*Celebi v. Mayorkas,*
744 F. Supp. 3d 100 (D. Mass. 2024) ..................................................... 9

*Cheejati v. Blinken,*
106 F.4th 388 (5th Cir. 2024),
*cert. denied,* 145 S. Ct. 1126 (2025) .................................................... 19

*City of Fall River v. Fed. Energy Regulatory Comm'n,*
507 F.3d 1 (1st Cir. 2007) ........................................................ 27, 28, 59

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................ 30, 33, 34, 37

*Conservation Law Found., Inc. v. Academy Express, LLC,*
129 F.4th 78 (1st Cir. 2025) ................................................................ 60

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
603 U.S. 799 (2024) ............................................................................ 24

*County of Los Angeles v. Shalala,*
192 F.3d 1005 (D.C. Cir. 1999) ...................................................... 57, 58

*Crawford v. Antonio B. Won Pat Int'l Airport Auth.,*
917 F.3d 1081 (9th Cir. 2019) ............................................................. 54

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,*
77 F.4th 679 (D.C. Cir. 2023) .................................................................................. 54

*Danilov v. Aguirre,*
370 F. Supp. 2d 441 (E.D. Va. 2005) ...................................................................... 21

*Democratic Nat'l Comm. v. Trump,*
No. 25-cv-587, 2025 WL 1573181 (D.D.C. June 3, 2025) ...................................... 34

*Dep't of Commerce v. New York,*
588 U.S. 752 (2019) ................................................................................................ 43

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) .................................................................................................... 50

*Dep't of the Navy v. Egan,*
484 U.S. 518 (1988) ................................................................................................ 16

*Doe v. Noem,*
784 F. Supp. 3d 437 (D. Mass. 2025) ..................................................................... 47

*Doe v. Town of Lisbon,*
78 F.4th 38 (1st Cir. 2023) ..................................................................................... 40

*Doe v. Trump,*
No. 1:26-cv-11382, slip op. (D. Mass. Apr. 6, 2026) (ECF 18) ............................. 60

*Doe v. U.S. Citizenship & Immigr Servs.,*
No. 1:26-cv-2389 slip. op. (N.D. Ill. Mar. 26, 2026) (ECF 33) ...................... 39, 49

*Duke Power Co. v. Carolina Envtl. Study Grp.,*
438 U.S. 59 (1978) .................................................................................................. 38

*Fafel v. DiPaola,*
399 F.3d 403 (1st Cir. 2005) .................................................................................... 3

*FDA v. Wages & White Lion Invs., L.L.C.,*
604 U.S. 542 (2025) ................................................................................................ 41

*Fed. Commc'ns Comm v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ................................................................................................ 56

*Fedorenko v. United States,*
449 U.S. 490 (1981) ................................................................................................ 24

*Fofana v. Noem,*
163 F.4th 1135 (8th Cir. 2026) ............................................................................... 18

*Food & Drug Admin. v. All. For Hippocratic Med.,*
602 U.S. 367 (2024) .......................................................................................... passim

*Franklin v. Massachusetts,*
505 U.S. 788, 827 (1992) ........................................................................................ 42

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ................................................................................ 60

*Garcia v. U.S. Citizenship & Immigr. Servs.,*
146 F.4th 743 (9th Cir. 2025) ............................................................... 18

*Garrison v. Johnson,*
286 F. Supp. 2d 41 (D. Me. 2003) ......................................................... 55

*Ge v. U.S. Citizenship & Immigr. Servs.,*
No. 3:18-cv-00889, 2019 WL 2713052 (E.D. Va. June 28, 2019) .................... 58

*Geda v. Dir. U.S. Citizenship & Immigr. Servs.,*
126 F.4th 835 (3d Cir. 2025).................................................................. 19

*Gupta v. Jaddou,*
118 F.4th 475 (1st Cir. 2024) ........................................................ passim

*Haig v. Agee,*
453 U.S. 280 (1981) .............................................................................. 15

*Harisiades v. Shaughnessy,*
342 U.S. 580 (1952) ........................................................................ 16, 17

*Harper v. Rettig,*
46 F.4th 1 (1st Cir. 2022) ....................................................................... 4

*Harper v. Werfel,*
118 F.4th 100 (1st Cir. 2024) ............................................................... 25

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ........................................................................ 30, 33

*Heckler v. Chaney,*
470 U.S. 821 (1985) .............................................................................. 23

*Holder v. Humanitarian Law Project,*
561 U.S. 1, 35 (2010) ............................................................................ 42

*Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.,*
664 F.3d 940 (D.C. Cir. 2012) ............................................................... 25

*Huisha-Huisha v. Mayorkas,*
27 F.4th 718 (D.C. Cir. 2022)............................................................. 7, 14

*Immigr. & Naturalization Serv. v. Aguirre-Aguirre,*
526 U.S. 415 (1999) ........................................................................ 15, 56

*Immigr. & Naturalization Servs. v. Cardoza-Fonseca,*
480 U.S. 421 (1987) ................................................................................ 7

*Immigr. & Naturalization Servs. v. Miranda,*
459 U.S. 14 (1982) ................................................................................ 36

*Jacinto v. Immigr. & Naturalization Servs.*,
208 F.3d 725 (9th Cir. 2000) ................................................................ 54

*Jama v. Dep't of Homeland Sec.*,
760 F.3d 490 (6th Cir. 2014) ................................................................ 26

*Kale v. Alfonso-Royals*,
139 F.4th 329 (4th Cir. 2025) ............................................................... 19

*Kanapuram v. Dir., U.S. Citizenship & Immigr. Servs.*,
131 F.4th 1302 (11th Cir. 2025) ........................................................... 19

*Kewayfati v. Bondi*,
165 F.4th 342 (5th Cir. 2026) ......................................................... 7, 26

*Khachutorov v. Britten*,
792 F. Supp. 3d 1106 (C.D. Cal. 2025) ................................................. 20

*Kucana v. Holder*,
558 U.S. 233 (2010) .............................................................................. 18

*La Casa Del Convaleciente v. Sullivan*,
965 F.2d 1175 (1st Cir. 1992) ............................................................... 51

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*,
844 F.3d 318 (1st Cir. 2016) ................................................................ 27

*Laird v. Tatum*,
408 U.S. 1 (1972) ........................................................................... 31, 38

*Le v. U.S. Citizenship & Immigr. Servs.*,
No. 21-CV-501 (JMC), 2025 WL 1743942 (D.D.C. June 24, 2025) ................ 51

*Lewis v. Casey*,
518 U.S. 343 (1996) .............................................................................. 57

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .............................................................................. 50

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) ................................................................ 32

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..................................................................... 3, 29, 30

*Mandel v. Boston Phoenix, Inc.*,
456 F.3d 198 (1st Cir. 2006) .................................................................. 4

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) .................................................... 46

*Mathews v. Diaz*,
426 U.S. 67 (1976) ................................................................................ 15

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ................................................................................. 56

*Me. Med. Ctr. v. Burwell,*
    841 F.3d 10 (1st Cir. 2016) ..................................................................... 57

*Mississippi v. Johnson,*
    71 U.S. 475, 501 (1866) .......................................................................... 42

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto.*
    *Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................ 5, 41

*Muminov v. Sessions,*
    No. 1:18-cv-1034, 2018 WL 5298386 (N.D. Ohio Oct. 25, 2018)..................... 21

*Murthy v. Missouri,*
    603 U.S. 42 (2024) ............................................................................ 3, 59

*N.H. Hosp. Ass'n v. Azar,*
    887 F.3d 62 (1st Cir. 2018) ............................................................. 51, 52

*Namarra v. Mayorkas,*
    924 F. Supp. 2d 1058 (D. Minn. 2013)........................................................ 17

*Nat. Res. Def. Council, Inc. v. Train,*
    510 F.2d 692 (D.C. Cir. 1974) .................................................................. 61

*Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.,*
    174 F.3d 13 (1st Cir. 1999) ................................................... 4, 5, 43, 49

*New York v. Trump,*
    769 F. Supp. 3d 119 (D.R.I. 2025) ............................................................ 25

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................................. 23

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ............................................................................... 28

*Okpoko v. Heinauer,*
    796 F. Supp. 2d 305 (D.R.I. 2011) ............................................................ 15

*Orlov v. Howard,*
    523 F. Supp. 2d 30 (D.D.C. 2007) .............................................................. 9

*Palisades Gen. Hosp. Inc. v. Leavitt,*
    426 F.3d 400 (D.C. Cir. 2005) .................................................................. 57

*Patel v. Garland,*
    596 U.S. 328 (2022) ............................................................................... 18

*PPG Indus., Inc. v. United States,*
    52 F.3d 363 (D.C. Cir. 1995) .............................................................. 57, 58

*Puerto Rico v. United States,*
490 F.3d 50 (1st Cir. 2007) ................................................................... 24

*R.I. Hosp. v. Leavitt,*
548 F.3d 29 (1st Cir. 2008) ..................................................................... 5

*Rajah v. Mukasey,*
544 F.3d 427 (2d Cir. 2008) ................................................................. 56

*Reno v. Flores,*
507 U.S. 292 (1993) .............................................................................. 54

*Rodríguez v. Mun. of San Juan,*
659 F.3d 168 (1st Cir. 2011) ................................................................... 3

*Roe v. Lynch,*
997 F.3d 80 (1st Cir. 2021) ................................................................... 54

*Safadi v. Howard,*
466 F. Supp. 2d 696 (E.D. Va. 2006) .................................................... 24

*Save Jobs USA v. U.S. Dep't of Homeland Sec.,*
664 F. Supp. 3d 143 (D.D.C. 2023),
*aff'd,* 111 F.4th 76 (D.C. Cir. 2024),
*cert. denied,* 146 S. Ct. 319 (2025) ...................................................... 20

*Secs. & Exchange Comm'n v. Chenery Corp.,*
318 U.S. 80 (1943) ................................................................................ 57

*Sherley v. Sebelius,*
689 F.3d 776 (D.C. Cir. 2012),
*cert. denied,* 133 S. Ct. 847 (2013) ...................................................... 43

*Shinseki v. Sanders,*
556 U.S. 396 (2009) .............................................................................. 53

*Smith v. Bayer Corp.,*
564 U.S. 299 (2011) .............................................................................. 59

*Steel Co. v. Citizens for Better Env't,*
523 U.S. 83 (1998) ................................................................................ 14

*Students for Fair Admissions, Inc. v. President &*
*Fellows of Harvard Coll.,*
600 U.S. 181 (2023) ......................................................................... 29, 34

*Sulaiman v. Mayorkas,*
No. 8:24-cv-01733, 2024 WL 5410126 (C.D. Cal. Dec. 11, 2024) ...................... 58

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ......................................................................... 37, 59

*Tanner-Brown v. Haaland,*
105 F.4th 437 (D.C. Cir. 2024) ............................................................. 35

*Tao Luo v. Keisler,*
        521 F. Supp. 2d 72 (D.D.C. 2007) ................................................................ 16

*Texas v. United States,*
        523 U.S. 296 (1998) ...................................................................................... 27

*Thigulla v. Jaddou,*
        94 F.4th 770 (8th Cir.),
        *pet. for reh'g en banc denied,*
        No. 22-3066, 2024 WL 2122426 (8th Cir. May 13, 2024)................................ 19

*Town of Castle Rock v. Gonzales,*
        545 U.S. 748 (2005) ...................................................................................... 54

*Trump v. CASA, Inc.,*
        606 U.S. 831 (2025) ................................................................................ 40, 59

*Trump v. Hawaii,*
        585 U.S. 667 (2018) .............................................................................. passim

*Trump v. New York,*
        592 U.S. 125 (2020) ...................................................................................... 28

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
        578 U.S. 590 (2016) ...................................................................................... 26

*U.S. Immigr. Fund-NY LLC v. Mayorkas,*
        No. 21-cv-0358, 2022 WL 715239 (D.D.C. Mar. 10, 2022) .............................. 28

*United Presbyterian Church in the U.S.A. v. Reagan,*
        738 F.2d 1375 (D.C. Cir. 1984) ..................................................................... 31

*United States ex rel. Knauff v. Shaughnessy,*
        338 U.S. 537 (1950) ...................................................................................... 14

*United States v. Castillo-Martinez,*
        16 F.4th 906 (1st Cir. 2021)........................................................................... 54

*United States v. Ginsberg,*
        243 U.S. 472 (1917) ...................................................................................... 24

*Usoh v. U.S.C.I.S.,*
        No. 2:22-cv-01470-SAL-MGB, 2023 WL 4998550 (D.S.C. Mar. 30,
        2023),
        *R & R adopted by* 2023 WL 4634955 (D.S.C. July 20, 2023),
        *aff'd as modified,* No. 23-6823, 2024 WL 3842106 (4th Cir. Aug. 16,
        2024) ............................................................................................... 21, 28

*V.U.C. v. U.S. Citizenship & Immigr. Servs.,*
        557 F. Supp. 3d 218 (D. Mass. 2021)............................................................. 20

*Vang v. Gonzales,*
        237 F. App'x 24 (6th Cir. 2007) (unpublished).................................................. 9

x

*Varniab v. Edlow,*
    No. 25-CV-10602-SVK, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026) ......... 48, 49

*Viana Guedes v. Mayorkas,*
    123 F.4th 68 (1st Cir. 2024) ..................................................................... 18

*Washington v. Mayorkas,*
    No. CV 24-10318-RGS, 2024 WL 3835029 (D. Mass. Aug. 15, 2024).......... 9, 23

*Washington v. Trump,*
    145 F.4th 1013 (9th Cir. 2025) .................................................................. 60

*West Virginia v. Env'tl Prot. Agency,*
    597 U.S. 697 (2022) ................................................................................... 44

*Zaytsev v. Gantner,*
    No. 04-cv-7101, 2004 WL 2251665 (S.D.N.Y. Sept. 24, 2004) ...................... 22

**Statutes**

5 U.S.C. § 553(b) ............................................................................................ 50

5 U.S.C. § 553(b)(A) ....................................................................................... 50

5 U.S.C. § 701(a)(1) ........................................................................................ 22

5 U.S.C. § 701(a)(2) .............................................................................. 22, 23, 24

5 U.S.C. § 704 ............................................................................................ 24, 25

5 U.S.C. § 706 ................................................................................................. 57

5 U.S.C. § 706(1) ....................................................................................... 23, 57

5 U.S.C. § 706(2) ....................................................................................... 58, 67

5 U.S.C. § 706(2)(A) ......................................................................................... 4

6 U.S.C. § 111(b)(1)(A) ..................................................................................... 5

6 U.S.C. § 271(b) .............................................................................................. 5

6 U.S.C. § 271(b)(5) .......................................................................................... 5

6 U.S.C. § 557 .................................................................................................. 5

8 U.S.C. § 1103(a) ........................................................................................... 20

8 U.S.C. § 1103(a)(1) ........................................................................................ 5

8 U.S.C. § 1105(a) ........................................................................................... 41

8 U.S.C. § 1105(b) ........................................................................................... 41

xi

8 U.S.C. § 1151(b)(1)(A) ............................................................................................... 7

8 U.S.C. § 1154 ............................................................................................................. 7

8 U.S.C. § 1155 ............................................................................................................. 7

8 U.S.C. § 1158 ........................................................................................................... 10

8 U.S.C. § 1158(b)(1)(A) ........................................................................................ 7, 39

8 U.S.C. § 1158(d)(5)(A) ........................................................................................... 8, 9

8 U.S.C. § 1158(d)(7) ................................................................................................. 23

8 U.S.C. § 1182(a) ........................................................................................................ 6

8 U.S.C. § 1182(a)(2) .................................................................................................... 6

8 U.S.C. § 1182(a)(3) ............................................................................................... 6, 41

8 U.S.C. § 1182(a)(3)(B) ............................................................................................... 6

8 U.S.C. § 1182(a)(3)(C) ............................................................................................... 6

8 U.S.C. § 1182(f) .................................................................................................... 6, 44

8 U.S.C. § 1184(a) ...................................................................................................... 20

8 U.S.C. § 1252(a)(2)(B) ..................................................................................... passim

8 U.S.C. § 1254a(a)(1) .................................................................................................. 7

8 U.S.C. § 1255 ............................................................................................................. 7

8 U.S.C. § 1255(a) ............................................................................................... passim

8 U.S.C. § 1255(b) ........................................................................................................ 6

8 U.S.C. § 1256(a) ........................................................................................................ 7

8 U.S.C. § 1324a ........................................................................................................ 20

8 U.S.C. § 1421(c) .................................................................................................. 20, 21

8 U.S.C. § 1427(a)(3) .................................................................................................. 24

8 U.S.C. § 1446(a) ................................................................................................... 6, 41

8 U.S.C. § 1446(b) ........................................................................................................ 6

8 U.S.C. § 1447 ............................................................................................................. 8

8 U.S.C. § 1447(b) ............................................................................................. 9, 20, 21

8 U.S.C. § 1571(b) ........................................................................................... 45

## Other Authorities

Antonin Scalia & Bryan Garner, Reading Law (2012)................................................ 7

Executive Order 14161,
90 Fed. Reg. 8451 (Jan. 20, 2025).................................................... 10

Proclamation No. 10949,
90 Fed. Reg. 24,497 (June 10, 2025)....................................... passim

Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 19, 2025)........................... passim

## Rules

Fed. R. Civ. P. 12(b)(1).............................................................................. 3, 4, 53

Fed. R. Civ. P. 12(b)(6).................................................................................. 4, 53

Fed. R. Civ. P. 56(a) ......................................................................................... 4

## Regulations

8 C.F.R. § 103.2(b)(1) ...................................................................................... 7

8 C.F.R. § 103.2(b)(10)(i)................................................................................. 8

8 C.F.R. § 103.2(b)(18) .................................................................................... 8

8 C.F.R. § 103.2(b)(7) ...................................................................................... 6

8 C.F.R. § 335.2(b)......................................................................................... 21

## Constitutional Provisions

U.S. Const. art. II, § 1, cl. 1 ........................................................................... 14

U.S. Const. art. III, § 2 .............................................................................. 55, 58

U.S. Const. amend. V...................................................................................... 53

**Introduction**

This case rests on a remarkable premise: that a federal court should prevent an agency from issuing the very policy guidance that provides government personnel with the guardrails necessary to ensure consistent, non-arbitrary, and individualized decisionmaking consistent with federal law.

Under the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress broadly delegated to various components of the Executive branch wide-ranging control over the entry of aliens into the United States as well as discretion within the statutory scheme to confer as well as withdraw various discretionary benefits—including employment authorization, permanent residence, asylum, and temporary protected status.

In delegating that authority, Congress authorized the Executive to assess aliens' eligibility for immigration benefits. Eligibility is substantially discretionary, informed by subjects that the INA specifies, including national security and foreign relations, which the Supreme Court has repeatedly cited as demanding judicial restraint out of separation-of-powers concerns.

In June 2025, the President ordered an inter-agency review of processes by which aliens are vetted for entry. Plaintiffs contest none of the findings of that review. Those findings identified a range of significant deficiencies, leading the President to restrict entry of aliens from 19 countries. Following well-publicized acts of violence committed by aliens in the United States, and borrowing from the findings of the preceding inter-agency review, the United States Citizenship and Immigration Services ("USCIS") issued three policy statements between November 27, 2025, and January 1, 2026. Together, they: (a) describe how USCIS will interpret its existing authority to conduct adjudications and, consistent with the INA's command to focus on national security and public safety, to consider certain country-specific facts and circumstances when making discretionary determinations for immigration

1

benefit requests filed by applicants from those 19 countries; (b) temporarily pause final decisions on all pending immigration-benefits applications for individuals from 39 countries, while the processing of all such applications continues; and (c) preview a reconsideration of all immigration benefits awarded to aliens from those same 39 countries since January 2021.

Plaintiffs, none an applicant for or recipient of immigration benefits, filed this case and ask this Court to vacate the USCIS' policy statements under 5 U.S.C. § 706, to enjoin the government from enforcing those policies, and to declare them unlawful under the Administrative Procedure Act ("APA") and the Constitution. For the reasons presented herein, the Court should dismiss Plaintiffs' claims and enter summary judgment for the government.

First, this Court lacks jurisdiction to hear Plaintiffs' claims. The policies that Plaintiffs challenge are predecisional guidance concerning the anticipated implementation of those policies. The Court lacks jurisdiction on several related grounds: the non-justiciability of claims contesting statutorily authorized, Executive-branch judgments about matters of foreign affairs and national security, the lack of final agency action, and Plaintiffs' lack of standing. The INA also expressly strips federal courts from reviewing any aspect of discretionary immigration-benefit adjudications.

Even if this Court had jurisdiction to hear Plaintiffs' claims, they fail. The INA confers substantial discretion on the government to adjudicate immigration benefits and to scrutinize individual applicants concerning anti-terrorism, public safety, and national security concerns. The statute also expressly authorizes the government to reconsider and revoke those same privileges. The implementation that USCIS' policy statements previews fits neatly within the authority Congress

2

delegated under the INA and the processes the APA requires. And, as a matter of law, Plaintiffs cannot state any Constitutional claims.[1]

Federal agencies must be able to advise their personnel to ensure consistency, transparency, and reasoned decisionmaking. Stripping USCIS of that ability here would rewrite the INA by narrowing the discretion that law provides, would calcify processes Plaintiffs ironically want to speed up, and—without enabling the government to apply vetting enhancements it continues to develop and publicize since issuing the policies Plaintiffs contest—would risk increasing ad hoc, inconsistent, and potentially arbitrary adjudications that the APA is designed to prevent. Plaintiffs' claims thus ask this Court to disable a basic function of agency administration in the name of preventing it, and thus should be denied.

### Standard of Review

**Federal Rule of Civil Procedure 12**. Federal Rule of Civil Procedure 12(b)(1) allows a defendant to challenge the court's subject matter jurisdiction over a particular claim or cause of action, the existence of which is "never presumed." *Fafel v. DiPaola*, 399 F.3d 403, 410 (1st Cir. 2005). The burden of establishing jurisdiction rests with the party asserting it. *Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996). Thus, Plaintiffs must show that this Court has subject-matter jurisdiction, including on "each element of standing." *Murthy v. Missouri*, 603 U.S. 42, 58 (2024) (internal quotation marks and citations omitted); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

---

[1] As Plaintiffs acknowledge, they have not moved for summary judgment on their Fifth Amendment claims (appearing in Plaintiffs' Complaint as Counts IV to VII, ECF 20, at 1; ECF 1, at 69-72). They have therefore waived them. *See, e.g.*, *Rodríguez v. Mun. of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) ("It should go without saying that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument."). The purpose of the parties' accelerated summary judgment briefing schedule was the resolution of all claims and defenses, not piecemeal litigation. Regardless, as set forth in Section IV below, this Court should dismiss Plaintiffs' constitutional claims as a matter of law.

Federal Rule of Civil Procedure 12(b)(6) also compels dismissal of complaints that fail to allege a plausible legal and factual basis for the relief requested. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-562 (2007). "Although dismissals under Rules 12(b)(1) and 12(b)(6) are conceptually distinct, the same basic principles apply in both situations." *Harper v. Rettig*, 46 F.4th 1, 5 (1st Cir. 2022) (cleaned up). Among other things, the Court must ignore allegations comprising only "legal labels or conclusions or merely rehash cause-of-action elements." *Id.* (cleaned up).

**Federal Rule of Civil Procedure 56**. Summary judgment is proper when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006). And "the summary judgment rubric has a special twist in the administrative law context," where "summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (cleaned up).

**The Administrative Procedure Act**. The Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23 (1st Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)). "The burden is on the party challenging the agency decision to show that the arbitrary and capricious standard has been met." *Bluestone Env't Grp., Inc. v. Zapisek*, No. 3:21-cv-30056-MGM, 2022 WL 16857173, at *4 (D. Mass. Nov. 10, 2022).

The APA standard of review is "narrow," and "a reviewing court may not substitute its judgment for that of the agency, even if it disagrees with the agency's

4

conclusions." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (cleaned up). "[A]gency action is presumptively valid . . . ." *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008) (cleaned up). An agency decision need only be "rational" to "pass muster under the APA's 'arbitrary and capricious test[.]' " *Beverly Enters.-Mass.*, 174 F.3d at 24; *see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (cleaned up).

### Legal Background—The Immigration and Naturalization Act

Congress expressly set forth that the U.S. Department of Homeland Security's ("DHS") "primary mission" includes "prevent[ing] terrorist attacks within the United States." 6 U.S.C. § 111(b)(1)(A). Congress also broadly delegated immigration and enforcement to various Executive personnel, *e.g.*, *id.*; 8 U.S.C. § 1103(a)(1)[2]—and adjudication of immigration benefits specifically to USCIS, *e.g.*, 6 U.S.C. § 271(b).

---

[2]     8 U.S.C. § 1103(a)(1) reads in full:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

*See also, e.g.*, *Gupta v. Jaddou*, 118 F.4th 475, 477 (1st Cir. 2024) ("As enacted, the [INA]'s text vests the Attorney General of the United States with the authority to adjust nonimmigrants' statuses, but Congress has since transferred that authority to the Secretary of Homeland Security.") (citing 6 U.S.C. §§ 271(b)(5), 557).

For these reasons and for simplicity, this brief refers collectively to these personnel as "the government" or the "Executive."

5

Under the INA, Congress set forth a necessary, express prerequisite to an alien's eligibility for nearly all immigration benefits: the validity of their admission to the United States. *E.g.*, 8 U.S.C. § 1182(a) (setting forth substantive grounds for inadmissibility); 8 U.S.C. § 1182(f) (permitting President to "suspend the entry of . . . any class of . . . immigrants" upon finding entry "would be detrimental to the interests of the United States"); 8 U.S.C. §§ 1255(a) & (b) (setting valid admissibility as prerequisite to adjustment of status).

Among the substantive grounds that Congress commanded the Executive to assess in considering the validity of any alien's admission are "[s]ecurity and related grounds" expressly set forth in 8 U.S.C. § 1182(a)(3)—including an alien's criminal history, § 1182(a)(2); participation in terrorist activities, § 1182(a)(3)(B); and any "reasonable ground" for the Secretary of State "to believe" admission "would have potentially serious adverse foreign policy consequences for the United States," § 1182(a)(3)(C).

These standards persist through the investigation and adjudication of applications for immigration benefits—processes that the INA and its regulations[3] also command. *E.g.*, 8 U.S.C. § 1255(a) (setting forth admissibility among permanent residency criteria); 8 U.S.C. §§ 1446(a) & (b) (mandating "personal investigation" "[b]efore a person may be naturalized" "concerning any matter touching or in any way affecting the admissibility of any applicant for naturalization"); 8 C.F.R. § 103.2(b)(7) (authorizing USCIC to "direct any necessary investigation" as part of adjudication of benefit requests).

---

[3]    Plaintiffs do not contest the validity of any regulations adopted under the INA.

6

Whether an applicant may receive immigration benefits—or whether they may be revoked (and, thus, necessarily reconsidered)—is a matter of discretion that Congress also expressly delegated to government personnel—*e.g.*,

- 8 U.S.C. § 1155 (revocation of approval of petitions) ("The Secretary of Homeland Security **may, at any time, for what he deems to be good and sufficient cause**, revoke the approval of any petition approved by him under section 1154 of this title.") (emphasis added); 8 U.S.C. § 1154 (procedure for granting immigrant status); *see also, e.g.*, *Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) ("In § 1155, Congress granted the Secretary broad authority to revoke an approved visa petition 'at any time, for what he deems to be good and sufficient cause.' Such a revocation is thus 'in the discretion of' the agency.");

- 8 U.S.C. § 1158(b)(1)(A) (stating that "Secretary of Homeland Security or the Attorney General **may** grant asylum" to aliens qualifying as refugees) (emphasis added); *see also, e.g.*, *Kewayfati v. Bondi*, 165 F.4th 342, 346 (5th Cir. 2026) ("After reviewing an alien's application, the 'asylum officer . . . *may* grant . . . asylum.' That decision is discretionary.") (quoting § 1158(b)(1)(A); footnotes omitted; emphasis in opinion); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730-31 (D.C. Cir. 2022) ("The Executive 'may grant asylum.' Or it may not. It is a matter of executive 'discretion.'") (citing and quoting, respectively, 8 U.S.C. § 1151(b)(1)(A); *Immigr. & Naturalization Servs. v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987));

- 8 U.S.C. § 1255 ("The status of an alien . . . **may** be adjusted by the Attorney General . . . .") (emphasis added); *see also, e.g.*, *Gupta*, 118 F.4th at 483;[4]

- 8 U.S.C. § 1254a(a)(1) ("[T]he Attorney General . . . **may** grant the alien temporary protected status . . . .") (emphasis added);

- 8 U.S.C. § 1256(a) ("If . . . it shall appear **to the satisfaction of** the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the . . . adjustment of status . . . .") (emphasis added).[5]

An alien's eligibility for immigration benefits is not fixed upon filing a request. *E.g.*, 8 C.F.R. § 103.2(b)(1) (requiring applicants to establish eligibility "at the

---

[4]    The First Circuit recognized that § 1255(a) vests the Secretary with discretion to prescribe regulations governing adjustment of a noncitizen's status and made clear that, even where an applicant "me[t] certain criteria for applying," the Secretary is not required to grant adjustment. *Gupta*, 118 F.4th at 483.

[5]    *See also, e.g.*, *Bouarfa*, 604 U.S. at 13 ("As this Court has repeatedly observed, the word 'may' *clearly* connotes discretion.") (internal quotation marks and citations omitted; capitalization adjusted; italics in opinion); Antonin Scalia & Bryan Garner, Reading Law, at 112 (2012) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive.").

time of filing the benefit request . . . through adjudication"). During adjudication, USCIS may ask applicants for additional information, 8 C.F.R. § 103.2(b)(10)(i), and routinely does. And USCIS regulations allow for the agency to withhold adjudication during renewable extensions for ongoing investigation. 8 C.F.R. § 103.2(b)(18).[6]

The INA sets forth timeframes by which USCIS is expected to complete its decisionmaking on certain immigration benefits. *E.g.*, 8 U.S.C. § 1447 (permitting applicant for naturalization to seek federal district determination if USCIS has not made final decision on application 120 days after any USCIS examination, but not setting deadline for examination); 8 U.S.C. § 1158(d)(5)(A) (requiring final decisions on asylum applications within 180 days after application absent "exceptional circumstances").

---

[6]    8 C.F.R. § 103.2(b)(18), whose last changes were effective as of April 1, 2024, states in full (bold emphases added):

> USCIS **may authorize withholding adjudication** of a visa petition or other application **if USCIS determines that an investigation has been undertaken involving a matter relating to eligibility or the exercise of discretion, where applicable, in connection with the benefit request**, and that the disclosure of information to the applicant or petitioner in connection with the adjudication of the benefit request would prejudice the ongoing investigation. **If an investigation has been undertaken and has not been completed within one year** of its inception, USCIS will review the matter and determine whether adjudication of the benefit request should be held in abeyance **for six months** or until the investigation is completed, whichever comes sooner. If, **after six months** of USCIS's determination, the investigation has not been completed, the matter will be reviewed again by USCIS and, if it concludes that more time is needed to complete the investigation, adjudication may be held in abeyance **for up to another six months**. If the investigation is not completed at the end of that time, USCIS may authorize that adjudication be held in abeyance **for another six months**. Thereafter, if USCIS determines it is necessary to continue to withhold adjudication pending completion of the investigation, it will review that determination **every six months**.

8

As most routinely construed by the federal courts, however, these provisions do not impose mandatory deadlines for USCIS to make final decisions on immigration benefit requests. Section 1447(b) ties its 120-day period to the completion of the examination—thereby preserving agency control over the antecedent steps necessary to conduct that examination—while § 1158(d)(5)(A)'s timeframes are expressly nonbinding and do not create enforceable rights. In practice, accordingly, the INA's timing provisions may be, and routinely are, lawfully extended for long periods.[7]

Furthermore, Congress expressly stripped the courts of any power to review "any judgment regarding the granting of relief" in the list above, *supra* at 7, with the exception of "constitutional claims or questions of law" presented to "an appropriate court of appeals." 8 U.S.C. § 1252(a)(2)(B). And the federal courts, including the Supreme Court, have held that this judicial-review-stripping provision applies to any subsidiary decision regarding an applicant's eligibility—not merely the result of a consummated application and administrative review of it. *See Patel v. Garland*, 596 U.S. 328, 338-39 (2022) (holding courts lack jurisdiction to review fact findings in immigration administrative proceedings under 8 U.S.C. § 1252(a)(2)(B)); *id.* 332. Congress similarly eliminated judicial review of any claim related to asylum applications concerning "any substantive or procedural right or benefit that is legally

---

[7]    *See Vang v. Gonzales*, 237 F. App'x 24, 31 (6th Cir. 2007) (unpublished) (affirming final order of Board of Immigration Appeals affirming Immigration Judge denial of asylum) ("[T]he fourteen-year delay which Petitioners rely on in this case does not violate their due process rights."); *Washington v. Mayorkas*, No. CV 24-10318-RGS, 2024 WL 3835029, at *1 (D. Mass. Aug. 15, 2024) (agreeing "with the chorus of other courts across the country that have concluded that § 1158(d)(7) of the INA bars Plaintiff from claiming any legally enforceable right to have [his asylum] application[ ] adjudicated within the provided timeframes.' ") (internal quotations and citations omitted); *Celebi v. Mayorkas*, 744 F. Supp. 3d 100, 105 (D. Mass. 2024) ("The Court cannot imply a right to adjudicate asylum claims within a reasonable time where the statute unequivocally disavows private enforcement of the timetables."); *Orlov v. Howard*, 523 F. Supp. 2d 30, 34 (D.D.C. 2007) ("Significantly, the statutory framework does not set forth any timeframe in which an adjustment determination must be made.")

enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1158.

## Factual Background

### Presidential Policy and Inter-Agency Factfinding

In January 2025, Executive Order ("EO") 14161 directed enhanced vetting for "all aliens who intend to be admitted, enter, or are already inside the United States," focusing on "aliens coming from regions or nations with identified security risks." EO 14161, § 2(a)(iv), 90 Fed. Reg. 8451 (Jan. 20, 2025). Nearly six months later, Presidential Proclamation 10949 reported on an inter-agency review—conducted by the Secretary of State, the Attorney General, the Secretary of DHS, and the Director of National Intelligence—concerning foreign countries' vetting practices. Proclamation No. 10949, 90 Fed. Reg. 24,497 (June 10, 2025).[8] Those findings identified concerns with respect to 39 countries based on specific, documented conditions relevant to national security and immigration enforcement—specifically:

- The presence or influence of terrorist organizations, some countries' sponsorship of terrorism, or conditions suggesting other, heightened security risks, including limited governmental control over portions of national territory.

- Deficiencies in governmental capacity or cooperation, including limitations in issuing reliable identity documents, conducting effective vetting and screening of nationals, or sharing law-enforcement and national security risk information with the United States.

- Patterns of visa overstays among nationals of certain countries, coupled with challenges in securing those countries' cooperation in accepting the return of individuals subject to removal.

---

[8]   This Proclamation is cited in each of the three policy statements Plaintiff challenge. USCIS, Policy Alert PA-2025-26, Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits (Nov. 27, 2025) (ECF 16-1) (CAR000072); USCIS, Policy Memorandum PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025) (ECF 16-2) (CAR000001); USCIS, Policy Memorandum PM-602-0194 (Jan. 1, 2026) (ECF 16-3) (CAR000046). Subsequent citations to each document's administrative record or the policies themselves will be to the ECF filing number and the corresponding Bates-numbered page.

10

*E.g.*, ECF 16-1, CAR000003-CAR000006.

Section 1(h) of this Proclamation did not disclose further details to avoid "caus[ing] serious damage to the national security of the United States" and because "many such details are classified." ECF 16-1, CAR000003. The Proclamation also banned entry of aliens from these countries. This effort marked a second prominent occasion on which the Executive branch assessed a range of countries and their practices concerning identity-management information, criminal-background checks, and other indicators of national security risks. The prior effort, conducted before Presidential Proclamation 9645 issued on September 24, 2017, provided the underlying information on which that same Proclamation banned the entry of all foreign nationals of eight countries, which the Supreme Court upheld in *Trump v. Hawaii*, 585 U.S. 667 (2018).

**USCIS Policy Memoranda**

In October 2025, USCIS invoked the preceding factual findings—and a wide range of INA sections and regulations—to inform potential enhancements to its guidance to officers regarding adjudication of discretionary benefit requests. ECF 16-1, CAR000010-CAR-000013, CAR000028-CAR000036, CAR000066-71 CAR000066; *see also* ECF 16-2, CAR000001 n.7 (December 2025 memorandum); ECF 16-3 at CAR000047 (January 2026 memorandum).

On November 27, 2025, USCIS issued a policy alert concerning all pending and later-filed applications for immigration benefits by which it will "consider[ ] any relevant country-specific factors such as those identified in PP 10949 as significant negative factors" and "not limited to insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the" 19 countries identified in Proclamation No. 10949. ECF 16-1, CAR000072-CAR000074.

One day before the preceding policy alert, as part of a thwarted terrorist attack involving Afghan nationals, two National Guard members were shot, and one

11

died. This—as well as the pre-existing findings in Proclamation No. 10949—led USCIS to issue a policy memorandum on December 2, 2025. That statement announced USCIS' intention to conduct "a comprehensive re-review, potential interview, and re-interview of all aliens from [the 19] high-risk countries of concern who entered the United States on or after January 20, 2021[.]" ECF 16-2, CAR000002 (citing EO 14161 and Proclamation No. 10949). USCIS announced "an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens" from the 19 countries that Proclamation No. 10949 identified, pending subsequent announcements from the USCIS Director. ECF 16-2, CAR000002-CAR000003.[9]

A stated purpose of this temporary hold is to "ensure[ ] that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States." ECF 16-2, CAR000003. USCIS re-affirmed the INA's directive to conduct these investigations and reviews on a "case-by-case basis." *Id*. USCIS aspired to "prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance" within 90 days. *Id*.

In issuing this policy memorandum, USCIS "weighed" any potential resultant "delay to the adjudication of some pending applications" against the "urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible." *Id*. It "determined that the burden of processing delays that will

---

[9]     The policy statement continues that the USCIS Director, or his Deputy, must approve "requests to lift the hold." ECF 16-2, CAR000003. Plaintiffs mischaracterize this statement as an instruction to defy court orders. ECF 20-1 at 13, 15. Nothing in the policy statement equates an internal "request to lift the hold" with compliance with a judicial order, and no reasonable reader would understand it to do so.

fall on some applicants is necessary and appropriate" given its "obligation to protect and preserve national security." *Id.*

Weeks later, Presidential Proclamation 10998 identified 39 countries (including the preceding 19) with documented deficiencies based on factfinding that overlapped with Proclamation No. 10949. Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 19, 2025). Section 7 of the Proclamation instructed the Secretary of State to submit reports to the President every 180 days in consultation with the Secretary of Homeland Security, recommending whether restrictions should be continued, modified, or terminated based on evolving vetting assessments. ECF 16-3, CAR000075.

On January 1, 2026, USCIS—relying on previous inter-agency factfinding and Proclamations 10949 and 10998—clarified and expanded in part its November and December 2025 guidance. ECF 16-3, at CAR000045-CAR000049. USCIS expanded the adjudication hold to the 39 additional countries collectively identified in Proclamation Nos. 10949 and 10998, called for a review of all vetting policies and practices for applicants from the same countries, forecasted a review of all benefits awarded to nationals from the same countries since January 2021, and clarified that the adjudication hold applied only to USCIS' final decisionmaking on an application and not to any intermediate processing or investigation. ECF 16-3, CAR000045 & n. 2. As in the December 2025 memorandum, USCIS aspired in the January 2026 memorandum to prioritize a list for review and to issue operational guidance within 90 days. ECF 16-3, CAR000049.

**Progress on USCIS Implementation**

The adjudication hold is neither categorical nor indefinite. Since the issuance of the preceding policy statements, and within the 90-day period that the January 2026 memorandum anticipated, USCIS implemented a range of improvements and operational guidance. *See* Decl. of Andrew Good, Chief, USCIS Office of Policy &

13

Strategy (Mar. 3, 2026) (attached as Ex. 1; originally filed as ECF 49-1 (Mar. 3, 2026) in *Doe v. Trump*, No. 1:25cv13946-JEK (D. Mass.)).

USCIS lifted adjudication holds on petitions for non-citizen relatives and fi-ancées/-és of U.S. citizens. Ex. 1, ¶ 8. It established a process for reviewing and lift-ing additional holds, and enhanced vetting processes, policies, and forms for ongoing administrative processes. Ex. 1, ¶¶ 7-8. And, all the while, USCIS continues to con-duct its own analyses of and responses to vetting deficiencies affecting national se-curity and public safety. Ex. 1, ¶¶ 9-11; USCIS, Update on USCIS' Strengthened Screening and Vetting (May 30, 2026), https://www.uscis.gov/newsroom/alerts/up-date-on-uscis-strengthened-screening-and-vetting (attached as Ex. 2).

## Argument

### I.    Because the Court lacks subject-matter jurisdiction over Plaintiffs' claims, they should be dismissed.

Federal courts must assure themselves of jurisdiction before reaching the merits. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95 (1998). As set forth below, multiple independent doctrines foreclose review. These limitations are grounded in statutory text and controlling precedent and do not require any merits inquiry. Because Plaintiffs' claims fall squarely within these jurisdictional bars, the Court should dismiss Plaintiffs' claims and grant summary judgment to the govern-ment without reaching the merits.

### A.    Because the Challenged Policies implicate national se-curity—and, thus, separation-of-powers concerns—they are not justiciable.

The Constitution confers "[t]he executive Power" of the United States to the President. U.S. Const. art. II, § 1, cl. 1. That power encompasses "the conduct of our foreign relations," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (citation omitted), and, in turn, "considerable authority over immigration." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 722 (D.C. Cir. 2022) (citing *United States ex rel. Knauff v.*

14

*Shaughnessy*, 338 U.S. 537, 542 (1950)). A long, consistent line of Supreme Court precedent precludes or substantially limits federal courts from reviewing non-constitutional disputes arising from matters of foreign policy and national security and in the context of immigration.[10]

Accordingly, where the Executive has determined that adjudications must be temporarily halted to permit additional vetting in the interest of national security and public safety, judicial review should not displace those determinations. *See, e.g.*, *Trump*, 585 U.S. at 686-87 ("[W]hen the President adopts a preventive measure . . .[ ] in the context of international affairs and national security, he is not required

---

[10]    *See, e.g.*,

- *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) ("[O]ur inquiry into matters of entry and national security is highly constrained.");

- *Immigr. & Naturalization Serv. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations.") (internal quotation marks and citation omitted);

- *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.");

- *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.");

- *Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012) ("[I]t is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.");

- *Okpoko v. Heinauer*, 796 F. Supp. 2d 305, 314 (D.R.I. 2011) (Smith, J.) (adopting R. & R. (Martin, M.J.)) ("Nowhere is the scope of judicial inquiry more limited than in the areas of immigration legislation.").

to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions.") (cleaned up).[11]

The temporary adjudication hold arises from anti-terrorism, public safety, and national security concerns sufficiently documented in the administrative record concerning specified countries. Specifically, USCIS's December 2025 and January 2026 policy memoranda identified two exceptional security incidents involving individuals vetted under then-existing procedures who nonetheless planned or executed terrorist attacks. ECF 16-2, CAR000002, CAR000006-CAR000007. Those are documented failures of the prior vetting regime, not speculative concerns.

The same is true of the November 2025 policy alert. ECF 16-1, CAR000072-CAR000073. That alert operationalizes a Presidential Proclamation identifying material deficiencies in certain countries' identity-management and information-sharing practices—deficiencies the President determined undermine the United States' ability to verify individuals' identities and assess security risks, thereby threatening

---

[11]    *See also, e.g.,*

- *Dep't of the Navy v. Egan*, 484 U.S. 518, 529-30 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.");

- *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . . Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.");

- *Ameziane*, 699 F.3d at 491, 494 (holding courts may not second-guess the Executive's national-security judgments, even where the district court deemed the government's concerns "speculative and conclusory");

- *Tao Luo v. Keisler*, 521 F. Supp. 2d 72, 74 (D.D.C. 2007) (court intervention into the agency's investigative and security-driven adjudicatory process was deemed inappropriate).

core national-security and counterterrorism objectives. ECF 16-1, CAR000003-CAR000006, CAR000010-CAR000012.

Adjudication holds arising from national security reviews are nothing new. *See, e.g.*, *Namarra v. Mayorkas*, 924 F. Supp. 2d 1058, 1059-60 (D. Minn. 2013). Because the Challenged Policies rest on sensitive, predictive judgments about risk, intelligence gaps, and foreign-government cooperation, they are "largely immune from judicial inquiry or interference." *See Harisiades*, 342 U.S. at 588-89.

### B. The INA strips the federal courts of judicial review of the Challenged Policies.

Plaintiffs' claims fail at the threshold for yet another reason: 8 U.S.C. § 1252(a)(2)(B) of the INA expressly strips the courts of jurisdiction over challenges to discretionary immigration decisions and the policies governing their administration.

**1. Adjustment of status**. While non-immigrants may seek an adjustment of status to that of a permanent resident under certain conditions, Congress made clear that the ultimate decision whether to grant such relief is within USCIS' discretion. *See* 8 U.S.C. § 1255(a); *Gupta v. Jaddou*, 118 F.4th 475, 483 (1st Cir. 2024) ("[T]he text of § 1255(a) provides only that the Secretary may adjust a noncitizen's status as a matter of discretion under such regulations as the Secretary may prescribe if the noncitizen has applied for adjustment and meets certain criteria for applying.").

Consistent with that broad discretion, § 1252(a)(2)(b) provides that "**no court** shall have jurisdiction to review— (i) **any judgment** regarding the granting of relief under section . . . 1255" and "(ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the [Secretary], other than the granting of relief under section 1158(a)[.]" 8 U.S.C. § 1252(a)(2)(B) (emphases

17

added); *see also Viana Guedes v. Mayorkas*, 123 F.4th 68, 71 (1st Cir. 2024) (USCIS's decision to revoke its approval of Petitions for Alien Worker and National Interest Waiver was unreviewable discretionary decision).

The Supreme Court underscored the breadth of this jurisdictional bar in *Patel v. Garland*, where it reiterated that "any" carries an "expansive meaning," encompassing judgments "of whatever kind" under § 1255. 596 U.S. 328, 338-39 (2022). That controlling reasoning leaves no room for Plaintiffs to contest the Challenged Policies in court. Section 1252(a)(2)(B) thus bars review not only of ultimate adjustment determinations, but also of subsidiary judgments and factual predicates that bear on the grant of relief. *Id.*; *Kucana v. Holder*, 558 U.S. 233, 246-47 (2010);[12] *see also, e.g.*, *Fofana v. Noem*, 163 F.4th 1135 (8th Cir. 2026) (deeming *Patel's* § 1252(a)(2)(B)(i) analysis relevant to (ii) in holding no jurisdiction to review determination that adjustment applicant was inadmissible for supporting terrorists); *Garcia v. U.S. Citizenship & Immigr. Servs.*, 146 F.4th 743, 758 (9th Cir. 2025) (Bress, J., concurring) ("This all-encompassing jurisdiction-stripping language [of § 1252(a)(2)(B)(i)] does not permit collateral challenges to agency policies in federal district court concerning discretionary immigration relief like adjustment of status under § 1255. It is hard to imagine broader statutory language . . . .") (citations omitted); *Abuzeid v. Mayorkas*, 62 F.4th 578, 583-84 (D.C. Cir. 2023) ("*Patel* precludes review of **all** kinds of agency decisions that result in the denial of relief—whether they be discretionary or nondiscretionary, legal or factual.") (emphasis added).

---

[12]      558 U.S. at 246-47:

> Congress added in clause (ii) [of § 1252(a)(2)(B)] a catchall provision covering "any other decision . . .the authority for which is specified under this subchapter [to be in the discretion of the Secretary]." The proximity of clauses (i) and (ii), and the words linking them—"any other decision"— suggests that Congress had in mind decisions of the same genre, i.e., those made discretionary by legislation.

This conclusion is reinforced by *Gupta*, where the First Circuit held that 8 U.S.C. § 1255(a) does not address how or when the Secretary must adjudicate adjustment applications once filed, but instead leaves the timing and procedural sequencing of adjudication to the agency's discretion under its implementing regulations. 118 F.4th at 483-84. Because the statute is silent as to post-filing adjudicatory management, the First Circuit rejected APA challenges to USCIS' policies governing when applications are adjudicated, including abeyance practices. *Id.* at 483-87; *see also, e.g.*, *Beshir v. Holder*, 10 F. Supp. 3d 165, 174 (D.D.C. 2014) (granting Secretary discretion to regulate adjudication process "necessarily includes" discretion over its pace).

Consistent with that statutory structure, multiple courts of appeals[13] have consistently held that challenges to policies governing the adjudication of adjustment of status applications—such as decisions to hold applications in abeyance or to require additional vetting—fall within § 1252(a)(2)(B)'s jurisdictional bar. This Court should so hold, too.

**2. Employment authorization**. Employment authorization likewise falls within § 1252(a)(2)(B)'s jurisdictional bar. Under the INA, Congress has given the

---

[13]    *See Kale v. Alfonso-Royals*, 139 F.4th 329, 331 (4th Cir. 2025) (holding federal courts lack jurisdiction over challenges to USCIS adjudication hold policy under 8 U.S.C. § 1252(a)(2)(B)(ii), and "join[ing] the Third, Fifth, Eight, and Eleventh circuits in finding that it does"); *id.* at 335 ("Our decision today is in accordance with the findings of every Court of Appeals to reach this exact question.").

The particular "hold" in *Kale*—and the five other circuit courts, including the First—was the USCIS's decision to hold plaintiff-applicants' adjudications "in abeyance until a visa number comes available," also known as "visa retrogression." The other circuit court decisions, aside from the First Circuit's *Gupta* decision, are: *Geda v. Dir. U.S. Citizenship & Immigr. Servs.*, 126 F.4th 835 (3d Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 390 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1126 (2025); *Thigulla v. Jaddou*, 94 F.4th 770 (8th Cir.), *pet. for reh'g en banc denied*, No. 22-3066, 2024 WL 2122426 (8th Cir. May 13, 2024); *Kanapuram v. Dir., U.S. Citizenship & Immigr. Servs.*, 131 F.4th 1302, 1309 (11th Cir. 2025). There is no principled, analytical distinction between permissible holds for visa retrogression and for the reasons stated in the Challenged Policies.

19

Executive Branch broad discretion to determine when noncitizens may work in the United States. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 664 F. Supp. 3d 143, 148-52 (D.D.C. 2023) (quoting 8 U.S.C. §§ 1103(a), 1184(a) & citing § 1324a[14]) (other citations omitted), *aff'd*, 111 F.4th 76 (D.C. Cir. 2024), *cert. denied*, 146 S. Ct. 319 (2025); *V.U.C. v. U.S. Citizenship & Immigr. Servs.*, 557 F. Supp. 3d 218, 222 (D. Mass. 2021) (because Secretary had broad discretion to grant work authorizations, district court lacked subject matter jurisdiction over claims of unreasonable delay in agency decisionmaking). And where Congress has committed a benefit to agency discretion, the First Circuit has recognized that challenges to the administration of that benefit—including eligibility-related policies, vetting requirements, and the timing of adjudication—fall within § 1252(a)(2)(B)'s jurisdictional limitation. *See Gupta*, 118 F.4th at 482-87.

Because Plaintiffs' claims seek to override those discretionary judgments—whether framed as delay or as restriction—they fall within § 1252(a)(2)(B)(ii)'s bar on judicial review and must be dismissed for lack of jurisdiction. *See Khachutorov v. Britten*, 792 F. Supp. 3d 1106, 1112-15 (C.D. Cal. 2025) (rejecting argument that USCIS has nondiscretionary duty to take any specific action on all immigration-related petitions, including work authorization applications, and dismissing APA claims for lack of subject-matter jurisdiction).

**3. Naturalization**. Plaintiffs' challenges to the Policies as applied to naturalization-related applications also fail at the threshold because Congress has established a comprehensive and exclusive scheme governing judicial review in this context. *See* 8 U.S.C. §§ 1421(c), 1447(b). That scheme delineates when courts may intervene in naturalization adjudications: § 1421(c) authorizes judicial review only

---

[14]    Sections 1184(a) and 1324a fall within the same subchapter of § 1252(a)(2)(B)(ii).

after the agency has denied naturalization following a hearing; § 1447(b) permits limited judicial involvement only where the agency fails to render a decision within 120 days after the applicant's examination.

By confining judicial review to the post-examination stage, Congress preserved agency control over processing, including the completion of background checks and other investigative prerequisites. Many courts have recognized that these specific jurisdictional provisions foreclose generalized APA challenges to the pace or manner in which naturalization applications are processed. *See, e.g., Usoh v. U.S.C.I.S.*, No. 2:22-cv-01470-SAL-MGB, 2023 WL 4998550, at *4 (D.S.C. Mar. 30, 2023), *R & R adopted by* 2023 WL 4634955 (D.S.C. July 20, 2023), *aff'd as modified*, No. 23-6823, 2024 WL 3842106 (4th Cir. Aug. 16, 2024).[15]

USCIS' regulations reinforce this conclusion. For instance, under 8 C.F.R. § 335.2(b), USCIS may not conduct a naturalization examination until the FBI has completed its criminal background check. This regulation compels the conclusion that USCIS has no mandate to proceed to its examination, much less adjudication, before those checks are completed. Courts consistently recognize this principle. *See Muminov v. Sessions*, No. 1:18-cv-1034, 2018 WL 5298386, at *4 (N.D. Ohio Oct. 25,

---

[15]    The court explained:

> To the extent that Petitioner is challenging the denial of Petitioner's application or the delay in adjudicating the application, the Report aptly explains why the court is without jurisdiction—the general grant of jurisdiction under the APA is trumped by the specific grant of jurisdiction over such claims in §§ 1421(c) and 1447(b).

*Usoh*, 2023 WL 4998550, at *4; *see also Danilov v. Aguirre*, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction. It follows therefore that plaintiff's invocation of [the] general grant[ ] of subject matter jurisdiction [under the APA] is to no avail and that this matter is controlled by the specific grant of subject matter jurisdiction set forth in 8 U.S.C. § 1447(b).").

2018); *Antonishin v. Keisler*, 627 F. Supp. 2d 872, 879 (N.D. Ill. 2007); *Zaytsev v. Gantner*, No. 04-cv-7101, 2004 WL 2251665, at *1 (S.D.N.Y. Sept. 24, 2004).

Where processing delays stem from ongoing security vetting, there is no discrete, legally required action that a court may compel under the APA. *See Albalwah v. Edlow*, No. 1:25-cv-01255, 2025 WL 3033472, at *4 (D. Colo. Oct. 29, 2025) ("[T]he Court cannot identify any alleged action that USCIS or the DHS must take while the FBI background check is pending. Accordingly, if the delay in processing is the result of the FBI not yet having completed a background check on Plaintiff, then Plaintiff has not adequately pled a Section 706(1) claim[.]"). Accordingly, where delays are attributable to the completion of required background and security checks—delays that the Challenged Policies anticipate for these very reasons—Plaintiffs cannot identify any statutory duty whose performance the Court could compel, underscoring that their claims fall outside the scope of judicial review under the INA.

### C. Plaintiffs' APA claims are not justiciable because adjudication of immigration benefits is committed to USCIS discretion.

Plaintiffs' claims also independently fail under the APA. Claims brought under § 706 are subject to the threshold limitations set forth in § 701, including where statutes preclude judicial review or where agency action is committed to agency discretion by law. *See* 5 U.S.C. §§ 701(a)(1), (2). As set forth above, Congress has expressed a clear intent to preclude judicial review of USCIS's discretionary decisions governing the adjudicatory process for adjustment of status, work authorization, and naturalization applications. Accordingly, Plaintiffs cannot invoke the APA to circumvent those jurisdictional limits. *See Safadi v. Howard*, 466 F. Supp. 2d 696, 700 (E.D. Va. 2006) (once review is precluded under § 1252(a)(2)(B), the APA "do[es] not serve to restore subject matter jurisdiction").

Nor does § 706(1) supply a basis for relief: "A claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases in original). Section 706(1) does not authorize courts to supervise agency operations generally or to compel action where the agency retains discretion over whether and when to act. Allowing Plaintiffs to proceed under the APA notwithstanding these limitations would improperly permit them to evade the statutory scheme Congress enacted—something the Supreme Court has squarely rejected. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833 (1976) ("It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.").

Plaintiffs' claims also fail under 5 U.S.C. § 701(a)(2) because the challenged actions are "committed to agency discretion by law." *Id.*; *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Thus, for the same reasons that adjustment of status and employment authorization matters are also not reviewable under § 1252(a)(2)(B), they are likewise precluded from review under § 701(a)(2) of the APA.

The same is true of Plaintiffs' claims regarding the hold on the adjudication of asylum applications regardless of the asylee's country of origin. In asking the Court to lift the hold, Plaintiffs essentially seek to compel final decisionmaking of asylum applications on Plaintiffs' preferred timeline. But Congress expressly foreclosed reliance on statutory timing provisions as a source of enforceable rights. *See Washington v. Mayorkas*, No. 24-cv-10318, 2024 WL 3835029, at *1 (D. Mass. Aug. 15, 2024) ("[8 U.S.C.] § 1158(d)(7) of the INA bars Plaintiff from claiming any legally enforceable right to have [his] [asylum] application[] adjudicated within the provided timeframes"). Where Congress leaves the timing and manner of adjudication to agency discretion, that discretion necessarily encompasses decisions to pause or prioritize adjudications in light of operational or policy concerns. *See Beshir*, 10

23

F. Supp. 3d at 174. Because Plaintiffs seek to displace those discretionary judgments, their challenge to the Global Asylum Hold is barred by § 701(a)(2).

Finally, the governing statutory standards confirm the breadth of the agency's discretion with respect to naturalization. It has long been settled that naturalization is not a right, but a privilege available only upon strict compliance with all statutory prerequisites. *See United States v. Ginsberg*, 243 U.S. 472, 474-75 (1917); *Fedorenko v. United States*, 449 U.S. 490, 506 (1981). Applicants must demonstrate good moral character throughout the statutory period and up to the time of the oath. 8 U.S.C. § 1427(a)(3). That requirement necessarily permits the agency to complete whatever investigations are necessary, including enhanced security checks for applicants from countries with documented vetting challenges, before granting naturalization. Thus, Plaintiffs' claims as they relate to delays in adjudicating naturalization applications are not justiciable.

Plaintiffs do not identify any case law compelling mandatory deadlines for adjudicating applications for the various immigration benefits they allege are at issue. Whether Plaintiffs' challenges focus on alleged delay, policy, or procedure, their claims only second-guess matters Congress has committed to agency discretion. The APA provides no vehicle for such challenges, and so, for this separate reason, the Court also lacks jurisdiction to compel USCIS to continue to adjudicate claims for immigration benefits.

**D.     Because the Challenged Policies do not constitute final agency action, Plaintiffs' claims are not ripe.**

Unless another statute makes the agency's action reviewable (and none does), judicial review is available only for "final agency action." 5 U.S.C. § 704; *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024); *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007) ("[F]inal action is normally a prerequisite to judicial review."). As this Court recently held,

24

> The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action is "final" if: (1) it marks the " 'consummation' of the agency's decisionmaking process," and (2) the action determines rights or obligations or creates legal consequences. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177 (1997)).

*New York v. Trump*, 769 F. Supp. 3d 119, 135 (D.R.I. 2025) (McConnell, C.J.) (citation cleaned up). Under this standard, Plaintiffs' claims fail because there is no final agency action to enable any review of USCIS policies under the APA. And, as such, Plaintiffs' claims are not ripe.

A challenged action fails the first prong of finality if it is "tentative or interlocutory" and does not express an agency's "unequivocal position." *Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943 (D.C. Cir. 2012) (finding that FDA's warning letters were not final where they contemplated possible, but not inevitable, enforcement action). The Challenged Policies here arise from, and operate within, an expressly ongoing and iterative decision-making framework established by Presidential Proclamation.

Proclamation No. 10998 directs that, within 90 days and every 180 days thereafter, the Secretary of State—in consultation with the Secretary of Homeland Security and other senior national security officials—must reassess the relevant conditions and recommend whether any suspensions or limitations imposed in connection with the Proclamation should be "continued, terminated, modified, or supplemented." ECF 16-1, CAR000007. Since the January 2026 memorandum, USCIS has implemented additional guidance and operational changes, including lifting some adjudication holds. Ex. 1. These developments confirm that the Policies are neither fixed nor final, but instead reflect interim, operational guidance explaining how adjudications are to proceed while USCIS continues to evaluate security concerns and complete necessary vetting. *See, e.g.*, ECF 16-3, CAR000007 ("This

25

[adjudicative] hold will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum[.]").

The Challenged Policies are also not final actions because no rights or obligations flow from them. At most, they "mark a midstream pause in an ongoing administrative process—one that remains open to further agency consideration." *Kewayfati v. Bondi*, 165 F.4th 342, 348-50 (5th Cir. 2026) (finding USCIS letters denying plaintiffs' asylum claims were not final agency action even as denial was unappealable); *id.* at 350 ("[The] USCIS stage is only one—and a preliminary one—in a broader administrative process."); *see also Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014) ("Congress has delegated to specific government agencies the task of enforcing immigration laws and determining aliens' immigration statuses. The agencies' decisionmaking process consummates when they issue a final decision regarding an alien's immigration status. Termination of refugee status and denial of a status adjustment application are intermediate steps in the removal of an alien, and not the consummation of the agencies' decisionmaking on the alien's immigration status."). That is the opposite of finality.

An adjudication "hold," moreover, does not halt everything; it means only that "a case [can] proceed through processing, up to final adjudication," with only the final decision deferred. ECF 16-3, CAR000045 n.2. Those steps remain individualized and case-specific, and they must be completed before any application can be approved regardless of whether a hold is in place. Plaintiffs thus cannot point to any action that determines rights or obligations or from which legal consequences flow, as they have not identified any final determination on any allegedly affected application. *Cf. U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (approved "jurisdictional determination" "mark[ed] the consummation of the Corps' decisionmaking" because it was "issued after extensive factfinding") (quotations omitted).

Because Plaintiffs' claims rest on hypothetical or anticipated outcomes rather than any finalized agency action, they are not ripe for judicial review. "Ripeness is a justiciability doctrine" whose purpose is to "prevent courts from 'entangling them-selves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). "The burden to prove ripeness is on the party seeking jurisdiction." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial re-view on ripeness grounds).

Courts apply a two-part test to determine whether a case is ripe for review, and both favor denial of the Plaintiffs' motion. First, "[a] claim is not ripe for adjudi-cation if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (inter-nal quotation marks and citation omitted); *see also Abbott Labs.*, 387 U.S. at 149; *City of Fall River*, 507 F.3d at 6 (declining to review agency's conditional project ap-proval for lack of ripeness). As already noted, the Challenged Policies do not consti-tute final agency action because they are interim guidance that do not fix any par-ticular rights, obligations, or legal consequences for any individual.

That lack of finality at the policy level is borne out at the individual adjudica-tion level as well. Plaintiffs do not identify any completed adjudication, much less any particular petition or application of any client that has been denied due to the Challenged Policies. *See, e.g., Cath. Charities CYO v. Napolitano*, 368 F. App'x 750, 753 (9th Cir. 2010) (unpublished).[16] Absent agency action—namely, an adverse

---

[16]    368 F. App'x at 753:

> The district court properly dismissed the challenge to the
> government's alleged delay in issuing regulations for U

27

adjudication—not even Plaintiffs' clients and members (much less Plaintiffs them-selves) suffer "concrete harm from the challenged policy itself" as the Policies here "do[ ] not require them to do anything or to refrain from doing anything." *See Trump v. New York*, 592 U.S. 125, 134 (2020); *id.* at 131 ("Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time.") (cleaned up); *see also U.S. Immigr. Fund-NY LLC v. Mayorkas*, No. 21-cv-0358, 2022 WL 715239, at *4 (D.D.C. Mar. 10, 2022) (granting government motion to dismiss given lack of ripeness arising from plaintiffs' conten-tion that USCIS Policy Manual update was arbitrary and capricious under APA) ("USCIS has yet to apply the 2020 Update to any party in an adjudication or other agency action."); *id.* at *5 ("Plaintiffs have not identified a single case of the 2020 Update ever being applied to any investor applicant now more than a year-and-a-half after its adoption."); *Usoh v. U.S. Citizenship & Immigr. Servs.*, No. 2:22-cv-1470, 2023 WL 4634955, at *4 (D.S.C. July 20, 2023), *aff'd as modified*, No. 23-6823, 2024 WL 3842106 (4th Cir. Aug. 16, 2024) (failure to administer oath notwithstand-ing "approval" not final agency action).

Second, a court must consider the hardship to both parties, but there is no hardship to the Plaintiffs. *See* Section II *infra*. Should the outcome that the Plain-tiffs expect actually occur, and if their clients and/or members have justiciable claims, they could challenge final agency decisionmaking in court. *See City of Fall River*, 507 F.3d at 7; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("The [plaintiff] thus will have ample opportunity later to bring its legal chal-lenge at a time when harm is more imminent and more certain.").

---

visa applicants and adjustment of status regulations for U visa recipients. Because none of the individual plaintiffs had been granted U visas, much less lawful permanent residence, at the time they brought suit, their claim that the agency's delay prejudiced their eligibility for naturali-zation was not ripe for review.

28

**II.    Plaintiffs—none of whom is an applicant for or recipient of immigration benefits—lack standing.**

Plaintiffs bear the burden to set forth "specific facts" establishing each element of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). That burden is "substantially more difficult" to establish where plaintiffs challenge broad governmental policies of which they are not themselves the object. *Id.* at 561-62.

Plaintiffs seek an order declaring the Challenged Policies unlawful and vacating the Challenged Policies, as well as an injunction barring Defendants from enforcing them or "issuing or enforcing any substantially similar policy." ECF 20-1 at 59. As Plaintiffs have not identified a single individual willing and able to proceed in their own name, they are left with only two avenues to establish standing: they can assert either (a) organizational standing on their own behalf, or (b) associational standing on behalf of their members. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (hereinafter, "*SFFA*").

Plaintiffs invoke both. They allege that the Challenged Policies "directly affect and interfere with their core business activities" as to Plaintiffs Dorcas International, RDC, and American Gateways. ECF 20-1 at 19 (cleaned up). And they allege that remaining Plaintiffs SEIU, UAW, VAM, ACT, and PANA have associational standing because the Challenged Policies have already caused—or are expected to cause—harm to their members. *Id.* at 25-28.

Even assuming the facts Plaintiffs allege were true, neither theory is availing. Plaintiffs' assertion of organizational standing fails because they cannot show how the Challenged Policies concretely injured their organizational interests. Their assertion of associational standing also fails because they have not identified a concrete injury suffered by one of their members because of the Challenged Policies. At

bottom, Plaintiffs attempt to bootstrap standing from speculative third-party harms to unidentified individuals.

### A.    Plaintiffs lack organizational standing.

To establish Article III standing, a plaintiff must show an invasion of a legally protected, concrete interest. *Lujan*, 504 U.S. at 560. Organizations, like all litigants, may "sue on their own behalf for injuries they have sustained," but must "satisfy the usual standards for injury in fact, causation, and redressability." *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (hereinafter, "*Alliance*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights. *Id.* at 381. Critically, it must be "real and not abstract" and particularized; that is, it must affect "the plaintiff in a personal and individual way" and not be a "generalized grievance." *Id.* The injury must also be actual or imminent. *Id.* And where, as here, Plaintiffs seek prospective relief, they must show a sufficient likelihood of future injury, not merely conjecture about the effects of alleged harms to third parties. *Id.*; *Lujan*, 504 U.S. at 555-56. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

In *Alliance*, four associations challenged FDA's relaxation of regulatory requirements for mifepristone, an abortion drug. 602 U.S. at 372-73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394. Thus, the associations contended that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to

30

oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" to "better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (quotation omitted). Those activities, the associations claimed, had required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (quotation omitted).

The Supreme Court unanimously held that the associations lacked Article III standing. *Id.* at 370, 396-97. The Court rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions," stating "that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies. *Havens* does not support such an expansive theory of standing." *Id.* at 395. Nor did the Court consider sufficient the associations' allegation that FDA's failure to "properly collect[] and disseminat[e] information about mifepristone" made "it more difficult" for the plaintiffs "to inform the public about safety risks" of the drug. *Id.* That generic setback to the associations' missions without any actual "impediment to [their] advocacy businesses" did not support Article III standing. *Id.* at 395-96.

Plaintiffs' theory invokes the same, alleged standing "injury" that the Supreme Court rejected in *Alliance.* They do not contend that the Challenged Policies "presently or prospectively subject" *them* to any "regulations, proscriptions, or compulsions." *See Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378-80 (D.C. Cir. 1984) (no standing because executive order "issues no commands or prohibitions to these plaintiffs, and sets forth no standards governing their conduct"). Rather, Plaintiffs' alleged injuries rest on the potential downstream consequences of possible, temporary delays

31

in processing their current or future clients' applications for immigrant benefits. ECF 20-1 at 19-25.

Such injuries, which their clients prospectively face, would be too attenuated to confer standing on Plaintiffs' clients, much less Plaintiffs themselves. Plaintiffs' own alleged injuries are several steps removed from any concrete governmental act and depend on a speculative chain of policy implementation and uncertain third-party effects. *See, e.g.*, Sique Decl. ¶¶ 21, 23 (alleging that certain, unidentified, clients' applications for immigration benefits and asylum applications are "pending" or are "indefinitely stalled"); Bah Decl. ¶¶ 19, 30 (same); Yang Decl. ¶ 14 (same).[17] Plaintiffs' standing claims also rest on multiple inferential steps—the existence of a sufficiently pervasive set of pending applications among current or future clients; the further assumption that such outcomes might materially affect their operations by requiring additional organizational responses; and attribution of those outcomes to specific policy directives rather than ordinary processing timelines or case-specific adjudicatory factors—and should be rejected. *See, e.g.*, *Louisiana v. Biden*, 64 F.4th 674, 678 (5th Cir. 2023) (dismissing appeal; vacating preliminary injunction given plaintiff States' lack of standing) ("Plaintiffs' allegations of 'injury in fact' rely on a chain of hypotheticals . . . . Such injuries . . . flow . . . from potential future regulations, i.e., final rules that are subject to their own legislated avenues of scrutiny, dialogue, and judicial review on an appropriately developed record."). The Supreme Court has cautioned against reliance on "speculative inferences" built on the

---

[17]    Plaintiff American Gateways' isolated reference to a single client allegedly informed that a decision on his asylum application would not be made "because of the pause on adjudications" does not alter this analysis. *See* Yang Decl. ¶ 19. That allegation concerns an asserted impact on an individual applicant, not any cognizable injury to American Gateways itself, and thus does not support organizational standing. And for the reasons discussed elsewhere, the allegation is not ripe to the extent it assumes that any future decision will be driven by the Challenged Policies rather than independent adjudicatory factors.

reactions of third parties. *Clapper*, 568 U.S. at 410-11; *cf. Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (holding that unions lacked standing to challenge incentive program for resignations because harm from anticipated loss of membership dues from anticipated resignations was insufficiently "certain" and related harms from "upstream effects" flowing from employees' choice to resign was not cognizable).

Plaintiffs also claim injury based on the anticipated need to expend additional "time and resources preparing and monitoring" and supporting their clients, thereby making their "existing work more challenging." ECF 20-1 at 20, 23.[18] But that is simply increased workload, not a "perceptible impairment" amounting to a concrete injury in fact. *See Havens Realty Corp.*, 455 U.S. at 379. Plaintiffs' ordinary business burdens, even if allegedly exacerbated by the Challenged Policies, is not a cognizable injury for standing purposes.[19] *See Alliance*, 602 U.S. at 394 (impairment

---

[18]    *See also* ECF 20-1 at 20 ("The two adjudicative holds have resulted in an ever-growing backlog of cases, in which Dorcas International's staff must continue to invest time and resources preparing and monitoring without any prospect of resolution."); *id*. at 22 ("RDC's clients are confused and uncertain about their futures, RDC staff are swamped with resulting requests for assistance, and RDC is required to address these immediate needs by diverting resources away from other work."); *id*. at 25 ("[M]any of American Gateways' clients have lost their jobs because the adjudicative holds prevent them from obtaining work authorizations, which has resulted in American Gateways' having to spend additional resources supporting clients who now face financial distress.").

[19]    For example, Plaintiff Dorcas International explains that its "core programs include citizenship and immigration legal services, adult education, refugee resettlement, employment services and workforce training, interpretation and translation services" and that its staff already "provide consultations to thousands of individuals annually and assist an average of more than 1,500 clients each year with applications and legal representation." ECF 20-2, Ex. A ("Sique Decl.") ¶¶ 7-9. It then asserts that the Challenged Policies require staff to "continue to invest time and resources preparing and monitoring ongoing cases," respond to inquiries, and "divert resources" to client education and counseling. *Id*. ¶¶ 21, 41, 44. Plaintiff RDC similarly describes spending "substantial additional time responding to inquiries," "counseling community members," and "attempting to identify alternative legal pathways," while asserting that increased uncertainty has made its programming less effective. ECF 20-3, Ex. B ("Bah Decl.") ¶¶ 10, 22, 27, 29, 41, 44, 50. And Plaintiff American Gateways likewise reports that it must spend more time "supporting

of an organization's "ability to provide services and achieve . . . organizational missions . . . does not work to demonstrate standing"). Plaintiffs simply lack the required direct stake in the Challenged Policies. *See id.* at 391-93; *Clapper*, 568 U.S. at 416-18; *see also Democratic Nat'l Comm. v. Trump*, No. 25-cv-587, 2025 WL 1573181, at \*6 (D.D.C. June 3, 2025) (no standing to challenge executive order because "committees' allegation of current burdens out of fear that the President or Attorney General will apply section seven of the executive order to the FEC or its Commissioners, reasonable or not, is not Article III injury").

Amplifying the preceding standing deficiencies, Plaintiffs do not identify— even anonymously—any client who might be affected by a review of awarded benefits once those policies are implemented. Plaintiffs' asserted injury thus rests on generalized operational adjustments voluntarily undertaken in response to perceived "uncertainty" about how those policies might be applied in the future. *See* Bah Decl. ¶ 38, Sique Decl. ¶¶ 33-34.

Plaintiffs' theory of injury is fundamentally derivative and reduces to the proposition that any operational inconvenience due to an increase in workload caused by government policy is sufficient for Article III standing. That theory cannot be squared with the constitutional requirement of a concrete and particularized injury.

## B.    Plaintiffs lack associational standing.

Plaintiffs' attempts to establish associational standing fare no better. Membership organizations can sometimes sue "as the representative of its members." *SFFA*, 600 U.S. at 199. But that doctrine applies only where the organization can identify at least one member with standing. *Id.* And it is unavailable where "the

---

[its] asylum-seeking clients" and keeping them informed, which in turn affects its capacity to take on new cases. ECF 20-9, Ex. H ("Yang Decl.") ¶¶ 22, 27.

nature of [the] suit necessarily requires consideration of the individual circum-stances of any aggrieved member of the organization." *Tanner-Brown v. Haaland,* 105 F.4th 437, 447 (D.C. Cir. 2024) (internal quotation marks omitted).

Like the Plaintiffs who claim direct standing, the Plaintiffs asserting associa-tional standing (SEIU, UAW, VAM, ACT, and PANA) largely fail to identify any member with a concrete, non-speculative injury. Plaintiffs assert that some of their members are awaiting adjudication or interviews in connection with their benefits applications and suffer from the alleged delay. *See* ECF 20-1 at 25-28. But USCIS has paused only final decisionmaking on applications, not any of the intermediary steps in the process. ECF 16-3, at CAR000045, n.2. Moreover, Plaintiffs only specu-late that any of the further investigations, adjudications of pending applications, or retrospective review of granted benefits necessarily will lack any of the procedural safeguards embedded in long-established USCIS procedures. *See* Section IV *infra.*

Plaintiffs' theory essentially rests on the unsupported assumption that *any* uncertainty or pace of adjudication in immigration proceedings: (1) is attributable to the Challenged Policies, rather than to the ordinary operation of the adjudication of immigration benefits and (2) amounts to a cognizable legal injury. This theory is flawed for several reasons.

First, the record does not identify specific individuals whose cases are linked to agency actions undertaken *because of* the Challenged Policies.[20] Second,

---

[20]     Some Plaintiff declarations refer to anonymized individuals who were alleg-edly informed that their applications for immigration benefits were affected by the challenged policies. *See, e.g.*, ECF 20-6, Ex. E ("Velasquez Decl.") ¶¶ 14, 16; ECF 20-7, Ex. F ("Kassa Decl.") ¶¶ 15, 17. Those isolated references do not entitle Plaintiffs to summary judgment for the reasons explained in this brief, including the absence of any final, non-speculative injury and the individualized, discretionary nature of the underlying determinations. *See* n.16 *supra.*

But even if the Court were to conclude otherwise found Defendants' liable, any relief must be strictly limited to those identified individuals. *See* Section V. *infra.*

allegations of "uncertainty" or "delay" under the circumstances Plaintiffs have alleged do not plausibly establish injury attributable to the Challenged Policies rather than to routine processing variability inherent in a discretionary adjudicatory system. *See Immigr. & Naturalization Servs. v. Miranda*, 459 U.S. 14, 18 (1982) (no entitlement to discretionary immigration relief).

The timelines Plaintiffs provide are not unusual by any measure—with or without the Challenged Policies. The earliest application Plaintiffs identify was filed in June 2025, *see* ECF 20-5, Ex. D ("Sweeney Decl.") ¶ 11—less than a year before this suit. And several others were filed even more recently, well within publicly reported timeframes.[21] For example, one SEIU member applied for asylum in October 2025 and had an interview in December 2025. ECF 20-4, Ex. C ("Neuman Decl.") ¶ 24. A UAW member filed an adjustment-of-status application in June 2025. ECF 20-5, Ex. D ("Sweeney Decl.") ¶ 11. Another UAW member filed an employment-based petition only in September 2025. *Id.* ¶ 13. That timing is dispositive for another reason: the first of the Challenged Policies was not announced until November 27, 2025. ECF 16-1. Thus, any alleged lack of progress before that then cannot be attributed to the Challenged Policies, let alone characterized as unreasonable.

Nor do Plaintiffs acknowledge critical features of the policies at issue: they do not mandate categorical denials; the adjudication pause is temporary; and that pause has ended altogether for some applicants. Ex. 1, ¶ 8. Plaintiffs cannot point to

---

[21]    *See* USCIS Case Processing Times, egov.uscis.gov/processing-times (last accessed Apr. 24, 2026) (noting that 80% of applications to register permanent residence or adjust status (I-485) at all field offices are completed within 11.5 months; that 80% of immigrant petitions for alien workers (I-140) based on national interest waivers are processed within 24 months). *See also* USCIS The Affirmative Asylum Process, www.uscis.gov/humanitarian/refugees-and-asylum/asylum/the-affirmative-asylum-process (last updated Oct. 17, 2026; last accessed Apr. 24, 2026) (noting certain, specified, circumstances under which longer processing times may be required before an asylum decision can be made following an asylum interview).

any individual whose application has been denied only because of the Challenged Policies—only to individuals who remain in the ordinary posture of awaiting agency action. Nor do they identify any specific application that would result in a favorable outcome if the Challenged Policies were vacated. Nor can they, as that conclusion rests on speculation about how discretionary adjudications (or received benefit reviews) would be resolved.

The additional examples Plaintiffs offer in support only underscore the problem: they only speculate about potential future adverse impacts. *See, e.g.*, Neuman Decl. ¶¶ 29, 33 (referencing an SEIU member who has not even applied for any adjustment of status but fears that a policy *may* be applied to her in future);[22] ECF 20-6 ("Velasquez Decl.") ¶ 21 (referencing generalized group of VAM members who claim they fear being subject to benefits review).[23]

The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper,* 568 U.S. at 409 (cleaned up; emphases in opinion). Time and again, the Supreme Court has rejected theories of standing that rest on a "speculative chain of possibilities." *Id.* at 414; *see also Summers v. Earth*

---

[22]    The harm arising from such forbearance is self-inflicted, as USCIS has a well-publicized first-in-first-out policy for processing applications for immigration benefits.

[23]    *See also* Neuman Decl. ¶ 27 (SEIU "Member B", who "will not be able to practice medicine in the United States" if he does not receive the J-1 waiver and is "concerned about what will happen to the hospital in the Southeast that he is supposed to work at if his J-1 waiver is not adjudicated . . . ."); Sweeney Decl. ¶ 12 ("This indefinite pause has created significant uncertainty and stress for Member A and his family . . . ."); Kassa Decl. ¶ 15 ("ACT Member B . . . is very disappointed because she has been conducting her job search on the assumption that she would soon be a U.S. citizen. Her employment options are now limited and she feels like her dream job is out of reach."). The adverse impacts Plaintiffs describe are, in any event, not tied to any final agency action and would be the same whether an application is ultimately delayed or denied for reasons unrelated to the Challenged Policies, reinforcing that these claims are not ripe for across-the-board adjudication in this posture.

*Island Inst.*, 555 U.S. 488, 495-97 (2009) (explaining that because standing theory depended on chain of contingencies, it might have demonstrated "a chance" of injury, but "hardly [the] likelihood" necessary to satisfy Article III and finding that a "vague desire to return [to the Forest at issue] is insufficient to satisfy the requirement of imminent injury"). Ultimately, Plaintiffs have failed to articulate a "specific present objective harm or a threat of *specific* future harm." *See Laird*, 408 U.S. at 13-14 (emphasis added). Plaintiffs cannot establish associational standing under Article III by relying on their members' bare speculation and general anxiety about the possible impacts of the potential application of the Challenged Policies on them.

Again, where the policies at issue have only plausibly been alleged to extend the timeline of adjudication—and where the cited examples fall within normal processing windows and do not give rise to an inference of an unreasonable delay—Plaintiffs have not shown that their members have suffered legally cognizable injuries traceable to the Challenged Policies as opposed to the inherent variability of a discretionary, case-by-case system. Plaintiffs have therefore failed to establish associational standing.

### C.    Plaintiffs lack redressable injuries.

Even if Plaintiffs could establish a cognizable injury traceable to the Challenged Policies, their claims still fail because their harms are fundamentally not redressable by this Court. To satisfy Article III, Plaintiffs must show a "substantial likelihood" that the requested relief will remedy their alleged injuries. *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 79 (1978). They cannot do so, and Plaintiffs' own theory of harm makes clear why.

Plaintiffs claim that the Challenged Policies have sweeping effects across the communities they serve—a broad, shifting, and largely unidentified group of noncitizens—and, in turn, on Plaintiffs' own operations. But that theory necessarily

depends on prospective relief that extends far beyond the parties before the Court—relief which this Court has no authority to grant.

As an initial matter, because immigration adjudications are discretionary and individualized, *see, e.g.*, 8 U.S.C. §§ 1255(a), 1158(b)(1)(A), this Court cannot order relief that would guarantee any particular result. Indeed, courts have recognized that even where a policy is subject to judicial review, the judiciary lacks authority to dictate how or when the agency resolves individual cases. In *Doe v. U.S. Citizenship & Immigration Services*, the court held that although it could consider the legality of a categorical adjudicative hold, it could not "direct Defendants' discretionary decision of when and how to adjudicate" applications or review "the timeline under which [the] process unfolds." Order at 5 (Mar. 26, 2026) (ECF 33), No. 1:26-cv-2389 (N.D. Ill.).[24] That limitation underscores the speculative nature of Plaintiffs' theory: even if the Challenged Policies were set aside, there is no basis to conclude that any particular application would be adjudicated on any particular timeline or to reach a favorable outcome for allegedly impacted individual and, by extension, any subsequent reduction in Plaintiffs' alleged burdens. That uncertainty alone defeats redressability.

More fundamentally, however, Plaintiffs' theory presents an insurmountable structural problem. By Plaintiffs' own telling, their alleged harms arise from the aggregate, systemwide effects of the Challenged Policies on a large and indeterminate population. Narrow relief would presumably leave those effects intact. The only way to redress the injuries as Plaintiffs describe them would be to enjoin the Challenged Policies across the board.

---

[24] The government, for the reasons stated herein, respectfully disagrees with the other findings in this *Doe* decision. *See also* Section III.A.2. *infra.*

39

But that is precisely the form of relief the Supreme Court has rejected. In *Trump v. CASA, Inc.*, the Supreme Court held that federal courts lack authority to issue universal injunctions and must ensure that any relief is no broader than necessary to remedy the specified plaintiffs' own injuries. 606 U.S. 831, 856, 862 (2025). That creates a dilemma that Plaintiffs cannot overcome. If relief is properly limited to Plaintiffs' specifically identified and verified clients and/or members (of which, there are none), the Court may not award relief that could be meaningful to Plaintiffs. Any other relief would necessarily operate as a nationwide, programmatic injunction governing the agency's conduct toward non-parties, in direct conflict with *CASA*. That dilemma is fatal to standing.

Because Plaintiffs have failed to establish a concrete and particularized injury in fact traceable to the Challenged Policies, they cannot establish organizational, associational, or third-party standing. And, crucially, their claims depend on relief that cannot be reconciled with Article III's limits, requiring precisely the sort of non-particularized, nationwide relief rejected in *CASA*. Accordingly, this Court lacks jurisdiction, and summary judgment should be entered for Defendants.

**III.    The USCIS policy memoranda and the temporary adjudication pause are consistent with the INA and APA.**

    **A.    The INA and its governing regulations expressly authorize enhanced scrutiny of immigration benefits applications and awards and the temporary adjudication pause.**

Even if the Court finds it has subject matter jurisdiction over Plaintiffs' claims, Plaintiffs' claims still fail on the merits. Under the INA, USCIS had the authority to issue the Challenged Policies to temporarily pause final adjudication of pending applications for immigration benefits and to announce its intent to reconsider past benefit awards. *See, e.g.*, *Doe v. Town of Lisbon*, 78 F.4th 38, 44-45 (1st Cir. 2023) ("[T]he question of [Article III] jurisdiction need not be resolved if a decision on the merits will favor the party challenging the court's jurisdiction.").

40

The INA requires USCIS to conduct adequate security investigations before granting benefits. For example, adjustment applicants must (among other things) be "admissible to the United States for permanent residence." 8 U.S.C. § 1255(a). The INA also contains security-related inadmissibility grounds. 8 U.S.C. § 1182(a)(3). For naturalization applicants, the Act requires "investigation and examination" before approval. 8 U.S.C. § 1446(a). The INA also directs the Secretary to liaise with other law enforcement and security agencies "for the purpose of obtaining and exchanging information for use in enforcing the provisions of this Act in the interest of internal and border security." 8 U.S.C. § 1105(a); *see also* 8 U.S.C. § 1105(b). These provisions thus impose affirmative duties to obtain and exchange security information—duties that cannot be fulfilled if applications are adjudicated before adequate information is obtained.

These statutory directives encompass and authorize USCIS' policy statements, which are not arbitrary and capricious. Those policy statements cite particular facts to support the agency's decision that more vetting is required, including the killing of a National Guardsman in Washington, D.C. in November 2025, a pattern of security lapses since 2021 tied to a foiled plot for a terrorist attack on Election Day 2024, and law enforcement determinations that 39 countries have governance structures that cannot be relied upon to share criminal history and terror-watch data, as well as widespread document fraud in those countries. This makes any adverse inference USCIS will draw based on information about individual applicants provided by the 39 identified high-risk countries rational.

The arbitrary and capricious standard is deferential. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025). Here, the agency explained the facts found and choices made, and that is all that is required. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, the reasoned analysis supporting the Challenged Policies, the temporary

41

adjudication pause, and the anticipated benefits review is as robust as the inter-agency review and findings that the Supreme Court upheld in *Trump v. Hawaii*, despite challenges to the sufficiency of that review and findings similar to those Plaintiffs lodge here. *Cf.* 585 U.S. at 685-88.[25]

Moreover, when assessing that earlier effort, the Supreme Court expressly held that the goal of promoting and implementing enhanced vetting was valid and relevant to an individualized evaluation (there, for determining admissibility). And the Court's reasoning applies equally to adjudication of immigrant-benefit applications and reviews of past awards:

> [T]he Proclamation supports Congress's individualized approach for determining admissibility. The INA sets forth various inadmissibility grounds based on connections to terrorism and criminal history, but those provisions can only work when the consular officer has sufficient (and sufficiently reliable) information to make that determination . . . .
>
> [T]he Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving sensitive and weighty interests of national security and foreign affairs.

---

[25]    585 U.S. at 686-87:

> [P]laintiffs' request for a searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere. . . . [W]hen the President adopts 'a preventive measure . . . in the context of international affairs and national security,' he is 'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical [687] conclusions.' ") (quoting *Holder v. Humanitarian Law Project,* 561 U.S. 1, 35 (2010)).

The Supreme Court's analysis of the quality and quantity of Executive action in *Trump* was part of a statutory-delegation analysis, rather than APA review, which does not apply to Executive Orders or Presidential Proclamations. *See, e.g., Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) (holding courts lack "jurisdiction . . . to enjoin the President in the performance of his official duties"); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part).

*Trump*, 585 U.S. at 689, 708 (internal quotation marks and citation omitted).

The contemporaneous explanations for USCIS' policies reflect similarly reasonable choices. *See Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23-24 (1st Cir. 1999). The Challenged Policies merely recognize and extend a policy directive that the President issued. *See, e.g.*, *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) ("Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power.") (cleaned up); *cf. Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[An agency] may not simply disregard an Executive Order. To the contrary, as an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."), *cert. denied*, 133 S. Ct. 847 (2013); *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[F]aithful execution of the laws enacted by the Congress, however, ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates. . . . Those officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law."), *cert. denied*, 537 U.S. 1171 (2003).

The INA—and the numerous courts interpreting it—make clear that the time and manner in which the government adjudicates applications for immigration benefits is committed to agency discretion. *See* Sections I.B. & C. & pp. 7-9 *supra*. For these reasons, the Court should enter summary judgment for the government.

### 1. The Court should reject Plaintiffs' arguments that the Challenged Policies exceed the government's statutory authority.

Plaintiffs contend, on only two grounds, that the USCIS policies exceed the government's statutory authority. Neither is meritorious.

Plaintiffs' first ground is a fallacy—that the sole statutory basis that the government cited for its authority issuing the Challenged Policies is a provision whose

express language addresses only the President's authority and concerns only a single aspect of federal immigration law: restrictions on entry. ECF 20-1 at 1, 32-35. That statutory provision is 8 U.S.C. § 1182(f). Plaintiffs betray their own non sequitur by observing that "none of the memoranda expressly rely on Section 1182(f) as the basis for the new policies." ECF 20-1 at 32. That statement, in turn, appears intended to support an even bolder claim: Plaintiffs invoke the Major Questions Doctrine to contend that Congress "has not spoken clearly" about the policies USCIS has announced. ECF 20-1 at 35.

The "major questions doctrine" requires an agency to "point to clear congressional authorization for the authority it claims." *West Virginia v. Env'tl Prot. Agency*, 597 U.S. 697, 723 (2022) (internal quotation marks and citation omitted). But that is precisely what the government has done across the three policy memoranda whose authority derives from express citations to multiple provisions of the INA and its regulations. ECF 16-1, CAR000012; *see also, e.g.*, ECF 16-1, CAR000028-CAR000036, CAR000066-71 CAR000066; ECF 16-2, CAR000001 n.7; ECF 16-3, CAR000047. The administrative record specifies, moreover, that as a result of the factfinding conducted under 8 U.S.C. § 1182(f), USCIS will use country-specific findings in assessing individual applications. USCIS will not consider the applicant's nationality itself as a significant negative factor. ECF 16-2, CAR000042.

Moreover, Plaintiffs offer no plausible interpretation of the INA that suggests that considerations of public safety or national security exceed the bounds of the very factors that the INA commands the government to consider in enforcing federal immigration law.

That the government might evaluate public safety and national security risks (whether in the first instance or upon any re-review) differently from how it has in the past—or how Plaintiffs would like—is a matter of discretion Congress delegated to the Executive. But none of the concerns animating the USCIS's policy

44

memoranda is outside of the INA's boundaries. Those are concerns that Congress expressly delegated to the Executive to evaluate in the INA. Those concerns obligate the Executive and are the very guardrails Plaintiffs hyperbolically claim allow the government to "withhold benefits adjudications, rescind benefits, and deny benefits, for any reason it chooses. . . ." ECF 20-1 at 35.

Plaintiffs' second ground to claim that the USCIS policies exceed statutory authority results from their reading the INA in a vacuum. They contend only that the temporary adjudication pause "contravene[s]" deadlines Congress has set concerning final decisionmaking on immigration benefits. But many of those very provisions are precatory, 8 U.S.C. § 1571(b) ("should"), and the federal courts routinely allow for delays in deciding immigrant-benefit applications. *E.g.*, *supra* at 9-10.

### 2. The Court should reject Plaintiffs' arbitrary-and-capricious arguments.

Plaintiffs' arguments about why the USCIS policy memoranda are arbitrary and capricious similarly overstate and second-guess what are, at heart, discretionary judgments that the INA delegated to the Executive. Beyond the arguments that the government has already addressed,[26] the Court should reject Plaintiffs' arguments for the additional five reasons.

First, they contend USCIS "did not articulate any reasons," or provided "virtually no explanation" for the policies. ECF 20-1 at 38. That ignores the Policies' express language. They expressly cite the factfinding disclosed in Proclamation Nos. 10949 and 10998—none of which Plaintiffs acknowledge, much less contest—that reveals concerning deficiencies in the quality and integrity of information USCIS

---

[26] Plaintiffs repeat the fallacy that the "stated goal" of USCIS' policy memoranda is to "prevent[ ] people from purportedly dangerous countries from entering the United States." ECF 20-1 at 46. Nothing in the administrative record supports that statement. They also contend that the Challenged Policies are "patently pretextual." ECF 20-1 at 49. The government addresses that issue in Section IV below.

possesses from certain countries to vet the eligibility of individuals who seek or already possess immigration benefits. ECF 16-1, CAR000072; ECF 16-2, CAR000001; ECF 16-3, CAR000045. The Challenged Policies merely set forth the government's substantiated, and thus reasonable, suspicion of that information's value in assessing eligibility for immigration benefits in an individual's case.

Plaintiffs repeatedly disparage the government's analysis as "vague," *e.g.*, ECF 20-1 at 38-39, yet there is a reasonable explanation for that, too. Section 1(h) of Proclamation No. 10949 did not disclose further details to avoid "caus[ing] serious damage to the national security of the United States" and because "many such details are classified." ECF 16-1, CAR000003. And the cases from which Plaintiffs derive the propositions that "conclusory statements will not do" feature domestic policy disputes—specifically, challenges to caps on indirect funding costs on federal research grants[27]—far afield from the INA's concerns with fighting terrorism, securing public safety, or promoting national security, to which the Supreme Court has instructed that there should be judicial deference. *E.g.*, Section I.A. *supra.*

Second, Plaintiffs claim that "USCIS did not so much as acknowledge . . . predictable harms, much less weigh [them] against the supposed benefits of the Challenged Policies." ECF 20-1 at 40. But one page later, Plaintiffs note where USCIS acknowledged these very points, ECF 20-1 at 41 (citing ECF 16-3, CAR000048); *see also* ECF 16-1, CAR000003; again simply without the outcome that they would prefer.

That Congress decided to give the Executive the discretion to make precisely such judgments could not be clearer given the INA's plain language setting forth

---

[27]    *See, e.g., Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 287 (D. Mass. 2025) (cited in ECF 20-1 at 39); *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 150 (D. Mass. 2025) (same); *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 127 (D. Mass. 2025).

46

that discretion expressly and stripping the federal courts of second-guessing it. *See* Section I.B. *supra.* And it is precisely those factors, as Plaintiffs essentially concede, ECF 20-1 at 43, that the reliance interest of their clients and members cannot overcome: the agency's obligation to protect and preserve national security.

A contrary result would only calcify administrative action that enjoys statutorily prescribed discretion to respond to national security threats that are either developing or that different Administrations might weigh differently. Those reliance interests, however, must also account for USCIS' longstanding regulations that already permit prolonged investigations and a long string of case law that strips the courts of power to set deadlines for action. One of Plaintiffs own cited authorities, moreover, reinforces the reasonableness of pausing "benefit requests to give [DHS] time to establish a baseline for screening and vetting standards," which the court there considered problematic because the pause risked becoming "an indefinite suspension." *Doe v. Noem*, 784 F. Supp. 3d 437, 464 (D. Mass. 2025), which the Good Declaration establishes is not the case here, Ex. 1.

Third, in claiming that the government "could simply undertake additional measures without enacting the Challenged Policies," ECF 20-1 at 44, Plaintiffs expose that their challenge is more about form than substance. This is simply a difference of opinion about timing, and it is likely a wash whether pausing adjudications to enhance vetting or simply enhancing the vetting would cause more delay. This also exposes Plaintiffs' primary concern—delay and the government's well-substantiated suspicion about the quality of information it receives from 39 high-risk countries—which are already a practical features of USCIS adjudications, whether USCIS had issued the Challenged Policies or not. *Cf. Trump*, 585 U.S. at 689.[28]

---

[28]    *Trump*, 585 U.S. at 689 (citations omitted):

> Plaintiffs suggest that the entry restrictions are unnecessary because consular officers can simply deny visas in

Fourth, Plaintiffs contend that various social media statements by the President betray what they believe is the actual objective of the Challenged Policies. But those statements fail to invalidate the reasoned analysis evidenced in the administrative record. *See supra* at 10-14; *see also* Section IV *infra*.

Finally, Plaintiffs urge this Court to join the rulings of other district courts that have in effect compelled USCIS to adjudicate immigration-benefit applications and/or have invalidated the USCIS temporary pause final decisionmaking on those applications. Those cases are distinguishable for multiple reasons.

**a.** Some of those other district court decisions turned on the fallacy that the adjudication hold is indefinite—a fallacy exposed by the Good Declaration. *See, e.g.*, *E.g.*, *Varniab v. Edlow*, No. 25-CV-10602-SVK, 2026 WL 485490, at \*8 (N.D. Cal. Feb. 20, 2026). But the Good Declaration establishes the "condition precedent" that the *Varniab* court demanded: the hold is lifted when the multi-office review process determines that the security vetting for a given category is sufficient. *See generally* Ex. 1. That criterion is being applied, and it produces results. The seven implemented vetting improvements and four category-based hold lifts documented in the Good Declaration reflect the substantive work that the USCIS policy memoranda contemplate; the guidance was directed to internal USCIS operational procedures.

The Good Declaration, moreover, is not the only evidence of ongoing administrative processes. On December 5, 2025—three days after the challenged December

---

individual cases when an alien fails to carry his burden of proving admissibility—for example, by failing to produce certified records regarding his criminal history. But that misses the point: A critical finding of the Proclamation is that the failure of certain countries to provide reliable information prevents the Government from accurately determining whether an alien is inadmissible or poses a threat. Unless consular officers are expected to apply categorical rules and deny entry from those countries across the board, fraudulent or unreliable documentation may thwart their review in individual cases.

48

memorandum was issued—USCIS announced the establishment of the USCIS Vetting Center, headquartered in Atlanta, to centralize enhanced vetting using advanced technologies including artificial intelligence. USCIS Press Release, "U.S. Citizenship and Immigration Services Establishes New Center to Strengthen Immigration Screening and Target Bad Actors" (Dec. 5, 2025) (cited in Good Decl. at n.5). The creation of a dedicated institutional unit for vetting further confirms that the hold is tied to a concrete, ongoing review process—not an open-ended pause.

**b.** The decision of these other courts also turned on their views that the USCIS policy memoranda were "conclusory." Order at 7 (Mar. 26, 2026) (ECF 33), *Doe v. U.S. Citizenship & Immigr Servs.*, No. 1:26-cv-2389 (N.D. Ill.) (citing *Varniab*); *Varniab*, 2026 WL 485490, at *19; *Bowser v. Noem*, No. 26-CV-10382-AK, 2026 WL 555624, at *7 (D. Mass. Feb. 27, 2026) (citing *Varniab*). The government contends, respectfully, that these courts have demanded more exposition than the law requires. An agency decision need only be "rational" to "pass muster under the APA's 'arbitrary and capricious test[.]' " *Beverly Enters.-Mass.*, 174 F.3d at 24.

**c.** These other decisions also concluded that the government insufficiently engaged with immigrants' reliance interests. *Varniab*, 2026 WL 485490, at *19; *Bowser*, 2026 WL 555624, at *7-9. The Good Declaration provides concrete evidence that USCIS has been weighing these interests—and acting on that weighing. The agency did not impose the hold uniformly and immovably across all categories. Through its formal internal review process, it has identified categories of applicants whose reliance interests and petition characteristics warrant exemption. Ex. 1, ¶ 8. Each exemption reflects a judgment that the security rationale for the hold is outweighed, for that category, by the interests of petitioners. That neither *Bowser* nor *Varniab* involved an analogous evidentiary record is precisely why this Court should not treat those rulings as controlling here.

49

Defendants recognize that post-decisional materials—such as the Good Dec-laration—cannot supply justifications that the agency did not consider at the time of a final agency action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020). But the Good Declaration is not a post-hoc rationalization of a completed decision, as the Challenged Policies are not final agency action andthere is no completed decision to which the post-hoc rationalization doctrine attaches. The Challenged Policies initiated a process; the Good Declaration documents its pro-gress. Even under § 706(2), however, the Declaration would properly be part of the record. It is a contemporaneous account of the ongoing implementation of the review process that the challenged memorandum initiated.

### B.    USCIS was not obligated to conduct notice-and-com-ment rulemaking to issue its interpretive guidance in the Challenged Policies.

The USCIS policy statements that Plaintiffs challenge are quintessential pre-decisional policy statements: they announce how USCIS will exercise its discretion in deciding whether, and the processes by which, it will investigate and adjudicate applications for immigration benefits, and they do not alter the rights or obligations of any applicant because they do not have "direct and appreciable legal conse-quences." Instead, they merely advise the "public prospectively of the manner" in which USCIS "proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (construing 5 U.S.C. § 553(b)(A)); *see also Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 706 (4th Cir. 2019).

Contrary to Plaintiffs' contentions, the Defendants were not required to en-gage in notice-and-comment rulemaking under the APA either to issue the Chal-lenged Policies for two reasons.

First, the APA itself includes an express exception to the APA's notice-and-comment-rulemaking requirement: "[E]xempted from this requirement are 'inter-pretive rules, general statements of policy, or rules of agency organization,

50

procedure, or practice.'" *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting 5 U.S.C. § 553(b)). These exemptions apply to instances in which the agency, as here, "merely . . . advise[s] the public of the agency's construction of the statutes and rules which it administers." *Id.* (cleaned up).

By contrast, "legislative rules" include rights, duties, or obligations "not already outlined in the law itself." *Id.* (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)). While the First Circuit set forth five considerations to distinguish policy statements from legislative rules, the first—"the words of the statute"—is dispositive. *See id.* (comparing result in *Azar*, where the contested agency action was legislative rule requiring notice-and-comment rulemaking, with an instance in which agency "was . . . simply following the statutory command, and was not making a discretionary policy judgment"); *see also, e.g., Le v. U.S. Citizenship & Immigr. Servs.*, No. 21-CV-501 (JMC), 2025 WL 1743942, at *12 (D.D.C. June 24, 2025) (granting government's cross-motion for summary judgment; denying plaintiff's summary judgment motion) (concluding challenged USCIS "pronouncements in 2019 training manual" was not legislative rule because requirement stated there "was consistent with the existing regulation and thus did not 'amend' it").

The USCIS policies impose no new obligations but merely explain how USCIS will exercise existing discretion during the operational review that they mandate. They do not create new substantive requirements; rather, they provide operational guidance on applying existing security mandates in light of Presidential findings documenting systematic vetting deficiencies among dozens of countries.

The only change forecasted by the Challenged Policies and adjudication pause is the emphasis that the government will give to certain factors, corresponding to already-existing statutory commands, when resuming final decisionmaking on adjudications for immigration benefits. Such emphasis is consistent with the

discretion that the INA confers broadly on government personnel. And if the Supreme Court has concluded that the government, by restricting entry, may (consistent with the INA) address "systematic problems such as the lack of reliable information . . . in a progression of case-by-case admissibility determinations," *Trump*, 585 U.S. at 689-90, then so too may the government undertake the same process for the same purpose concerning the adjudication of immigration benefits, for which the applicant's valid admission is a necessary prerequisite.

Critically, the policies expressly preserve officer discretion in case-by-case adjudicatory decisions. This is the paradigm interpretive rule, and renders unnecessary any analysis of the other four considerations by which the First Circuit distinguishes mere policy statements from legislative rules. *Azar*, 887 F.3d at 71-73; *see also, e.g.*, *Casa De Maryland*, 924 F.3d at 702-03 (rejecting claim that memorandum concerning Deferred Action for Childhood Arrivals ("DACA") was subject to notice-and-comment rulemaking as memorandum did not end DACA, allowed for case-by-case adjudication, did not bind future administrations from adjusting policy, and did not set forth a new binding rule of substantive law); *cf. Trump*, 585 U.S. at 689 ("[P]laintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting system.").

Second, although encompassed analytically by the prior point, notice-and-comment rulemaking would not have changed the government's approach—as the INA already allows the government to issue interpretive guidance, extend adjudication periods, and even reconsider (and rescind) previous grants of immigration benefits. Instead, Plaintiffs simply invoke a procedural criticism without explaining what difference the additional procedure could have made aside from, apparently, delaying the very exercise of discretion that Congress, under the INA, broadly

52

conferred on the government and that is has exercised by temporarily pausing adjudications.

As a result, Plaintiffs cannot carry their burden to show that the absence of notice-and-comment rulemaking, even if it were required, would result in any meaningful prejudice. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690-91 (D.C. Cir. 2023) (affirming order dismissing APA challenge to agency action based on lack of notice-and-comment rulemaking); *id.* at 690 ("[E]rror can be harmless if notice-and-comment would not alter the legal conclusion of the rule.") (citing *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471-72 (D.C. Cir. 2014), with parenthetical: "recognizing that 'all the procedure in the world' could not change when statutory language, as interpreted under D.C. Circuit precedent, foreclosed the appellants' interpretation"); *id.* ("Ultimately, it is the plaintiff's responsibility to show that an error is harmful") (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

Requiring notice-and-comment rulemaking for this type of internal, procedural guidance would effectively disable the agency's ability to provide timely direction to adjudicators and adapt its processes to evolving operational and national-security conditions—something the APA does not demand.

## IV.    Plaintiffs lack Fifth Amendment claims.

Even Plaintiffs had not waived their Fifth Amendment claims, the Court should dismiss them under Federal Rules of Civil Procedure 12(b)(1), (b)(6) or 56—even if Plaintiffs could overcome the preceding jurisdictional hurdles——for four additional reasons. The Due Process Clause of the Fifth Amendment provides, in part, that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

First, a viable Fifth Amendment procedural due process claim depends on the alleged deprivation of a cognizable property interest. But, as a matter of law, there

53

are no cognizable property interests in government programs—like the immigration benefits at issue here—that the government has the discretion to award or deny or rescind.[29] *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *Roe v. Lynch*, 997 F.3d 80, 85 (1st Cir. 2021) (affirming dismissal of Fifth Amendment procedural due process claim) ("[A claimant] cannot have a protected interest in something that government officials can grant or deny in their discretion.") (citing *Town of Castle Rock*, 545 U.S. at 756); *Crawford v. Antonio B. Won Pat Int'l Airport Auth.*, 917 F.3d 1081, 1090 (9th Cir. 2019) (same).

Second, even if there were cognizable property rights in discretionary immigration benefits, Plaintiffs' Fifth Amendment claims still would fail as a matter of law. Plaintiffs contend that the government's anticipated re-review "fails to ensure that benefits recipients **will** receive adequate notice and an opportunity to be heard" or that its "procedures **will** otherwise satisfy the requirements of due process." Compl. ¶ 216, 223 (ECF 1) (respectively, Counts V and VII) (bold emphases added).

Plaintiffs' future-tense, speculative allegations only expose the lack of any case and controversy for this Court to decide and reinforce the lack of any final

---

[29]    Plaintiffs assert a "property interest" that individuals granted permanent residence have in that status. Compl. ¶¶ 214-18 (Count V, "Comprehensive Re-Review") (ECF 1). Neither their Complaint nor their summary judgment filing identifies any authority substantiating that purported property interest as legally cognizable. And while asylum applicants have due process rights, those rights attach only to individuals in deportation proceedings. *See, e.g.*, *United States v. Castillo-Martinez*, 16 F.4th 906, 917 (1st Cir. 2021) ("[R]emoval proceedings must comport with the fundamental requirements of the Due Process Clause under the Fifth Amendment.") (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *Jacinto v. Immigr. & Naturalization Servs.*, 208 F.3d 725, 727 (9th Cir. 2000). As this case lacks any specified individual in deportation proceedings to vindicate such rights, the Plaintiffs' claims must be dismissed. And, even if Plaintiffs could pursue such claims, their Complaint lacks any factual allegations necessary to state any claim that such proceedings have violated the Constitution or any of USCIS' own procedures.

54

agency action and ripeness. *See* Sections I.C. & D. *supra.* Moreover, Article III limits the federal courts' jurisdiction to "cases" and "controversies," U.S. Const. art. III, § 2, a requirement the Supreme Court has "long understood" to demand "a genuine, live dispute between adverse parties," not one—such as Plaintiffs'—that invites "advisory opinions" or forward-looking supervision of agency policy. *Carney v. Adams*, 592 U.S. 53, 58 (2020).

A viable procedural Fifth Amendment due process claim, moreover, must allege facts showing the process to which Plaintiffs were entitled but were actually denied. *See, e.g., Garrison v. Johnson*, 286 F. Supp. 2d 41, 42 (D. Me. 2003) (granting motion to dismiss Fifth Amendment due process claims given absence of allegations of process plaintiff contended he was owed but was denied). Plaintiffs' real concern is the *additional* process that the Contested Policies foreshadow—namely, enhanced vetting. Such concerns, moreover, are premature because the Challenged Policies are, by definition, predecisional guidance for final decisionmaking on immigration applications, once adjudications resume.

Third, Plaintiffs allege that the government's contested conduct "den[ies] individuals equal protection under the laws." Compl. ¶ 220 (ECF 1) (Count VI). But—aside from contentions that USCIS' policies are pretextual for the supposedly "real" objectives expressed in Presidential social media postings—neither the Complaint nor Plaintiffs' summary judgment motion explains how they have been denied equal protection of the law. And, even if they had, their equal protection claim fails as a matter of law. As the Supreme Court has stated:

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

55

*Fed. Commc'ns Comm v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Courts rarely strike down policies as illegitimate under rational basis scrutiny. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 705 (2018) (upholding entry restriction allegedly based on religion because of "legitimate grounding in national security concerns").

The Supreme Court has long "recognized that judicial deference to the Executive is especially appropriate in the immigration context." *Immigr. & Naturalization Servs. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999). "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive [and must be upheld] [s]o long as [they] are not wholly irrational[.]" *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (alterations in opinion) (program implemented after 9/11 that was "designed to monitor more closely aliens from certain countries selected on the basis of national security criteria" is "plainly rational attempt to enhance national security" and does not violate equal protection principles). The temporary adjudication hold similarly arises from anti-terrorism, public safety, and national security concerns sufficiently documented in the administrative record concerning specified countries. And, again, USCIS will use country-specific findings in assessing individual applications, but will not consider the applicant's nationality itself as a significant negative factor. ECF 16-2, CAR000042.

Finally, Plaintiffs do not contend that any of the further investigations, adjudications of pending applications, or retrospective review of already-granted benefits necessarily will lack any of the procedural safeguards embedded in long-established USCIS procedures (none of which Plaintiffs challenge in this case). This is another fatal hole in their pleading of any Fifth Amendment claims. *Cf. Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.") (cleaned up). The very policies that Plaintiffs contest provide some of the very notice in anticipation of further, operational implementation.

56

**V.     If the Court does not grant summary judgment to the Defendants, the Court should narrowly prescribe any resulting
relief.**

> **A.     The proper remedy would be remand the policy memo
> randa to USCIS.**

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996). APA § 706 authorizes two forms of relief. A reviewing court may either compel agency action unlawfully held or unreasonably delayed, 5 U.S.C. § 706(1), or it may "hold unlawful and set aside agency action" on certain statutorily enumerated grounds, 5 U.S.C. § 706(2). What the APA does not authorize is "jurisdiction to order specific relief." *See, e.g.*, *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005);[30] *Me. Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (applying *Palisades*).

To ensure that reviewing court does not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency," *Secs. & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943), and "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be

---

[30]     426 F.3d at 403:

> The district court had no jurisdiction to order specific re
> lief. Unlike a district court managing a "garden variety
> civil suit," a district court reviewing a final agency action
> " 'does not perform its normal role' but instead 'sits as an
> appellate tribunal.' " *County of Los Angeles v. Shalala*,
> 192 F.3d 1005, 1011 (D.C.Cir.1999) (quoting *PPG Indus.,
> Inc. v. United States*, 52 F.3d 363, 365 (D.C.Cir.1995)).
> Thus, " 'under settled principles of administrative law,
> when a court reviewing agency action determines that an
> agency made an error of law, the court's inquiry is at an
> end: the case must be remanded to the agency for further
> action consistent with the correct legal standards.' " *Id.*

remanded to the agency for further action consistent with the corrected legal standards." *Shalala*, 192 F.3d at 1011 (quoting *PPG*, 52 F.3d at 365); *see also Sulaiman v. Mayorkas*, No. 8:24-cv-01733, 2024 WL 5410126, at *1, 3 (C.D. Cal. Dec. 11, 2024) (remanding delayed adjudication to USCIS based on its investigative expertise, where application was subject to additional vetting under national security policy); *Ge v. U.S. Citizenship & Immigr. Servs.*, No. 3:18-cv-00889, 2019 WL 2713052, at *3 (E.D. Va. June 28, 2019) (remanding USCIS guidance to agency, despite 3-year delay in adjudicating naturalization application). Accordingly, any relief that this Court might order in this case should be limited to remedying improper agency action and must leave intact the Executive's discretion to evaluate applications for and potential recission of immigration benefits consistent with its lawful authority.

**B. The Court should reject Plaintiffs' request to enjoin imagined, prospective agency action that might impose "similar" policies.**

This Court lacks jurisdiction to grant Plaintiffs' request for injunctive relief about future agency action by the Defendants for two primary reasons.

First, as already noted, Article III limits the federal courts' jurisdiction to "cases" and "controversies," U.S. Const., art. III, § 2, precluding courts from issuing "advisory opinions" or superintending forward-looking agency policy. *Carney v. Adams*, 592 U.S. 53, 58 (2020); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). Plaintiffs' request that the Court enjoy some future policy violates this very principle.

Second, the Court should deny Plaintiffs' request for prospective relief under the ripeness doctrine. *See* Section I.D. *supra*. Without any agency action setting forth any "similar" policies, it is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. *See, e.g., City of Fall*

*River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) ("[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

### C. The Court should limit any permanent injunctive relief to the named Plaintiffs and any identified and verified members of the organizational Plaintiffs.

A court may only grant relief to plaintiffs who have standing to sue. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024). And because "standing is not dispensed in gross," any permanent relief must be tailored only to those specific plaintiffs who have established standing "for each form of relief that they seek." *Id*. at 61 (citation omitted).

These principles foreclose any attempt by Plaintiffs to obtain de facto universal relief through organizational or associational standing. As already explained, the Court may not grant a universal injunction. *Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025). Nor can it indirectly do so by extending relief to nonparties who are represented by a party, other than through class certification under Rule 23 or properly established associational standing tied to identified members. *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) (rejecting "virtual representation" as impermissible attempt to bring "common-law kind of kind of class action" circumventing R. 23; holding that nonparties may be bound only through properly certified class action); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 497-500 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm . . . ."). Plaintiffs cannot end-run all three of those limits—*CASA*, Rule 23, and associational standing requirements—by seeking an injunction barring the government from enforcing the Challenged Policies against an amorphous group of individuals unknown to the government and whose identity has not been established in the record.

Yet Plaintiffs' request for relief here does exactly that. They rely on generalized and anonymized references to individuals who allegedly may have been affected in unspecified ways, and then seek relief that would bind the government as to all similarly situated persons. But as courts have recognized, relief cannot be meaningfully crafted or enforced without identifying who is covered by the judgment. *See, e.g.*, Electronic Order (Apr. 6, 2026) (ECF 18), *Doe v. Trump*, No. 1:26-cv-11382 (D. Mass.) ("Without information about Plaintiffs' identities, the Court cannot enjoin Defendants from applying the USCIS Policy Memoranda to them.").

Thus, to comply with Article III and the mandate of *CASA*, any permanent injunction must be limited to specifically identified individuals who have been shown to have standing and who were members of an organizational Plaintiff at the time suit was filed.[31] *See Conservation Law Found., Inc. v. Academy Express, LLC*, 129 F.4th 78, 85 (1st Cir. 2025) ("[T]he [Supreme] Court has made clear that standing 'must exist at the commencement of the litigation' and 'must continue throughout its existence.'") (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *see also CASA*, 606 U.S. at 867 (Thomas, J., concurring) ("Left unchecked, the practice of reflexive . . . third-party standing will undermine today's decision as a practical matter"); *Washington v. Trump*, 145 F.4th 1013, 1040 (9th Cir. 2025) (Bumatay, J., concurring and dissenting in part) ("[W]e should approach any request for universal relief with good-faith skepticism, mindful that the invocation of 'complete relief' isn't a backdoor to universal injunctions. Otherwise, *CASA* would be a mere drafting exercise rather than a binding precedent . . . .

---

[31]    Defendants, as a general policy, do not seek to compel disclosure of private organization's membership and does not ask the Court to do so here. The government asks that the judgment apply only to identified members while still leaving Plaintiffs with the choice to disclose their membership entirely, partially, or not at all. Defendants reiterate that they would agree to a protective order that limits use of any member information that Plaintiffs may choose to provide to compliance with the Court's judgment in this case.

Equity sometimes demands that courts grant *less* than complete relief."). That limitation reflects the strategic and procedural choices Plaintiffs made. They could have identified additional members, sought class certification, or otherwise proceeded in a manner that would allow broader relief. They did not.

Limiting a remedy to the members Plaintiffs identify appropriately leaves the breadth of the remedy Plaintiffs can receive in their own hands. Nothing prevents Plaintiffs from naming as many of its members as it wishes so that each member can benefit from any relief the Court orders. Likewise, nothing prevents Plaintiffs' members from seeking to litigate this case as a class action. What the Court cannot do is enjoin the government from implementing the Challenged Policies against Plaintiffs' clients and/or members when the government does not know who they are because Plaintiffs have not identified them. *Cf. Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) ("It would be unreasonable and unjust to hold in contempt a defendant who demonstrated that he was powerless to comply."). The Court should therefore make clear that the government is enjoined from enforcing the Challenged Policies against only the Plaintiffs' clients and / or members that Plaintiffs choose to identify to the government.[32]

### D.    Any injunctive relief should be stayed pending appeal and accompanied by a bond.

To the extent the Court issues any injunctive relief, the government respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum that such relief be

---

[32]    Note, however, that once relief is properly confined to identified plaintiffs, the jurisdictional defects identified already become all the more dispositive for the reasons already explained. To the extent Plaintiffs' theory depends on relief extending beyond identified individuals, it highlights the same redressability concerns that preclude standing in the first place.

61

administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## Conclusion

For the preceding reasons, the Court should dismiss Plaintiffs' claims and enter summary judgment for the government.

Dated: April 24, 2026                    Respectfully submitted,

                                         CHARLES C. CALENDA
                                         United States Attorney

                                         */s/ Kevin Bolan*
                                         KEVIN BOLAN
                                         Assistant United States Attorney
                                         One Financial Plaza, 17th Floor
                                         Providence, RI 02903
                                         401.709.5000
                                         kevin.bolan@usdoj.gov

## Certificate of Service

I hereby certify that, on April 24, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

                                         */s/ Kevin Bolan*
                                         KEVIN BOLAN
                                         Assistant United States Attorney