## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF RHODE ISLAND

DORCAS INTERNATIONAL
INSTITUTE OF RHODE ISLAND, *et al.*,

    *Plaintiffs,*

v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.*,

    *Defendants.*

Case No. 1:26-cv-00132-JJM-PAS

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Introduction .............................................................................................................. 1

Argument .................................................................................................................. 4

I.  The Court Has Subject-Matter Jurisdiction. .................................................... 4

    A.  Plaintiffs Have Standing.......................................................................... 4

    B.  Plaintiffs' Claims Are Ripe. .................................................................. 12

    C.  Plaintiffs' Claims Are Justiciable. ......................................................... 14

    D.  The INA Does Not Bar Jurisdiction. ...................................................... 15

II.  The Challenged Policies Are Reviewable Under the APA............................... 22

    A.  The Challenged Policies Are Final Agency Action................................ 22

    B.  The Challenged Policies Are Not Committed to Agency Discretion................................................................................................ 25

III.  The Challenged Policies Violate the APA. ...................................................... 27

    A.  USCIS Exceeded Its Statutory Authority When It Enacted the Challenged Policies. ............................................................................... 27

    B.  The Challenged Policies Are Arbitrary and Capricious........................ 30

    C.  USCIS Failed to Follow Notice-and-Comment Procedures. ................. 41

IV.  The Court Should Deny Defendants' Motion to Dismiss Plaintiffs' Constitutional Claims....................................................................................... 48

    A.  Plaintiffs Have Adequately Stated a Fifth Amendment Due Process Claim. ....................................................................................... 48

    B.  Plaintiffs Have Adequately Stated a Fifth Amendment Equal Protection Claim...................................................................................... 50

V.  The Court Should Vacate the Challenged Policies and Enjoin the Government from Issuing or Enforcing any Similar Policy. ............................ 52

    A.  The Appropriate Remedy Is Vacatur...................................................... 52

    B.  An Ancillary Injunction Is Also Warranted. ......................................... 54

Conclusion ........................................................................................................... 60

## INTRODUCTION

The United States Citizenship and Immigration Services (USCIS) has effectively shut down the legal immigration system for people from the thirty-nine countries subject to presidentially imposed entry restrictions ("Entry Ban"). As a result of recent USCIS directives ("the Challenged Policies"), noncitizens across the country are barred from obtaining citizenship, green cards, work permits, and other essential benefits. The same communities also face revocation of existing status, exposure to immigration enforcement, and removal.

Plaintiffs—a coalition of immigration organizations and labor unions—brought suit under the Administrative Procedure Act (APA), moved for summary judgment, and asked the Court to vacate and enjoin the Challenged Policies. The government's opposition does nothing to disturb the merits of that motion. Instead, the government hides behind an array of procedural and jurisdictional defenses. These threshold arguments are an unpersuasive and transparent attempt to avoid defending the legality of the Challenged Policies.

The Court should not hesitate to reach the merits. The government, however, has little to say on the merits. With regard to whether USCIS acted within the scope of its statutory authority, the government candidly admits that 8 U.S.C. § 1182(f), a provision in the Immigration and Nationality Act (INA) repeatedly cited by USCIS, does not authorize the agency to enact any of the Challenged Policies. And the government fails to cite any other statute giving USCIS sweeping power to impose categorical restrictions on access to immigration benefits. That failure amounts to a concession that the Challenged Policies exceed USCIS's statutory authority.

1

The Challenged Policies are also arbitrary and capricious. The Challenged Policies offer no reasoning other than vague invocations of national security and conclusory assertions about the need for additional vetting. Critically, the agency never explains how its purported national-security objectives are served by restricting access to immigration benefits for people who are already in the United States, and, in some cases, have lived here for years. For these and a host of other reasons, the Challenged Policies cannot withstand arbitrary-and-capricious review.

And, at bare minimum, USCIS was required to follow notice and comment. The government invokes the exceptions to the notice-and-comment requirement for interpretive rules and general statements of policy, but neither is applicable. The Challenged Policies are not general statements of policy because they establish rules that bind agency personnel and cabin agency discretion going forward. And the Challenged Policies are not interpretive rules because they are a naked exercise of power untethered from any statutory or regulatory text.

The Challenged Policies thus violate the APA. The only remaining question is relief. The government does not dispute that the Court may vacate the Challenged Policies under the APA. And vacatur is the appropriate remedy here because the legal defects in the Challenged Policies cannot be cured on remand. The government does not dispute that vacatur under the APA as a practical matter has nationwide effect.

To ensure the effectiveness of APA vacatur, the Court should also enjoin USCIS from issuing or enforcing any substantially similar policy. That would ensure a return to the status quo ante and prevent the government from circumventing the

2

Court's judgment. The government proposes narrower relief, relying on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). But *CASA* does not control remedies issued under the APA. And the injunction Plaintiffs seek is narrowly tailored to effectuate an order vacating the Challenged Policies under the APA. In any event, the government concedes that a nationwide injunction is necessary to remediate Plaintiffs' injuries, and *CASA* permits nationwide injunctions where necessary to provide complete relief.

This Court is not writing on a blank slate. There have now been at least eight decisions from other federal courts ordering USCIS to adjudicate specific requests for immigration benefits. *See* Order, *Doe v. Trump*, No. 1:25-cv-13946 (D. Mass. Apr. 30, 2026), ECF No. 82; *Meschi v. Edlow*, No. 26-cv-1993, 2026 WL 1157151 (N.D. Cal. Apr. 29, 2026); *Saghafi v. Edlow*, No. 26-cv-100, 2026 WL 1127468 (D. Md. Apr. 24, 2026); *Karimi v. Mullin*, No. 5:26-cv-5049, 2026 WL 1103448 (W.D. Ark. Apr. 23, 2026); *Behdin v. Edlow*, No. 26-cv-00566, 2026 WL 1031079 (N.D. Cal. Apr. 16, 2026); Order, *Doe v. USCIS,* No. 26-cv-2389 (N.D. Ill. Mar. 26, 2026), ECF No. 33; *Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624 (D. Mass. Feb. 27, 2026); *Varniab v. Edlow*, No. 25-cv-10602, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026). Each of these decisions finds that the indefinite, categorical hold on access to immigration benefits is reviewable by federal courts and unlawful under the APA.

This Court should join that chorus, grant Plaintiffs' motion for summary judgment, vacate the Challenged Policies, and enjoin USCIS from issuing or enforcing any substantially similar policy.

**ARGUMENT**

## I.   The Court Has Subject-Matter Jurisdiction.

### A.   Plaintiffs Have Standing.

Defendants' arguments that Plaintiffs lack standing fail at every turn. Defs.' Mem. at 29–40. Defendants misread *Alliance for Hippocratic Medicine* and dismiss the concrete, quantified harms documented in Plaintiffs' declarations. They assert that Plaintiffs' injuries are speculative even as their own declarant confirms that the Challenged Policies are fully operational. The undisputed record establishes standing under both organizational and associational standing theories. And, as long as at least one Plaintiff has standing, the case may proceed. *See Biden v. Nebraska*, 600 U.S. 477, 488 (2023).

**1.   *Alliance for Hippocratic Medicine* Supports Standing for Dorcas International, RDC, and American Gateways.**

Defendants' organizational standing argument rests on a fundamental overreading of *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Defendants treat *Alliance* as though it eliminated organizational standing whenever the plaintiff is not the direct object of a government policy. That is not what *Alliance* held. Instead, the Supreme Court held that medical associations lacked standing to challenge the FDA's regulation of mifepristone because the associations' alleged injuries consisted entirely of voluntary expenditures on advocacy campaigns opposing the FDA's policy. *Id.* at 394–96. Critically, the associations did not prescribe, dispense, or administer mifepristone. *Id.* at 393–96. They simply opposed the FDA's decision to make it more accessible. The Supreme Court held only

4

that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. The Court affirmed that standing is available where the challenged action "directly affected and interfered with" the organization's "core business activities." *Id.* at 395 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

In this case, Dorcas International Institute, Refugee Dream Center ("RDC"), and American Gateways are not advocacy organizations that simply chose to spend money advocating or lobbying against a government policy. They are immigrant-service organizations whose ongoing, day-to-day programmatic work—including representing clients before USCIS and filing benefits applications—has been directly disrupted by the Challenged Policies. Their injuries are not self-inflicted; they are the unavoidable consequences of Defendants' interference with their core business activities. USCIS has directly burdened Plaintiffs' existing dockets and impaired their ability to carry out core programs. That is exactly the kind of "perceptibl[e] impair[ment]" that *Havens* recognized and that *Alliance* preserved. *Havens*, 455 U.S. at 379; *Alliance*, 602 U.S. at 395–96.

The undisputed record reflects operational injuries to Plaintiffs. Dorcas International has had 414 pending benefits applications frozen under the Benefits Hold, 27 asylum applications frozen under the Global Asylum Hold, and approximately 365 previously approved cases placed at risk of revocation under the Comprehensive Re-Review. Sique Decl. ¶¶ 21, 23, 31–32. Dorcas International is thus

5

barred from fulfilling its mission to obtain immigration benefits for its clients and has consequently been prevented from taking on new clients or cases. *Id.* ¶ 27.

Similarly, for RDC, the Challenged Policies have made it more difficult for the organization to assist its clients in securing legal status, and required staff to spend more time responding to questions about pending cases and to devote more resources to counseling and supporting its clients in distress. Bah Decl. ¶¶ 47–50. This work consumes approximately 330 staff-hours per week in immigration counseling and related work that would not otherwise be necessary. *Id.* ¶ 51. RDC was forced to hire a paralegal to handle the increased volume of immigration-related work, diverting funds from direct community services. *Id.* ¶ 50. RDC also had hundreds of client matters frozen by the Challenged Policies, forcing it to divert staff away from other work, making it more difficult to take on new cases, and impairing the effectiveness of its other programming. *Id.* ¶¶ 18, 22, 29–32, 40–49.

The Challenged Policies have likewise directly interfered with the ordinary business operations of American Gateways. The adjudicative holds have indefinitely stalled its clients' asylum, adjustment, naturalization, and visa matters; staff must continue monitoring and updating paused cases; and these burdens have forced the organization to devote additional resources to existing cases while reducing capacity to accept new ones. Yang Decl. ¶¶ 15–18, 20, 25, 32–38, 41–43. The Comprehensive Re-Review will require American Gateways to reopen closed files and devote additional resources to clients whose matters had already been resolved. *Id.* ¶ 44.

6

Those are not "ordinary business burdens," or merely an "increased workload." Defs.' Mem. at 33. They are concrete organizational injuries. *See Am. Acad. of Pediatrics v. Kennedy*, 814 F. Supp. 3d 150, 161 (D. Mass. 2026) ("[T]here is no question that, but for the [challenged action, the organization] would not have expended the resources that it did."). For a legal-services organization, being forced to carry open cases indefinitely, maintain paused matters on the docket, absorb related staffing and counseling costs, reopen resolved files, and forgo other work as a result of those needs is not an abstract disagreement with policy. It is a concrete injury to the organization's core activities. That is why *Alliance* distinguished self-inflicted advocacy expenditures from the kind of direct operational interference recognized in *Havens* and which Plaintiffs suffer here. 602 U.S. at 394–96.

That is precisely the distinction that courts in this Circuit and elsewhere have drawn in the wake of *Alliance*. For example, in *Alianza Americas v. DeSantis*, the court found standing where an immigrant services organization was "forced to divert programmatic . . . resources from its usual activities" to respond to an "unforeseen and urgent demand for . . . assistance." 727 F. Supp. 3d 9, 49 (D. Mass. 2024); *see also Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (finding plaintiff had standing where one of its "core activities is providing legal representation and counseling to its members regarding employment- and education-related matters" and the government's action "impairs [its] ability to offer these counseling services"); *Immigrant Defs. L. Ctr. v. Noem*, No. 25-2581, 2025 WL 2017247, at *8 (9th Cir. July 18, 2025) (plaintiff had organizational standing where

7

the government's policies forced it to expend additional resources in order "to continue advancing its core business activities and longstanding mission of providing direct representation"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 67 (D.D.C. 2025) (organizational standing where immigration organizations "have each identified various ways [the challenged government actions] have interfered with their core business activity").

Defendants also argue that Plaintiffs' injuries depend on a "speculative chain." Defs.' Mem. at 32. This argument ignores the record. Defendants enacted the Challenged Policies, those policies halted adjudications, the halted adjudications froze Plaintiffs' pending cases, caused clients to lose work authorization, and forced Plaintiffs to divert resources. These are present injuries, not hypothetical future ones.

Defendants' reliance on *Laird v. Tatum*, 408 U.S. 1 (1972), and *United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984), is misplaced. Defs.' Mem. at 31. In both cases, the challenged action imposed no direct regulatory burden on the plaintiffs. Here, by contrast, the Challenged Policies do not merely make Plaintiffs uncomfortable; they halt the adjudication of applications that Plaintiffs have prepared, freeze the work authorization on which Plaintiffs' employment programs depend, and threaten to revoke the benefits that Plaintiffs previously helped clients obtain, forcing Plaintiffs to provide additional support services as a result. The Challenged Policies directly regulate the immigration adjudication process that is the core of Plaintiffs' activities.

### 2. SEIU, UAW, ACT, VAM, and PANA All Have Associational Standing.

Defendants argue that Plaintiffs asserting associational standing—Service Employees International Union (SEIU), United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), African Communities Together (ACT), Venezuelan Association of Massachusetts (VAM), and Partnership for Advancement of New Americans (PANA)—have "largely fail[ed] to identify any member with a concrete, non-speculative injury." Defs.' Mem. at 35. To the contrary, Plaintiffs' declarations identify numerous specific members with concrete injuries.

For example: SEIU identified a physician with a pending asylum application who was two weeks from a decision when the Global Asylum Hold took effect and who has since been forced to drop out of his residency because he cannot secure work authorization. Neuman Decl. ¶¶ 23–25. UAW identified a neuroscientist with pending applications for adjustment of status, travel documents, and employment authorization, none of which have been adjudicated. Sweeney Decl. ¶¶ 11–12. VAM identified a Cuban member who lost her job, took on debt, and was evicted because she cannot obtain employment authorization or adjust status. Velasquez Decl. ¶¶ 18–19. ACT identified a member from Côte d'Ivoire who cannot renew her DACA status and, as a result, cannot work or care for her son. Kassa Decl. ¶¶ 16–18. PANA identified an Afghan national who served with American forces and cannot obtain adjudication of his family's applications for permanent residence. Sahid Decl. ¶¶ 18–19. These are not abstract harms. They are people who have lost jobs, lost income, lost the ability to care for their families, and face the threat of removal.

9

Defendants respond that these timelines are "not unusual" and fall "within normal processing windows." Defs.' Mem. at 36. But the Challenged Policies do not merely delay adjudications within ordinary processing variability; they categorically halt all adjudications for an indefinite period. The December Policy Memorandum "directs" USCIS personnel to "[p]lace a hold on . . . pending benefit requests," ECF No. 16-3 (DEC-CAR-1), and states that the hold "will remain in effect until lifted by the USCIS Director," *id.* (DEC-CAR-2–3). This is not ordinary processing delay; it is an affirmative policy decision to refuse to adjudicate applications that are otherwise ready for decision. And it is that policy decision that Plaintiffs challenge.

Defendants also argue that Plaintiffs' members' injuries are "speculative" because "no individual's application has been denied only because of the Challenged Policies." Defs.' Mem. at 37. But standing does not require a final denial. The indefinite withholding of adjudication is itself a cognizable injury. *See, e.g., Bowser*, 2026 WL 555624, at *6 ((("Even short delays can have serious consequences.") (citing *Doe v. Trump*, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017))).

Defendants' citation to the *Hunt* requirement that the "nature of the suit" must not "necessarily require[] consideration of the individual circumstances of any aggrieved member" is inapposite. Defs.' Mem. at 34–35. This suit challenges systemic, policy-level agency actions and seeks declaratory and injunctive relief, precisely the type of suit for which associational standing exists. *See Auto. Workers v. Brock*, 477 U.S. 274, 287–88 (1986) (associational standing appropriate where suit seeks prospective relief that does not require individualized proof).

10

### 3.    Plaintiffs' Injuries Are Redressable.

Defendants' redressability argument, Defs.' Mem. at 38–40, fails because it demands the wrong kind of certainty. Plaintiffs do not need to show that a favorable ruling would guarantee approval of any particular immigration application. Redressability requires only that a favorable decision would likely redress "at least some" of the injuries Plaintiffs are presently suffering. *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 114 (2025). Vacating the Challenged Policies would directly redress Plaintiffs' organizational injuries by removing the impediments to their core activities: USCIS would resume adjudicating the applications Plaintiffs' attorneys have filed and Plaintiffs' programs could function effectively. It would also redress the associational Plaintiffs' members' injuries by allowing their pending applications to proceed. That is all Article III requires.

Defendants invoke *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), to argue that Plaintiffs' injuries cannot be effectively redressed unless relief is extended to non-parties, which Defendants say *CASA* would preclude. *See* Defs.' Mem. at 40. But *CASA* poses no obstacle to redressability because Plaintiffs seek vacatur of the Challenged Policies under the APA, and, as the government concedes, vacatur is a universal remedy that is by its nature not party specific. *See infra* at pp. 52–54. Nor is it true that *CASA* categorically prohibits universal injunctive relief: to the contrary, it allows it where, as here, the parties cannot otherwise be afforded complete relief. *See infra* at pp. 57–59. At bottom, the government seems to argue that Plaintiffs' claims are not redressable because even if the Court declares the Challenged Policies unlawful the agency will continue to enforce them. Needless to say, this Court's

11

jurisdiction is not defeated by the government's threats to circumvent any relief the Court might enter.

### B.    Plaintiffs' Claims Are Ripe.

The government is wrong to suggest that Plaintiffs' claims are not ripe. *See* Defs.' Mem. at 27–28. There are two prongs to the ripeness analysis: "fitness" and "hardship." *Jensen v. Rhode Island Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025) (quoting *Penobscot Nation v. Frey*, 3 F.4th 484, 509 (1st Cir. 2021)). "The fitness prong asks 'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all.'" *Penobscot Nation*, 3 F.4th at 509 (quoting *Town of Barnstable v. O'Connor*, 786 F.3d 130, 143 (1st Cir. 2015)). "The hardship prong is prudential and asks what harm would come to those seeking relief if [the court] withheld a decision." *Id.* Both prongs are satisfied here.

First, none of Plaintiffs' claims involve uncertain or contingent events. The Challenged Policies are all operational. The policies are already having profound consequences for Plaintiffs, their members, and their clients. *See supra* at pp. 4–10. The government never explains what further factual development is necessary to decide Plaintiffs' claims. The government simply complains that "Plaintiffs do not identify … any particular petition or application of any client that has been denied due to the Challenged Policies." Defs.' Mem. at 27. But the Challenged Policies are restricting access to immigration benefits and inflicting ongoing harm in other ways including, for example, by withholding adjudications altogether. And "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in

the form of inaction rather than in the form of an order denying relief." *Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970).

Indeed, the government badly mischaracterizes the record when it claims that Plaintiffs have yet to suffer any "concrete harm." Defs.' Mem. at 28. The Challenged Policies, individually and in concert, have resulted in chaos for the organizational, plaintiffs, drained their resources and impeded their core activities. *See supra* at pp. 4–8. Likewise, as a result of the Challenged Policies, Plaintiffs' members and clients have suffered real and immediate consequences including loss of employment, loss of legal status, as well as financial and emotional distress. *See supra* at pp. 4–10. The fact that Plaintiffs have already been harmed as a result of the Challenged Policies should put to rest any doubts about whether their claims are ripe. *See Rhode Island v. Trump*, 781 F. Supp. 3d 25, 39 (D.R.I. 2025) (explaining that where "the harms … are already unfolding or are certain to occur" then the "claims are sufficiently ripe"); *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 22 (1st Cir. 2020) (a claim is ripe if it "hinges on an assessment of events that have already occurred" (quoting *Town of Barnstable*, 786 F.3d at 143)).

Second, Plaintiffs' claims satisfy the hardship prong of the ripeness inquiry for largely the same reason. The harms to Plaintiffs are ongoing. The Challenged Policies are operative and presently restricting the ability of Plaintiffs' clients and members to secure and retain essential immigration benefits. With each passing day, Plaintiffs' clients and members remain barred from obtaining work permits, asylum, permanent residence, citizenship or other immigration benefits. Withholding a decision would

13

plainly impose hardship on Plaintiffs. With regard to the hardship prong, the government simply asserts—without explanation—that "there is no hardship to the Plaintiffs." Defs.' Mem. at 28. That conclusory assertion flies in the face of the record which substantiates significant, ongoing, and compounding harms.

### C.    Plaintiffs' Claims Are Justiciable.

This Court should reject the government's extraordinary suggestion that federal courts are precluded from reviewing "disputes arising from matters of foreign policy and national security . . . in the context of immigration." Defs.' Mem. at 15. The position has sweeping implications. It would allow the federal government to shut down any litigation challenging immigration policy merely by invoking foreign policy or national security and would effectively inoculate all immigration policy from judicial review. The law, however, provides no such immunity.

None of the authorities cited by the government hold that immigration-related disputes are nonjusticiable. Take, for example, the government's lead case, *Trump v. Hawaii*, 585 U.S. 667 (2018). There, the Court noted that judicial inquiries into "national security" are "highly constrained." *Id.* at 704. It also stated that a "deferential standard of review" is generally appropriate when reviewing constitutional claims in the immigration context. *Id.* at 703. But deference is not the same as immunity. The Court did not hold that it lacked jurisdiction over the dispute or that the claims were nonjusticiable. The Court heard the case and resolved it on the merits. If the Supreme Court had jurisdiction to reach the merits in *Hawaii*, then this Court certainly has jurisdiction here. In *Hawaii*, the Court was reviewing presidentially imposed entry restrictions pursuant to a statute that the Court found

14

"exudes deference" to the President, and it held that questions pertaining to "the admission and exclusion of foreign nationals" implicate foreign policy and therefore are better left to the political branches. *Id.* at 702. This case, however, does not challenge the Entry Ban or otherwise pertain to entry restrictions. Rather, this case involves routine questions pertaining to the administration of immigration laws for noncitizens already living in the country, and its purported implications for national security and foreign policy are attenuated at best.

The other cases cited by the government are all of a piece with *Hawaii. See* Defs.' Mem. at 15–16 nn.10–11. They generally advise courts to be cautious before interfering in matters of foreign policy or urge some level of deference in immigration cases. But none holds that challenges to immigration policy are categorically beyond the reach of federal courts. To the contrary, courts routinely consider such challenges to ensure the lawfulness of the executive's administration of immigration laws. *See, e.g., Biden v. Texas*, 597 U.S. 785 (2022) (reviewing challenge to rescission of Migrant Protection Protocols on the merits); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) (reviewing challenge to recission of Deferred Action for Childhood Arrivals program on the merits); *see also* Order, *Doe*, ECF No. 82 at 22 n.14 (rejecting government's justiciability argument).

### D.    The INA Does Not Bar Jurisdiction.

Contrary to the government's contention, Defs.' Mem. at 17–22, the INA does not bar jurisdiction over any of Plaintiffs' claims. At the outset, Defendants challenge the Court's jurisdiction to review the Challenged Policies only as applied to three specific immigration benefits: adjustment of status, employment authorization, and

15

naturalization. *Id.* But USCIS adjudicates dozens of different types of benefits. *See* Pls.' Mem. at 4. It is thus undisputed that the INA does not preclude review of the Challenged Policies as applied to any other type of benefit. In any event, the INA does not preclude review in any respect.

The government invokes 8 U.S.C. § 1252(a)(2)(B) to argue that the Court lacks jurisdiction over Plaintiffs' claims with regard to adjustment-of-status and employment-authorization adjudications. But Section 1252(a)(2)(B) bars jurisdiction to review only certain "judgment[s] regarding the granting of relief" under specific provisions of the INA and other "decision[s] or action[s]" that are "specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security." Section 1252(a)(2)(B) has no bearing here for two reasons: (1) Plaintiffs seek review of generally applicable policies, and the Supreme Court has repeatedly recognized that narrow jurisdictional bars governing individual adjudications do not swallow general collateral challenges to policies of broad applicability. *See McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479, 492 (1991). And (2) USCIS's enactment of the Challenged Policies is not an exercise of discretion. And as the Supreme Court has repeatedly recognized, targeted review bars governing individual adjudications do not swallow general collateral challenges to policies of broad applicability.

First, Section 1252(a)(2)(B) does not bar review of challenges to generally applicable policies. A court in the District of Massachusetts recently held that the very policies at issue in this litigation are subject to judicial review for precisely this reason. The court considered the government's invocation of Section 1252(a)(2)(B) at

16

length and concluded that the provision only bars review of "judgments made in connection with individual applications for discretionary relief," not "claims challenging agency policies of general applicability." Order, *Doe*, ECF No. 82 at 15–21. Invoking *Patel v. Garland*, 596 U.S. 328 (2022), the government argues for a more expansive reading of Section 1252(a)(2)(B). Defs.' Mem. at 9. But *Patel* critically did not involve a challenge to a policy of general applicability. As the *Doe* court explained: "Unlike the plaintiffs in *Patel*, the plaintiffs here have not challenged—and cannot challenge—factual findings or decisions made on their individual adjustment of status applications, because no final adjudication has occurred. The text of Section 1252(a)(2)(B)(i) does not support expanding *Patel* to cover claims challenging generally applicable policies and procedures." Order, *Doe*, ECF No. 82 at 15–21.

The holding is consistent with a wealth of precedent. For one, the Supreme Court has long distinguished between the "direct review of individual denials" of benefits applications and "general collateral challenges to practices and policies." *McNary*, 498 U.S. at 492; *see also Regents,* 591 U.S. at 19–20 (differentiating challenges to "actions," "decisions," or "proceedings" from a challenge to an agency "program"); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (differentiating challenges to "the denial of any individual application" from challenges to the "legality of a regulation").

Consistent with that distinction, lower courts have routinely held that Section 1252(a)(2)(B) precludes judicial review only over individual adjudications not generally applicable policies. *E.g.*, *Nakka v. USCIS*, 111 F.4th 995, 1002–03 (9th Cir.

17

2024) (holding that Section 1252(a)(2)(B) does not preclude review of "general collateral challenges to agency policies" which do not "refer[] to or rely[] on the denial of any individual application"); *Texas v. Biden*, 20 F.4th 928, 977 (5th Cir. 2021), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022) (explaining that while Section 1252(a)(2)(B) might bar review of a "discretionary decision to return one specific person to Mexico" is does not foreclose review of the "decision to terminate an *entire program*"); *Roe v. Mayorkas*, No. 22-cv-10808, 2023 WL 3466327, at *7–8 (D. Mass. May 12, 2023) (holding that while Section 1252(a)(2)(B) "bars review of individual parole determinations" it "does not bar review of the agency's own changes in policy" and collecting cases).

Here, Plaintiffs do not challenge any particular decision adjudicating an application for an immigration benefit. Rather, Plaintiffs allege that the Challenged Policies are unlawful under the APA. Because Plaintiffs ask the Court to review the legality of generally applicable policies, this Court has jurisdiction.

Second, Section 1252(a)(2)(B) is also inapplicable because USCIS does not have discretion to categorically withhold benefits or impose other blanket restrictions on access to immigration benefits. While USCIS may have discretion to grant or deny any particular benefit application, USCIS's legal authority to enact the Challenged Policies "is not a matter of discretion" and thus does not implicate Section 1252(a)(2)(B) at all. *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). Whether a policy is contrary to statute "is a purely legal question and as such is not within the jurisdictional bar of 8 U.S.C. § 1252(a)(2)(B)." *Succar v. Ashcroft*, 394 F.3d 8, 19 (1st

18

Cir. 2005); *see also Zadvydas*, 533 U.S. at 688 ("The [noncitizens] here, however, do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion."). That rule is dispositive here. Plaintiffs challenge whether USCIS has authority to enact the Challenged Policies, and that question is within the Court's jurisdiction.

Likewise USCIS does not have discretion to categorically withhold adjudications. Discretion over how to adjudicate a particular application does not equate to discretion to "withhold action" altogether. *Bowser*, 2026 WL 555624, at \*3 (quoting *Varniab*, 2026 WL 485490, at \*7). "[W]hile it is undisputed that the substance of the Attorney General's decision is discretionary, he does not have discretion to decide not to adjudicate at all." *Id.* (quoting *Tang v. Chertoff*, 493 F. Supp. 2d 148, 154 (D. Mass. June 26, 2007); *see also Roe*, 2023 WL 3466327, at \*8 (explaining "that DHS's discretionary power over the outcome of adjudications does not extend to whether it may suspend adjudications altogether" and collecting cases).

The government attempts to avoid this conclusion by repeatedly citing and mischaracterizing *Gupta v. Jaddou*, 118 F.4th 475 (1st Cir. 2024). Per the government, *Gupta* "recognized that challenges to the administration of" adjustment-of-status applications "including eligibility-related policies, vetting requirements, and the timing of adjudications," all "fall within § 1252(a)(2)(B)'s jurisdictional limitation." That is incorrect. *Gupta* is not a jurisdictional case at all. There, the First Circuit expressly declined to address the scope of Section 1252(a)(2)(B) and instead

19

resolved the case on the merits (assuming hypothetical jurisdiction). 118 F.4th at 482 ("Rather, we may assume there are no statutory bars to the exercise of jurisdiction and proceed directly to the merits, because, for the reasons we will next explain, we resolve the merits in the defendants' favor.").

And *Gupta*'s merits discussion provides no support for the proposition that USICS has unfettered discretion to withhold benefits adjudications. There, the First Circuit considered the legality of USCIS's "abeyance policy," under which the agency defers adjudicating an adjustment-of-status application when an immigrant visa is not available for the applicant due to statutory caps on the number of visas that can be issued. *Gupta*, 118 F.4th at 483. The court held the policy is authorized by the plain language of 8 U.S.C. § 1255(a), which provides that an applicant is not eligible for adjustment of status unless "an immigrant visa is immediately available." *See Gupta*, 118 F.4th at 483. In other words, *Gupta* holds that specific language in a particular provision of the INA allows USCIS to withhold adjustment-of-status adjudications when no visa is available. That holding does not imply that USCIS has discretion to categorically withhold any adjudication.

The government also points to several other "visa retrogression" cases which address the same question. *See* Defs.' Mem. at 19. While those cases—unlike *Gupta*—resolved the issue on jurisdictional grounds, their logic is similarly limited. For example, in *Kale v. Alfonso-Royals*, the Fourth Circuit held that under Section 1255(a), "USCIS is not only granted discretion with respect to the ultimate decision on whether to grant adjustment of status" but also to "prescribe regulations" for

20

"managing several competing statutory requirements." 139 F.4th 329, 335 (4th Cir. 2025). In light of that specific "statutory grant of discretion," the abeyance policy was held to be unreviewable under Section 1252(a)(2)(B). *Id.*

Here, the government has failed to point to an analogous statutory grant of discretion that would render the Challenged Policies beyond the Court's jurisdiction. For that reason, multiple courts have found the Challenged Policies reviewable notwithstanding the visa retrogression caselaw. *E.g.*, Order, *Doe*, ECF No. 82 at 21 (distinguishing the visa retrogression cases because the Challenged Policies "were not issued as regulations promulgated by USCIS" and "unlike in the retrogression policy cases, the adjudicative hold and significant negative factor policies are not an exercise of discretion compelled by visa limits set by Congress"); *Saghafi*, 2026 WL 1127468, at *9–10 (similar); *Varniab*, 2026 WL 485490, at *8 (similar); *Bowser*, 2026 WL 555624, at *4 (similar).

Finally, the government also argues that the INA impliedly precludes review of the Challenged Policies as applied to naturalization. *See* Defs.' Mem. at 20–22. On this front, the government asserts that specific statutory provisions governing naturalization create an "exclusive scheme governing judicial review in this context." *Id.* at 20 (citing 8 U.S.C. §§ 1421(c), 1447(b)). This argument fails for similar reasons. The statutory provisions the government cites both govern the process for seeking judicial review of a specific, individual application for naturalization. *See* 8 U.S.C. § 1421(c) (providing "[a] person whose application for naturalization … is denied" a right to judicial review); *id.* § 1447(b) (providing that "[i]f there is a failure to make a

21

determination" on a naturalization application within a specified timeframe, "the applicant" may seek judicial review). Neither provision purports to bar review of general policies pertaining to naturalization. Tellingly, none of the cases the government cites, *see* Defs.' Mem. at 21, refused to hear a programmatic challenge to a policy governing naturalization, *e.g.*, *Usoh v. USCIS*, No. 2:22-cv-01470, 2023 WL 4998550, at \*4 (D.S.C. Mar. 30, 2023) (reviewing denial of particular application for naturalization). There is thus no basis to conclude that the Court lacks jurisdiction to review generally applicable policies pertaining to naturalization. *See* Order, *Doe*, ECF No. 82 at 28 n.15 ("And the government offers no convincing argument for why this Court should read the INA's provisions on individual application delays or denials to preclude a challenge under Section 706(2) to a general USCIS policy that prevents final decisions on thousands of naturalization applications.").

## II.    The Challenged Policies Are Reviewable Under the APA.

The Challenged Policies are subject to judicial review under the APA because those policies constitute "final agency action," 5 U.S.C. § 704, and have not been "committed to agency discretion by law," *id.* § 704.

### A.    The Challenged Policies Are Final Agency Action

An agency action is final if it (1) marks the consummation of the agency's decision-making process and (2) is an action from which legal consequences flow. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). As Plaintiffs explained in their opening brief, the Challenged Policies are final agency actions because they reflect a final decision on the part of USCIS and have had profound and immediate legal consequences for noncitizens in the United States. *See* Pls.' Mem. at 29–31.

22

Consistent with that reasoning, numerous courts have already held that these policies, which are operational and presently imposing legal consequences, are final agency action. *E.g.*, Order, *Doe*, ECF No. 82 at 11–15.

The government's primary response is to insist that USCIS is engaged in an "ongoing and iterative" decision-making process. Defs.' Mem. at 25. Yet the government has failed to demonstrate that the agency's decision-making is still ongoing in any meaningful way. And even if the agency's decision-making is ongoing, that is not dispositive: a wealth of authority holds that interim measures are not rendered nonfinal simply because they are temporary and subject to change.

To begin, the government has not demonstrated that USCIS's decision-making is meaningfully ongoing. The government points to Presidential Proclamation No. 10988, which enacted the Entry Ban, as evidence of the agency's iterative decision-making. Defs.' Mem. at 25. Specifically, the government notes language in the proclamation requiring the Secretary of Homeland Security to regularly reassess the conditions in countries subject to the Entry Ban. *See* ECF No. 16-2 (NOV-CAR-7). But this language requires iterative reconsideration of the entry restrictions imposed by the President. It has nothing to do with the Challenged Policies and does not require those policies to be reviewed or reconsidered.

The government next points to the Declaration of Andrew Good as evidence that "USCIS has implemented additional guidance and operational changes" since the Challenged Policies were enacted. Defs.' Mem. at 25. The Good Declaration asserts that USCIS has established an internal process for lifting the adjudicative

23

holds on a case-by-case basis and also that USCIS is working to develop new procedures for vetting people from countries subject to the Entry Ban. ECF No. 21-1 at ¶¶ 8–10. While the declaration notes a few extremely limited categories of benefits requests for which the adjudicative holds have purportedly been lifted, it does not attest to any significant changes to the Challenged Policies. Nor does it provide a basis for the Court to believe that the policies will be modified in the near future.

In any event, even if the Challenged Policies are interim measures, that does mean that they are not final agency action. The mere fact that an action is subject to change does not render it nonfinal. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (possibility of revision "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"); *Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal."); *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, F.3d 999, 1006–07 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is subject to change in the future.").

And there is a wealth of authority—cited in Plaintiffs' opening brief and altogether ignored by the government—holding that interim measures, including temporary suspensions of agency activities, constitute final agency action. *E.g.*, *Renew Ne. v. U.S. Dep't of Interior*, No. 25-cv-13961-DJC, 2026 WL 1078282, at *17 (D. Mass. Apr. 21, 2026) (holding that "agency imposed suspension of certain activities" including "significant pauses and blanket moratoria" are final agency action and collecting cases); *New York v. Trump*, 811 F. Supp. 3d 215, 233 (D. Mass.

24

2025) (similar); *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D. Mass. 2025) (similar); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (similar). This includes suspensions of agency activities, when, as here, the agency is purportedly reviewing the underlying activity. *E.g.*, *Renew*, 2026 WL 1078282, at *17 (finding pause on approval of certain energy projects pending review was final agency action and collecting cases); *New York*, 811 F. Supp. 3d at 233 (similar).

### B. The Challenged Policies Are Not Committed to Agency Discretion.

The government also argues that the Challenged Policies are not reviewable under the APA because they have been "committed to agency discretion by law," 5 U.S.C. 701(a)(2). *See* Defs.' Mem. at 22–24. That argument is misguided because the exception to APA reviewability for decisions committed to agency discretion is construed narrowly to exempt only categories of agency action that have historically not been subject to judicial review or where there is no law to apply.

The Supreme Court has repeatedly recognized that the APA establishes a "basic presumption of judicial review." *Regents*, 591 U.S. at 16 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). "To 'honor the presumption of review,'" courts "'read the exception in § 701(a)(2) quite narrowly.'" *Id.* at 17 (quotation omitted). The exception applies only to "those rare 'administrative decision[s]'" that are "traditionally left to agency discretion," *id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)), or where the "statutes are drawn in such broad terms that … there is no law to apply," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *accord Cowels v. FBI*, 936 F.3d 62, 66 (1st Cir. 2019).

25

Here, it would strain credulity to suggest that the administration of immigration benefits is a domain "traditionally left to agency discretion," *Lincoln*, 508 U.S. at 191. Courts routinely review policies related to immigration benefits for compliance with the APA, the INA, and other federal laws. *E.g.*, *Regents*, 591 U.S. 1 (reviewing DACA rescission for compliance with APA).

It would be equally farfetched to argue that this is a domain in which there is "no law to apply." *Cowels*, 936 F.3d at 66. As Plaintiffs previously explained, immigration-benefits adjudications are governed by the INA, a detailed statutory regime. *E.g.*, Pls.' Mem. at 4–8. And the government's brief, replete with statutory citations, makes clear that there is ample relevant law. *E.g.* Def.' Mem. at 5–10 (discussing numerous provisions in the INA that govern immigration-benefits adjudications). In short, there is no basis for the Court to conclude that the administration of immigration benefits is not governed by any relevant legal standard. *See* Order, *Doe*, ECF No. 21–28 (rejecting the government's argument that the Challenged Policies are committed to agency discretion and discussing the legal standards that apply to benefits adjudications).

Indeed, even if there would be no law to apply in reviewing an individual decision to grant or deny an immigration benefit, generally applicable policies that dictate how USCIS exercises its discretion can be judged against a legal standard and are reviewable. *E.g.*, *Casa De Maryland v. U.S. Dep''t of Homeland Sec.*, 924 F.3d 684, 699–701 (4th Cir. 2019) (holding that "[m]ajor agency policy decisions" are reviewable unlike an "individual enforcement decision"); *OSG Bulk Ships, Inc. v.*

26

*United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (holding that a "general enforcement policy" is reviewable unlike a "single-shot non-enforcement decision" (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676–77 (D.C. Cir. 1994)).

## III.    The Challenged Policies Violate the APA.

### A.    USCIS Exceeded Its Statutory Authority When It Enacted the Challenged Policies.

The Challenged Policies exceed USCIS's statutory authority and are contrary to law. Neither the Immigration and Nationality Act nor any other statute gives the agency unbounded power to restrict noncitizens' ability to secure and obtain immigration benefits. *See* Pls.' Mem. at 32–37.

The government's brief offers only silence as to its statutory authority, failing to identify any statute that could plausibly support the sweeping authority USCIS claims. All three of the policy memoranda announcing the Challenged Policies discuss and appear to rely on one provision of the INA, codified at 8 U.S.C. § 1182(f), and all three memoranda also cite the Entry Ban, which itself was promulgated pursuant to Section 1182(f). *See* Pls.' Mem. at 32. But, Section 1182(f) gives the President the authority to impose entry restrictions—and nothing more. *Id.* at 32–35. The government apparently agrees. It expressly disclaims Section 1182(f) as the statutory authority for any of the Challenged Policies and candidly admits that the provision's "express language addresses only the President's authority and concerns only a single aspect of federal immigration law: restrictions on entry." Defs.' Mem. at 44.

Having disclaimed any reliance on Section 1182(f), the government never identifies any other source of statutory authority. Its brief does not identify any

27

specific statute that authorizes USCIS to indefinitely withhold adjudications. Nor does it identify any statute that authorizes sweeping reconsideration and rescission of previously granted benefits or any statute that authorizes it to mandate country-of-origin discrimination in the adjudication of discretionary benefits.

The closest the government comes to identifying a statute that might authorize the Challenged Policies is a passing reference to the agency's authority to deny some benefits to people who are inadmissible. *See* Defs.' Mem. at 41 (citing 8 U.S.C. §§ 1182(a)(3), 1255(a)). But USCIS's authority to deny adjustment of status on certain security-related grounds does not imply that the agency has authority to indefinitely and categorically restrict access to immigration benefits merely by invoking national security. And it especially does not imply that the agency has the authority to restrict access to benefits for people who pose no security threat and for whom there is no reason to suspect are inadmissible.

The government also suggests that USCIS's authority to enact the Challenged Policies might emanate from its "discretion" to administer the INA. Defs.' Mem. at 44–45. That argument is a nonstarter. The INA does not give USCIS unbounded discretion to dictate immigration policy by administrative fiat. *See* Pls.' Mem. at 36–37. To the contrary, the INA is a highly prescriptive statute that narrowly circumscribes the Executive Branch's responsibilities. The INA obligates USCIS to conduct certain adjudications, *e.g.*, 8 U.S.C. §§ 1158(d)(5)(A), 1446(d), establishes timeframes for completing some adjudications, *e.g., id.* §§ 1158(d)(5)(A)(iii), 1447(b), 1571(b), establishes the criteria to be used in conducting adjudications, *e.g., id.* §§

28

158(b), 1427(a), and specifies the specific conditions under which adjudications may be withheld or reconsidered, *e.g.*, §§ 1158(c)(2), 1256(a), 1451. The Challenged Policies disregard these statutory requirements and instead arrogate to USCIS the authority to withhold, deny, or rescind immigration benefits for any reason it chooses.

The government essentially ignores this argument other than to characterize one provision in the INA, setting a policy that adjudications be complete within 180 days, as "precatory." Defs.' Mem. at 45 (citing 8 U.S.C. § 1571(b)). But even if the 180-day adjudication timeline is not judicially enforceable, it is nonetheless a statutory boundary probative of congressional intent. And, in any event, by quibbling over a single provision, the government misses the forest for the trees. The INA specifies and circumscribes the Executive Branch's authorities and responsibilities in exacting detail. And had Congress wanted to give USCIS the sweeping authority to withhold, deny, and reconsider adjudications for any reason, it surely would have said so. *See Gallo Motor Ctr. Corp. v. Mazda Motor of Am., Inc.*, 172 F. Supp. 2d 292, 294 (D. Mass. 2001) (explaining that under the *expressio unius* interpretive canon, "to include one thing implies the exclusion of the alternative").

In sum, USCIS "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Because USCIS fails to point to any clear congressional authorization for the Challenged Policies those policies violate the APA. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 472 (D.R.I. 2025) ("It is well-established that an agency 'literally has

29

no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute.'" (quoting *FEC v. Cruz*, 596 U.S. 289, 301 (2022))).

## B.  The Challenged Policies Are Arbitrary and Capricious.

The Challenged Policies are arbitrary and capricious. *See* Pls.' Mem. at 37–51. Nothing in the government's brief disturbs that conclusion. The government relies extensively on the Good Declaration to try to cure the deficiencies in the administrative record, but that declaration is a classic post-hoc rationalization that cannot be considered. *See Regents*, 591 U.S. at 20 ("An agency must defend its actions based on the reasons it gave when it acted."); *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026). And, in any event, the declaration provides almost no new information as to why the policies were enacted, what evidence the agency considered, or when they will be lifted. The Challenged Polices thus remain arbitrary and capricious for the six independent reasons set forth in Plaintiffs' opening brief.

### 1.  USCIS failed to explain its reasoning.

First, USCIS failed to comply with the basic requirement of administrative law that an agency articulate the reasons underlying a policy decision. *E.g.*, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51–52 (1983). Beyond vague, cursory invocations of national security and conclusory assertions about the need for additional vetting, the policy memoranda announcing the Challenged Policies do not explain why the agency imposed new restrictions on access to immigration benefits. *See* Pls.' Mem. at 37–39. The memoranda fail to explain what deficiencies the agency has identified with regard to the screening and vetting of noncitizens living in the country, how those deficiencies implicate national

30

security, or what new screening or vetting measures it intends to implement or otherwise offer any explanation at all for how the Challenged Policies further national-security objectives. The government offers various excuses for USCIS's failure to explain its reasoning, but none withstands scrutiny.

For one, the government notes that the policy memoranda each "expressly cite[s] the factfinding" contained in the Entry Ban. Defs.' Mem. at 45–46. But, as Plaintiffs explained in their opening brief, the Entry Ban merely explains the President's reasoning for imposing entry restrictions on certain countries; it does not offer any reasoning for restricting access to immigration benefits for people who are already in the country. *See* Pls.' Mem. at 46–49. The Entry Ban points to factors such as terrorist activity and high visa-overstay rates as reasons for imposing entry restrictions but never explains why those facts would warrant withholding immigration benefits from people who are already here. For example, the Entry Ban imposes entry restrictions on people from Afghanistan on the basis that the Taliban controls the country. ECF No. 16-4 (JAN-CAR-58). But the Entry Ban never explains why Taliban control of Afghanistan warrants withholding asylum, a green card, a work permit, or other immigration benefits from Afghan nationals who have already been vetted, are already here, many of whom have been in the United States for years, and who came here specifically to escape the Taliban. Indeed, the Entry Ban does not even mention USCIS or discuss immigration benefits adjudications at all. In short, if the President's reasoning for imposing entry restrictions also somehow supports USCIS's decision to restrict access to immigration benefits, the agency was required

31

to explain that connection. But it failed to do so. And that failure is fatal under the APA.

Next, the government attempts to excuse USCIS's failure to explain its reasoning by citing language in the Entry Ban in which the President notes that disclosure of "additional details" about why certain countries are subject to entry restrictions would risk "serious damage to national security" by revealing "classified" information. Defs.' Mem. at 46. This misunderstands the problem. Plaintiffs do not here contest the factual findings in the Entry Ban and do not argue that USCIS is obligated to provide additional evidence (classified or otherwise) to support those findings. What Plaintiffs contend—and the APA demands—is that USCIS must explain why the factual findings in the Entry Ban somehow support imposing restrictions on access to immigration benefits for people who are already in the country. To continue the example from above, the Entry Ban imposes entry restrictions on Afghanistan in light of terrorist activity in the country. ECF No. 16-4 (JAN-CAR-58). The President might have additional details about terrorist activity in Afghanistan that are classified or cannot be disclosed without jeopardizing national security. That is beside the point. The relevant question here is whether there is some reason why terrorist activity in Afghanistan warrants imposing indefinite, categorical restrictions on the ability of Afghan nationals who are already here from accessing important immigration benefits. The Entry Ban is totally silent on that question, as are all three of the memoranda announcing the Challenged Policies.

Finally, the government argues that while "conclusory" reasoning may be impermissible in the context of "domestic policy," it is satisfactory in the context of immigration policy where national security is implicated. Defs.' Mem. at 46. That is simply wrong. Courts routinely apply the arbitrary-and-capricious standard in the context of immigration policy in the same manner as it applies in other contexts. *E.g.*, *Regents*, 591 U.S. at 24–33 (holding that DACA rescission was arbitrary-and-capricious because the agency failed to explain its reasoning). Immigration policies are not exempt from the APA's requirement of reasoned decision-making. And the government cites no authority to support that unfounded suggestion.

### 2.    USCIS failed to consider serious harms.

Second, USCIS failed to comply with the APA's requirement that it consider both the benefits and the costs of its decision. *See Michigan v. EPA*, 576 U.S. 743, 753 (2015). As Plaintiffs explained in their opening brief, none of the memoranda announcing the Challenged Policies consider the significant harms that the policies are inflicting on immigrants, their employers, families, and communities. Pls.' Mem. at 39–41. The Challenged Policies have predictably upended the lives of noncitizens across the country by preventing them from securing citizenship, lawful permanent residence, asylum, employment authorization, and other important immigration benefits. *Id.* at 19–28 (discussing the wide-ranging harms inflicted on immigrant communities). But USCIS utterly failed to account for these harms.

The government's only response is to cite a cursory reference in one of the policy memoranda noting potential delays in adjudications. Defs.' Mem. at 46. But Plaintiffs have already explained why this passing acknowledgment of adjudicative

33

delays falls far short of the reasoned explanation the APA demands. *See* Pls.' Mem. at 41. For one, the Challenged Policies do far more than merely "delay" adjudications: the Comprehensive Re-Review exposes noncitizens to the risk of losing benefits that have already been granted, and the Country-Specific Factors Policy erects a permanent obstacle to noncitizens from Entry Ban countries being granted any sort of discretionary benefit. And, in any event, USCIS never explains how long the delays will last, what the consequences of those delays will be for noncitizens and their communities, or why the costs associated with the delays are outweighed by the supposed benefits of the policies. The bare assertion that "delays" are "necessary and appropriate," ECF No. 16-4 (JAN-CAR-48), is not the sort of reasoning that the APA requires.

### 3. USCIS failed to consider important reliance interests.

Third, USCIS failed to comply with the APA's basic requirement that an agency consider the reliance interests of affected communities. *See Regents*, 591 U.S. at 30; *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026). As Plaintiffs previously explained, many noncitizens living in the United Sates came here and made important life and career decisions with the reasonable expectation that immigration laws would be administered fairly and in a manner consistent with past practice. Pls.' Mem. at 42. Some noncitizens have lived in this country for years and built and structured their lives around the understanding that they would be eligible for immigration benefits including the ability to apply for citizenship, permanent residence, asylum, work permits, and other benefits. *Id.* USCIS was required to acknowledge and consider these reliance interests. *See Doe v. Noem*, 784 F. Supp. 3d

34

437, 465 (D. Mass. 2025); *see also* Pls.' Mem. at 42–43 (citing cases). But USCIS made no attempt to do so here.

The government's only response is to argue that any reliance interests are diminished in light of "USCIS' longstanding regulations that already permit prolonged investigations and a long string of case law that strips the courts of powers to set deadlines for action[s]." Defs.' Mem. at 47. That argument is wrong many times over. For one, the government does not cite any of the referenced "regulations" and "caselaw" or explain how the "regulations" and "caselaw" somehow diminish noncitizens' reliance interests. The Court should not credit the government's unsubstantiated and undeveloped assertion.

Moreover, to the extent that the government means to suggest that noncitizens could not reasonably rely on the government to adjudicate benefits request in light of existing law allowing it to withhold some adjudications, that too is unpersuasive. USCIS does not and has never had  unbounded discretion to withhold adjudications, and courts routinely compel USCIS to conduct adjudications consistent with its legal obligations. *E.g.*, *Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624 (D. Mass. Feb. 27, 2026); *Varniab v. Edlow*, No. 25-cv-10602, 2026 WL 485490 (N.D. Cal. Feb. 20, 2026). And even if noncitizens should have anticipated that adjudications could be lawfully withheld in certain circumstances, they had no way to anticipate the breadth and severity of the Challenged Policies, which go far beyond merely withholding adjudications and are entirely unauthorized by statute.

Finally, this reasoning is nowhere to be found in the relevant policy memoranda. APA review "is limited to the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20 (internal citations and quotation marks omitted). It is blackletter law that an agency "must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation." *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 37 F.4th 746, 761 (1st Cir. 2022); *see Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026) (similar). USCIS made no attempt to consider the relevant reliance interests when it enacted the Challenged Policies, and that alone renders those policies arbitrary and capricious under the APA.

### 4.    USCIS failed to consider alternative policy options.

Fourth, USCIS also failed to comply with the APA's basic requirement that an agency consider reasonable alternative policy options. *See Regents,* 591 U.S. at 30; *Massachusetts v. HHS*, 513 F. Supp. 3d 215, 225 (D. Mass. 2021). As Plaintiffs previously explained, USCIS failed to consider any alternative policies, including three obvious options that might have achieved the agency's policy objectives while exacting fewer cost: (1) USCIS could have simply implemented new vetting and screening measures; (2) USCIS could use existing adjudicatory processes and vetting procedures to safeguard any national security interests; or (3) USCIS could have relied on the Entry Ban itself to achieve its purported national-security objectives. *See* Pls.' Mem. at 43–46.

The government never disputes that the APA imposes an obligation to consider reasonable alternative policies. Nor does it argue that USCIS did so here. Instead,

36

the government dismisses this argument as "more about form than substance." Defs.' Memo. at 47. That could not be further from the truth.

In enacting the Challenged Policies, USCIS implemented severe restrictions on the ability of noncitizens to secure and retain immigration benefits and did so purportedly to ensure adequate vetting of noncitizens living in the country. But USCIS could have adopted a variety of substantively different policies in furtherance of the same policy goal. USCIS could have, for example, implemented any variety of new screening and vetting measures to ensure noncitizens who pose security risks are not afforded immigration benefits. Pls.' Mem. at 44–45. But USCIS never considered that option at all. Nor did it consider the viability of any other alternative policy. This is not a quibble over form. Implementing new screening and vetting measures is just one of many options available to USCIS that might have allowed it to safeguard national security interests without instituting blanket restrictions on access to immigration benefits. Multiple courts have already held that USCIS's failure to consider its other options is fatal to the Challenged Policies under the APA. *E.g.*, *Bowser*, 2026 WL 555624, at *7; *Varniab*, 2026 WL 485490, at *18–19.

The government also briefly hints at two reasons why it believes the other options available to USCIS might not have been preferable. First, it asserts that those other options might have caused "more delay" than the Challenged Policies. Defs.' Mem. at 47. Second, it notes that those other options might not have worked in light of USCIS's "well-substantiated suspicion about the quality of information it receives" from Entry Ban countries. *Id.* at 47–48 & n.28. But the government never develops

37

either argument. And the burden was on the agency to explain its reasoning at the time it enacted the Challenged Policies. The government cannot rescue the Challenged Policies by providing post hoc rationalizations in litigation. *See Am. Hosp. Ass'n*, 164 F.4th at 34; *Fin. Oversight & Mgmt. Bd.*, 37 F.4th at 761.

### 5.    USCIS's stated reasoning is facially implausible.

Fifth, the Challenged Policies also fail to withstand arbitrary-and-capricious review because the agency's stated reasoning for enacting the policies is "so implausible that it could not be ascribed to a difference in view." *State Farm*, 463 U.S. at 43. As Plaintiffs previously explained, the stated goal of the Challenged Policies is to protect national security by facilitating enhanced screening and vetting of noncitizens to ensure that people from dangerous countries are not allowed to enter the United States. Pls.' Mem. at 47. But the Challenged Policies largely restrict the rights of noncitizens who are already in the United States and therefore cannot further a goal of preventing entry. Given the gross mismatch between USCIS's stated objective and what the policies actually do, those policies cannot survive scrutiny under the APA. *See Bowser*, 2026 WL 555624, at *8 (holding that national-security concerns do not justify withholding immigration benefits from people who "are already in the country"); *Varniab*, 2026 WL 485490, at *19 (similar); *Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1260 (W.D. Wash. 2008) (similar).

The government largely ignores this argument. The only response it offers is a cursory footnote questioning whether the stated purpose of the Challenged Policies is to prevent dangerous people from entering the country. Defs.' Mem. at 45 n.26. But, as Plaintiffs explained, all three policy memoranda extensively reference the Entry

38

Ban and suggest that the Challenged Policies were enacted in furtherance of the same policy considerations that underlie the Entry Ban, including a desire to prevent dangerous people from entering the country. Pls.' Mem. at 47. And the government never clarifies what it now believes the stated purpose of the Challenged Policies is or explains how the policies plausibly serve any other objective. The government's inability to articulate the Challenged Policies' objective simply underscores the total absence of any reasoned explanation for the policies.

In any event, beyond quibbling with Plaintiffs' characterization of the policies' stated purpose, the government never rebuts Plaintiffs' larger point: that USCIS never explained how restricting access to immigration benefits for people already in the country serves any national-security purpose. Having failed to develop any responsive argument, the government has waived any new argument it might make in its reply. *E.g.*, *Chad B. v. Kijakazi*, No. 22-cv-228-JJM, 2023 WL 6867120, at *2 (D.R.I. Oct. 18, 2023) (arguments not developed in opening brief are waived); *Doe v. Brown Univ.*, No. 15-cv-144 S, 2017 WL 1373270, at *2 (D.R.I. Apr. 13, 2017) (same).

### 6.  USCIS's stated reasoning is patently pretextual.

Finally, USCIS's stated national-security motivations for enacting the Challenged Policies are plainly pretextual. *See* Pls.' Mem. at 49–51. As Plaintiffs explained in their opening brief, a court may look past an agency's stated reasoning to assess its true motivations, and agency action cannot survive arbitrary-and-capricious review where its stated reasoning is shown to be pretextual. *See Dep't of Com. v. New York,* 588 U.S. 752, 785 (2019); *see also* Pls.' Mem. at 51 (citing case).

Here, the public record is replete with evidence that the Challenged Policies were not enacted in furtherance of genuine national-security concerns but out of animus toward immigrants from the targeted countries. For instance, on November 27, 2025, the very day USCIS began announcing the Challenged Policies, President Trump asserted on social media that most immigrants "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels," claimed that immigrants were responsible for "social dysfunction," and blamed them for "[f]ailed schools, high crime, urban decay, overcrowded hospitals, housing shortages, and large deficits" and more. @realDonaldTrump, Truth Social (Nov. 27, 2025, 11:27 PM), https://perma.cc/8JW9-D7B5.

Just a few days later, President Trump reposted then-Secretary of Homeland Security Kristi Noem's post describing immigrants as "killers, leeches, and entitlement junkies," calling them "foreign invaders" who came here "to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS," and concluding, "WE DON'T WANT THEM. NOT ONE." @realDonaldTrump, Truth Social (Dec. 1, 2025, 9:36 PM), https://perma.cc/P9V8-WZG7. These are just a few of President Trump's contemporaneous statements evidencing a raw animus toward immigrants. *See* Pls.' Memo. at 10–11, 49–50.

The government does not rebut the operative facts nor dispute that it is appropriate for the Court to look past USCIS's contrived reasoning to assess the true motivations underlying the Challenged Policies. Nor does it make any attempt to rebut the evidence showing that the true motivation for the Challenged Policies was

40

not a genuine concern about national security but rather an unadulterated disdain for immigrants. The government offers only a two-sentence response that merely cross-references the background section of the government's brief as well as the discussion of Plaintiffs' Fifth Amendment claims. Defs.' Mem. at 48. But neither of the cross-referenced sections provides any rebuttal. The cited background discussion simply recites USCIS's stated reasoning for enacting the Challenged Policies without attempting to refute Plaintiffs' contention that the agency's stated reasoning is pretextual. *See* Defs.' Mem. at 10–14. Likewise, the cited discussion of Plaintiffs' Fifth Amendment claims merely questions whether Plaintiffs have adequately alleged an equal protection claim but again does not respond, either factually or legally, to the proposition that USCIS's stated reasoning for enacting the Challenged Policies is pretextual. Having failed to develop any response to Plaintiffs' pretext argument, the government has waived any argument it might make in reply. *E.g.*, *Chad B.*, 2023 WL 6867120, at *2; *Doe.*, 2017 WL 1373270, at *2.

### C.    USCIS Failed to Follow Notice-and-Comment Procedures.

USCIS also failed to follow notice-and-comment procedures. The notice-and-comment requirement applies to any "legislative rule," which is a rule that "'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)). As Plaintiffs established in their opening brief, the Challenged Policies are legislative rules that required notice-and-comment procedures because those policies contravene regulations with the force of law and supplant the existing

41

regulatory regime with categorical rules that bind USCIS personnel going forward. *See* Pls.' Mem. at 51–55. The government does not directly rebut any of that analysis. Instead, it invokes the narrow exceptions to the notice-and-comment requirement for interpretive rules and general statements of policy. *See* 5 U.S.C. § 553(b). Neither exception is applicable here.

### 1.    The Challenged Policies are not interpretive rules.

USCIS cannot evade the notice-and-comment requirement by characterizing the Challenged Policies as interpretive rules. Interpretive rules "'advise the public of the agency's construction of the statutes and the rules which it administers.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 92 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). In *N.H. Hosp. Ass'n v. Azar*, the First Circuit considered five factors when assessing whether a rule is legislative or interpretive. 887 F.3d 62, 71 (1st Cir. 2018). All five *Azar* factors clearly point in the same direction: the Challenged Policies are legislative rules.

The first *Azar* factor is "the words of the statute." *Azar*, 887 F.3d at 71. Where "Congress has specifically declined to create a standard," and instead leaves the "policy choice to an agency," generally "the agency's making of that choice requires notice and comment." *Id.* As discussed above, the Challenged Policies are not authorized by any statute, nor do they purport to interpret or administer any statute. *See supra* at pp. 27–30. At best, the Challenged Policies are an exercise of implied agency discretion. But a "discretionary policy judgment" not compelled by any "statutory command" is precisely when notice-and-comment procedures are most warranted. *Id.* Thus, the first *Azar* factor clearly indicates that the Challenged

42

Policies are not interpretive rules, and, to the extent that the government is correct that the first factor "is dispositive," Defs.' Mem. at 51, the Court can end its inquiry here. Nonetheless, the remaining factors counsel the same result. The second *Azar* factor is "the explanation or lack thereof given by the agency in adopting a policy." 887 F.3d at 71. If the Challenged Policies were interpretive rules, "then one would expect that the agency's justification … would rely on an interpretive methodology." *Id.* at 72. Yet there is nothing resembling interpretation of any statute or regulation in any of the memoranda announcing the Challenged Policies. To the extent that USCIS offers any reasoning, it merely asserts a naked policy preference for restricting access to immigration benefits untethered from statutory or regulatory text. In short, the agency is announcing "a new policy out of whole cloth, rather than engaging in an interpretive exercise." *Id.* at 72.

The third *Azar* factor is "whether the rule is inconsistent with another rule having the force of law." *Id.* at 73 (internal citations and quotation marks omitted). That is the case here: USCIS has previously promulgated binding regulations pursuant to notice and comment that govern the adjudication of benefits requests. *See generally* 8 C.F.R. § 103.2. As the government emphasizes, *see* Defs.' Mem. at 8 n.6, one such regulation speaks specifically to when the agency can withhold adjudications, *see* 8 C.F.R. § 103.2(b)(18). Other regulations speak to when USCIS can review a prior benefit determination. *See id.* § 103.5(a)(5). The Challenged Policies institute adjudicative holds and require re-review of past determinations

43

contrary to these binding regulations. The fact that the Challenged Policies supplant binding regulations strongly indicates that the policies are legislative rules.

Finally, the fourth and fifth *Azar* factors confirm that the Challenged Policies are legislative rules. Those factors consider where the policies "fit within the statutory and regulatory scheme" and other "pragmatic considerations." 887 F.3d at 73. In essence, the final *Azar* factors require the Court to ask "how 'big of a deal' the regulation is." *New York v. DOJ.*, 804 F. Supp. 3d 294, 317 (D.R.I. 2025). Here, USCIS is asserting the broad authority to instate adjudicative holds denying millions of noncitizens benefits necessary for them to work, to remain in the country, and to have certainty about their futures. The agency is also asserting the authority to subject untold numbers of noncitizens to re-review and reconsideration of past benefits decisions, exposing them to loss of legal status, and erecting a permanent barrier in the form of the Country-Specific Factors Policy to many noncitizens ever securing important discretionary benefits. The Challenged Policies are clearly a "big deal," and their "considerable import" confirms that they are legislative rules that required notice-and-comment. *Id.*

### 2. The Challenged Policies are not general statements of policy.

The government's invocation of the notice-and-comment exception for general statements of policy is equally meritless. That exception applies to "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted). The "critical issue" is "whether the statement has genuinely left

44

the agency decisionmakers free to exercise discretion." *Doe v. Noem*, No. 1:25-cv-10495-IT, 2026 WL 184883, at *15 (D. Mass. Jan. 25, 2026) (internal citations and quotation marks omitted).

The government's assertion that the Challenged Policies "preserve officer discretion" is plainly contradicted by the text of the policies themselves. Defs.' Mem. at 52. The Global Asylum Hold and the Benefits Hold expressly "direct[]" USCIS personnel to halt adjudications, ECF No. 16-4 (JAN-CAR-45), and make clear that USCIS personnel do not retain any discretion to make case-by-case decisions, *e.g.*, *id.* (JAN-CAR-47, 48 & n.10) ("Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director."). This sort of "mandatory language" is the hallmark of a legislative rule, *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011), because it creates "a binding norm" that cabins agency discretion going forward, *Doe*, 2026 WL 184883, at *15 (citation omitted). The Global Asylum Hold and the Benefits Hold "effectively replace[] agency discretion with a new 'binding rule of substantive law'" requiring USCIS personnel to halt adjudications. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir. 1987) (citation omitted). Because the adjudicative holds constrain the discretion of agency personnel, they fall far beyond the reach of the general policy statement exception.

The same is true for the Comprehensive Re-Review and the Country-Specific Factors Policy. Both policies, like the adjudicative holds, tie the hands of USCIS personnel. The Comprehensive Re-Review mandates that discretionary benefits

45

granted to non-citizens from Entry Ban countries be reconsidered pursuant to a prescribed process, and it leaves no room for USCIS personnel to exercise discretion when determining whether a re-review is necessary. Likewise, the Country-Specific Factors Policy requires USCIS personnel to consider the fact that a person comes from a country subject to the Entry Ban as a significant negative factor when deciding whether to grant a discretionary benefit. Whereas agency personnel previously had discretion in deciding whether to grant a benefit, the Country-Specific Factors Policy cabins that discretion by imposing a new categorial rule, which is the telltale sign that notice-and-comment procedures were required. *E.g.*, *Mada-Luna*, 813 F.2d at 1014; *Doe* 2026 WL 184883, at *15.

For these reasons, the Challenged Policies all tie the hands of agency personnel and therefore should have been subject to notice and comment. It makes no difference that the Challenged Policies include language suggesting that agency personnel retain some discretion. *E.g.*, ECF No. 16-4 (JAN-CAR-49) ("This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions."). Neither "boilerplate" language nor strategic "disclaimer[s]" allow an agency to escape its notice-and-comment obligations. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000). What matters is the thrust of the agency action overall. If a rule is directive in nature, then notice-and-comment rulemaking is required notwithstanding empty gestures towards discretion. *Id.* (holding that notice-and-comment was required because "the entire [rule], from beginning to end—

46

except the last paragraph—reads like a ukase. It commands, it requires, it orders, it dictates"); *see also Presidents' All. on Higher Educ. and Immigr. v. Noem*, No. 25-cv-11109, 2026 WL 788185, at *20 (D. Mass. Mar. 20, 2026) (holding that an agency's "disclaimer about the effects of its" action is "not dispositive" of whether notice-and-comment rulemaking is required). The Challenged Policies all dictate exactly how USCIS personnel are required to exercise their discretion. Notice and comment were therefore required.

As a final matter, contrary to the government's assertion, Plaintiffs do not bear any burden of showing that notice-and-comment rulemaking would have changed the government's approach. Defs.' Mem. at 52. The one and only case the government cites for this assertion acknowledges that courts generally "have not been hospitable to claims of harmless error in cases in which the government violated § 553 of the APA by failing to provide notice." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). The only reason the error was harmless in that case was because the challenged rule was compelled by statute, and "all the procedure in the world" would not have changed the outcome. *Id.* (quoting *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472 (D.C. Cir. 2014)). That is not the case here. Had USCIS provided notice and an opportunity for comment, it would have received input from affected communities and might have ultimately adopted a different policy. And had it refused to consider that input—as the government now suggests it would have done—that failure would have been arbitrary and capricious.

**IV.   The Court Should Deny Defendants' Motion to Dismiss Plaintiffs' Constitutional Claims.**

Plaintiffs also plead claims under the Fifth Amendment. *See* Compl. ¶¶ 206–224, ECF No. 1. Contrary to the government's suggestion, *see* Defs.' Mem. at 3 n.1, Plaintiffs did not waive those claims by electing not to move for summary judgment on them. There is no requirement that a party move for summary judgment on a claim to preserve it. Summary judgment is appropriate only where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Here, Plaintiffs determined that summary judgment on their constitutional claims would likely be precluded by the presence of fact issues. For example, Plaintiffs' equal protection claim requires a showing of discriminatory intent, a factual showing not easily amenable to judgment as a matter of law. The government cites *Rodriguez v. Mun. of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011), but that case simply recites the ordinary rules governing waiver on appeal. It does not support the government's contention that Plaintiffs have waived any claims on which they did not seek summary judgment.

The government's argument for dismissing the constitutional claims also fails. *See* Defs.' Mem. at 53–56. The allegations underlying those claims readily withstand the motion-to-dismiss standard.

**A.   Plaintiffs Have Adequately Stated a Fifth Amendment Due Process Claim.**

The Court should not dismiss Plaintiffs' Fifth Amendment Due Process claims, which challenge the Comprehensive Re-Review Policy, *see* Compl. ¶¶ 206–218, 222–224. The government argues that: (1) Plaintiffs have not alleged "deprivation of a

48

[protected] property interest," Defs.' Mem. at 53, (2) Plaintiffs have not alleged "facts showing the process to which Plaintiffs were entitled but were actually denied," *id.* at 55, and (3) the claim is not ripe, *id.* at 54–55. Each argument misses the mark.

First, Plaintiffs allege that "[p]eople who have been previously granted an immigration benefit by USCIS have a property interest in that benefit." Compl. ¶ 215. The government cites cases holding that a person does not have a cognizable property interest in a discretionary benefit before the benefit is conferred, but even accepting that premise, once an important benefit has been conferred, recipients do "have a protected property interest that requires a fair process before the government may take that benefit away." *Inland Empire - Immigrant Youth Collective v. Nielsen*, No. 17-cv-2048, 2018 WL 4998230, at *19 (C.D. Cal. Apr. 19, 2018) (collecting cases); *see also, e.g.*, *Singh v. Bardini*, No. 09-cv-3382, 2010 WL 308807, at *7 (N.D. Cal. Jan. 19, 2010) ("Even if there is no constitutional right to be granted asylum, that does not necessarily mean that, once granted, asylum status can be taken away without any due process protections."). Indeed, courts have even recognized cognizable property interests in certain nondiscretionary immigration benefits even before they are conferred. *See Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1014 (W.D. Wash. 2023) (regulatory language conferred TPS holder with property interest in a work permit).

Second, Plaintiffs allege that the "Comprehensive Re-Review requires USCIS personnel to reconsider past benefits determinations without ensuring that the benefits recipients will be provided notice and an opportunity to respond," Compl. ¶ 217, and that the policy does not provide for benefits recipients to receive any

49

"explanation of the reasons why the agency is considering revoking previously granted immigration benefits," *id.* ¶ 216. In short, the Complaint explains that the Comprehensive Re-Review Policy does not guarantee benefits recipients any process prior to revocation of legal status and other benefits, let alone process sufficient to satisfy the Due Process Clause. Those allegations are more than sufficient to allege a process deprivation.

Third, the due process claim is ripe for the same reason as Plaintiffs' other claims. *See supra* at pp. 12–14. No further factual development is necessary to assess whether the Comprehensive Re-Review Policy complies with the Due Process Clause, and withholding a decision would be harmful to Plaintiffs. The record shows that the policy is already causing fear, uncertainty, and confusion, and is already requiring Plaintiffs to divert resources to supporting noncitizens who fear the imminent loss of their legal status. *E.g.*, Bah Decl. ¶¶ 39–41. Given that Plaintiffs are suffering ongoing harms from the Comprehensive Re-Review Policy, their due process challenge to that policy is ripe.

## B.    Plaintiffs Have Adequately Stated a Fifth Amendment Equal Protection Claim.

Nor should the Court dismiss Plaintiffs' Fifth Amendment Equal Protection claims, which apply to all of the Challenged Policies, *see* Compl. ¶¶ 206–213, 219–221. The government argues that: (1) Plaintiffs have failed to allege "how they have been denied equal protection [under] the law," Defs.' Mem. at 55, and (2) the Executive Branch is entitled to "judicial deference" in the "immigration context," *id.* at 56. Neither argument warrants dismissal.

First, the Complaint includes ample plausible allegations that the Policies violate equal protection. Plaintiffs allege that the Challenged Policies "restrict the ability of people from Travel Ban countries to secure discretionary benefits from USCIS but do not impose the same restrictions on other countries"; that most of "the countries subject to the Travel Ban are majority non-white, or "majority-Muslim"; and that the policies therefore "discriminate against people from countries subject to the Travel Ban on the basis of their race, religion, or national origin." Compl. ¶ 209; *see also id.* ¶¶ 210–211. The government never acknowledges these allegations much less explains why they are insufficient to state an equal protection claim.

Second, while the government insists that immigration policies are entitled to "deference," Defs.' Mem. at 56, any deference that is owed does not amount to immunity from judicial enforcement of the Constitution. The government never explains why the deference courts often afford to the Executive in matters of immigration policy should foreclose Plaintiffs' equal protection claims altogether. To the contrary, the Supreme Court has made clear that equal protection claims may be viable even in the immigration context. In *Regents*, for example, the Supreme Court assessed the factual sufficiency of a claim that the government's rescission of DACA violated equal protection without suggesting that deference to the Executive should be a dispositive consideration. *See* 591 U.S. at 34 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Similarly, the government asserts without explanation that Plaintiffs' equal protection claims are reviewed under a deferential rational-basis standard. Defs.' Mem. at 55–56. But the appropriate

51

standard of review is an open legal question. *See United States v. Carrillo-Lopez*, 68 F.4th 1133, 1142 (9th Cir. 2023) (explaining that courts have applied different standard to equal protection claims in the immigration context). More to the point, the government never explains why rational-basis review would warrant dismissal of Plaintiffs' equal protection claims at the pleadings stage, particularly given Plaintiffs' allegation that there is no rational basis for the Challenged Policies. Compl. ¶ 212. In short, the government's insistence that it is entitled to deference is not a reason to dismiss Plaintiffs' equal protection claim.

## V.   The Court Should Vacate the Challenged Policies and Enjoin the Government from Issuing or Enforcing any Similar Policy.

Because the Challenged Policies violate the APA, the Court should vacate those policies and enter an injunction barring USCIS from issuing or enforcing any substantially similar policy. The government argues that remand to the agency is the appropriate remedy, and objects to the scope of the proposed injunctions. *See* Defs.' Mem. at 57–61. But the government's remedial arguments all miss the mark. The proposed remedies are appropriate, expressly contemplated by the APA, and necessary to provide Plaintiffs' complete relief and ensure a return to the status quo ante. *See* Pls.' Mem. at 55–59.

### A.   The Appropriate Remedy Is Vacatur.

The default remedy under the APA and the appropriate remedy here is vacatur. *See* Pls.' Mem. at 55. Indeed, the government concedes that the APA requires the Court to "hold unlawful and set aside" or, in other words, to vacate, unlawful agency action. Defs.' Mem. at 57 (citing 5 U.S.C. § 706(2)); *see also Ass'n of Am. Univs.*

*v. DOD*, 806 F. Supp. 3d 79, 120–21 (D. Mass. 2025) ("Put simply, the APA requires this Court to set aside unlawful or inadequately reasoned agency action. To set aside agency action is to annul or vacate it." (internal citations and quotation marks omitted)). Moreover, Plaintiffs previously explained—and the government does not contest—that vacatur is a universal remedy. *See* Pls.' Mem. at 56–57; *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (citation omitted). The government has waived any argument challenging the propriety of vacatur or its scope.

The government does suggest that the Court should simply remand the Challenged Policies to the agency. *See* Defs.' Mem. at 57–58. The thrust of this argument appears to be limited to challenging the scope of the proposed injunction. But to the extent that the government is also proposing that the court remand without vacatur, then the government errs for the reasons set forth in Plaintiffs' opening brief. Namely, vacatur is required where, as here, the errors cannot be cured on remand. *See* Pls.' Mem. at 56. Indeed, the authorities that the government cites for the proposition that remand to the agency is the appropriate remedy recognize that remand must be accompanied by vacatur. *E.g.*, *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) ("Accordingly, the district court had jurisdiction only to vacate the Secretary's decision rejecting the hospital's revised wage data and to remand for further action consistent with its opinion."); *Maine Med.*

53

*Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (citing *Palisades* for the proposition "that district court lacked authority to order specific relief because it had jurisdiction only to vacate agency's decision, and then had to remand").

### B.    An Ancillary Injunction Is Also Warranted.

The Court should also enter an injunction narrowly tailored to prevent USCIS from issuing or enforcing any substantially similar policies and thereby ensure a return to the status quo ante. *See* Pls.' Mem. at 57–59. The government's objections to the proposed injunction are unavailing.

### 1.    The Court has the authority to enter an injunction.

The government is wrong to suggest that the Court does not have the authority to enter an injunction because the APA does not authorize "specific relief." Defs.' Mem. at 57. To the contrary, the APA expressly contemplates injunctive relief. *See* 5 U.S.C. § 703. And when courts hold agency action unlawful under the APA, courts routinely both vacate the action and enjoin further unlawful conduct. *E.g.*, *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 310–14 (D.R.I. 2025) (entering a permanent injunction in addition to vacatur); *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 311–14 (D.R.I. 2025) (same). Here, Plaintiffs merely request a narrow injunction prohibiting USCIS from issuing or enforcing any substantially similar policy in the future. That request is consistent with the Court's remedial authority and necessary to ensure that vacatur of the Challenged Policies under the APA effectively restores the status quo ante. *See Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024) (entering an injunction barring issuance of any "substantially similar" policy in order to prevent an "end-run" around vacatur).

Citing *Palisades Gen. Hosp. Inc.*, 426 F.3d at 403, and *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999), the government responds that a court reviewing agency action under the APA has no jurisdiction to enter so-called "specific relief." *See* Defs.' Mem. at 57–58. But the relief requested in those cases was a far cry from the narrow, prohibitory injunction requested here. The plaintiffs in those cases sought orders that went far beyond prohibiting the agency from implementing an unlawful policy and instead asked the court to affirmatively mandate implementation of a particular policy. The courts declined to do so on the ground that it was better to remand to the agency to devise a lawful policy in the first instance. Nothing in *Palisades* or *Shalala* casts any doubt on the uncontroversial proposition that a district court may enter a prohibitory injunction to ensure an agency ceases its unlawful conduct. *See Tex. Childs. Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014) (granting an injunction and distinguishing *Palisades and Shalala* on the basis that that the plaintiffs in those cases "sought not only to maintain the status quo, but also to obtain affirmative relief that was different in kind, for example, the recovery of funds lost in the past—effectively a retrospective, compensatory remedy").

### 2.    Plaintiffs have standing to seek injunctive relief.

The government is also wrong to question whether Plaintiffs have standing to seek an injunction and whether their claim for injunctive relief is ripe. *See* Defs.' Mem. at 58–59. Plaintiffs have standing and their claims are ripe for the reasons set forth above. *See supra* at pp. 4–12. The only additional requirement that Article III imposes on a plaintiff seeking prospective injunctive relief is a showing of "ongoing

injury or a sufficient threat that the injury will recur." *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023). Plaintiffs' injuries are ongoing and they therefore have standing to seek an injunction. The government's standing and ripeness objections appear to rest on a misunderstanding of the injunction that Plaintiffs seek. Plaintiffs merely seek a narrow injunction prohibiting USCIS from issuing or enforcing the Challenged Policies under a different name. The injuries Plaintiffs have suffered as a result of the Challenged Policies, which are severe, ongoing, and compounding, are adequate to confer standing to pursue that injunctive relief.

### 3. The Court should not limit the injunction to Plaintiffs' identified members.

The government errs in arguing that the Court should limit an injunction "to specifically identified individuals who have been shown to have standing and who are members of an organizational Plaintiff." Defs.' Mem. at 60. In requesting the injunction be narrowed only to injured members, the government relies on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). But that reliance is misplaced for a few reasons.

To begin, Plaintiffs request only a narrow injunction sufficient to ensure that vacatur of the Challenged Policies under the APA is effective. The purpose of APA vacatur is to "reestablish the *status quo ante.*" *VanDerStok v. Garland*, No. 23-cv-10718, 2023 WL 4945360, at *1 (5th Cir. July 24, 2023) (quoting *Defense Distributed v. Platkin*, 55 F.4th 486, 491 (5th Cir. 2022)). In other words, when a court sets aside a rule under the APA, it aims to restore "the world before the [r]ule became effective." *Id.* Vacatur could not operate to restore the prior world if an agency could simply continue enforcing a vacated policy. Accordingly, the APA gives courts sufficient

56

remedial authority to ensure that an unlawful agency action is truly "set aside," 5 U.S.C. § 706(2), and that the agency can no longer enforce the unlawful policy. *Id.* § 703. Any reading of the APA that deprives courts of that authority would render the APA's remedial scheme impotent.

Here, Plaintiffs merely seek an injunction sufficient to ensure that the remedy of APA vacatur is efficacious by barring Defendants from continuing to enforce the Challenged Policies under another name (or, for that matter, no name at all). The requested injunction is necessary to ensure a return to the world before the Challenged Policies were enacted and is therefore consistent with the APA's remedial scheme. *CASA* expressly does not reach vacatur under the APA. 606 U.S. at 847 n.10. And the proposed injunction here is perfectly tailored to ensure the efficacy of an order vacating the Challenged Policies under the APA.

Additionally, in *CASA*, the Supreme Court expressly acknowledged that universal injunctions might be appropriate where necessary to provide the parties with "complete relief." *Id.* at 852; *see also Doe v. Trump*, 157 F.4th 36, 80–81 (1st Cir. 2025) ("Nothing in *CASA* provides that, as a categorical matter, it is improper for a district court to impose an injunction of such breadth if it is necessary to do so to provide the plaintiff with complete relief.").

Plaintiffs are a broad, national coalition of immigration organizations that represent over a million people including noncitizens living in every corner of the country. Many of the Plaintiffs are legal service providers who will serve any noncitizen who walks in the door requesting assistance. Given the breadth and

57

fluidity of the population served by Plaintiffs, the only way to ensure complete relief is to enjoin enforcement of the Challenged Policies. The government concedes this point. It explains: "Plaintiffs' … alleged harms arise from the aggregate, systemwide effects of the Challenged Policies on a large and indeterminate population. Narrow relief would presumably leave those effects intact. The only way to redress the injuries as Plaintiffs describe them would be to enjoin the Challenged Policies across the board." Defs.' Mem. at 39; *see id.* at 61 n.32 (explaining that redressing Plaintiffs' injuries requires relief "extending beyond identified individuals").

The government seems to think this poses a "structural problem" for Plaintiffs because the Supreme Court rejected universal injunctions in *CASA*. *Id.* at 39–40. That misreads the case. *CASA* recognizes "that the complete-relief principle has deep roots in equity." 606 U.S. at 851. And *CASA* poses no obstacle to the issuance of a universal injunction where broad injunctive relief is necessary to provide complete relief. *Doe*, 157 F.4th at 80 (affirming, post-*CASA*, "a universal injunction" issued "to give complete relief to the [parties]"). And the government has now conceded that the only way to provide Plaintiffs with complete relief is through a universal injunction.

To the extent the Court disagrees and believes *CASA* counsels in favor of a narrower injunction, at most the injunction should be limited to Plaintiffs. The government's request that the injunction be further limited to apply only to Plaintiffs' specific members who have shown standing is without basis in the law. *See Doe*, 157 F.4th at 80 (declining to limit an injunction only to associational members who have shown standing); *N.H. Indonesian Cmty. Support v. Trump*, 157 F.4th 29, 35 (1st Cir.

58

2025) (same); *cf. Ass'n of Am. Univs. v. DOD,* 792 F. Supp. 3d at 176 n.74 (D. Mass. 2025) (explaining that a court can infer harm to all members evidence of harm to specific members). The government has not cited any case to the contrary.

That the government does not know the identities of Plaintiffs' members, Defs.' Mem. at 60–61, simply underscores the difficulty of providing complete relief to Plaintiffs without a universal injunction. The Court should enjoin the agency from enforcing the Challenged Policies or any substantially similar policies universally to avoid the complexities of enforcing an injunction limited to the large and fluid constituencies served by Plaintiffs. In the alternative, the Court could enter an injunction that prohibits enforcement of the Challenged Policies as to any person known to the agency to be a member or client of any Plaintiff. Such an injunction would allow any of Plaintiffs' members or clients to identify themselves in order to receive the protection of the injunction while also protecting their privacy. *See Chamber of Com. of U.S. of Am. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023) (issuing injunction "limited to plaintiffs' members, who can disclose their membership to the agency to stop prohibited conduct"); *Franciscan All., Inc. v. Becerra*, No. 7:16-cv-00108, 2021 WL 6774686, at *1 (N.D. Tex. Oct. 1, 2021) (similar).

### 4.    The injunction should not be stayed pending appeal, and no bond is required.

Finally, the government concludes its brief with a perfunctory request that the Court stay any injunction pending appeal and that a bond be required. Defs.' Mem. at 61–62. Those requests should be denied. A stay pending appeal is warranted only if the movant shows: "(1) likelihood of success on appeal; (2) irreparable harm absent

59

injunctive relief; (3) a lack of substantial injury to others having an interest in the decision under appeal; and (4) service of the public interest." *Am. Hosp. Ass'n v. Kennedy*, No. 2:25-cv-00600, 2025 WL 3764086, at *1 (D. Me. Dec. 30, 2025). The government has made no attempt to explain why it meets this standard and therefore waived any argument as to why a stay is warranted. Moreover, the government cannot satisfy this standard because, among other reasons, Plaintiffs are likely to succeed on appeal and a stay would substantially injure Plaintiffs and their members for the reasons stated above.

Further, given the public interest at stake in this case, no injunction bond is required, and any bond should be nominal. *See Maine v. United States Dep't of Agric.*, 778 F. Supp. 3d 200, 237 (D. Me. 2025) (noting that in public interest litigation bonds are generally not required).

## CONCLUSION

The Court should grant Plaintiffs summary judgment, declare the  Challenged Policies unlawful, vacate the Challenged Policies pursuant to 5 U.S.C. § 706(2), and issue an injunction pursuant to 5 U.S.C. § 703 barring Defendants from enforcing the Challenged Policies or issuing or enforcing any substantially similar policy.

Dated: May 1, 2026                    Respectfully submitted,

 /s/ Amy R. Romero
Amy R. Romero (RI Bar No. 8262)
Kevin Love Hubbard (MA Bar No. 704772)*
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com

60

kevin@dwbrlaw.com
Cooperating Counsel, Lawyers' Committee for
    Rhode Island

/s/ Ryan Cooper
Ryan Cooper (DC Bar No. 1645301)*
Anashua Dutta (DC Bar No. 90007329)*
Catherine M.A. Carroll (DC Bar No. 497890)*
Robin F. Thurston (DC Bar No. 1531399)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
rcooper@democracyforward.org
adutta@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

/s/ Kristy Blumeyer-Martinez
Kristy Blumeyer-Martinez (TX Bar No.
    24087177)*
Mona Iman (CA Bar No. 309525)*
Refugee and Immigrant Center for
    Education and Legal Services
131 Interpark Boulevard
San Antonio, TX 78216
(210) 222-0964
mona.iman@raicestexas.org
kristy.blumeyermartinez@raicestexas.org

/s/ Melissa Keaney
Melissa Keaney* (CA Bar No. 265306)*
Abbey Koenning-Rutherford* (CO Bar No.
    59636))*
Muslim Advocates
1032 15th Street NW No. 362
Washington, DC 20005
(202) 655-296

melissa@muslimadvocates.org
abbey@muslimadvocates.org

/s/ Kalpana V. Peddibhotla
Kalpana V. Peddibhotla (Cal. Bar No. 200330)*

61

Anisa Rahim (NJ Bar No. 007802007)*
South Asian American Justice Collaborative
333 West San Carlos Street Suite 600
San Jose, CA 951110
(408) 550-9240
kalpana@saajco.org
anisa.rahim@saajco.org

*Counsel for Plaintiffs*
*Admitted pro hac vice