**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

DORCAS INT'L INST. OF R.I., *et al.*,

      Plaintiffs,

v.

U.S. CITIZENSHIP AND
IMMIGRATION SERVS., *et al.*,

      Defendants.

Civil Action No.
26cv132-JJM-PAS

**DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY
JUDGMENT AND MOTION TO DISMISS (FIFTH AMENDMENT CLAIMS)**

USCIS has temporarily paused final decisionmaking on applications for immigration benefits out of well-publicized concerns about subjects that the Immigration and Naturalization Act ("INA") commands government personnel to assess: public safety, national security, and risks posed by terrorism. During this pause, USCIS continues to assess its operations to consider how to implement guidance that Plaintiffs have challenged in this case under the Administrative Procedure Act ("APA") and the Fifth Amendment in a manner consistent with those statutory responsibilities. That guidance—including guidance directing officers to consider relevant, country-specific factors when vetting applicants from the 39 countries identified in Presidential Proclamations—reflects USCIS' discretionary authority under the INA to account for those subjects in its final, discretionary decisionmaking relative to otherwise qualified (or already granted) applications. And USCIS has already resumed final decisionmaking for applications for some immigration benefits, underscoring that Plaintiffs' contentions about a categorical halt to all adjudications mischaracterizes USCIS' ongoing administrative processes.

The Court should grant summary judgment to Defendants on Plaintiffs' APA claims contesting USCIS' Challenged Policies and dismiss their Fifth Amendment

1

claims. Defendants' arguments appear substantially in their preceding brief (ECF 21), which they augment below in response to Plaintiffs' reply (ECF 23).

## I.    The INA forecloses judicial review.

8 U.S.C. § 1252(a)(2)(B) broadly precludes the federal courts from reviewing USCIS' predecisional guidance, even if it were fully ripe, final agency action (*see* Section II *infra*). The Challenged Policies expressly pertain to how USCIS will exercise existing discretion when reviewing immigration benefit applications according to the discretion conferred on the government by the INA. The policies impose no new obligations, nor do they create new substantive requirements, while preserving officer discretion in adjudicatory decisions. The Challenged Policies merely interpret how USCIS intends to apply already-existing discretionary authority. ECF 21 at 5-12.[1]

Section 1252 insulates the exercise of that discretion from judicial review in individual cases—which Plaintiffs concede. ECF 23 at 16. Plaintiffs' clients and members are not harmed unless their applications are denied or rescinded because of the Challenged Policies (and Plaintiffs identify none that have been denied or rescinded on those grounds), and, under § 1252, none of those applicants may seek judicial review of those decisions.

Plaintiffs largely skate past the breadth of § 1252, which also insulates agency discretion from judicial review more broadly than the adjudication of

---

[1]    *See also* ECF 16-2, CAR000042 (emphases added):

> The mere fact that an individual is from a country subject to INA 212(f) restrictions on entry or admission, however, is not by itself a significant negative factor. USCIS considers relevant country-specific facts and circumstances such as those outlined in the Proclamation **on a case-by-case basis in the totality of the circumstances**, considering the relevance of those facts to the benefit request being adjudicated and the alien requesting the benefit. **USCIS weighs all relevant positive and negative factors** when making these discretionary determinations.

individual applications. Section 1252(a)(2)(B)(ii) expressly strips judicial review of "any other decision or action" by the government where Congress "under this sub-chapter" delegated "discretion"[2] to government personnel.[3] This broad language—"any other decision or action"—is more expansive than language that Plaintiffs, and other courts, have relied on to assert that Congress did not insulate the Challenged Policies from judicial review. ECF 23 at 16; *cf.* 8 U.S.C. § 1252(a)(2)(A)(iv); *see, e.g.*, *Doe v. Trump*, No. 1:25-CV-13946-JEK, 2026 WL 1170971, at *7-8 (D. Mass. Apr. 30, 2026) (focusing solely on § 1252(a)(2)(B)(i)).

Plaintiffs contend, moreover, that courts have recognized an exception to § 1252 (and other jurisdiction-stripping provisions in other statutes) when a plaintiff frames their claims as "general collateral challenges to policies of broad applicability." ECF 23 at 16 (citing, *inter alia*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991)). Not so.

The proposition that Plaintiffs abstract from *McNary* is untenable as applied to § 1252, this case, and the government's arguments. In *McNary*, the Supreme Court assessed an entirely different statute (the 1991 version of 8 U.S.C. § 1160(e)(3)), which, as then-worded, stripped judicial review of only "*a determination* respecting *an application.*" 498 U.S. at 492 (quoting § 1160(e)(3); emphases supplied by the Court). It was on the basis of that precise language—notably, of a statutory provision different from the one USCIS relies on here—that the *McNary*

---

[2]    Defendants understand this discretion to encompass all, or nearly all, immigration benefit decisions at issue in this case, and certainly do not waive (contrary to Plaintiffs' contentions) that point merely because of grouping programs in their preceding brief. ECF 21 at 17-22.

[3]    Plaintiffs cite the Supreme Court's discussion of § 1252(a)(2)(B)(ii) in *Zadvydas v. Davis* (ECF 23 at 18), but the issue there was "the extent of the Attorney General's authority under the post-removal-period detention statute," which is not at issue here and was not "a matter of discretion." 533 U.S. 678, 688 (2001). Here, by contrast, the INA has conferred on government personnel discretion in granting and rescinding immigration benefits.

Court concluded that this language foreclosed judicial review of only "individual denials" and not "general collateral challenges." *Id*.

*McNary*, moreover, did not announce a general proposition that jurisdiction-stripping provisions do not extend to "systematic" policies or practices. Nor did the other cases Plaintiffs cite to evade the consequences of § 1252 as applied to facts analogous to this one.[4] To the extent Plaintiffs attempt to extract from those cases a principle permitting "general collateral challenges to policies of broad applicability" notwithstanding jurisdiction-stripping provisions, that argument fails because the statutes construed in those decisions materially differ from the jurisdictional framework at issue here.[5] (One of the authorities that Plaintiffs cite for their contrived proposition, moreover, only reinforces USCIS' arguments that Plaintiffs' claims are

---

[4]    The statute in *Texas v. Biden* (cited in ECF 23 at 18) is the same, but the facts differ materially from here as the Challenged Policies preserve individualized, case-by-case adjudication and do not impose a categorical denial or permanent bar on immigration benefit applications. *See* 20 F.4th 928, 977 (5th Cir. 2021) (construing agency action concerning termination of "entire program" rather than, as here, a temporary pause of adjudications and an anticipated review of already granted benefits), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022); *see also Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *8 (D. Mass. May 12, 2023) (cited in ECF 23 at 18) (addressing suspension of adjudications, which USCIS here has already started to end); ECF 21-1.

[5]    *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 8, 19-20 (2020) (cited in ECF 23 at 17) (rejecting argument that 8 U.S.C. §§ 1252(b)(9) (barring judicial review of "action[s]" or "proceeding[s] brought to remove an alien") and 1252(g) (limiting review of cases "arising from" decisions "to commence proceedings, adjudicate cases, or execute removal orders") barred judicial review of DHS rescission of Deferred Action for Childhood Arrivals program under APA).

*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 46 (1993) (cited in ECF 23 at 17) ("We find the record insufficient to decide all jurisdictional issues and accordingly vacate and remand for new jurisdictional determinations and, if appropriate, remedial orders limited in accordance with the views expressed here."); *id.* at 55-56 ("There [*i.e.*, in *McNary*] as here, the critical language was 'a determination respecting an application for adjustment of status.'") (quoting 8 U.S.C. § 1255a(f)(1)).

*Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1002-03 (9th Cir. 2024) (cited in ECF 23 at 17-18) (construing only § 1252(a)(2)(B)(i)—but not subsection (ii)—to strip jurisdiction over only "individual application denials" but not "general collateral challenges to agency policies").

not ripe precisely because "USCIS has not denied [anyone's] application[ ] based on the challenged policies." *See Nakka*, 111 F.4th at 999.)

Plaintiffs cannot evade the INA's jurisdictional limitations by repackaging their claims as broad APA challenges to "generally applicable policies." ECF 23 at 18. Whatever label Plaintiffs attach to their claims, the relief they seek would directly regulate how USCIS exercises discretionary authority in adjudicating immigration benefits. The INA forecloses judicial review of such discretionary determinations and the processes by which they are made. *See* ECF 21 at 17-22. Plaintiffs' attempt to characterize the challenged policies as "systemic" does not change the substance of what they seek: judicial supervision of discretionary immigration adjudications.

## II.    Plaintiffs' remaining jurisdictional arguments fail.

Plaintiffs' remaining jurisdictional arguments fare no better. At bottom, Plaintiffs seek judicial oversight of how USCIS exercises discretionary authority in administering immigration benefits in areas implicating national security, foreign affairs, and individualized adjudicatory judgment. Congress did not authorize that form of review.

First, Plaintiffs resist Defendants' argument that the challenged policies implicate discretionary national-security judgments traditionally insulated from judicial review. But courts have repeatedly recognized a "tradition of nonreviewability" for agency decisions involving national security, intelligence, and foreign affairs. *See Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 319 (3d Cir. 2020) (citing *I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987); *Webster v. Doe*, 486 U.S. 592, 600-01 (1988)). The INA expressly requires USCIS to consider whether granting certain immigration benefits, such as adjustment of status, would be in the national interest and not contrary to national security. *See, e.g.*, 8 U.S.C. § 1255b(b).

5

In *Almabruk v. Robinson*, the court considered whether it could review USCIS' denial of an adjustment-of-status application under a statutory scheme requiring executive officials to assess standards such as "national interest, welfare, safety, and security." 741 F. Supp. 3d 228, 235-37 (M.D. Pa. 2024). The court concluded that these determinations were not susceptible to judicial second-guessing because they required precisely the sort of subjective, policy-laden judgments committed to the political branches. *Id.* at 235. As the court explained, while courts may be capable of identifying objective geopolitical developments such as "a change in government in a country, a revolution, or an invasion," it remains "outside of the province of a court to determine the sufficiency" of whether those developments are "significant" enough to warrant favorable immigration treatment. *Id.*

The same principle applies here. Plaintiffs ask this Court to second-guess USCIS' discretionary determination that certain adjudications of applications for immigration benefits should not proceed until identified national-security concerns have been fully investigated and resolved before officers exercise their case-specific decision on whether the immigration benefits should ultimately be granted or denied. But those decisions necessarily require predictive assessments, policy balancing, and discretionary line-drawing for which there is no meaningful judicial standard. As *Almabruk* recognized, courts are not equipped to determine whether particular national-security or public-interest concerns are sufficiently "significant" to justify a more cautious or searching adjudicatory approach. *Id.*

*Almabruk* is especially instructive because, although it involved adjustment of status rather than a direct admissibility or exclusion determination, the court nevertheless concluded that the same principles of deference and nonreviewability applied. The court acknowledged that "an adjustment of status is not the same as admission to the United States," but nonetheless held that "the principle remains that noncitizen's status is not for courts to decide." *Id.* at 237. That reasoning

6

squarely undermines Plaintiffs' repeated efforts to cabin non-reviewability principles to formal entry or exclusion decisions. Here, too, Plaintiffs would require the Court to second-guess how USCIS operationalizes and weighs national-security and public-interest considerations in immigration adjudications—a role the courts are not equipped, and were not authorized, to perform.

The Supreme Court's recent decisions reinforce that conclusion. Decisions concerning the admission, exclusion, and immigration status of noncitizens implicate a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Dep't of State v. Muñoz*, 602 U.S. 899, 907-08 (2024) (quoting *Trump v. Hawaii*, 585 U.S. 667, 702 (2018)). Plaintiffs attempt to minimize these principles by emphasizing that the Challenged Policies concern immigration benefits rather than formal admissibility decisions. But that distinction does not alter the underlying point: Congress has vested executive officials—not courts—with broad discretion to determine whether granting discretionary immigration benefits aligns with the national interest and the integrity of the immigration system. The judicial branch has no role to play "unless expressly authorized by law." *Id*. at 908. For the reasons set forth in the Defendants' brief, ECF 21 at 17-22, and expounded upon above, section I, *supra*, the INA does not authorize judicial review of the challenged policies; thus, as a rule, the federal courts cannot review those policies.

Plaintiffs' APA claims also fail because the challenged policies concern matters committed to agency discretion by law. Discretion has always been central to USCIS adjudications, particularly where officers must determine whether granting an immigration benefit would align with the public interest, national security, and the integrity of the immigration system. *See, e.g.*, 8 U.S.C. §§ 1105(a), 1182(a)(3), 1255(a), 1446(a). The Challenged Policies do not eliminate that discretion inherent in individualized decisionmaking or dictate predetermined outcomes. Nor do they

7

impose categorical nationality-based bans. To the contrary, the USCIS Policy Manual expressly preserves case-by-case adjudication and rejects nationality alone as a dispositive factor. *See* n.1 *supra.*

What the policies do—and what Plaintiffs overlook—is provide a more detailed framework for how officers should evaluate factors already within their discretion when adjudicating certain immigration benefits applications. The policies seek to promote greater consistency in how officers weigh positive and negative aspects of an application.

The challenged policies also reflect USCIS' discretionary judgment that adjudications presenting identified national-security concerns should not proceed until those concerns have been appropriately investigated and resolved. Plaintiffs thus ask this Court to supervise not merely individual immigration outcomes, but the manner in which USCIS structures and exercises discretionary judgment in administering the immigration system. But Plaintiffs identify no meaningful judicial standard by which a court could determine how much vetting is appropriate, how officers should balance competing discretionary public-interest and national security considerations, or when such concerns have been sufficiently resolved to permit adjudication to proceed. Those are precisely the kinds of predictive, policy-laden determinations committed to agency expertise rather than judicial review. The APA therefore provides no basis for review.

Finally, Plaintiffs' claims are not ripe. As explained above, the challenged policies guide officers' discretionary analysis; they do not compel any particular adjudicatory outcome. USCIS officers retain discretion to grant or deny applications on an individualized basis, and Plaintiffs identify no final adjudicatory decisions applying the challenged guidance in a concrete factual setting suitable for judicial review. Instead, Plaintiffs ask the Court to adjudicate abstract disagreements over

how discretionary factors may be weighed in future immigration proceedings. That is precisely the kind of premature challenge the ripeness doctrine forbids.

That defect also has significant remedial consequences. Plaintiffs repeatedly invoke the APA to justify the sweeping remedy of vacatur. But if, as discussed above, Plaintiffs have no viable APA claims because the challenged policies are committed to agency discretion and otherwise unreviewable and unripe, then the APA's remedial provisions are unavailable as well. Plaintiffs are therefore left seeking what is, in substance, a universal injunction against USCIS' administration of immigration benefits. But such relief is unavailable under Plaintiffs' remaining claims and irreconcilable with the Supreme Court's recent warning that federal courts may not use sweeping universal remedies to regulate executive actions beyond what is necessary to redress the injuries of the parties before them. *See Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025).[6] Thus, Defendants reiterate their request that, to comply with Article III and *CASA*, any permanent injunction this Court is inclined to grant be limited to specifically identified individuals who have been shown to have standing and who were members of an organizational Plaintiff at the time suit was filed.

## III.    Plaintiffs lack standing.

Plaintiffs' standing theory is not just unpersuasive—it is unbounded and unreasonable. At its core, it asks this Court to recognize a form of derivative, service-provider standing that Article III does not permit: the idea that an organization may sue whenever a statute, regulation, or agency practice affects its clients and, in

---

[6]    Even in *Doe v. Trump*, the district court originally limited preliminary relief to only 22 of 200 plaintiffs because it was only the 22 who had filed declarations showing irreparable harm. No. 1:25-CV-13946-JEK, 2026 WL 1170971, at *19 (D. Mass. Apr. 30, 2026). The court later expanded the preliminary relief to all named Plaintiffs, but only after requiring each Plaintiff to provide the court with a declaration demonstrating irreparable harm. Order (May 7, 2026) (ECF 87).

turn, its workload. The Supreme Court has repeatedly rejected that approach. ECF 21 at 30-38.

Standing requires a concrete injury to the plaintiff itself—not the indirect consequences of government action on third parties. Plaintiffs cannot satisfy that requirement and their theory collapses under their own description of the facts. Nothing in the policies curbs, prohibits, or even directly regulates Plaintiffs' activities. Instead, Plaintiffs repeatedly assert that the policies have required them to devote additional time and resources to their cases, "burden[ing] [their] existing dockets." ECF 23 at 5. They attempt to recast this as a "diversion" of resources to handle "immigration-related work," "respond[] to questions about pending cases," "counsel[] and support[] . . . clients in distress," provide "immigration counseling," and even "reopen closed files." *Id.* at 6. But that is not a diversion at all. It is semantic relabeling of their ordinary business activities. Plaintiffs effectively concede as much. In their own words, they are "*immigrant-service* organizations whose ongoing, day-to-day programmatic work . . . includ[es] representing clients before USCIS and filing benefits applications. . . ." *Id.* at 5 (emphasis added); *see also, e.g.*, Sique Decl. at ¶ 7; Bah Decl. at ¶ 7. That description gives the game away.

Far from identifying any actual disruption to their operations, Plaintiffs describe only the ordinary performance of the immigration-service functions that lie at the heart of many of the organizations' missions. For instance, monitoring case files and responding to client inquiries—things that Plaintiffs cast as burdens uniquely attributable to the challenged policies, ECF 23 at 6—are routine features of immigration representation, whether or not any particular adjudicative hold is in place. That is not an injury. It is the job.

Plaintiffs remain free to operate exactly as before: to advise clients, provide services, and advocate on their behalf. They do not identify any concrete operational disruption that would elevate these ordinary case-management activities into a

10

cognizable injury. Plaintiffs admit, moreover, that the policies reinforce the very need for their existence, confirming that there remains substantial demand for the immigration and social services they provide.

In short, Plaintiffs' alleged "diversion" is nothing more than continuing to perform the very work that they exist to perform. Organizations may not manufacture standing by rebranding routine, day-to-day, service work as a "diversion of resources" or by claiming injury simply because they must do more of their ordinary work under different circumstances. Accepting Plaintiffs' theory would effectively create a system of proxy standing, allowing service providers to litigate agency policy whenever government action increases demand for their services or affects their workloads—a result squarely foreclosed by Supreme Court precedent. *See generally Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).

Even if Plaintiffs' characterization of increased "burdens" amounted to a cognizable legal injury (it does not), their opposition only underscores how attenuated their theory of standing remains. Their theory reduces to a generalized complaint that some unspecified number of their clients may experience prolonged adjudications and may ultimately not receive certain immigration benefits. But those asserted harms arise only through multiple intervening steps involving third-party applications, individualized adjudications, and Plaintiffs' own decisions about how to allocate their resources in response. And critically, Plaintiffs do not—and cannot—separate the effects of the challenged policies from the many other lawful factors that may affect the pace or outcome of immigration adjudications.

That defect is especially apparent when it comes to redressability. Even if the challenged policies were vacated, Plaintiffs cannot show that the burdens they identify—such as responding to client questions, monitoring pending matters, counseling anxious clients, and managing delayed cases—would materially disappear.

Even absent the challenged policies, USCIS would still retain discretion over how applications are adjudicated, including the pace and manner of adjudication, and applications could still face prolonged processing times, additional vetting, requests for evidence, or denial for any number of lawful reasons. Plaintiffs therefore cannot establish that the relief they seek would meaningfully eliminate the operational burdens they describe. Their argument ultimately depends on the speculative assumption that vacatur would produce materially different outcomes for an unspecified subset of their clients and, in turn, reduce Plaintiffs' workload. That falls short of establishing standing under Article III.

Plaintiffs' reliance on general standing formulations does not change that conclusion. Their invocation of *Diamond Alternative. Energy, LLC v. Environmental Protection Agency*, 606 U.S. 100 (2025), for the proposition that relief need only redress "at least some" injury, ECF 23 at 11, assumes the existence of a concrete, non-derivative injury in the first place. *Diamond* involved fuel producers challenging regulations that directly reshaped the automobile market by requiring manufacturers to produce more electric vehicles and fewer gasoline-powered cars. 606 U.S. at 108. In that context, the Supreme Court relied on "commonsense economic inferences about the operation of the automobile market" to conclude it was sufficiently predictable that invalidating the regulations would increase demand for the plaintiffs' products and thereby redress their injury. *Id.* at 120.

Nothing remotely comparable exists here. Plaintiffs are not market participants directly regulated or economically targeted by the Challenged Policies. The policies govern USCIS adjudications, not Plaintiffs' operations. And unlike in *Diamond*, where the connection between the challenged regulation and the plaintiffs' asserted economic injury followed from straightforward market dynamics, *see id.* at 118-20, Plaintiffs here have not shown that their asserted burdens are uniquely caused by the Challenged Policies, nor that the requested relief would eliminate

12

those burdens, which would persist so long as applications remain pending for any reason. Plaintiffs therefore cannot establish—through "commonsense" inference or otherwise—that the relief they seek would materially reduce the amount of client counseling, case monitoring, or immigration-related work they perform. At most, their theory rests on speculation that some unidentified subset of their clients might receive different outcomes on some unspecified timeline.

The absence of any limiting principle confirms the defect of Plaintiffs' standing theories. Plaintiffs may well serve communities that include individuals potentially affected by the Challenged Policies, and the interests of those individuals may be germane to Plaintiffs' organizational missions. But Plaintiffs' asserted injuries remain several steps removed from the challenged conduct itself, arising only through the downstream effects of government action on an undefined subset of current or potential clients. If that attenuated relationship were sufficient for standing, then virtually any business whose clientele could hypothetically be affected by government action could claim standing based on resulting operational strain on the business itself. That theory is plainly untenable. Ultimately, Plaintiffs do not connect their asserted burdens to the challenged policies in any principled or non-attenuated way. The Court should therefore grant summary judgment to Defendants on jurisdictional grounds.

## IV. The Challenged Policies are consistent with the INA and APA.

Plaintiffs' opposition refuses to engage with the administrative record, the Challenged Policies themselves, or with Defendants' briefing showing the consistency of those materials with the INA and the APA. Even if this Court reaches the merits of Plaintiffs' APA claims, it should reject Plaintiffs' arguments and enter summary judgment for the Defendants.

First, Plaintiffs contend that the government is silent "as to its statutory authority," ECF 23 at 27, although the government presented that information in its opening brief, *e.g.*, ECF 21 at 5-8, 11. Plaintiffs continue to misconstrue the citation in the policies themselves to 8 U.S.C. § 1182(f) as somehow being the only ground for the Challenged Policies, when that citation was provided to identify the grounds on which the Policies' factual predicate was established. And that factual predicate reasonably explains why the government, within the bounds of its existing discretion, intends to enhance its vetting processes—for example, because the government, with respect to 39 countries, either has credible evidence about the rates of visa overstays or reasonably distrusts the quality of the information about public safety and criminal conduct that comes from those countries. ECF 21 at 42, n.25 & 45-46.

Second, Plaintiffs exaggerate the Challenged Policies as imposing indefinite and categorical restrictions on immigration benefits "for any reason" that the government "chooses." ECF 23 at 28-29. But this is one of Plaintiffs' strawman arguments that USCIS has exposed given its ongoing efforts to implement the Challenged Policies consistent with the INA and its resumption of final decisionmaking concerning certain types of immigration benefits. ECF 21-1. The Challenged Policies, moreover, reflect the Administration's view that the quality of information that it receives from certain countries deserves less weight for a range of well substantiated reasons. *See, e.g.*, ECF 21 at 10-11. The government's opening brief, citing the administrative record, ECF 16–2, CAR000003, explains the purpose of the temporary hold, which is necessarily connected to the quality of information that the agency must review as part of its investigations for any immigration benefit application. *See* ECF 21 at 12. And, again, Plaintiffs can point to no one who has lost any immigration benefits because of a temporary delay in implementing the Challenged Policies.

Third, Plaintiffs simply disagree with the government's judgment in balancing the alleged harms and reliance interests that they value more highly than the government's stated purpose: to "ensure[ ] that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States." ECF 16-2, CAR000003. But Plaintiffs cannot credibly argue that the government failed utterly to even acknowledge those interests, which is the deficiency in the cases that they cite in support of that very argument. *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026) (cited ECF 24 at 34) ("[T]he administrative record previewed below is devoid of evidence that the federal government considered the hospitals' significant reliance interests. . . ."); *Doe v. Noem*, 784 F. Supp. 3d 437, 465 (D. Mass. 2025) (same) (noting agency "gave no consideration of the reliance interests" of affected individuals and only had to "acknowledge them").

USCIS did not ignore the potential adverse consequences on applications; it expressly recognized them, but ultimately concluded that the founding values behind the agency of which it is a component (DHS) that the INA also enshrines—the advancement of national security—warranted a more cautious adjudicatory approach. ECF 21 at 12-13 (citing ECF 16-2, CAR000003). The APA is designed to ensure proper administrative procedure, not provide a veto to agency decisionmaking with which claimants disagree. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (cleaned up).

Fourth, it remains difficult to see why Plaintiffs' next argument—that USCIS failed to consider alternative policy options—is not putting form over substance (which Plaintiffs deny). In describing their preferred alternatives, Plaintiffs only seem to describe what the government intends to do when implementing the

Challenged Policies—enhancing vetting already required by statute—just not at the pace or in the sequencing that plaintiff would prefer. ECF 23 at 37.

Fifth, Plaintiffs erect yet another strawman to attack USCIS' reasoning as "facially implausible," but fail to prove pretext. It is only Plaintiffs' supposition that a purpose of the policies is to discourage entry to the United States. ECF 23 at 38. That purpose does not appear anywhere in the Challenged Policies or the administrative record, which is why the government did not devote substantial attention to engaging with Plaintiffs' argument. ECF 21 at 45 n.26. Yet Plaintiffs attempt to transform the government's decision not to dwell on their unsupported characterization of the Challenged Policies into some sort of evidentiary concession. There is no such concession. Plaintiffs then compound the error by asserting, incorrectly, that the government merely "questions" policy objectives that Plaintiffs themselves cannot substantiate with any support from the Challenged Policies or the administrative record. ECF 23 at 38–39.

Plaintiffs cite a substantial amount of social media, some of it posted close in time to USCIS' disclosure of its predecisional guidance. Yet none of those posts refers to the Challenged Policies, nor does the administrative record refer to the posts as informing the agency's predecisional guidance. Plaintiffs' asserted connection between the cited social media posts and the Challenged Policies is just conjectural. And Plaintiffs have to resort to social media because the Challenged Policies and their corresponding administrative record lack "the disconnect between the decision made and the explanation given" that caused the Supreme Court to find an APA violation in *Dep't of Commerce v. New York*. 588 U.S. 752, 785 (2019).

## V.    USCIS' predecisional guidance is expressly an interpretation of its existing authority, which does not require notice-and-comment rulemaking.

Plaintiffs do not contest that USCIS has a statutory obligation to investigate and vet all applications for immigration benefits. They also do not contest that the

INA includes anti-terrorism, public safety, and national security among the subjects that USCIS may include in vetting those applications and investigating the applicants. ECF 21 at 5-10. Nor do Plaintiffs contest that it is clearly within USCIS' existing expertise and statutory obligation to assess the credibility and quality of information from certain countries that may inhibit its ability to assess the risks posed by individuals from those countries when they apply for immigration benefits. The preceding facts about USCIS' statutory authority refutes Plaintiffs attempts to impose notice-and-comment rulemaking by simply asserting that USCIS' consideration of these subjects, and enhanced vetting around them, is some invention that "[a]t best" is only implied by the INA and thus requires notice-and-comment rulemaking. ECF 23 at 42.

Plaintiffs then mount an attack on the Challenged Policies by claiming that the Challenged Policies amount to rules, which they are not, rather than interpretations, which they are. How USCIS will implement the Challenged Policies will remain in its case-by-case discretion, and indeed the weighing of "positive" or "negative" factors remains a subject for further guidance from USCIS (reinforcing the lack of final agency action). Plaintiffs question that individualized officer discretion by changing the subject and noting that lifting the adjudication pause has been escalated to the USCIS Director or Deputy Director. *Id.* at 45. But this escalation does not undermine individualized decisionmaking on any benefits application and does not mean that the USCIS Director or Deputy Director are robbed of discretion in assessing whether and when (or for whom) to lift the pause. And Plaintiffs' repeated rhetoric—"a new categorical rule," which "tie[s] the hands of agency personnel," *id.* at 45, 46—simply assumes that *being* from one of the 39 countries the Challenged Policies refer to amounts to a rule that all such applicants will be denied benefits— an assumption squarely foreclosed by the very Policies themselves. *See* n.1 *supra.*

17

## VI.   The Court should dismiss Plaintiffs' Fifth Amendment claims.

Plaintiffs concede that non-citizens who have not been awarded immigration benefits—which are discretionary—cannot state any Fifth Amendment claims because they lack any tangible right otherwise protected by the Amendment. They also concede that there is no live controversy for this Court to adjudicate. Their pleading and its future-tense allegations anticipate deficiencies that they only imagine. They assume again that the Challenged Policies are USCIS' final word, ECF 23 at 49-50, when they are not. They cannot state any facial Fifth Amendment challenge because how USCIS will implement the Challenged Policies—and what notice and process that they will give to applicants—remains subject to ongoing administrative processes. Nor can they proceed on any as-applied challenge, because they identify no client who has lost (that is, been denied) any prospective benefit or had any awarded-benefit rescinded. Plaintiffs' response to these deficiencies, which are fatal to all of their Fifth Amendment claims, is to effectively rely on mere anticipation ("fear, uncertainty, and confusion") of what further guidance or action USCIS might take. *Id*. at 50. Were this enough to state valid claims, the courts would be flooded with litigation seeking advisory opinions about planned, but incomplete action by any government actor, and that is simply not the law.

Finally, because USCIS has offered reasonable explanations for the Challenged Policies and Plaintiffs' have failed to establish pretext, their Fifth Amendment Equal Protection claims fail. *See* Section IV *supra*; ECF 21 at 55-56.

## Conclusion

For the reasons presented herein and in Defendants' opening brief, the Court should dismiss Plaintiffs' Fifth Amendment claims and enter summary judgment for the government.

Dated: May 11, 2026

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

CHARLES C. CALENDA
First Assistant U.S. Attorney

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
401.709.5000
kevin.bolan@usdoj.gov

### Certificate of Service

I hereby certify that, on May 11, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant United States Attorney

19