**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

DORCAS INT'L INST. OF R.I., et al.,

     Plaintiffs,

v.

U.S. CITIZENSHIP AND
IMMIGRATION SERVS., et al.,

     Defendants.

Civil Action No.
26-cv-132-JJM-PAS

EXPEDITED RELIEF
REQUESTED

**DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

Defendants respectfully move for a stay pending appeal of the Court's June 5, 2026 Memorandum and Order (ECF 28) in which the Court granted in part Plaintiffs' motion for partial summary judgment. The judgment also encompasses this Court's order entered on June 11, 2026, in which the Court granted Defendants' motion for final judgment under Federal Rule of Civil Procedure 54(b) (ECF 36). Defendants have filed a notice of appeal (ECF No. 37) and now seek a stay of the Court's vacatur order and order enforcing the vacatur while the appeal is pending before the United States Court of Appeals for the First Circuit.

**INTRODUCTION**

On June 5, 2026, the Court granted in part Plaintiffs' motion for summary judgment and vacated in its entirety United States Citizenship and Immigration Services ("USCIS") policy statements addressing the adjudication of immigration-benefit requests filed by nationals of countries identified through an interagency national-security review as presenting significant vetting and screening concerns. ECF 28 at 134-35. Defendants then moved for entry of a final judgment and

1

clarification regarding the effect of the Court's vacatur order, and on June 11, 2026, the Court granted Defendants' motion for final judgment. ECF 36. As a result, USCIS has implemented this Court's final judgment and vacated the policies that govern the adjudication of immigration-benefit requests involving identified vetting and national-security concerns.[1] Defendants now seek a stay of this Court's order given the significant harms to national security interests. Because Defendants are diligently pursuing appeal, and because the harms identified below stand likely to occur before that process is complete, a stay pending appeal is warranted.

Defendants have made a strong showing that they are likely to succeed on the merits given that this Court lacked jurisdiction to review the challenged policies in light of the jurisdiction-stripping provisions of 8 U.S.C. § 1252(a)(2)(B), and the limits on judicial review under various provisions of the Immigration and Nationality Act ("INA") and the Administrative Procedures Act ("APA"). Defendants are also likely to prevail on the merits because the INA confers broad discretion on the Secretary and USCIS in the adjudication, review, and reconsideration of immigration benefits and because the challenged policies fall comfortably within that authority. Those questions warrant preservation of the status quo while the Court of Appeals considers them on appeal.

---

[1] USCIS has posted notice of its compliance. *See* https://www.uscis.gov/newsroom/alerts/court-order-on-hold-policies (last viewed June 18, 2026) ("With entry of final judgment this order is effective immediately, and pursuant to the court-ordered vacatur, applies agency-wide. Thus, the vacatur applies to PM 602-0192, PM 602-0194, and PA 2025-26, which should be treated as if they are not in effect.").

As discussed more fully below, the remaining factors required to evaluate the need for a stay likewise favor it. *See* Declaration of USCIS Deputy Director Angelica Alfonso-Royals ("Declaration"), attached. Absent a stay, USCIS will be required to abandon policies that it adopted to address vetting deficiencies identified by the President, resume final adjudications before enhanced vetting procedures currently under development can be implemented, and make discretionary immigration-benefit decisions notwithstanding the agency's determination that additional review is necessary to adequately address significant national-security and public-safety concerns identified by the President. The balance of equities and public interest thus strongly favor a stay pending appeal.

## ARGUMENT

A stay pending appeal is warranted. In determining whether to grant a stay pending appeal, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Doe v. Noem*, 152 F.4th 272, 283 (1st Cir. 2025). The first two factors are the "most critical." *Nken*, 556 U.S. at 434; *see Doe*, 152 F.4th at 285. Because the Government is a party, the third and fourth factors merge. *Nken*, 556 U.S. at 435.

## I.    DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS.

Defendants are likely to succeed on appeal for at least three independent reasons. First, Congress deprived this Court of jurisdiction to review the challenged

3

policies. Second, the challenged USCIS policy memoranda are consistent with the broad discretion conferred upon the agency by the INA, were not developed arbitrarily or capriciously, and do not violate the APA. Third, substantial questions exist concerning the scope of the Court's remedy and its decision to vacate the challenged policies in their entirety.

### A.  The Challenged Policies Are Not Reviewable

### 1)  The Comprehensive Re-Review Policy Is Not Reviewable

First, USCIS's Comprehensive Re-Review Policy is not reviewable, and the Court erred in holding otherwise.  As discussed in prior briefing, the Comprehensive Re-Review Policy concerns the agency's review of previously granted benefits using authority already conferred by Congress.  *See* ECF 21 at 6-7, 40, 44-45; ECF 16-1 at 3-6, 45-49; ECF 21-1 at 3-4.  Among those benefits are adjustment of status under 8 U.S.C. § 1255, and the provision of work authorization under 8 U.S.C. § 1324a.[2] Provision of those benefits is generally committed to the agency's discretion under 8 U.S.C. §§ 1252(a)(2)(B)(i) and (ii).  The Supreme Court and the First Circuit have repeatedly recognized that these provisions sweep broadly and are intended to prevent judicial second-guessing of discretionary immigration determinations.  *See*,

---

[2]  8 C.F.R. § 274a.12(c) includes individuals who must file a Form I-765 with USCIS and obtain employment authorization before working, i.e., the grant of work authorization itself is discretionary.  Subsections (a) and (b) are "nondiscretionary" under the regulation, insofar as those subsections pertain to a grant of work authorization incident to status, and nonimmigrant workers whose work authorization is tied to a particular employer petitioning for them.  However, subsections (a) and (b) describe workers whose authorization to work is contingent on the grant of a particular immigrant benefit first, before work authorization can be obtained.  *See* 8 C.F.R. § 274a.12(a), (b).

*e.g.*, *Patel v. Garland,* 596 U.S. 328, 332, 338-39 (2022); *Leao v. Bondi*, 144 F.4th 43, 51-52 (1st Cir. 2025) (collecting cases) ECF 21 at 9-20 (collecting cases and arguing same); *see also Trump v. Hawaii*, 585 U.S. 667, 704 (2018); *Kucana v. Holder*, 558 U.S. 233, 246-47 (2010); *Immigr. & Naturalization Serv. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Naturalization applications and asylum are also subject to re-review.  As discussed in the Government's prior briefing, 8 U.S.C. § 1421(c) and 8 U.S.C. § 1447(b), precluded judicial review over Plaintiffs' naturalization claims.  ECF 21 at 20-22. Furthermore, with respect to Plaintiffs' asylum claims, Congress has left the timing and manner of adjudication to the agency's discretion.  *See* ECF No. 21 at 22-23. Therefore, the Court erred in finding jurisdiction to review those discretionary determinations.

Turning first to Plaintiffs' claims regarding re-review of applications for adjustment of status, Plaintiffs' claims are barred by the APA and the INA.  The APA, as a general matter, offers legal recourse to a "person suffering legal wrong because of agency action, or [who is] adversely affected or aggrieved by agency action within the meaning of [the] relevant statute."  5 U.S.C. § 702.  However, the APA expressly precludes review of actions "committed to agency discretion by law[,]" 5 U.S.C. § 701(a)(2); *see Heckler v. Chaney,* 470 U.S. 821, 830 (1985), and adjustment of status is expressly committed to the discretion of the Attorney General.  *See* 8 U.S.C. § 1255(a).

Legal redress under the APA is also unavailable when a "statute[ ] preclude[s] judicial review." *Id.* § 701(a)(1); *see Chaney*, 470 U.S. at 830. The jurisdiction stripping provision, 8 U.S.C. § 1252(a)(2)(B)(i), does just that. The statute provides that "regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review ... any judgment regarding the granting of relief under section ... 1255 of this title." 8 U.S.C. § 1252(a)(2)(B)(i). Section 1255(a), the provision governing the adjustment of status, in turn, states that the "status of an alien ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a).

Recently, in *Patel*, the Supreme Court assessed whether § 1252(a)(2)(B)(i) precluded judicial review of factual determinations underpinning the denial of an adjustment of status application during removal proceedings. 596 U.S. at 331, 334-36. The Supreme Court determined that the statute did preclude such review, focusing its analysis on the meaning of "any judgment" in § 1252(a)(2)(B)(i). *Id.* at 338. The Supreme Court explained that "any" has an "expansive meaning" and "regarding" has a "broadening effect," meaning that "any judgment" not only includes the final, last in time grant of relief but also "*any* judgment *regarding* the granting of relief." *Id.* at 338-39 (emphasis in original). Thus, the Supreme Court concluded that 8 U.S.C. § 1252(a)(2)(B)(i) "prohibits review of any judgment *relating to* the granting of relief" under § 1255 and the other enumerated provisions. *See id.* at 339 (emphasis in original).

6

Although *Patel* expressly declined to address whether § 1252(a)(2)(B)(i)'s plain language bars judicial review of USCIS's denial of adjustment of status applications under § 1255, *id.* at 345-46, and the First Circuit has yet to evaluate this precise issue, other Circuits have held that the statute's plain language bars judicial review of USCIS denials pursuant to § 1255(a). *See, e.g., Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1014-16 (9th Cir. 2024) (judicial review of discretionary relief under § 1255 unavailable); *Abuzeid v. Mayorkas*, 62 F.4th 578, 585 (D.C. Cir. 2023) ("[Section] § 1252(a)(2)(B)(i) leaves no path for judicial review of denials of adjustment of status by USCIS.") *Britkovvy v. Mayorkas*, 60 F.4th 1024, 1032 (7th Cir. 2023) ("The plain text of 8 U.S.C. § 1252(a)(2)(B)(i) strips us of jurisdiction to review USCIS's denial of an adjustment-of-status application."); *see also Moncada v. Mayorkas*, No. 20-cv-11561, 2023 WL 6174422, at *11 (D. Mass. Aug. 11, 2023) ("Under 8 U.S.C. § 1252(a)(2)(B)(i), the court lacks jurisdiction to review USCIS's denial of plaintiff's § 1255 application for adjustment of status."), *appeal dismissed*, No. 23-1751, 2024 WL 1097988 (1st Cir. Feb. 6, 2024). Given the plain text of 8 U.S.C. § 1255 and § 1252(a)(2)(B)(i), the Court lacked jurisdiction to review the Plaintiffs' APA claim under 5 U.S.C. § 701(a) and § 702.

Plaintiffs' challenges to the re-review of other applications, such as employment authorization, likewise fails under the INA and APA. *Contra* ECF 28 at 32-39. Again, the APA expressly precludes review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Chaney*, 470 U.S. at 830. Section 1252(a)(2)(B)(ii) bars review of "any other decision or action" specified by statute to

be within the discretion of the Secretary of Homeland Security. Significantly, and as this Court acknowledged, ECF 28 at 37, the Courts of Appeals have almost uniformly held that Section 1252(a)(2)(B)(ii) bars jurisdiction over challenges to USCIS's visa retrogression policies and challenges to the adjudication of adjustment of status applications—such as decisions to hold applications in abeyance or to require additional vetting—fall within § 1252(a)(2)(B)'s jurisdictional bar. *See Kale v. Alfonso-Royals*, 139 F.4th 329, 334-36 (4th Cir. 2025); *Kanapuram v. Dir., U.S. Citizenship & Immigr. Servs.*, 131 F.4th 1302, 1306-08 (11th Cir. 2025); *Geda v. Dir., U.S. Citizenship & Immigr. Servs.*, 126 F.4th 835, 844-45 (3d Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 394-96 (5th Cir. 2024); *Thigulla v. Jaddou*, 94 F.4th 770, 774-79 (8th Cir. 2024). That conclusion is reinforced by *Gupta v. Jaddou*, where the First Circuit held that 8 U.S.C. § 1255(a) does not address how or when the Secretary must adjudicate adjustment applications once filed, but instead leaves the timing and procedural sequencing of adjudication to the agency's discretion under its implementing regulations. 118 F.4th 475, 483-85 (1st Cir. 2024). This Court erred in holding otherwise.

The Court's reliance on *Kucana*, 558 U.S. at 248-52, *see* ECF 28 at 34-39, misses the mark. In *Kucana*, the Supreme Court considered whether the statutory provision at 8 U.S.C. § 1252(a)(2)(B)(ii) deprived the federal courts of jurisdiction to review the Board of Immigration Appeals' denials of motions to reopen. *See* 558 U.S. at 236-53. The Supreme Court emphasized that with Section 1252(a)(2)(B)(i), Congress specifically and explicitly intentionally deprived the federal courts of

jurisdiction over particular discretionary determinations. *See id*. at 241, 246-49. The Supreme Court found "significant the character of the decisions Congress enumerated in § 1252(a)(2)(B)(i), thereby insulating them from judicial review." *Id*. at 247. "[T]he determinations there listed are substantive decisions . . . made by the Executive in the immigration context as a matter of grace, things that involve whether aliens can stay in the country or not[,]" and include, among other things, "adjustment of status, § 1255." *Id*. at 247-48. "Other decisions specified by statute "to be in the discretion of the Attorney General," and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind." *Id*. at 248. In contrast, the Supreme Court noted that "[a] court decision reversing the denial of a motion to reopen does not direct the Executive to afford the alien substantive relief; ordinarily, it touches and concerns only the question whether the alien's claims have been accorded a reasonable hearing." *Id*. But adjustment of status and the decision whether to grant employment authorization are forms of substantive relief, insofar as an individual applying has a "right to a ruling," *see INS v. St. Cyr*, 533 U.S. 289, 307-08 ("Eligibility that was governed by specific statutory standards provided a right to a ruling on an applicant's eligibility, even though the actual granting of relief was not a matter of right under any circumstances, but rather is in all cases a matter of grace") (cleaned up); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014). Thus, while the Court determined that *Kucana* supports that the agency's Re-Review Policy is subject to review, *see* ECF 28 at 34-35, the Court of Appeals is unlikely to agree.

9

The Court's ruling that there was sufficient law to apply to evaluate the agency's exercise of discretion, *see* ECF 28 at 44-51, likewise fails. As discussed above, whether to grant or deny adjustment of status is a discretionary determination under 8 U.S.C. § 1252(a)(2)(B). Congress has given the Executive Branch broad discretion to determine when aliens may be authorized to work in the United States. *See Brewer*, 757 F.3d at 1062; *see, e.g.,* 8 U.S.C. § 1324a(a)(1) (generally making it unlawful to employ "unauthorized aliens"); 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien," for employment purposes, as an alien who is neither a lawful permanent resident nor "authorized to be ... employed by this chapter or by the Attorney General").[3] There is no judicial review of agency action where "statutes

---

[3] In its opinion, the Court reasoned that because the source for conferring employment authorization sometimes arose from regulation, not statute, the jurisdictional bar at 8 U.S.C. § 1152(a)(2)(B)(ii) would not apply to all employment authorization grants. *See* ECF 28 at 35. There are several flaws in that analysis. First, Congress by statute has left the decision of whether to grant or deny, how to evaluate, and who merits employment authorization to the Attorney General's discretion, and the Attorney General has delegated that authority to the Secretary of the Department of Homeland Security. *See* 8 U.S.C. § 1324a(h)(l) (providing that Attorney General is responsible for certifying aliens' right to work in the United States); 8 U.S.C. § 1324a(b)(l)(C)(ii) (providing that a document is valid as evidence of employment authorization if "the Attorney General finds [it], by regulation, to be acceptable" for that purpose); *see also* 8 U.S.C. § 1103(g)(2) (authorizing Attorney General to "perform such other acts as the Attorney General determines to be necessary" to enforce the nation's immigration laws). The fact that the statute states that the Attorney General could promulgate regulations to guide the agency in making that discretionary determination does not override the fact that the discretionary authority is statutory. Additionally, as the Court seemingly acknowledged, ECF 28 at 35, employment authorization is at times conferred by statute. *E.g.* 8 U.S.C. § 1184(p)(6) (U-visa applicants). Taking the Court's analysis to its logical conclusion, despite the fact that employment authorization is a discretionary determination, certain employment authorization applications would be statutory and therefore generally barred from review, while other employment authorization determinations would not be. *See* ECF 28 at 35.

[granting agency discretion] are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971). Furthermore, an agency's decision to grant or deny applications in the exercise of discretion is necessarily exempt from judicial review because there are no meaningful standards against which to judge the agency's exercise of discretion. *See Chaney*, 470 U.S. at 830. Though the Court relies on its conclusion that there was sufficient law to evaluate what it characterizes as USCIS's "halt" of applications, *see* ECF 28 at 44-51, the Court did not identify any law that would guide its analysis as to re-review of applications. *See id.* This is not surprising, because the agency's decision as to whether to re-review applications to ensure they were not granted in error plainly falls within the jurisdictional bar at 8 U.S.C. § 1252(a)(2)(B)(ii), and the Court erred in concluding otherwise.

In addition, this Court's decision sweeps broadly enough to encompass vetting of applicants for naturalization.[4] As discussed in Defendants' prior briefing, *see* ECF 21 at 8-9, 20-24, 41, Congress has generally preserved agency control over naturalization processing, including the completion of background checks and other investigative prerequisites, *see* 8 U.S.C. §§ 1421, 1447, and USCIS's regulations reinforce this conclusion, *see, e.g.*, 8 C.F.R. § 335.2(b). Congress specifically

---

[4] The Court noted that the cases cited primarily relate to denaturalization. ECF 28 at 50. Nothing in the Comprehensive Re-Review policy documents suggest that the Government was not planning on initiating the statutory de-naturalization process, if it determined that naturalization was granted in error, especially if there were ineligibility concerns.

proscribed court review of applicants for naturalization except pursuant to specified procedures. *See* 8 U.S.C. §§ 1421(c),1447(b). The Court's determination that naturalization is a right, not a privilege, and that it "shall" be granted by default, *see* ECF 28 at 50-51, is unlikely to be upheld on appeal. *See, e.g., U.S. v Manzi*, 276 U.S. 462, 467 (1928) (*"Citizenship is a high privilege,* and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant.") (emphasis added). Similarly, with respect to Plaintiffs' asylum claims, Congress has left the timing and manner of adjudication to the agency's discretion. *See* ECF No. 21 at 23. While asylum applications are specifically exempt from the jurisdictional bars at 8 U.S.C. § 1252(a)(2)(B), those applications are also discretionary. *See* 8 U.S.C. § 1158(a) (the Attorney General may grant asylum, as a matter of discretion, to an otherwise deportable alien who meets the definition of a refugee under § 1101(a)(42)(A)); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 443 (1987) ("[A]n alien who satisfies the applicable standard under [§ 1158(a)] does not have a *right* to remain in the United States; he or she is simply *eligible* for asylum if the Attorney General, in his discretion, chooses to grant it.") (emphasis in original). Therefore, the Court erred in finding jurisdiction to review those discretionary determinations. Moreover, where processing delays stem from ongoing security vetting—which the vacated Comprehensive Re-Review Policy anticipated—there is no discrete, legally required action that a court may compel under the APA. Because the Court's decision plainly encompasses and implicates the agency's completion of background and security check processes, a stay pending appeal is warranted.

12

In its opinion, the Court repeatedly distinguishes between "individual" applications and "agency-wide" policies, *see*, *e.g.*, ECF 28 at 21, 28-39, 101-09. For example, the Court's determined that neither § 1252(a)(2)(B)(i) nor § 1252(a)(2)(B)(ii) deprived it of jurisdiction because Plaintiffs challenge agency-wide policies rather than individual adjudications. ECF 28 at 28-39. That analysis gives insufficient weight to both the breadth of Congress's jurisdiction-stripping provisions and to the nature of the challenged agency actions. Likewise, in terms of asylum, naturalization, work authorization, and adjustment of status, the Court reasoned that the Challenged Policies constitute "general policies and procedures" collateral to individual benefits determinations and therefore fall outside the jurisdictional bar. *See* ECF 28 at 28, 31-39, 101-06. The Challenged Policies do not operate independently of immigration-benefit adjudications. Rather, they govern how USCIS exercises discretionary authority when determining whether previously granted benefits warrant reconsideration. As discussed above and in the Government's prior briefing, that is a quintessential discretionary judgment entrusted to the Executive Branch. *See* ECF 21 at 17-24; ECF 25 at 1-8.

Furthermore, and contrary to the Court's assessment, the Comprehensive Re-Review policy does not effectively bar individualized review. *Contra* ECF 28 at 31-39. Nothing in the documents suggested that the Comprehensive Re-Review would not involve individualized assessments and determinations. *See* ECF 16-2, 16-3; *see also* ECF 25 at 7-8 (noting same). To the contrary, the December Memorandum required that "all aliens meeting these criteria undergo a thorough re-review process,

13

including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." *See* ECF 28 at 14 n. 10 (quoting ECF 16-2 at 1). That plainly envisions an individualized assessment of applications. *Contra* ECF 28 at 28-39.

Plaintiffs cannot evade Congress's jurisdictional limitations through artful pleading. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833 (1976). The relevant inquiry is not the level of generality at which Plaintiffs choose to frame their claims, but the nature of the agency action being challenged. As Defendants previously explained, the challenged policies govern how USCIS exercises discretionary authority in adjudicating immigration-benefit requests. *See* ECF 21 at 1-24; ECF 25 at 2-5. Because Congress expressly foreclosed judicial review of such discretionary decisions in 8 U.S.C. § 1252(a)(2)(B), Plaintiffs cannot circumvent that limitation by recasting their challenge as a facial attack on agency guidance rather than a challenge to the exercise of discretionary adjudicatory authority itself.

Additionally, a long line of Supreme Court precedent precludes or substantially limits federal courts from reviewing non-constitutional disputes arising from matters of foreign policy and national security and in the context of immigration. *See, e.g.*, *Trump*, 585 U.S. at 704 ("[O]ur inquiry into matters of entry and national security is highly constrained."); *Aguirre-Aguirre*, 526 U.S. at 425 ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign

relations.") (cleaned up); *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").  The Comprehensive Re-Review policy arises from anti-terrorism, public safety, and national security concerns sufficiently documented in the administrative record concerning specified countries.  Specifically, USCIS's December 2025 and January 2026 policy memoranda identified two exceptional and recent security incidents involving alien individuals vetted under then-existing procedures, who nevertheless planned or executed terrorist attacks.  *See* ECF 21 at 16; ECF 16-2 at 2, 6-7.

The same is true of the November 2025 policy alert, which implemented a Presidential Proclamation identifying material deficiencies in certain countries' identity-management and information-sharing practices—deficiencies the President determined undermine the United States' ability to verify individuals' identities and assess security risks, thereby threatening national security and counterterrorism operations.  *See* ECF 21 at 16; ECF 16-1 at 72-73.  The Comprehensive Re-Review policy was intended to address those vetting lapses and material deficiencies, and arose from anti-terrorism, public safety, and national security concerns sufficiently documented in the administrative record concerning specified countries.  Because it rests on sensitive, predictive judgments about risk, intelligence gaps, and foreign government cooperation, those findings are "largely immune from judicial inquiry or interference."  *See Harisiades*, 342 U.S. at 588-89; *see also* ECF 21 at 14-17.  Thus,

although this Court reasoned that USCIS's actions are not committed to agency discretion by law under 5 U.S.C. § 701(a)(2), ECF 28 at 42-48, respectfully, the Court of Appeals is likely to conclude otherwise.

Unless another statute makes the agency's action reviewable (and none does), judicial review is available only for "final agency action."  5 U.S.C. § 704; *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024); *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007) ("[F]inal action is normally a prerequisite to judicial review.").  The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  An agency action is "final" if: (1) it marks the " 'consummation' of the agency's decisionmaking process," and (2) the action determines rights or obligations or creates legal consequences.  *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  A challenged action fails the first prong of finality if it is "tentative or interlocutory" and does not express an agency's "unequivocal position."  *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943-44 (D.C. Cir. 2012) (holding that FDA's warning letters were not final where they contemplated possible, but not inevitable, enforcement action).  The Comprehensive Re-Review Policy plainly arises from, and operates within, an expressly ongoing decision-making framework established by Presidential Proclamation.  That Proclamation directs that, within 90 days and every 180 days thereafter, the Secretary of State—in consultation with the Secretary of Homeland Security and other senior national security officials—must reassess the relevant conditions and

16

recommend whether any suspensions or limitations imposed in connection with the Proclamation should be "continued, terminated, modified, or supplemented."  ECF 16-1 at 7.  Since implementing the Comprehensive Re-Review Policy, USCIS has implemented additional guidance and modified operations.  *See* ECF 28 at 16-17, 54-56; ECF 21-1 at 2-4.  These developments confirm that the Comprehensive Re-Review Policy is neither fixed nor final.  Instead, it reflects operational guidance of whether particular applications are subject to additional review given the national security and public safety concerns that subsequently came to light.

The Comprehensive Re-Review Policy also is not a final agency action because no rights or obligations flow from it.  At most, it "mark[s] a midstream pause in an ongoing administrative process—one that remains open to further agency consideration."  *Kewayfati v. Bondi*, 165 F.4th 342, 348-50 (5th Cir. 2026) (holding USCIS letters denying plaintiffs' asylum claims were not final agency action even as denial was unappealable); *id.* at 350 ("[The] USCIS stage is only one—and a preliminary one—in a broader administrative process."); *see also Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014) ("Congress has delegated to specific government agencies the task of enforcing immigration laws and determining aliens' immigration statuses.  The agencies' decisionmaking process consummates when they issue a final decision regarding an alien's immigration status. Termination of refugee status and denial of a status adjustment application are intermediate steps in the removal of an alien, and not the consummation of the agencies' decisionmaking on the alien's immigration status.").  Thus, these determinations are not final agency

17

action. *See Trump v. New York*, 592 U.S. 125, 134 (2020); *id.* at 131 ("Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time.") (cleaned up). Beyond generally discussing the Benefits Hold Policy and the Country-Specific Factors Policy, the Court did not identify any reason that the Comprehensive Re-Review policy is not final agency action. *See* ECF 28 at 54-56. To the extent that the Court held otherwise, the First Circuit is unlikely to agree.

### 2) The Country-Specific Factors Policy Is Not Reviewable

Plaintiffs asked the Court to prevent USCIS from considering pertinent country conditions and country-specific factors. But, the identification of country-specific factors relevant to discretionary determinations, are inextricably intertwined with the agency's exercise of discretion over immigration benefits and are not reviewable.

As discussed in detail above, the APA expressly precludes review of actions "committed to agency discretion by law[,]" 5 U.S.C. § 701(a)(2); *see Chaney*, 470 U.S. at 830, and claims brought under § 706 are subject to the threshold limitations set forth in § 701. *See* 5 U.S.C. §§ 701(a)(1), (2); *see also supra* Section (I)(A)(1). Plaintiffs' challenges to the Country-Specific Factors Policy ought to have failed. Indeed, the Court recognized that the Country-Specific Factors Policy directs adjudicators to consider identified country conditions and vetting concerns when exercising discretion in individual cases. ECF 28 at 21. Again, Congress expressed a clear intent to preclude judicial review of USCIS's discretionary decisions. *See supra*

18

Section I(A)(1). The broad language of § 1252(a)(2)(B) expressly strips judicial review of the agency's discretionary denial of adjustment of status, *see id.* § (i), and over "any other decision or action" by the government where Congress "under this subchapter" delegated "discretion" to government personnel, *see id.* (ii). So too did Congress preclude review of the discretionary analysis and adjudication of applications regardless of the asylee's country of origin. *See* ECF 21 at 23-24; *see also* 8 U.S.C. § 1158(a); *Cardoza-Fonseca*, 480 U.S. at 443. Thus, Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. *See* ECF 21 at 7; *see supra* Section I(A)(1). The Country-Specific Factors Policy's clarification to adjudicators of pertinent factors falls well within that discretion, and the Court lacked jurisdiction to review it. Plaintiffs cannot invoke the APA to circumvent those jurisdictional limits, and the Court erred in concluding otherwise.

Furthermore, like the Comprehensive Re-Review policy, the Country-Specific Factors Policy is not final. *See supra* Section I(A)(1). *Contra* ECF 28 at 54-56. The policy memoranda do not reflect the consummation of any agency action in any individual case. *See Trump*, 592 U.S. at 131 ("Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time.") (cleaned up); *Jama*, 760 F.3d at 496 ("The agencies' decisionmaking process consummates when they issue a final decision regarding an alien's immigration status."). Instead, the policy reflects an ongoing decision-making framework established by Presidential Proclamation. That Proclamation directs

19

that, within 90 days and every 180 days thereafter, the Secretary of State—in consultation with the Secretary of Homeland Security and other senior national security officials—must reassess the relevant conditions and recommend whether any suspensions or limitations imposed in connection with the Proclamation should be "continued, terminated, modified, or supplemented." ECF 16-1 at 7. USCIS has implemented additional guidance and modified operations. *See* ECF 21 at 16-17, 54-56; *see* ECF 21-1 at 2-4. These developments confirm that the Country-Specific Factors Policy is operational guidance that provides adjudicators guidelines into whether particular applications are subject to additional review given the national security and public safety concerns identified by the President. *See* ECF 25 at 7-9.

### 3) The Benefits Hold Policy Is Also Not Reviewable

The Benefits Hold Policy temporarily pauses final adjudications while USCIS continues processing applications and assesses additional vetting measures. ECF 21 at 12. The Benefits Hold Policy applies to countries that the President identified as likely to invoke national security concerns. *See id.* As set forth above and in Defendants' prior briefing, Congress expressed a clear intent to preclude judicial review of USCIS's discretionary decisions. In asking the Court to lift the hold, Plaintiffs essentially seek to compel final decision making of those applications on Plaintiffs' preferred timeline.

Plaintiffs identified no case law or statute compelling mandatory deadlines for adjudicating applications for the various immigration benefits they allege are at issue. To the contrary, in *Gupta*, the First Circuit held that 8 U.S.C. § 1255(a) does

not address how or when the Secretary must adjudicate adjustment applications once filed, but instead leaves the timing and procedural sequencing of adjudication to the agency's discretion under its implementing regulations. 118 F.4th at 483-84. Indeed, in *Gupta*, because the statute is silent as to post-filing adjudicatory management, the First Circuit rejected APA challenges to USCIS's policies governing when applications are adjudicated, including abeyance practices. *Id*. at 483-87; *see also, e.g., Beshir v. Holder*, 10 F. Supp. 3d 165, 174 (D.D.C. 2014) (granting Secretary discretion to regulate adjudication process "necessarily includes" discretion over its pace).

Furthermore, like the Comprehensive Re-Review Policy and the Country-Specific Factors Policy, the Benefits Hold Policy is not final. *Contra* ECF 28 at 54-56. The policy memoranda do not reflect the consummation of any agency action in any individual case. *See Trump*, 592 U.S. at 131 ("Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time.") (cleaned up); *Jama*, 760 F.3d at 496 ("The agencies' decisionmaking process consummates when they issue a final decision regarding an alien's immigration status."). Since implementing the Challenged Policies, USCIS has implemented additional guidance and modified operations, including lifting some adjudications holds. *See* ECF 28 at 16-17, 54-56. The Court's assertion that the agency's policies impose an "indefinite" pause on those applications, *see* ECF 28 at 58-60, therefore misses the mark.

### B. The Challenged Policies Are Consistent With The INA

Defendants have also made a strong showing that they will prevail on the merits because the challenged policies reflect a lawful exercise of authority that Congress expressly entrusted to Department of Homeland Security ("DHS") and USCIS, and the Court's Order intrudes on Defendants' lawful authority. The Court concluded that the challenged memoranda exceeded the agency's statutory authority and were arbitrary and capricious. ECF 28 at 94-127. But we submit the Court of Appeals will likely disagree.

### 1) The Comprehensive Re-Review Policy Was Not Contrary To Law

The Court's determination that the Comprehensive Re-Review Policy was contrary to law, *see* ECF 28 at 101-06, is unlikely to be upheld on appeal. Congress authorized the agency to revisit prior benefit determinations through procedures for review, reconsideration, rescission, and revocation. *See* ECF 21 at 7. As the Court acknowledged, both the D.C. Circuit and the Ninth Circuit have recognized the inherent power to reconsider past agency decisions. *See* ECF 28 at 102-03 (citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions."); *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1019 (9th Cir. 2025) ("[A]gencies have some authority to reconsider prior decisions.").

The INA confers substantial discretion on the Executive Branch, through DHS and USCIS, to adjudicate immigration-benefit requests. *See* ECF 21 at 7. That authority necessarily includes the ability to investigate applications, assess national-

22

security and public-safety concerns, determine what information is necessary before a final adjudication may occur, and decide whether discretionary immigration benefits should be granted. *See, e.g., id*. at 7-8, 41. In that regard, USCIS is required by law to conduct adequate security investigations before granting immigrants a benefit, which includes an affirmative duty to obtain the requisite background and security information.[5] *See, e.g.*, 8 U.S.C. § 1105(a), (b), 1182(a)(3), 1255(a), 1446(a). The Comprehensive Re-Review Policy concerns the agency's review of previously granted benefits using authority already conferred by Congress. *See* ECF 21 at 7, 40. Those duties cannot be fulfilled when USCIS is forced to adjudicate applications before adequate information is obtained.

In finding the Comprehensive Re-Review Policy contrary to law, the Court relied on the assertion that the procedures for revoking or terminating immigration benefits "contemplate only individual revocations or terminations of benefits." ECF 28 at 103-04; *see id*. at 104-05. The Court emphasized that "[t]he statutes make clear that, if the agency wishes to institute revocation or termination of proceedings, it must proceed on an individualized level and determine whether a particular person— not a large swath of people—lack eligibility for a benefit provided." *Id.* at 105. But nothing in the Comprehensive Re-Review policy indicates that the agency will not undertake an individualized assessment of the applications it re-reviews. It does not

---

[5] The Court's assertion that 8 C.F.R. § 335.2(b) "contemplates a pending FBI background investigation, not a pending USCIS investigation[,]" ECF No. 38 at 42, appears contrary to its own acknowledgment that immigration benefits like naturalization require fingerprinting and an FBI background check. *See id.* at 49 (citing 8 C.F.R. §§ 334.2, 316.4, 316.10 and 8 C.F.R. § 335.2(b)).

follow that simply because an administrative agency makes an assessment, based on background information about fraud, national security concerns, and a potential lack of reliable information, that certain applications are more likely to necessitate re-review, that review of those applications would not be individualized. Because the Court's decision essentially holds that an administrative agency cannot make general priorities for which applications are the most likely to necessitate re-review, ECF 28 at 31-39, 103-05, that holding was in error.

## 2) The Country-Specific Factors Policy Was Not Contrary To Law

The Court found that, at least as it applied to the processing of adjustment of status and employment authorization applications, the Country-Specific Factors Policy was contrary to law. *See* ECF 28 at 112. The First Circuit is unlikely to uphold that determination. The Country-Specific Factors Policy directs adjudicators to consider identified country conditions and vetting concerns when exercising discretion in individual cases. ECF 28 at 21. Plaintiffs' argument below was that there was no statutory authority to impose the Country-Specific Factors Policy, and that the DHS needed specific authority under the major questions doctrine. *See generally* ECF 20-1 at 30-37. But, across three policy memoranda, the Government described its authority, which derived from citations to multiple provisions of the INA and its regulations. *See* ECF 21 at 10-12, 40-53 (citing *inter alia* ECF 16-1 at 12, 28-36, 66-71; ECF 16-2 at 1 n.7; ECF 16-3 at 47). The administrative record specifies, moreover, that as a result of the fact-finding conducted under 8 U.S.C. § 1182(f), which described the country-specific concerns underpinning the Country-Specific

24

Factors Policy, USCIS would use country-specific findings in assessing individual applications, ECF 16-2, but that the USCIS will not consider the applicant's nationality itself a significant negative factor. *Id.* at 42. Given that statement, the Court of Appeals is unlikely to agree that the purpose of the Country Specific Factors Policy was discriminatory. *Contra* ECF 28 at 111.

Additionally, the First Circuit is unlikely to hold that the policy discriminated against applicants from those countries, in violation of 8 U.S.C. § 1152(a)(1)(A). Notably, Plaintiffs have never challenged the national security lapses identified in the agency reports underlying the Challenged Policies. Instead, Plaintiffs' entire argument below was that there was no statutory authority to impose the Country-Specific Factors Policy, and the DHS needed specific authority under the major questions doctrine. *See* ECF 20-1 at 30-37. As discussed above, that argument lacked merit. Yet, in analyzing this provision, the Court did not address the major questions doctrine, or mention it in its decision. *See* ECF 28 at 88-112. Instead, the Court concluded that the policy discriminated against applicants from those countries in violation of 8 U.S.C. § 1152(a)(1)(A)—despite the fact that Plaintiffs never asserted such an argument. *See* ECF 28 at 88-90, 108-12. The Court erred in addressing arguments not advanced by Plaintiffs, and that were not raised or briefed by the parties in the case before it. *See, e.g.*, *Margolin v. Nat. Ass'n. of Immigration Judges*, 608 U.S. ----, 140 S. Ct. 1285, 1288 (2026) ("The Fourth Circuit violated the party-presentation principle when it decided "a case different from the one [respondent] advanced."); *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) ("But, as

25

a general rule, our system is 'designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'") (cleaned up).

Additionally, the Court's conclusions applying § 1152(a)(1)(A) fail on the merits. By its own terms, § 1152(a)(1)(A) applies to "the issuance of an immigrant visa." 8 U.S.C. § 1152(a)(1)(A). However, neither work authorization nor adjustment of status involve immigrant *visas*; work authorization in particular falls under a different statutory provision. Furthermore, as discussed in detail above, those applications are discretionary. Plaintiffs offer no plausible interpretation of the INA that suggest that considerations of public safety or national security exceed the bounds of the very factors that the INA commands the government to consider in enforcing federal immigration law. To the contrary,"[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive [and must be upheld] [s]o long as [they] are not wholly irrational[.]" *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (alterations in opinion) (program implemented after 9/11 that was "designed to monitor more closely aliens from certain countries selected on the basis of national security criteria" is "plainly rational attempt to enhance national security" and does not violate equal protection principles) (quoting *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (citations omitted)).

### 3) The Benefits Hold Policy Was Not Contrary To Law

As discussed above and prior briefing, the USCIS had authority under the INA to issue the Challenged Policies. That included authority to temporarily pause the final adjudications of pending applications for immigrant benefits. While the Court concluded that the Benefits Hold Policy contravened Congress' intent that benefits adjudication should generally proceed, *see* ECF 28 at 100, that conclusion overlooks other saliant factors, and particularly Congress' broader intent in enacting our country's immigration laws.[6]

Congress has expressly declared that the DHS's "primary mission" includes "prevent[ing] terrorist attacks within the United States." 6 U.S.C. § 111(b)(1)(A). Congress broadly delegated immigration and enforcement to various Executive personnel, *e.g.*, *id.*; 8 U.S.C. § 1103(a)(1)—and adjudication of immigration benefits specifically to the USCIS, *e.g.*, 6 U.S.C. § 271(b). Under the INA, Congress made the validity of an alien's admission to the United States a necessary and express prerequisite for nearly all immigration benefits. *See* ECF 21 at 6-7, 41-42. Among the substantive grounds that Congress commanded the Executive Branch to assess in considering the validity of any alien's admission are "[s]ecurity and related grounds" expressly set forth in 8 U.S.C. § 1182(a)(3)—including an alien's criminal

---

[6] It is unclear from the Court's opinion whether anything akin to the Challenged Policies would ever be permissible under any factual scenario. *See* ECF 28. For example, it is unclear if a one-week (or one day) hold on applications from a particular country or countries would be permissible, regardless of the national security and foreign policy-related grounds at play. *See id.* That is inconsistent with Congressional intent. 6 U.S.C. § 111(b)(1)(A).

history, *id.* § 1182(a)(2); participation in terrorist activities, *id.* § 1182(a)(3)(B); and any "reasonable ground" for the Secretary of State "to believe" admission "would have potentially serious adverse foreign policy consequences for the United States," *id.* § 1182(a)(3)(C). These standards apply through the investigation and adjudication of applications for immigration benefits—processes that the INA and its regulations also command. *See* ECF 21 at 6. These provisions thus impose affirmative duties to obtain and exchange security information—duties that cannot be fulfilled if applications are adjudicated before adequate information is obtained.

Here, the Court reasoned, based on various statutory and regulatory provisions, that adjudication was required within a certain timeframe, *see* ECF 28 at 47-51, seemingly regardless of whether USCIS had sufficient information or not. For example, the Court noted that 8 U.S.C. § 1158(d)(5)(A)(iii) provides that asylum applications "shall be completed within 180 days" of filing in the absence of exceptional circumstances. *See id.* at 47. Even aside from whether obtaining requisite security information is an exceptional circumstance under that subsection, Congress has precluded any private rights stemming from this timing provision. 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person"). *Contra* ECF 28 at 91-94. Therefore, the Court erred in finding that statute created an enforceable right to adjudication within a particular timeframe.

Further, as the Court acknowledged, the statutes governing adjustment of status and employment authorization themselves "use discretionary terms." *Id.* at 96. While the Court reasoned that "the relevant statutes and regulations" concerning adjustment of status and employment authorization contain mandatory terms, *see id.* at 96-97, those terms pertain to the fact that the *applicant* must apply for adjustment of status or employment authorization, and thereafter the applicant "shall be notified" of the agency's decision. *See id.* at 96-97. To state the obvious: a mandate on the *applicant* creates no obligations on the *government*. And a mandate to notify an applicant of a decision once made does not create a mandate to make a decision within a particular timeframe.

Moreover, as the Court acknowledged, a different statute, 8 U.S.C. § 1571(b), states that Congress believes that "the processing of an immigration benefit application *should*[,]" not must, "be completed not later than 180 days after the initial filing of the application[.]" At bottom, the Court's analysis fails because USCIS has not "categorically withheld adjudication of immigration benefits." *Contra* ECF 28 at 100. Rather, the USCIS has temporarily paused the final adjudications of certain specified applications, which is well within its discretionary authority.

**C. The Challenged Policies Are Consistent With The APA.**

Defendants have explained at length why the challenged policies are neither arbitrary nor capricious under the APA. *See* ECF 21 at 45-50; ECF 25 at 16. Defendants are likely to succeed on appeal in contesting this Court's contrary ruling.

29

*First*, the Defendants explained at length the reasons for the challenged policies.  As discussed above and in detail in Defendants' prior briefing, the administrative record identifies the national-security, public-safety, and vetting concerns that prompted the policies, explains why USCIS determined that additional scrutiny and enhanced vetting measures were necessary, and articulates the agency's rationale for temporarily pausing final adjudications while those measures are assessed and implemented.  *See* ECF 21 at 10-14, 44.  The policies themselves delineate and address concerning deficiencies in the quality and integrity of information provided from certain countries to vet the eligibility of individuals who seek or already possess immigration benefits.  *See* ECF 21 at 45-46 (citing ECF 16-1 at 72; ECF 16-2 at 1; ECF 16-3 at 45).  Although the Court disagreed with the sufficiency of those explanations and ultimately concluded that the policies were pretextual, ECF 28 at 113-127, that disagreement does not alter the fact that the agency provided reasons for its actions in the administrative record.  *See* ECF 21 at 45-50.  This is not a *State Farm* case where the agency failed to explain itself; instead, the Court found USCIS's explanation *unpersuasive*.  But such policy disagreement does not establish an APA violation. *C.f. Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("Not having discussed the possibility [of a mandatory airbag standard], the agency submitted no reasons at all.").

*Second*, Defendants plainly *did* consider the reliance interests at stake here.  *See* ECF 16-1 at 3.  Indeed, Plaintiffs seemingly conceded as much in briefing.  *See*

30

ECF 20-1 at 41 (citing ECF 16-3 at 48). The agency reasonably determined that the national security interests at play here outweighed those reliance interests. While the Court determined that was insufficient, *see* CAR 28 at 118-19, the agency's actual balancing of those reliance interests belies the Court's conclusion that no such weighing occurred. And the reasonability of the agency's conclusions is underscored by the fact that Plaintiffs' reliance interest must also account for USCIS's longstanding regulations that already permit prolonged investigations, and a long string of case law that strips the courts of power to set deadlines for action.

Finally, the Court's determination that USCIS provided "pretextual reasons" for its policies, *see* ECF 28 at 120-27, is grounds for further review. The Court's consideration of extra-record, cherry-picked statements on social media, ECF 28 at 11-13, does not permit a reviewing court to disregard the agency's stated rationale and invalidate the policies based on perceived deficiencies in the agency's explanation rather than the absence of one. *See* ECF 21 at 45-50; *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025); *see, e.g.*, *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (the APA standard of review is "narrow," and "a reviewing court may not substitute its judgment for that of the agency, even if it disagrees with the agency's "conclusions.") (cleaned up); *Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 24 (1st Cir. 1999) (An agency decision need only be "rational" to "pass muster under the APA's 'arbitrary and capricious test[.]'").

Indeed, in *Trump v. Hawaii*, the Supreme Court rejected the same extra-record, allegations-of-animus that the Court relied on here. *See* 587 U.S. at 685-707;

31

*but see* ECF 28 at 120-28.  The Supreme Court emphasized that the Proclamation at issue reflected an in-depth analysis of relevant conditions, including country conditions.  *See* 587 U.S. at 706-10.  Here, too, the Presidential Proclamation (and subsequent memoranda) contain in-depth analyses and discussion of country conditions.  *See* ECF 16-1, 16-2, 16-3.

Furthermore, while Plaintiffs in *Trump*, as in this case, argued that the Proclamation was motivated by animus toward a particular group and cited the President's social media statements as evidence, *see* 587 U.S. at 701-07, the Supreme Court rejected that argument.  *See id.* at 681, 699-710.  The Supreme Court observed that the standard of review is rational basis scrutiny, *i.e.*, that the animus claim could only succeed if it is "impossible to discern a relationship to legitimate state interest[,]" or that the policy is "inexplicable by anything but animus."  *Id.* at 670 (citing *Romer v. Evans*, 517 U.S. 620, 632 (1996)).  Here, as in *Trump v. Hawaii*, the Presidential Proclamation and the resulting Comprehensive Re-Review Policy "cannot be said that it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus."  *See* 687 U.S. at 706.  Instead, the question is whether the Challenged Policies "plausibly related to the Government's stated objective to protect the country and improve vetting processes[,]" *see id.* at 704-05.  As discussed above, the policies challenged here do.

None of the challenged policies alter the substantive eligibility criteria for immigration benefits established by Congress.  Nor do any of the policies categorically deny immigration benefits to any applicant.  Instead, they provide guidance

32

concerning the exercise of existing discretionary authority in light of concerns identified by the President regarding national security, public safety, terrorism-related risks, and the reliability of information available from particular foreign governments. In identifying such circumstances warranting additional scrutiny, the policies temporarily defer final adjudications while additional vetting measures are assessed and implemented, and preview the agency's consideration of whether previously granted benefits should be reviewed using authorities already provided by statute and regulation. The Court's contrary conclusion rests on a significantly narrower conception of the discretion Congress conferred on the agency. Particularly in matters implicating national security, immigration, and foreign affairs, Congress has vested the Executive Branch with substantial latitude to determine what information is necessary before granting discretionary immigration benefits. *See* ECF 21 at 14-17; ECF 25 at 5-9. The Challenged Policies considered the very factors that the INA commands the government to consider in enforcing federal immigration law. Thus, the Defendants are likely to succeed in demonstrating on appeal that the challenged policies are consistent with both the INA and the APA, and are neither contrary to law nor arbitrary and capricious.

### D. The Court's Order Extends Relief Far Beyond Its Scope

The Supreme Court has repeatedly emphasized that relief must be tailored to the injury established by the parties before the court and limited to the inadequacy that produced the plaintiffs' injury. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). Recent decisions likewise underscore the need to carefully consider the proper

scope of relief, particularly where the challenged agency action implicates broad questions of federal policy and administration.  *See, e.g.*, *Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025); *Washington v. Trump*, 145 F.4th 1013, 1040-41 (9th Cir. 2025) (Bumatay, J., concurring and dissenting in part) ("[W]e should approach any request for universal relief with good-faith skepticism, mindful that the invocation of 'complete relief' isn't a backdoor to universal injunctions.  Otherwise, *CASA* would be a mere drafting exercise rather than a binding precedent. . . . Equity sometimes demands that courts grant *less* than complete relief.") (emphasis in original).

Those concerns are especially significant here.  The Court's order effectively nullifies agency guidance governing discretionary immigration adjudications nationwide, notwithstanding the absence of any individual applicant challenging the denial of a benefit and notwithstanding that the organizational Plaintiffs' asserted injuries arise from the downstream effects of agency policy rather than any particular adjudication.  This Court's nationwide, programmatic vacatur governs the agency's conduct toward non-parties, in direct conflict with *CASA*.  The government is likely to prevail on appeal in its argument that relief of this breadth is not necessary to redress the injuries asserted, nor is this Court's order likely to stand in the face of Article III and *CASA*.

Moreover, although the Court concluded that the Challenged Policies exceeded USCIS's statutory authority, Defendants respectfully submit that the proper remedy for any identified defect as to the arbitrary and capricious claim is itself a substantial appellate question.  Courts have long recognized that remand, rather than the

34

wholesale invalidation of agency action, may be appropriate where further agency consideration or explanation could address the perceived deficiency.  *See* ECF 21 at 57-58 (collecting cases).  Defendants are therefore likely to prevail with respect to the scope of the relief ordered.  Defendants are likely to succeed in demonstrating that the relief ordered exceeds what is necessary to remedy any cognizable injury established in this litigation.

## II.    THE REMAINING FACTORS FAVOR A STAY.

Absent a stay, USCIS will suffer immediate and irreparable harm.  The challenged policies were adopted to address identified deficiencies in the information available to vet applicants from designated countries and to ensure that immigration benefits are not granted before potentially significant national-security, public-safety, and terrorism-related concerns have been adequately investigated and resolved.

Those determinations did not arise in a vacuum.  As reflected in the challenged memoranda, USCIS identified significant concerns regarding the availability, reliability, and completeness of vetting information from the designated countries. *See* ECF 21 at 10-14; *see also* Declaration ¶¶ 5-7.  The agency further determined that existing adjudicatory procedures should be supplemented by enhanced vetting measures before final immigration-benefit decisions are rendered in affected cases. *See id.* ¶¶ 8-11 .

USCIS is currently developing and implementing those enhanced vetting procedures and expected to complete that process in the coming weeks/months.  *See* id. ¶ 11.  The challenged policies were intended to allow the agency to evaluate how

best to address the identified deficiencies in available screening information. *See id.* ¶¶ 12-14. The Court's order not only intrudes upon USCIS's lawful authority and prevents it from completing that process before resuming final adjudications; it requires the agency to proceed under inadequate procedures that it has already determined warrant further review and enhancement. *See id.* ¶¶ 13-14.

The Court's order therefore places USCIS in an untenable position. Requiring USCIS to proceed with adjudications before those concerns have been fully investigated and before enhanced vetting protocols are implemented effectively compels the agency to make discretionary immigration decisions under circumstances that the agency has determined may be inadequate to protect national-security and public-safety interests. That harm cannot be remedied after the fact.

Once discretionary immigration benefits are granted, the consequences of those decisions may be difficult or impossible to fully unwind. Indeed, this Court held that the agency could not reconsider them (albeit incorrectly). *See id.* ¶¶ 12-14. The risk that immigration benefits may be granted before relevant, potentially significant, security concerns are identified and resolved constitutes irreparable harm to the Government and the public. Even where subsequent review mechanisms are available, they cannot eliminate the risks associated with granting discretionary immigration benefits before USCIS has completed the vetting process that it has determined is necessary to make informed adjudicatory decisions.

Although USCIS possesses authorities to revisit prior decisions in appropriate circumstances, *see* ECF 21 at 7, reconsideration and revocation mechanisms are not

36

substitutes for informed decision-making in the first instance. Absent a stay, USCIS will be required to adjudicate applications now under procedures it has determined warrant further enhancement, only to revisit those same applications after enhanced vetting protocols are implemented or if Defendants ultimately prevail on appeal. The resulting duplication of effort, diversion of agency resources, and disruption of ongoing implementation efforts constitute independent irreparable harms. Defendants will therefore suffer from the same sorts of harm—diversion of scarce resources and resource diversion and disruption of ongoing operations—that the Court found would harm plaintiffs.

Moreover, the Court's sweeping Order undermines the Executive Branch's broad constitutional and statutory authority over immigration, and constitutes an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013). Precluding the government from ensuring that immigration decisions are consistent with the protection of national security as codified by Congress in the INA endangers the public and is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigr. & Naturalization Serv. v. Legalization Assistance Project of L.A. Cty. Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993).

Nor would a stay pending appeal impose comparable harm on Plaintiffs. As the record reflects, adjudication of many of the affected immigration benefits frequently requires months—and often substantially longer—in the ordinary course. *See* ECF 21 at 36. The temporary continuation of the challenged policies while USCIS

37

completes implementation of enhanced vetting procedures, *see* Declaration ¶¶ 8-15, and while appellate review proceeds would therefore preserve existing agency processes rather than impose materially different delays from those already associated with complex immigration-benefit adjudications. This is also ultimately a zero-sum game—resources steered towards aliens from the impacted countries will result in slower adjudications for aliens from other countries. Any incremental delay attributable to a stay is outweighed by the Government's compelling interest in ensuring that discretionary immigration benefits are not granted before identified vetting concerns have been adequately addressed. *See* ECF 21 at 46-47.

Plaintiffs have long contended that USCIS could simply continue adjudicating applications while implementing additional vetting measures. *See, e.g.*, ECF 20-1 at 44. But that contention reflects a disagreement about timing rather than outcome. USCIS determined that a temporary pause was necessary to provide the agency time to develop and implement enhanced vetting procedures before final adjudications occur. A stay pending appeal simply preserves the status quo: it maintains the agency's chosen method of addressing identified vetting concerns and does not create a new or materially different form of delay. Indeed, given the lengthy processing times that frequently accompany complex immigration-benefit adjudications, any difference between temporarily pausing adjudications while enhanced procedures are implemented and implementing those procedures during ongoing adjudications is likely to be marginal for many applicants. *See* ECF No. 21 at 36.

The public interest strongly favors a stay for the same reasons. Administration of immigration laws, assessment of national security risks, and determination of what vetting procedures are necessary before discretionary benefits are granted are matters entrusted principally to the Executive Branch.  Courts, including this Court, have repeatedly recognized the particularly weighty interests implicated when government action concerns immigration, foreign affairs, and national security.  *See* ECF 28 at 24; ECF 21 at 14-17, 56; ECF 25 at 5-7.  Those interests are directly implicated here.  The public has a compelling interest in ensuring that USCIS retains the ability to address identified vetting deficiencies and security concerns. Accordingly, the balance of equities and the public interest strongly favor a stay pending appeal.

## CONCLUSION

For these reasons and those set forth in Defendants' earlier filings, the Court should grant a stay of its Order pending appeal.

Dated: June 19, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CHARLES C. CALENDA
First Assistant United States Attorney

*/s/ Tyler J. Becker*
TYLER J. BECKER (V.A. Bar No. 97636)
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
Tel.: (202) 514-4052
Email: tyler.becker@usdoj.gov

*Attorneys for the Defendants*

## Certificate of Service

I hereby certify that, on June 19, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Tyler J. Becker*
TYLER J. BECKER
Counsel to the Assistant Attorney General

40