UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

DORCAS INT'L INST. OF R.I., *et al.*,

      Plaintiffs,

v.

U.S. CITIZENSHIP AND
IMMIGRATION SERVS., *et al.*,

      Defendants.

Civil Action No.
26cv132-JJM-PAS

## DECLARATION OF ANGELICA ALFONSO-ROYALS

I, Angelica Alfonso-Royals, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the District of Rhode Island. I hereby certify:

1. I am the Deputy Director of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since May 31, 2026. Previously I served as the Principal Deputy Director of USCIS from April 15, 2026 to May 30, 2026. Before that, I served in various senior leadership roles at USCIS, including Chief Operating Officer, and Acting Director.

2. The statements contained in this declaration are based upon my personal knowledge and upon information provided to me in my official capacity.

3. On June 5, 2026, this Court entered an order granting in part Plaintiffs' motion for summary judgment. ECF No. 28. The order explained that "[e]ach of the Challenged Policies—the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—

1

are declared unlawful and are hereby VACATED and SET ASIDE." ECF 28 at 135.

4. On June 11, 2026, this Court entered partial judgment in favor of Plaintiffs.

5. Following the issuance of Presidential Proclamation 10998, USCIS determined that to address potential vulnerabilities, it was necessary to "place an adjudicative hold on all pending benefit requests submitted by or for aliens from the high-risk countries . . . allowing for a thorough case-by-case review." PM 602-0194, p. 3. USCIS initiated the adjudicative hold as outlined in the memoranda as a means to address risks posed by countries identified in PP 10998. These risks arise, in part, from the identified countries' inconsistent provision of credible information regarding their citizens or issuance of identity documents that lack modern security features to prevent and discourage fraudulent activity.

6. USCIS relies on biometric vetting as the primary method for verifying identity, a foundational step in immigration vetting. However, the unavailability of biometric information and information-sharing agreements significantly limits USCIS's ability to rely solely on biographic information to verify identify. For example, Dominica offers citizenship by investment programs, which are used primarily by Iranian nationals to obtain Dominican citizenship. However, Dominica does not yet have a biometric identity program and, therefore does not share biometric identity information with the U.S. Reliable and credible identity and civil documents are crucially important to ensuring USCIS is performing security and background checks using accurate identity information when applicants with Dominican citizenship apply for benefits with USCIS. Moreover, reliable and credible civil documents are crucially important to verifying family relationships in an immigration system that grants family-based immigration pathways.

7. The countries impacted by the vacated hold policies generally possess little to no credible identity management infrastructure. This makes it very difficult, if not impossible, for USCIS to rely on civil and identity documents presented to perform identity verification, conduct screening and vetting, or evaluate eligibility for immigration benefits. Where there are identity management infrastructures in place,

2

pervasive corruption and the ease with which someone can obtain a genuine document through fraudulent means limits the utility of these documents as proof of identity or eligibility. Consider the following ten examples based upon USCIS's assessments and from the Department of State Reciprocity Guide:

a) Somalia does not have a competent civil document authority, and many historical records were destroyed during civil strife. The Somali government issues civil and identity documents based on testimony provided by unverified sources.

b) Yemen does not have a reliable system for civil or vital statistics, and documents are seldom issued contemporaneously. Many Yemeni nationals only request identification and civil documents for immigration purposes years or decades after an event has occurred. When issuing documents, Yemeni authorities rely on the testimony from persons who sometimes lack direct knowledge of events to which they are testifying.

c) In Afghanistan, birth documents are so scarce and unreliable that Department of State does not require them for visa issuance purposes. The Tazkera, which serves as the national identity document and is used to apply for a passport, is oftentimes issued based on information provided by a community elder or local leader without corroborating evidence. Corruption in Afghanistan is extremely high, further limiting document credibility.

d) Nigerian documents also have limited credibility due to corruption. In Nigeria, it is common for government officials to falsify records. Furthermore, Nigerian birth and death registrations rarely happen at the time of the event, and often only occur when needed, which can be years later. Many Nigerian marriage and divorce events are not recorded in formal government databases. When they are, record keeping is poor to non-existent.

e) With Pakistan, corruption and frivolous document issuance are major concerns. Pakistani civil documentation of vital events rarely happens at the time the event occurred, and documents are usually acquired years later with minimal, if any, evidence.

f)  When South Sudan gained independence in 2011, they began issuing their own civil documents. All documents from previous regimes became invalid. This created a situation where many nationals had to acquire formal civil and identity documents decades later. South Sudan also issues an "age assessment", which is an attempt to establish a person's true age.

g)  In Liberia, public corruption and frivolously issued documents heavily afflict the infrastructure. The only requirement for a person to register a birth in Liberia is that they have "knowledge" that the birth occurred. Little to no supporting documentation is needed, and the origin of information is not verified. Accordingly, any documentation derived from a Liberian birth certificate, to include a national ID or passport, is not reliable.

h)  In Ethiopia, births, marriages and deaths are not automatically registered. Ethiopian authorities do not ensure that the information presented in support of an application for civil or identity documents is accurate. Accordingly, even in instances where an Ethiopian document was issued by the proper authority, credibility is limited.

i)  In Angola, civil unrest has often limited the general availability of identity documents. Late registration of births is also common.

j)  In Sierra Leone, nationals can simply acquire identity documents containing whatever information is desired.

8.  USCIS is engaged in evaluating the specific risks posed by each country and developing specific mitigation strategies to manage these risks. The intent of the agency is to release cases from high-risk countries for adjudication as mitigation strategies are approved and implemented. USCIS is prioritizing these efforts based on the severity of risks identified, while also making agency-wide systematic and procedural changes when applicable and seeking additional information from countries that may assist with mitigating fraud risks in particular. For example, USCIS seeks specific information from countries with document credibility concerns to better understand document issuance and other practices to inform mitigation strategies. USCIS plans to complete its assessment and strategies for the highest risk countries in the coming weeks/months.

9.  USCIS compiled available information on each country listed within the two presidential proclamations – including indicators of fraud, public safety, or national security risk – and compared these to existing agency screening and vetting practices. This allowed USCIS to identify needed improvements and begin developing both technical and procedural tools to help mitigate risks. USCIS has already gained more complete access to various sources of potentially derogatory information to bolster its vetting including more complete criminal history information and financial records.

10. USCIS is finalizing its enhanced vetting plan based upon risk factors present within each country but also based upon screening vulnerabilities identified writ large by gaining access to information and tools not previously available to USCIS. The plan layers classified, unclassified, identity verification, and other ad hoc checks to close security gaps. For example, USCIS recently gained access to more fulsome criminal history information and developed technical tools to facilitate more person-centric vetting processes, saving significant time. While the plan is largely complete and many technical developments are well underway, USCIS needs additional time to implement planned changes and to further develop procedures and resources for the workforce.

11. USCIS is developing guidance to help adjudicators understand the specific risk factors each country presents, again prioritized by countries presenting the highest risk. These resources provide suggested lines of inquiry related to those risks, including document reliability concerns and designated Foreign Terrorist Organizations (FTOs) operating within a country. The first set of these resources will be complete in the coming weeks/months.

12. The vacatur prevents USCIS from adequately addressing the risks identified in the high-risk countries, developing plans to manage these risks, and adjudicating petitions and applications from citizens of these countries in a way that is fair, uniform, and consistently protects national security and the integrity of our immigration system.

13. The main harm of the Court's vacatur is that until USCIS is prepared to fully implement maximum vetting capabilities, cases will be adjudicated without the benefit of review through maximum vetting.  As a result, USCIS may miss critical national security, public safety, or integrity concerns that put the American people and the lawful immigration system at risk. Further, USCIS may face challenges coordinating with its law enforcement and intelligence community partners to combat these risks and ensure immigration benefits cannot be used to facilitate terrorist or criminal acts, or to exploit immigration processes. The hold permitted USCIS time to develop and improve agency vetting capabilities.  Continuing the hold will provide USCIS with the ability to continue that effort while avoiding the risk of granting benefits to ineligible applicants from high-risk countries.  The goal is to ensure USCIS adjudicators have the benefit of the best vetting tools, which will ensure, to the best of our capabilities, that USCIS only grants benefits to eligible applicants.  These concerns arise equally with respect to applications that were previously granted using potentially unreliable information. USCIS found that as a result of insufficient vetting, many applicants for naturalization and lawful permanent residence were approved and individuals were naturalized who should not have been.  The policy memoranda allowed USCIS to strengthen screening and vetting procedures, and prevent fraud in the immigration system. The comprehensive re-review policy in particular enabled USCIS to ensure uniform adjudication and review of previously-granted applications, request any additional evidence, and re-interview applicants as necessary to ensure that applicants were actually eligible for the benefits that they received.

14. Moreover, the County-Specific Factor policy enables USCIS to take into account the specific problems USCIS has identified with regard to issues like insufficient vetting and screening that results from the lack of reliable information from high-risk countries, and assign appropriate weight to those realities when adjudicating applications.

15. USCIS remains committed to efficient case processing while conducting thorough screening and vetting of applicants for U.S. immigration benefits to identify

potential fraud, national security concerns, public safety risks, or any combination of these issues.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 19th day of June 2026, in Camp Springs, Maryland.

_____

Angelica Alfonso-Royals
Deputy Director
U.S. Citizenship and Immigration Services
Department of Homeland Security

7